UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE: JPMORGAN CHASE MORTGAGE MODIFICATION LITIGATION | ) ) ) | No. 1:11-md-02290-RGS |
| | ) | **CONSOLIDATED CLASS ACTION** |
| THIS DOCUMENT RELATES TO: | ) | **COMPLAINT** |
| All Actions | ) ) | **JURY TRIAL DEMANDED** |
| | ) ) | |

Plaintiffs, by their undersigned attorneys, hereby consolidate the complaints filed in the following actions for the purpose of pretrial proceedings in this Multidistrict Litigation proceeding:

*Durmic, et al. v. JPMorgan Chase Bank, N.A.*, Case No. 1:10-cv-10380 (D. Mass. filed Mar. 3, 2010);

*Turbeville, et al. v. JPMorgan Chase Bank, N.A., et al.*, Case No. 8:10-cv-01464 (C.D. Cal. filed Sept. 28, 2010);

*Wilcox, et al. v. EMC Mortg. Corp., et al.*, Case No. 8:10-cv-01923 (C.D. Cal. filed Dec. 16, 2010);

*Pacheco, et al. v. EMC Mortg. Corp., et al.*, Case No. 2:11-cv-03002 (E.D. Wash. filed Jan. 10, 2011);

*Senter, et al. v. JPMorgan Chase Bank, N.A., et al.*, Case No. 0:11-cv-60308 (S.D. Fla. filed Feb. 11, 2011);

*U.S. Bank Nat'l Assoc. v. Follmer*, Case No. 1:11-cv-00133 (S.D. Ohio filed Mar. 3, 2011);

*Montez, et al. v. Chase Home Finance LLC, et al.*, Case No. 3:11-cv-00530 (S.D. Cal. filed Mar. 17, 2011);

*Keller, et al. v. JPMorgan Chase & Co., et al.*, Case No. 2:11-cv-01791 (D.N.J. filed Mar. 29, 2011);

*Leopold, et al. v. Chase Home Finance LLC, et al.*, Case No. 2:11-cv-00669 (W.D. Wash. filed Apr. 19, 2011);

*Karnes v. Chase Home Finance, LLC, et al.*, Case No. 0:11-cv-01574 (D. Minn. filed June 15, 2011);

*Hajnal, et al. v. Chase Home Finance, LLC, et al.*, Case No. 2:11-cv-06025 (C.D. Cal. filed July 21, 2011);

*Hayes, et al. v. JPMorgan Chase Bank, N.A. d/b/a Chase, et al.*, Case No. 4:11-cv-01429 (E.D. Mo. filed Aug. 16, 2011);

*Larkin v. JPMorgan Chase Bank, N.A.*, Case No. 2:11-cv-06727 (C.D. Cal. filed Aug. 16, 2011);

*Ross v. JPMorgan Chase Bank, N.A. d/b/a EMC Mortg., et al.*, Case No. 1:11-cv-05798 (S.D.N.Y. filed Aug. 18, 2011);

*Hanf, et al. v. JPMorgan Chase Bank, N.A.*, Case No. 2:11-cv-06072 (E.D. Pa. filed Sept. 27, 2011);

*Mason, et al. v. JPMorgan Chase & Co., et al.*, Case No.2:11-cv-14797 (E.D. Mich. filed October 31, 2011).

By this consolidation, the allegations in each of these class action complaints are intended to be preserved as if reasserted and alleged herein.  The Named Plaintiffs and those similarly situated in each and every one of these consolidated actions ("Plaintiffs") allege the following based, among other things, on the investigation made by Plaintiffs and through their attorneys.[1]

---

[1] Plaintiffs reserve in full all claims pending in the consolidated Actions that have been or will be transferred herein for pretrial proceedings. In light of *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 33-34 (1998), the constituent cases will be returned to the District Courts where they originated after consolidation for pretrial proceedings. The underlying cases do not lose their separate identity from having been consolidated temporarily in this Court. *Johnson v. Manhattan Ry. Co.*, 289 U.S. 479, 496-97 (1933) ("[c]onsolidation is permitted as a matter of convenience and economy in administration, but does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another."). Plaintiffs intend to preserve all claims for which they meet a class definition, regardless of their status as a Named Plaintiff for any particular portion of the Consolidated Complaint. Additionally, Plaintiffs reserve all rights to amend this Consolidated Complaint to plead, as Class Representatives, claims for which they are not currently put forth as Class Representatives, where appropriate.

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................. 10

II.   JURISDICTION AND VENUE ..................................................................... 11

III.  PARTIES ......................................................................................................... 12

      A.   Plaintiffs. ............................................................................................... 12

      B.   Defendants. ............................................................................................ 15

IV.   BACKGROUND ............................................................................................. 17

      A.   The Foreclosure Crisis. ......................................................................... 17

      B.   Loan Modifications. ............................................................................... 18

      C.   Chase's Mishandling of Loan Modifications......................................... 18

      D.   Treasury Findings that Chase's Modification Practices Are Worst
           Among Its Peers. .................................................................................... 20

      E.   Summary of Claims. ............................................................................... 22

PART 1 – BREACH OF  TPP AGREEMENTS– FACTS, CLASSES AND
CLAIMS ................................................................................................................... 23

V.    PART 1 FACTS............................................................................................... 23

      A.   Factual Background on HAMP TPPs, Chase's Participation in
           HAMP, and Analogous Proprietary "TPP" Programs Offered by
           Chase and EMC. ..................................................................................... 24

           1.   Chase's Participation in HAMP............................................... 24

           2.   The Form TPP Agreements. .................................................... 25

      B.   Named Plaintiffs' Facts.......................................................................... 29

           1.   Joyce Clapham (WA)............................................................... 29

           2.   Jacquelyn and Samuel Colleta (IL).......................................... 30

           3.   Christine Ellis (WA) ................................................................ 31

           4.   Gustavo Franco (FL)................................................................ 32

5.      Kiersten Hajnal (CA) ......................................................... 33

6.      John and Kathleen Hanf (PA) ........................................... 35

7.      Thomas and Sharon Hayes (MO) ...................................... 36

8.      Michele and Robert Hood (CA) ........................................ 37

9.      Julie Karnes (MN) ............................................................. 38

10.     Gary Larkin (CA) ............................................................... 39

11.     Natalie Layman (MA) ........................................................ 40

12.     Jean Licata (MA) ............................................................... 42

13.     Susan Mason and Evan Burkholder (MI) .......................... 43

14.     Dianna Montez (CA) .......................................................... 44

15.     Arsenia Rodrigues (MA) .................................................... 45

16.     Ronald Ryan (NV) ............................................................. 46

17.     Michael and Audra Schmierer (CA) .................................. 47

18.     Anthony Taylor (IN) .......................................................... 48

19.     Donald and Heather Treannie (MA) .................................. 50

20.     Kelly Turbeville (CA) ........................................................ 51

21.     Daniel Ware (CA) .............................................................. 52

22.     Jean Wilcox (CA) .............................................................. 53

VI.     PART 1 CLASS ALLEGATIONS AND CLASS DEFINITIONS ................................ 54

A.      Class Definitions. .............................................................................. 54

1.      National TPP Class. ........................................................... 54

2.      Statewide TPP Classes. ..................................................... 55

B.      Exclusions. ........................................................................................ 55

C.      Numerosity/Impracticability of Joinder. .......................................... 56

D.      Commonality and Predominance. ..................................................... 56

E.      Typicality. ................................................................................... 57

F.      Adequacy. .................................................................................... 57

G.      Certification under Rule 23(b). ................................................... 57

VII.    PART 1 CAUSES OF ACTION .............................................................. 58

COUNT 1 – BREACH OF CONTRACT/BREACH OF DUTY OF GOOD
         FAITH AND FAIR DEALING ...................................................... 58

COUNT 2 --  PROMISSORY ESTOPPEL, IN THE ALTERNATIVE ................................... 62

COUNT 3 -- VIOLATIONS OF STATE UNFAIR AND DECEPTIVE ACTS
         AND PRACTICES STATUTES .................................................... 64

PART 2 – MODIFICATION PROCESS – FACTS, CLASSES AND CLAIMS .................... 73

VIII.   PART 2 FACTS ................................................................................ 73

A.      Chase's Modification Process Consists of a Common Course of
        Conduct. ....................................................................................... 74

B.      Chase's Documentation of Loan Modification Agreements and Its
        Accompanying Written and Verbal Representations .......................... 76

        1.      Promises and Representations Contained in TPP Cover
                Letters. ............................................................................. 76

        2.      Forbearance Agreements and Repayment Agreements. ......... 77

        3.      Temporary Payment Plans and Trial Modifications are
                Systematically Used In Forbearance/Modification
                Packages .......................................................................... 81

        4.      Final Modifications. ......................................................... 82

C.      Chase's Common Course of Conduct is a Result of Its Policies and
        Practices. ..................................................................................... 82

D.      A Prolonged Modification Process Leads to Unfair Outcomes for
        Mortgagors Which in Turn Benefit Chase. ..................................... 84

        1.      Chase Profits From Increased Principal Balances and
                Extended Loan Terms. ....................................................... 85

        2.      Delaying Foreclosure is Advantageous to Chase .................. 86

3.      Mortgagors Suffer Whether or Not They Are Eligible for a
        Modification.....................................................................................87

E.      Plaintiffs' Common Experiences. ......................................................88

        1.      Janet Cureton (WA) ...............................................................88

        2.      Frank & Sandra Fischer (MI)..................................................91

        3.      Sharie Green (CA) ...................................................................97

        4.      Amy Keller (NJ) ......................................................................99

        5.      Thomas Leopold (WA) ..........................................................103

        6.      Basilisa Pacheco (WA) ..........................................................109

        7.      Michael Sabouhi (CA) ...........................................................112

IX.     PART 2 CLASS ACTION ALLEGATIONS AND CLASS
        DEFINITIONS.............................................................................................119

A.      Class Definitions..........................................................................................119

        1.      Statewide Modification Promises Class................................119

        2.      Nationwide Modification Promises Class.............................120

B.      Exclusions. ...................................................................................................121

C.      Numerosity/Impracticability of Joinder....................................................121

D.      Commonality and Predominance. .............................................................121

E.      Typicality. ....................................................................................................124

F.      Adequacy. .....................................................................................................125

G.      Certification Under Rule 23(b). .................................................................125

X.      PART 2 CAUSES OF ACTION – CONSUMER CLAIMS ........................126

COUNT 4 -- "UNLAWFUL," "UNFAIR," AND/OR "FRAUDULENT"
        BUSINESS PRACTICES IN VIOLATION OF THE CALIFORNIA
        UNFAIR COMPETITION LAW ("UCL"), CAL. BUS. & PROF. CODE
        §§ 17200, *ET SEQ*.....................................................................................129

COUNT 5 -- UNFAIR DEBT COLLECTION PRACTICES IN VIOLATION OF
THE ROSENTHAL FAIR DEBT COLLECTION PRACTICES ACT
("ROSENTHAL ACT"), CAL CIV. CODE § 1788, *ET SEQ.* ..................................... 133

COUNT 6 -- VIOLATION OF THE MICHIGAN MORTGAGE BROKERS,
LENDERS AND SERVICERS LENDING ACT ("MBLSA"), MICH.
COMP. LAWS §§ 445.1651, *ET SEQ.* ......................................................................... 135

COUNT 7 -- VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD
ACT ("CFA"), N.J. STAT. ANN. § 56.8-1, *ET SEQ.* .................................................. 138

COUNT 8 -- VIOLATIONS OF THE WASHINGTON CONSUMER
PROTECTION ACT ("CPA"), WASH. REV. CODE § 19.86, *ET SEQ.* .................... 142

XI.     PART 2 CAUSES OF ACTION – PROMISSORY ESTOPPEL CLAIM ................... 148

COUNT 9 -- PROMISSORY ESTOPPEL – MODIFICATION PROMISES ........................ 148

XII.    PART 2 CAUSES OF ACTION – INJUNCTIVE RELIEF ......................................... 150

COUNT 10 -- INJUNCTIVE RELIEF – REFORMATION OF ACCOUNTS,
CORRECTION OF CREDIT REPORTING, AND REFORMATION OF
FINAL LOAN MODIFICATION AGREEMENTS ..................................................... 150

        Fees and Interest. .................................................................................................... 150

        Damaged Credit. ....................................................................................................... 151

        Final Modifications. .................................................................................................. 151

        Injunctive Relief Requested. .................................................................................... 153

PART 3 – FINAL MODIFICATIONS – FACTS, CLASSES AND CLAIMS ...................... 153

XIII.   PART 3 FACTS .............................................................................................................. 154

        A.      The Form Final Loan Modification Agreements. ............................................ 154

                1.      HAMP Loan Modification Agreements ................................................ 154

                2.      Chase Loan Modification Agreements. ................................................. 155

        B.      Chase Routinely Breaches Final Loan Modification Agreements .................... 157

        C.      Chase Breached Plaintiffs' Final Modifications. .............................................. 159

                1.      Kathy Kurtzner (NY) ............................................................................ 159

2.      Thomas and Felicia Minerva (NY) ....................................................... 161

3.      Donna Follmer (OH) ............................................................................. 163

XIV.    PART 3 CLASS ACTION ALLEGATIONS AND CLASS
        DEFINITIONS ........................................................................................... 165

        A.      Statewide Final Modification Classes ................................................ 165

        B.      Nationwide Final Modification Class. .............................................. 165

        C.      Exclusions. ......................................................................................... 166

        D.      Numerosity/Impracticability of Joinder. ........................................... 166

        E.      Commonality and Predominance. ...................................................... 166

        F.      Typicality. ........................................................................................... 168

        G.      Adequacy. ........................................................................................... 168

        H.      Certification Under Rule 23(b). ......................................................... 169

XV.     PART 3 CAUSES OF ACTION ................................................................. 169

BREACH OF CONTRACT ................................................................................... 169

COUNT 11 -- BREACH OF CONTRACT / BREACH OF THE DUTY OF
        GOOD FAITH AND FAIR DEALING – LOAN MODIFICATION
        AGREEMENTS ........................................................................................... 170

PROMISSORY ESTOPPEL ................................................................................... 173

COUNT 12 -- PROMISSORY ESTOPPEL, IN THE ALTERNATIVE ................. 173

CONSUMER PROTECTION ACT CLAIMS ........................................................ 174

COUNT 13 -- VIOLATION OF THE NEW YORK CONSUMER PROTECTION
        FROM DECEPTIVE ACTS AND PRACTICES ACT, N.Y. GEN. BUS.
        LAW § 349, *ET SEQ*. ............................................................................... 177

COUNT 14 -- OHIO CONSUMER SALES PRACTICES ACT (“CSPA”), OHIO
        REV. CODE ANN. § 1345.01, *ET SEQ*. ................................................. 179

COUNT 15 -- OHIO CPA CLAIM 2 ..................................................................... 182

INJUNCTIVE RELIEF ........................................................................................... 184

COUNT 16 -- INJUNCTIVE RELIEF – REFORMATION OF ACCOUNTS........................ 184

COUNT 17 -- INJUNCTIVE RELIEF – REFORMATION OF FINAL
    MODIFICATION AGREEMENTS ........................................................... 185

PART 4 – UNFAIR DEBT COLLECTION PRACTICES – FACTS, CLASSES
    AND CLAIMS ...................................................................................... 186

XVI.    PART 4 FACTS ................................................................................... 186

XVII.   PART 4 CLASS ACTION ALLEGATIONS AND CLASS DEFINITION ............... 188

    A.     Nationwide Debt Collection Practices Class. .................................... 188

    B.     Exclusions. ..................................................................................... 188

    C.     Numerosity/Impracticability of Joinder. ........................................... 188

    D.     Commonality and Predominance. .................................................... 189

    E.     Typicality. ...................................................................................... 190

    F.     Adequacy. ...................................................................................... 191

    G.     Certification Under Rule 23(b). ....................................................... 191

XVIII.  PART 4 CAUSE OF ACTION ............................................................... 192

COUNT 18 -- VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES
    ACT ("FDCPA"), 15 U.S.C. § 1692, *ET SEQ*............................................. 192

XIX.    PRAYER FOR RELIEF .......................................................................... 197

XX.     JURY TRIAL DEMANDED ..................................................................... 199

CERTIFICATE OF SERVICE ................................**ERROR! BOOKMARK NOT DEFINED.**

# I.    INTRODUCTION

1.      When large financial institutions, such as Defendants (hereinafter "Chase" or "Defendants"), promise to modify home mortgage loans to prevent foreclosure, homeowners who live up to their end of the bargain expect those promises to be kept.  As set forth below, Chase made such promises to borrowers routinely and systematically throughout the last several years and then failed to honor them.  As a result, Plaintiffs and the classes they seek to represent have been subjected to unnecessary foreclosure proceedings, have suffered fear and anxiety as their homes hung in limbo, and, in some circumstances, felt compelled to accept deals on less favorable terms than were promised to them.

2.      Several of the cases consolidated in this complaint allege that Chase systemically breached obligations set forth in form contracts that it sent to its borrowers pursuant to the federal government's Home Affordable Modification Program ("HAMP").  As a participating servicer in HAMP, Chase entered into written agreements with its borrowers, known as Trial Period Plan ("TPP") Agreements.[2]  In these Agreements, Chase agreed to a finite "trial period," and promised that borrower compliance with the TPP Agreement would result in the tender of a permanent loan modification under HAMP rules or, at the very least, a timely decision that such a modification was not forthcoming.  Plaintiffs in these cases fully complied with their TPP Agreements by submitting the required documentation and making payments.  Despite Plaintiffs' full performance, Chase failed to meet its contractual obligation to tender permanent modifications complying with HAMP rules or otherwise issue timely notifications.

3.      In addition, several of the underlying complaints allege that Chase deceived, strung along, and misled Plaintiffs and members of the Classes as they sought loan

_____

[2] "TPP Agreements" as used and discussed in detail herein include, unless differentiated, HAMP, CHAMP and EMC TPP Agreements.

modifications, frequently requesting duplicative information from them and holding foreclosure over their heads while continuing to collect monthly payments.  Through this protracted process and serial bad faith negotiations—in which Chase seldom timely modified loans and often foreclosed in any event—Chase racked up excessive fees and inflated Plaintiffs' debt by thousands of dollars.  Chase profited from its customers' misfortunes and from their desires to keep their homes.  Plaintiffs have alleged that in these instances, Chase's behavior amounts to nothing short of an unlawful modification scheme that violates state consumer protection and unfair and deceptive acts and practices statutes, as well as common law violations.

4.      In three of the underlying complaints, Plaintiffs also allege that Chase has breached final modifications typically called "Loan Modification Agreements."  These agreements are clear in their finality and permanence and give Chase no right to unilaterally renege on the terms.  Yet Chase has failed to honor these modifications, either by continuing to treat the homeowner's account as if no modification had occurred, or by cancelling the modification without notice several months after the modification, throwing the homeowner back into delinquency.  In these instances, Chase has failed to meet its contractual obligation to honor the terms of its modification agreements.

5.      Finally, Chase has engaged in unfair, deceptive, and abusive debt collection practices in connection with its home loan modification program.  Plaintiffs therefore plead a claim under the federal Fair Debt Collection Practices Act.

## II.   JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because this action is between citizens of different states and at least one member of the class of Plaintiffs is a citizen of a state different from any Defendant, a class action has been pled, and the

matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and there are 100 or more members in the proposed classes.  For diversity jurisdiction purposes, a national bank is a citizen of the state designated as its main office on its organization certificate. *Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303, 306 (2006).  JPMorgan Chase Bank, N.A. is, on information and belief, a citizen of New York.  The other Defendants incorporated states and principal places of business are outlined in Section III below.  Plaintiffs are citizens of California, Florida, Illinois, Indiana, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, Nevada, New York, Ohio, Pennsylvania, and Washington.

7.      This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 based on the federal question presented by Chase's alleged violation of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq*.

8.      Venue is proper in this District under 28 U.S.C. §§ 1391(a) and (c).  Chase does substantial business within this Federal Judicial District, receives substantial compensation and profits from the servicing of home mortgage loans in this District, has made material omissions and misrepresentations, breached contracts and/or other promises, and engaged in unlawful practices in this District, so as to subject Defendants to personal jurisdiction in this District.  In addition, several of the named plaintiffs reside in this District.

9.      By an Order dated October 11, 2011, the Multidistrict Judicial Panel issued an order transferring all cases to this Court for coordinated pre-trial proceedings. MDL No. 2290, Dkt. No. 34.

### III.   PARTIES

**A.      Plaintiffs.**

10.      Plaintiff Joyce Clapham is a natural person and citizen of the state of Washington.

11.     Plaintiffs Jacquelyn and Samuel Colleta are natural persons and citizens of the state of Illinois.

12.     Plaintiff Janet Cureton is a natural person and citizen of the state of Washington.

13.     Plaintiff Christine Ellis is a natural person and citizen of the state of Washington.

14.     Plaintiffs Frank and Sandra Fischer are natural persons and citizens of the state of Michigan.

15.     Plaintiff Donna Follmer is a natural person and citizen of the state of Ohio.

16.     Plaintiff Gustavo Franco is a natural person and citizen of the state of Florida.

17.     Plaintiff Sharie Green is a natural person and citizen of the state of California.

18.     Plaintiff Kiersten Hajnal is a natural person and citizen of the state of California.

19.     Plaintiffs John and Kathleen Hanf are natural persons and citizens of the state of Pennsylvania.

20.     Plaintiffs Thomas and Sharon Hayes are natural persons and citizens of the state of Missouri.

21.     Plaintiffs Michele and Robert Hood are natural persons and citizens of the state of California.

22.     Plaintiff Julie Karnes is a natural person and citizen of the state of Minnesota.

23.     Plaintiff Amy Keller is a natural person and citizen of the state of New Jersey.

24.     Plaintiff Kathy Kurtzner is a natural person and citizen of the state of New York.

25.     Plaintiff Gary Larkin is a natural person and citizen of the state of California.

26.     Plaintiff Natalie Layman is a natural person and citizen of the state of Massachusetts.

27.     Plaintiff Thomas Leopold is a natural person and citizen of the state of Washington.

28.     Plaintiff Jean Licata is a natural person and citizen of the state of Massachusetts.

29.     Plaintiffs Susan Mason and Evan Burkholder are natural persons and citizens of the state of Michigan.

30.     Plaintiffs Thomas and Felicia Minerva are natural persons and citizens of the state of New York.

31.     Plaintiff Dianna Montez is a natural person and citizen of the state of California.

32.     Plaintiff Basilisa Pacheco is a natural person and citizen of the state of Washington.

33.     Plaintiff Arsenia Rodrigues is a natural person and citizen of the state of Massachusetts.

34.     Plaintiff Ronald Ryan is a natural person and citizen of the state of Nevada.

35.     Plaintiff Michael Sabouhi is a natural person and citizen of the state of Washington.

36.     Plaintiffs Michael and Audra Schmierer are natural persons and citizens of the state of California.

37.     Plaintiff Anthony Taylor is a natural person and citizen of the state of Indiana.

38.     Plaintiffs Donald and Heather Treannie are natural persons and citizens of the state of Massachusetts.

39.     Plaintiff Kelly Turbeville is a natural person and citizen of the state of California.

40.     Plaintiff Daniel Ware is a natural person and citizen of the state of California.

41.     Plaintiff Jean Wilcox is a natural person and citizen of the state of California.

**B.      Defendants.**

42.      Defendant Chase Home Finance LLC is a mortgage bank and home mortgage loan servicer, servicing mortgages on behalf of lenders and investors, including pooled mortgage-backed securities.  Chase Home Finance LLC is a Delaware corporation and during the time period relevant to this action was a wholly-owned subsidiary of JPMorgan Chase Bank, N.A.  On information and belief, on May 1, 2011, Chase Home Finance LLC was merged into Defendant JPMorgan Chase Bank, N.A, making JPMorgan Chase Bank, N.A. the successor by merger to Chase Home Finance LLC.

43.      Defendant EMC Mortgage Corporation (hereinafter "EMC") is a mortgage bank and home mortgage loan servicer, servicing mortgages on behalf of lenders and investors, including pooled mortgage-backed securities.  EMC Mortgage Corporation is a Delaware corporation headquartered in Lewisville, Texas.  It is a wholly-owned subsidiary of The Bear Stearns Companies LLC, a Delaware LLC.  The Bear Stearns Companies LLC is a wholly owned subsidiary of JPMorgan Chase & Co. ("JPMC").  On information and belief, EMC services over 480,000 home mortgage loans nationwide.  Defendant EMC Mortgage Corporation includes all successors and assigns to the extent that they are responsible for the conduct alleged herein.

44.      Defendant The Bear Stearns Companies LLC, f/d/b/a The Bear Stearns Companies, Inc. (hereinafter "Bear Stearns") is a Delaware LLC that maintains its principal place of business in New York, NY.  The Bear Stearns Companies LLC is a wholly owned subsidiary of JPMC. On information and belief, Bear Stearns directed, controlled, formulated, and/or participated in Defendant EMC's loan servicing activities and is jointly and severally

liable for EMC's unlawful activity.  Defendant The Bear Stearns Companies LLC includes all

successors and assigns to the extent that they are responsible for the conduct alleged herein.

45.     Defendant JPMorgan Chase Bank, N.A. is a national banking association with

corporate headquarters located at 270 Park Avenue, New York, NY 10017.  JPMorgan Chase

Bank, N.A. is a wholly owned subsidiary of JPMorgan Chase & Co. ("JPMC").  On information

and belief, JPMorgan Chase Bank, N.A. directed, controlled, formulated, and/or participated in

the loan servicing activities of Defendants Chase Home Finance, EMC, and Bear Stearns and is

jointly and severally liable for their unlawful activities.  In addition, because of the merger of

Chase Home Finance LLC into JPMorgan Chase Bank, N.A., Defendant JPMorgan Chase Bank,

N.A. is the successor in interest to Defendant Chase Home Finance LLC.  On information and

belief, EMC servicing rights were transferred from EMC to JPMorgan Chase Bank, N.A. as of

April 1, 2011, after the commencement of this action.[3]  EMC's website now states that "EMC

Mortgage a registered trade service mark of JPMorgan Chase & Co.[]  JPMorgan Chase Bank,

N.A. services loans under the EMC Mortgage name."  EMC Mortgage, About Us, at

https://www.emcmortgagecorp.com/EMCMORTGAGE/MainContent/about_us.jsp (last visited

Apr. 22, 2011).  Therefore, on information and belief, JPMorgan Chase Bank, N.A. directed,

controlled, formulated, and/or participated in Defendant EMC's and Defendant Bear Stearns's

loan servicing activities, has assumed liabilities therefor, and will continue to direct, control,

formulate, and/or participate in these servicing activities in the future.

_____

[3] The Federal Reserve's April 2011 Consent Order with JPMC references the April 1, 2011 transfer of "all of the
residential mortgage loan servicing rights and certain related assets and liabilities of the Mortgage Servicing
Companies to the Bank (the 'EMC Servicing Rights Transfer')." *In the Matter of JPMorgan Chase & Co. et al.*,
11-023-B-HC / 11-023-B-DEO, Consent Order, at 2 (Fed. Reserve Bd. Apr. 13, 2011), *available at*
http://www.federalreserve.gov/newsevents/press/enforcement/enf20110413a5.pdf (last visited July 19, 2011).  The
Order further notes that "[f]ollowing consummation of that transfer, the Mortgage Servicing Companies [including
EMC] are no longer in the business of residential mortgage loan servicing, and only the Bank is conducting
residential mortgage loan servicing within the JPMC organization."  *Id.*

46.     On September 25, 2008, JPMorgan Chase & Co. purchased the banking operations of Washington Mutual Bank in a transaction facilitated by the Federal Deposit Insurance Corporation.  *See* Press Release, Federal Deposit Insurance Corporation, JPMorgan Chase Acquires Banking Operations of Washington Mutual (Sept. 25, 2008).[4]  As a part of this transaction, Defendant JPMorgan Chase Bank, N.A. acquired the loan servicing portfolio of Washington Mutual.  JPMorgan Chase Bank, N.A. continued operating using the Washington Mutual brand for several months after the sale.  While some Plaintiffs' loans were serviced by Washington Mutual prior to the sale, at all times relevant to the allegations herein, JPMorgan Chase Bank, N.A. was the servicer.

47.     As noted above, Defendants are collectively referred to as "Chase" or "Defendants."

## IV.   BACKGROUND

### A.   The Foreclosure Crisis.

48.     Over the past several years, the United States housing market has been in crisis. The Congressional Oversight Panel noted in 2009 that one in eight U.S. mortgages was currently in foreclosure or default.  Press Release, Congressional Oversight Panel, An Assessment of Foreclosure Mitigation Efforts After Six Months (Oct. 9, 2009).[5]  In 2010 alone, a record 2.9 million homes, or one out of every forty-five, received a foreclosure filing.  In 2011, that total dipped to 1.9 million.  According to RealtyTrac, however, that "does not necessarily indicate the housing market is getting better, as many foreclosures have been delayed due to confusion over documentation and legal issues involved in the process."  *2011 Foreclosure Activity is the*

---

[4] *Available at* http://www.fdic.gov/news/news/press/2008/pr08085.html.

[5] *Available at* http://cybercemetery.unt.edu/archive/cop/20110402043235/http://cop.senate.gov/documents/cop-100909-report.pdf (last visited July 19, 2011).

*Lowest Since 2007, Before the Recession Began*, Washington Post, Jan. 12, 2012.[6]  It is

expected that foreclosures will increase in 2012.  *Id.*

**B.     Loan Modifications.**

49.     Loan modification programs are not new to the mortgage industry or solely a

result of the recent foreclosure crisis.  However, the housing crisis of the past half-decade has

been accompanied by a surge in both the prevalence and the awareness among homeowners of

mortgage modification options that their servicers may provide.

50.     In addition to Chase's proprietary programs already in existence and which it has

continued to use in the past several years, the federal government established a loan modification

program in 2009 that has been widely used and promoted by Chase.

51.     In February of 2009, the Secretary of the Treasury and the Director of the Federal

Housing Finance Agency announced the Making Home Affordable ("MHA") program.  In an

effort to stem the foreclosure crisis, HAMP was created by the U.S. Treasury Department, as part

of the MHA.  HAMP "lowers [mortgagors'] monthly payment[s] to 31 percent of [their] verified

monthly gross (pre-tax) income to make [their] payments more affordable."[7]  While not the only

vehicle for modifications, HAMP has been increasingly used by servicers either to modify loans

or as a template for proprietary loan modification programs since 2009.

**C.     Chase's Mishandling of Loan Modifications.**

52.     As of November 18, 2010, Chase was servicing over nine million loans with a

total value of $1.2 trillion.  *Robo-Signing, Chain of Title, Loss Mitigation and Other Issues in*

*Mortgage Servicing: Hearing Before the Subcomm. On Insurance, Housing, and Community*

---

[6] *Available at* http://www.washingtonpost.com/business/economy/2011s-foreclosure-rate-the-lowest-since-2007-
before-the-recession-began/2012/01/12/gIQAR3G9sP_story.html (last visited Jan. 12, 2012).

[7] Home Affordable Modification Program, http://www.makinghomeaffordable.gov/programs/lower-
payments/Pages/hamp.aspx, (last visited July 19, 2011).

*Opportunity*, 111th Cong., Panel Two (Nov. 18, 2010) (written testimony of Stephanie Murdick, head of the "Office of Consumer Practices" at Chase).  The Office of the Comptroller of the Currency ("OCC") recently found that Defendant JPMorgan Chase Bank, N.A. currently services a portfolio of 6.3 million residential mortgage loans, and between 2008 and 2010, Chase's "foreclosure inventory grew substantially."  *In the Matter of JPMorgan Chase Bank, N.A.*, AA-EC-11-15, Consent Order, at 2 (Dep't of the Treasury, Office of the Comptroller of the Currency, Apr. 13, 2011).[8]

53.     Yet, Chase has modified less than a quarter of mortgages of "seriously delinquent" borrowers; the vast majority of the balances of such mortgages are "unresolved" with neither a modification nor a foreclosure.  Olga Pierce & Paul Kiel, ProPublica, *By the Numbers: A Revealing Look at the Mortgage Mod Meltdown*, Mar. 8, 2011 [hereinafter Pierce et al., *Meltdown*] (analyzing Moody's data on 300,000 subprime loans more than three months behind, all of which currently sit in mortgage-backed securities).[9]  Indeed, Moody's data reveals that "[t]he *worst* [servicer] was JPMorgan Chase, where the average modification occurred 11 months after the borrower fell behind."  *Id*. (emphasis added).

54.     Chase and its affiliates have denied modifications, cancelled modification trial periods, and left mortgagors in limbo at a rate of approximately 57% according to Treasury Department data.  And this statistic does not even account for situations where Chase has not reported application response data.  *Id*.

55.     Chase itself acknowledges that it mishandled foreclosures, including periods while mortgage modifications were pending.

---

[8] *Available at* http://www.occ.treas.gov/news-issuances/news-releases/2011/nr-occ-2011-47e.pdf.

[9] *Available at* http://www.propublica.org/article/by-the-numbers-a-revealing-look-at-the-mortgage-mod-meltdown/single (last visited Jan. 10, 2012).

> Jamie Dimon, chief executive of JPMorgan Chase, addressed the issue Tuesday at a banking conference in Washington.  "Some of the mistakes were egregious, and they're embarrassing," he said, according to Bloomberg News.  "But we made a mistake, and we're going to pay for that mistake."

David Streitfeld, *Servicers Said to Agree to Revamped Foreclosures*, N.Y. Times, Apr. 5, 2011, at B4.

56.     Though the head of Chase has said that Chase will "pay for [its] mistake" in handling foreclosures, no compensation has been offered to Plaintiffs or the Classes for the types of damages set forth herein.  Dawn Kopecki, *JPMorgan's Dimon Says Bank Will Pay for Foreclosure Mistakes*, BLOOMBERG (April 5, 2011 2:04 PM).[10]

**D.     Treasury Findings that Chase's Modification Practices Are Worst Among Its Peers.**

57.     As part of HAMP, the Department of the Treasury monitors the modification programs of participating servicers and issues quarterly reports assessing the servicers' modification programs and their compliance with HAMP.

58.     In December 2011, the Treasury released its servicer assessment results for the third quarter of 2011, giving Chase the lowest rating of all servicers participating in HAMP. Chase was the only servicer in need of "substantial improvement" in its modification practices, "due to their lack of progress in implementing previously identified improvements."  Making Home Affordable, Program Performance Report Through October 2011 (Dec. 7, 2011) (hereinafter, December Performance Report).[11]  According to a Treasury press release, Chase "has a number of outstanding items from previous quarters that have not yet been addressed and

---

[10] *Available at* http://www.bloomberg.com/news/2011-04-05/dimon-says-jpmorgan-s-foreclosure-mistakes-were-egregious-.html (last visited July 19, 2011).

[11] *Available at* http://www.treasury.gov/initiatives/financial-stability/results/MHA-Reports/Documents/October%202011%20MHA%20Report%20FINAL.pdf

play a critical part in their broader execution of" HAMP.  Press Release, U.S. Treasury Dep't,

Obama Administration Releases November Housing Scorecard (Dec. 7, 2011).

59.     Chase has received the Treasury's lowest marks throughout 2011, reflecting its

consistently inadequate modification practices.  *Id.*  As a result, Chase is the only servicer to

which the Treasury is threatening to permanently reduce incentive payments.

60.     Of servicers participating in HAMP, Chase is among the worst in several key

categories.  The Treasury found Chase to have:

- the lowest rate of conversion from trial periods to final modifications as of September 2011;

- the longest average delay in granting modification following a trial period; and,

- the most days on average to resolve escalated cases (Chase averaged 39 days to resolve escalated cases).

*Id.*

61.     As the below chart from the report shows, for trial periods started before June 1,

2010, the average Chase trial period lasted longer than *eight months* before being converted into

a final modification.  This was more than three months longer than the same average for the rest

of the servicers participating in HAMP.



*Id.*

62.     Moody's data corroborates the Treasury's findings for HAMP and proprietary programs, revealing that "[t]he *worst* [servicer] was JPMorgan Chase, where the average modification occurred 11 months after the borrower fell behind."  Pierce et al., *Meltdown* (emphasis added).

**E.     Summary of Claims.**

63.     This Consolidated Complaint is subdivided into four Parts, each focusing on a different aspect of Chase's misconduct.

*   Part 1 addresses Chase's breaches of Trial Period Plan ("TPP") Agreements under HAMP and the proprietary programs of Chase and EMC, pleading claims for breach of contract and breach of the duty of good faith and fair dealing, promissory estoppel, and state consumer protection violations.

- Part 2 addresses Chase's misleading and deceptive misconduct in prolonging the modification process far beyond what was promised to homeowners, using the promise of modifications as a lure to get homeowners to perform in ways that will benefit Chase but are detrimental to homeowners, and ultimately failing to timely grant promised modifications, pleading claims for state consumer protection violations, promissory estoppel, and injunctive relief.

- Part 3 addresses Chase's failure to honor final Loan Modification Agreements, pleading claims for breach of contract and breach of the duty of good faith and fair dealing, promissory estoppel, state consumer protection violations, and injunctive relief.

- Part 4 addresses Chase's unfair, deceptive, and abusive debt collection practices in violation of the federal Fair Debt Collection Practices Act.

*       *       *

**PART 1 – Breach of  TPP Agreements– Facts, Classes and Claims**

**V.   PART 1 FACTS**

64.     The allegations contained in this Part I of the Consolidated Complaint are limited to claims arising from form Trial Period Plan ("TPP") Agreements under the U.S. Treasury's Home Affordable Modification Program ("HAMP"), the Chase Modification Program ("CHAMP"), or the EMC Modification Program ("EMC").

65.     In their form TPP Agreements, proffered under HAMP, CHAMP, and EMC, Chase set forth a finite "trial period," and promised that successful compliance with the agreement would result in the tender of a permanent loan modification.  Plaintiffs, for their part, have fully complied with these agreements by submitting the required documentation and making payments.  Despite Plaintiffs' full performance, Chase has failed to meet its contractual obligation to tender promised permanent modifications, or even to notify Plaintiffs by the trial period deadline that they would not be receiving a permanent modification.

66.     The same problems affect other members of the putative classes.  As a result, Plaintiffs and thousands of other homeowners are wrongfully being deprived of an opportunity to

cure their delinquencies, pay their mortgage loans and save their homes.  Chase's actions breach

the TPP Agreement, thwart the purpose of HAMP and are illegal under state law(s).

**A.      Factual Background on HAMP TPPs, Chase's Participation in HAMP, and Analogous Proprietary "TPP" Programs Offered by Chase and EMC.**

      **1.      Chase's Participation in HAMP.**

67.      In 2008, J.P. Morgan Chase accepted $25 billion in funds from the United States

Government as part of the Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211.  On July

31, 2009 Michael R. Zarro Jr., Senior Vice President of JPMorgan Chase Bank, N.A., signed a

contract with the U.S. Treasury (attached as Exhibit 1 and incorporated herein by reference)

agreeing to participate in HAMP—a program in which Chase received incentive payments for

providing affordable mortgage loan modifications and other alternatives to foreclosure to eligible

borrowers.  This Service Participation Agreement ("SPA") was amended and restated on March

24, 2010 (attached as Exhibit 2 and incorporated herein by reference).  A similar contract was

made between EMC Mortgage Corp. and the U.S. Treasury on July 30, 2009 (attached as Exhibit

3 and incorporated herein by reference). This agreement was also signed by Michael R. Zarro,

who there listed his title as "President, EMC Mortgage Corporation, Inc." and was amended and

restated on March 25, 2010 (attached as Exhibit 4 and incorporated herein by reference).

68.      By entering into the SPA, Chase promised that it would follow all guidelines,

procedures, and directives issued as a part of HAMP.  According to the first supplemental

directive ("SD") issued under HAMP, participating servicers "will use a uniform loan

modification process to provide a borrower with sustainable monthly payments."  Home

Affordable Modification Program, Supplemental Directive 09-01, 4/6/2009, SD 09-01, at 1

[hereinafter HAMP SD].[12]   *See also* Making Home Affordable Program, HANDBOOK FOR SERVICERS OF NON-GSE MORTGAGES 11 (ver. 3.0, Dec. 2010) [hereinafter MHA HANDBOOK]; *see also* Making Home Affordable Program, HANDBOOK FOR SERVICERS OF NON-GSE MORTGAGES (ver. 3.3, Sep. 2011).  In addition, Chase's entry into the SPA provided a promise that its services would be performed in compliance with all applicable federal, state, and local laws, specifically including state laws designed to prevent unfair, discriminatory, or predatory lending practices.  Exs. 1 & 2 at "Financial Instrument" ¶ 5(b).  Chase also covenanted that it would perform services in accordance with the "practices, high professional standards of care, and degree of attention used in a well-managed operation, and no less than that which the Servicer exercises for itself under similar circumstances," as well as "use qualified individuals with suitable training, education, experience and skills to perform" services.  *Id.* ¶ 5(d).

69.     As a participating servicer, Chase is required to evaluate all loans that are 60 or more days delinquent or appear to be at risk of imminent default, to determine which loans meet the HAMP eligibility criteria.  HAMP SD 09-01 at 4.  Chase is also required to consider a HAMP modification if, after receiving hardship information from a borrower, "the servicer concludes a current borrower is in danger of imminent default."  *Id.* at 13.  Servicers are required to suspend foreclosure proceedings during HAMP evaluations and during trial modification periods.  *Id.* at 14.

**2.      The Form TPP Agreements.**

70.     A HAMP Modification consists of two stages.  First, a Participating Servicer is required to gather information via an application and, if appropriate, offer the homeowner a Trial

---

[12] All Supplemental Directives are available at https://www.hmpadmin.com/portal/programs/guidance.jsp (last visited Jan. 10, 2012).

Period Plan.[13]   The TPP consists of a three-month period in which the homeowner makes mortgage payments based on a formula that uses the initial financial information provided. Second, upon successful completion of the TPP, the Servicer must offer the homeowner a permanent modification.  Generally speaking, the goal of a HAMP modification is for owner-occupants to receive a permanent modification of a first-lien loan by which the monthly mortgage payment is reduced to 31% of their monthly income for the next five years.

71.      Before it offers a borrower a TPP, the servicer must determine that the loan meets certain criteria (including that the investor who owns the loan is participating in HAMP) and also evaluate the homeowner's eligibility for a permanent Home Affordable Modification, subject to verification.  *See* MHA HANDBOOK, § 5; MHA HANDBOOK, § 6; MHA HANDBOOK, § 1.1.  This includes determining what the terms of the modification will be under the HAMP "Waterfall." MHA HANDBOOK § 7 at 73-77; MHA HANDBOOK § 6.3 at 65-67.  Chase does not have discretion as to how the Waterfall formula is applied—HAMP rules require servicers to take these enumerated steps in the prescribed order until the target monthly mortgage payment equaling 31% of monthly income is reached.

72.      If application of the Waterfall steps yields terms that produce the target 31% monthly mortgage payment, the servicer must offer the borrower a TPP Agreement if the modification provides a net present benefit to the mortgage holder.  This determination is known as the "Net Present Value" or ("NPV") test and is to be performed prior to the tender of a HAMP TPP Agreement.  MHA HANDBOOK § 7 at 73-77; MHA HANDBOOK § 6.3 at 65-67.

73.      Chase offers form HAMP TPP Agreements to eligible homeowners which describe the homeowner's duties and obligations under the plan and promise a permanent HAMP

---

[13] The eligibility criteria for HAMP, as well as the formula used to calculate monthly mortgage payments under the modification, are explained in detail in MHA HANDBOOK, § 6.3, 7.

modification for those homeowners that execute the agreement and fulfill the documentation and payment requirements.

74.      The very first sentence of the form HAMP TPP Agreement used by Chase states: "If I am in compliance with this Trial Period Plan (the 'Plan') and my representations in Section 1 continue to be true in all material respects, then the Servicer will provide me with a Home Affordable Modification Agreement ('Modification Agreement'), as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage."  An example of the form HAMP TPP Agreement proffered by Chase under HAMP is attached hereto as Exhibit 5.

75.      Section 3 of the form HAMP TPP Agreement repeats this promise:  "If I comply with the requirements in Section 2 and my representations in Section 1 continue to be true in all material respects, the Servicer will send me a Modification Agreement for my signature which will modify my Loan Documents as necessary to reflect this new payment amount and waive any unpaid late charges accrued to date."  *See* Ex. 5.

76.      Further, the form HAMP TPP Agreement defines a finite "trial period" (usually three months but in some cases, four months), states that "TIME IS OF THE ESSENCE" and identifies the "modification effective date" as the first day of the month following the month in which the final trial payment is due.  *See* Ex. 5.

77.      The HAMP TPP Agreement requires homeowners to undertake several duties that they are not otherwise obligated to undertake.  Section 1 of the TPP Agreement requires the homeowner to agree to undergo credit counseling.  In addition, the TPP Agreement requires homeowners to submit financial documentation that they were not otherwise required to provide,

to set up newly established escrow accounts, and to make legally binding representations about their personal circumstances.

78.     Subject to adjustments that can be made to account for documented and verified changes in circumstances, HAMP directs that the terms of the Trial Plan are automatically made permanent upon a homeowner's successful completion of the Plan.  Specifically, HAMP SD 09-01 states that "[i]f the borrower complies with the terms and conditions of the Trial Period Plan, the loan modification will become effective on the first day of the month following the trial period as specified in the Trial Period Plan."  HAMP SD, at 18.

79.     In addition to the HAMP program, Chase also maintains an internal loan modification program, known as the Chase Modification Program or "CHAMP."  Through CHAMP, Chase utilized proprietary "Chase TPP" documents modeled on HAMP TPPs.  An example of the form TPP Agreement proffered by Chase under CHAMP is attached hereto as Exhibit 6.

80.     EMC also maintained a similar program and utilized proprietary "EMC TPP" documents modeled off of HAMP TPPs.  An example of the form TPP Agreement proffered by EMC is attached hereto as Exhibit 7.

81.     Chase and EMC TPP Agreements utilize a nearly identical form TPP as HAMP and are likewise clear in their finality.  They definitively state that "[a]fter successful completion of the Trial Period Plan, Chase *will* send you a Modification Agreement for your signature which *will modify the Loan* as necessary to reflect this new payment amount."  *See* Ex. 6 (emphasis added).

82.     Given the similarities between the form documents, unless specifically differentiated by name, HAMP, CHAMP and EMC TPP Agreements are referred to hereinafter collectively as TPP Agreements.

**B.     Named Plaintiffs' Facts.**

**1.     Joyce Clapham (WA)**

83.     EMC is the servicer of a loan made to Joyce Clapham.  Sometime after taking out the loan, Ms. Clapham began experiencing hardships that caused her to have difficulty making monthly payments on her mortgage.

84.     Ms. Clapham applied for a HAMP modification in 2009.  Based on information supplied by Ms. Clapham as well as information already in EMC's possession, Ms. Clapham was determined eligible for HAMP by EMC and sent a HAMP TPP Agreement in October 2009 that is substantially identical to the form HAMP TPP Agreement described in section V.A.2, *supra*. Ms. Clapham accepted, executed and returned the HAMP TPP Agreement to EMC.

85.     Ms. Clapham's HAMP TPP Agreement described a trial period that was to run from November 2009 through January 2010. Ms. Clapham made each of the payments described in the HAMP TPP Agreement, as well as additional payments beyond the trial period, which were accepted by EMC.

86.     Since the trial period began, and at all times relevant, Ms. Clapham has responded to all document requests made by EMC by timely supplying the requested documents.  Ms. Clapham supplied information to EMC that was truthful to the best of her knowledge throughout the HAMP process.

87.     Despite Ms. Clapham's full compliance with the HAMP TPP Agreement, Ms. Clapham received neither the tender of a permanent loan modification that complied with HAMP

rules, nor notification that she was ineligible during the time periods prescribed in her HAMP

TPP Agreement.

88.     Like other Class members in this matter, Ms. Clapham has been living in a state

of limbo and stressful anxiety, without any assurances that she can save her home, despite her

compliance with HAMP requirements and the HAMP TPP Agreement.

### 2.     Jacquelyn and Samuel Colleta (IL)

89.     Chase is the servicer of a loan made to Jacquelyn and Samuel Colleta in 2007.

Sometime after taking out the loan, Mr. and Mrs. Colleta began experiencing hardships that

caused them to have difficulty making monthly payments on their mortgage.

90.     Mr. and Mrs. Colleta applied for a HAMP modification in 2009.  Based on

information supplied by Mr. and Mrs. Colleta as well as information already in Chase's

possession, Mr. and Mrs. Colleta were determined eligible for HAMP by Chase and sent a

HAMP TPP Agreement in October 2009 that is substantially identical to the form HAMP TPP

Agreement described in section V.A.2, *supra*.  Mr. and Mrs. Colleta accepted, executed and

returned the HAMP TPP Agreement to Chase.

91.     Mr. and Mrs. Colleta's HAMP TPP Agreement described a trial period that was to

run from December 2009 through February 2010.  Mr. and Mrs. Colleta made each of the

payments described in the HAMP TPP Agreement, as well as additional payments beyond the

trial period, which were accepted by Chase.

92.     Since the trial period began, and at all times relevant, Mr. and Mrs. Colleta have

responded to all document requests made by Chase by timely supplying the requested

documents.  Mr. and Mrs. Colleta supplied information to Chase that was truthful to the best of

their knowledge throughout the HAMP process.

93.     Despite their full compliance with the HAMP TPP Agreement, Mr. and Mrs. Colleta received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that they were ineligible during the time period prescribed in their HAMP TPP Agreement.

94.     Chase has since restarted foreclosure proceedings against the Colletas' home. Like other Class members in this matter, Mr. and Mrs. Colleta have been living in a state of limbo and stressful anxiety, without any assurances that their home will not be foreclosed, despite their compliance with HAMP requirements and the HAMP TPP Agreement.

**3.     Christine Ellis (WA)**

95.     EMC is the servicer of a loan made to Christine Ellis.  Sometime after taking out the loan, Ms. Ellis began experiencing hardships that caused her to have difficulty making monthly payments on her mortgage.

96.     Ms. Ellis applied for a HAMP modification in 2009.  Based on information supplied by Ms. Ellis as well as information already in EMC's possession, Ms. Ellis was determined eligible for a trial modification by EMC and sent an EMC TPP Agreement in December 2009 that is substantially identical to the form EMC TPP Agreement described in section V.A.2, *supra*.  Ms. Ellis accepted, executed and returned the EMC TPP Agreement to EMC.

97.     Ms. Ellis's EMC TPP Agreement described a trial period that was to run from January through March 2010.  Ms. Ellis made each of the payments described in the EMC TPP Agreement, as well as additional payments beyond the trial period, which were accepted by EMC.

98.     Since the trial period began, and at all times relevant, except when otherwise instructed by EMC representatives, Ms. Ellis has responded to all document requests made by EMC by timely supplying the requested documents.  Ms. Ellis supplied information to EMC that was truthful to the best of her knowledge throughout the HAMP process.

99.     Despite her full compliance with the EMC TPP Agreement, Ms. Ellis received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that she was ineligible during the time periods prescribed in her EMC TPP Agreement.

100.     Following Ms. Ellis's three-month trial period, Ms. Ellis received letters from EMC threatening to begin foreclosure proceedings against her home.  Like other Class members in this matter, Ms. Ellis has been living in a state of limbo and stressful anxiety, without any assurances that she can save her home, despite their compliance with HAMP requirements and the EMC TPP Agreement.

**4.      Gustavo Franco (FL)**

101.     Chase is the servicer of a loan made to Gustavo Franco.  Sometime after taking out the loan, Mr. Franco began experiencing hardships that caused him to have difficulty making monthly payments on his mortgage.

102.     Mr. Franco applied for a HAMP modification in May 2009.  Based on information supplied by Mr. Franco as well as information already in Chase's possession, Mr. Franco was determined eligible for HAMP by Chase and sent a HAMP TPP Agreement in August 2009 that is substantially identical to the form HAMP TPP Agreement described in section V.A.2, *supra*.  Mr. Franco accepted, executed and returned the HAMP TPP Agreement to Chase.

103.    Mr. Franco's HAMP TPP Agreement described a trial period that was to run from September through November 2009.  Mr. Franco made each of the payments described in the HAMP TPP Agreement, as well as additional payments beyond the trial period, which were accepted by Chase.

104.    Since the trial period began, and at all times relevant, Mr. Franco has responded to all document requests made by Chase by timely supplying the requested documents.  Mr. Franco supplied information to Chase that was truthful to the best of his knowledge throughout the HAMP process.

105.    Despite his full compliance with the HAMP TPP Agreement, Mr. Franco received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that he was ineligible during the time period prescribed in his HAMP TPP Agreement.

106.    During Mr. Franco's trial period, attorneys acting on behalf of Chase prosecuted foreclosure proceedings against his home.  Like the other Class members in this matter, Mr. Franco has been living in a state of limbo and stressful anxiety, without any assurances that he can save his home, despite his compliance with HAMP requirements and his right to a permanent HAMP modification.

**5.    Kiersten Hajnal (CA)**

107.    Chase is the servicer of a loan assumed by Kiersten Hajnal.  Sometime after taking out the loan, Ms. Hajnal began experiencing hardships that caused her to have difficulty making monthly payments on her mortgage.

108.    Ms. Hajnal applied for a HAMP modification in 2009.  Based on information supplied by Ms. Hajnal as well as information already in Chase's possession, Ms. Hajnal was

determined eligible for HAMP by Chase and sent a HAMP TPP Agreement in June 2009 that is substantially identical to the form HAMP TPP Agreement described in section V.A.2, *supra*. Ms. Hajnal accepted, executed and returned the HAMP TPP Agreement to Chase.

109.    Ms. Hajnal's HAMP TPP Agreement described a trial period that was to run from June 2009 through August 2009. Since Chase did not send her the TPP Agreement until some time after the June payment was due, Ms. Hajnal was instructed that her trial period would instead run from July 2009 to September 2009.  Ms. Hajnal made each of the payments described in the HAMP TPP Agreement, as well as additional payments beyond the trial period, which were accepted by Chase.

110.    Since the trial period began, and at all times relevant, Ms. Hajnal has responded to all document requests made by Chase by timely supplying the requested documents.  Ms. Hajnal supplied information to Chase that was truthful to the best of her knowledge throughout the HAMP process.

111.    Despite her full compliance with the HAMP TPP Agreement, Ms. Hajnal received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that she was ineligible during the time periods prescribed in her HAMP TPP Agreement.

112.    During Ms. Hajnal's modification process, Chase continued foreclosure proceedings against her home.  Like other Class members in this matter, Ms. Hajnal has been living in a state of limbo and stressful anxiety, without any assurances that she can save her home, despite her compliance with HAMP requirements and the HAMP TPP Agreement.

6.      **John and Kathleen Hanf (PA)**

113.    Chase is the servicer of a loan made to John and Kathleen Hanf in 1998. Sometime after taking out the loan, Mr. and Mrs. Hanf began experiencing hardships that caused them to have difficulty making monthly payments on their mortgage.

114.    Mr. and Mrs. Hanf applied for a HAMP modification in or around June of 2009. Based on information supplied by Mr. and Mrs. Hanf as well as information already in Chase's possession, Mr. and Mrs. Hanf were determined eligible for HAMP by Chase and sent a HAMP TPP Agreement in June 2009 that is substantially identical to the form HAMP TPP Agreement described in section V.A.2, *supra*.  Mr. and Mrs. Hanf accepted, executed and returned the HAMP TPP Agreement to Chase.

115.    Mr. and Mrs. Hanf's HAMP TPP Agreement described a trial period that was to run from July 2009 through September 2009. Mr. and Mrs. Hanf made each of the payments described in the HAMP TPP Agreement, as well as additional payments beyond the trial period, which were accepted by Chase.

116.    Since the trial period began, and at all times relevant, Mr. and Mrs. Hanf have responded to all document requests made by Chase by timely supplying the requested documents.  Mr. and Mrs. Hanf supplied information to Chase that was truthful to the best of their knowledge throughout the HAMP process.

117.    Despite their full compliance with the HAMP TPP Agreement, Mr. and Mrs. Hanf received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that they were ineligible during the time period prescribed in their HAMP TPP Agreement.

118.    In January 2010, attorneys acting on behalf of Chase improperly commenced foreclosure proceedings against their home—proceedings that were subsequently withdrawn. Like other Class members in this matter, Mr. and Mrs. Hanf have been living in a state of limbo and stressful anxiety, without any assurances that their home will not be foreclosed, despite their compliance with HAMP requirements and their HAMP TPP Agreement.

119.    During the Hanfs' modification process, Chase continued foreclosure proceedings against their home.  Like other Class members in this matter, the Hanfs have been living in a state of limbo and stressful anxiety, without any assurances that they can save their home, despite their compliance with HAMP requirements and the HAMP TPP Agreement.

**7.    Thomas and Sharon Hayes (MO)**

120.    Chase is the servicer of a loan made to Thomas and Sharon Hayes.  Sometime after taking out the loan, Mr. and Mrs. Hayes began experiencing hardships that caused them to have difficulty making monthly payments on their mortgage.

121.    Mr. and Mrs. Hayes applied for a HAMP modification in October 2009.  Based on information supplied by Mr. and Mrs. Hayes as well as information already in Chase's possession, Mr. and Mrs. Hayes were determined eligible for HAMP by Chase and given a HAMP TPP Agreement in October 2009.[14]

122.    Mr. and Mrs. Hayes were told that their HAMP TPP Agreement included a trial period that was to run from October 2009 through December 2009.  Mr. and Mrs. Hayes made each of the payments described in the HAMP TPP Agreement, as well as additional payments beyond the trial period, which were accepted by Chase.

---

[14] Mr. and Mrs. Hayes entered into a Chase TPP Agreement with Chase – an internal proprietary loan modification similar to a HAMP TPP.

123.    Since the trial period began, and at all times relevant, Mr. and Mrs. Hayes have responded to all document requests made by Chase by timely supplying the requested documents.  Mr. and Mrs. Hayes supplied information to Chase that was truthful to the best of their knowledge throughout the HAMP process.

124.    Despite their full compliance with the HAMP TPP Agreement, Mr. and Mrs. Hayes received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that they were ineligible during the time period prescribed in their HAMP TPP Agreement.

125.    Chase prosecuted foreclosure proceedings against the Hayes' home during the modification process and eventually forced the Hayes to vacate the home under threat of eviction by a sheriff.  So, despite their full compliance, the Hayes family lost their home.

**8.    Michele and Robert Hood (CA)**

126.    EMC is the servicer of a loan made to Michele and Robert Hood in 2007. Sometime after taking out the loan, Mr. and Mrs. Hood began experiencing hardships that caused them to have difficulty making monthly payments on their mortgage.

127.    Mr. and Mrs. Hood applied for a HAMP modification in the May 2009.  Based on information supplied by Mr. and Mrs. Hood as well as information already in EMC's possession, Mr. and Mrs. Hood were determined eligible for HAMP by EMC and sent a HAMP TPP Agreement in June 2009 that is substantially identical to the form HAMP TPP Agreement described in section V.A.2, *supra*.  Mr. and Mrs. Hood accepted, executed and returned the HAMP TPP Agreement to EMC.

128.    Mr. and Mrs. Hood's HAMP TPP Agreement described a trial period that was to run from July 2009 through September 2009.  Mr. and Mrs. Hood made each of the payments

described in the HAMP TPP Agreement, as well as additional payments beyond the trial period, which were accepted by EMC.

129.    Since the trial period began, and at all times relevant, Mr. and Mrs. Hood have responded to all document requests made by EMC by timely supplying the requested documents. Mr. and Mrs. Hood supplied information to EMC that was truthful to the best of their knowledge throughout the HAMP process.

130.    Despite their full compliance with the HAMP TPP Agreement, Mr. and Mrs. Hood received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that they were ineligible during the time period prescribed in their HAMP TPP Agreement.

131.    Like other Class members in this matter, Mr. and Mrs. Hood have been living in a state of limbo and stressful anxiety, without any assurances that they can save their home, despite their compliance with HAMP requirements and their HAMP TPP Agreement.

**9.    Julie Karnes (MN)**

132.    Chase is the servicer of a loan made to Julie Karnes.  Sometime after taking out the loan, Ms. Karnes began experiencing hardships that caused her to have difficulty making monthly payments on her mortgage.

133.    Ms. Karnes applied for a HAMP modification in 2009.  Based on information supplied by Ms. Karnes as well as information already in Chase's possession, Ms. Karnes was determined eligible for HAMP by Chase and sent a HAMP TPP Agreement in January 2010 that is substantially identical to the form HAMP TPP Agreement described in section V.A.2, *supra*. Ms. Karnes accepted, executed and returned the HAMP TPP Agreement to Chase.

134.    Ms. Karnes's HAMP TPP Agreement described a trial period that was to run from March through May 2010. Ms. Karnes made each of the payments described in the HAMP TPP Agreement, as well as additional payments beyond the trial period, which were accepted by Chase.

135.    Since the trial period began, and at all times relevant, Ms. Karnes has responded to all document requests made by Chase by timely supplying the requested documents.  Ms. Karnes supplied information to Chase that was truthful to the best of her knowledge throughout the HAMP process.

136.    Despite her full compliance with the HAMP TPP Agreement, Ms. Karnes received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that she was ineligible during the time periods prescribed in her HAMP TPP Agreement.

137.    During Ms. Karnes's modification process, Chase continually and repeatedly threatened foreclosure of her home.  Like other Class members in this matter, Ms. Karnes has been living in a state of limbo and stressful anxiety, without any assurances that she can save her home, despite her compliance with HAMP requirements and the HAMP TPP Agreement.

**10.    Gary Larkin (CA)**

138.    Chase is the servicer of a loan made to Gary Larkin.  Sometime after taking out the loan, Mr. Larkin began experiencing hardships that caused him to have difficulty making monthly payments on his mortgage.

139.    Mr. Larkin applied for a HAMP modification in 2009.  Based on information supplied by Mr. Larkin as well as information already in Chase's possession, Mr. Larkin was determined eligible for CHAMP by Chase and sent a CHAMP TPP Agreement in March 2010

that is substantially identical to the form CHAMP TPP Agreement described in section V.A.2, *supra*. Mr. Larkin accepted, executed and returned the CHAMP TPP Agreement to Chase.

140.   Mr. Larkin's CHAMP TPP Agreement described a trial period that was to run from April through June 2010. Mr. Larkin made each of the payments described in the CHAMP TPP Agreement, as well as additional payments beyond the trial period, which were accepted by Chase.

141.   Since the trial period began, and at all times relevant, Mr. Larkin has responded to all document requests made by Chase by timely supplying the requested documents. Mr. Larkin supplied information to Chase that was truthful to the best of his knowledge throughout the HAMP process.

142.   Despite his full compliance with the CHAMP TPP Agreement, Mr. Larkin received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that he was ineligible during the time periods prescribed in his CHAMP TPP Agreement.

143.   During Mr. Larkin's modification process, Chase continually threatened foreclosure proceedings against his home. Like the other Class members in this matter, Mr. Larkin has been living in a state of limbo and stressful anxiety, without any assurances that he can save his home, despite his compliance with HAMP requirements and his right to a permanent HAMP modification.

   **11.   Natalie Layman (MA)**

144.   Chase is the servicer of a loan made to Natalie Layman in 2007. Sometime after taking out the loan, Ms. Layman began experiencing hardships that caused her to have difficulty making monthly payments on her mortgage.

145.     Ms. Layman applied for a HAMP modification in Fall 2009.  Based on information supplied by Ms. Layman as well as information already in Chase's possession, Ms. Layman was determined eligible for HAMP by Chase and sent a HAMP TPP Agreement in January 2010 that is substantially identical to the form HAMP TPP Agreement described in section V.A.2, *supra*.  Ms. Layman accepted, executed and returned the HAMP TPP Agreement to Chase.

146.     Ms. Layman's HAMP TPP Agreement described a trial period that was to run from March 2010 through May 2010.  Ms. Layman made each of the payments described in the HAMP TPP Agreement, as well as additional payments beyond the trial period, which were accepted by Chase.

147.     Since the trial period began, and at all times relevant, Ms. Layman has responded to all document requests made by Chase by timely supplying the requested documents.  Ms. Layman supplied information to Chase that was truthful to the best of her knowledge throughout the HAMP process.

148.     Despite her full compliance with the HAMP TPP Agreement, Ms. Layman received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that she was ineligible during the time periods prescribed in her HAMP TPP Agreement.

149.     During Ms. Layman's trial period, attorneys acting on behalf of Chase commenced foreclosure proceedings against her home.  Like the other Class members in this matter, Ms. Layman has been living in a state of limbo and stressful anxiety, without any assurances that he can save his home, despite her compliance with HAMP requirements and her right to a permanent HAMP modification.

### 12.     Jean Licata (MA)

150.     Chase is the servicer of a loan made to Jean Licata in 2005.  Sometime after taking out the loan, Ms. Licata began experiencing hardships that caused her to have difficulty making monthly payments on her mortgage.

151.     Ms. Licata applied for a HAMP modification in August 2009.  Based on information supplied by Ms. Licata as well as information already in Chase's possession, Ms. Licata was determined eligible for HAMP by Chase and sent a HAMP TPP Agreement in May 2009 that is substantially identical to the form HAMP TPP Agreement described in section V.A.2, *supra*.  Ms. Licata accepted, executed and returned the HAMP TPP Agreement to Chase.

152.     Ms. Licata's HAMP TPP Agreement described a trial period that was to run from September 2009 through November 2009.  Ms. Licata made each of the payments described in the HAMP TPP Agreement, as well as additional payments beyond the trial period, which were accepted by Chase.

153.     Since the trial period began, and at all times relevant, Ms. Licata has responded to all document requests made by Chase by timely supplying the requested documents.  Ms. Licata supplied information to Chase that was truthful to the best of her knowledge throughout the HAMP process.

154.     Despite her full compliance with the HAMP TPP Agreement, Ms. Licata received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that she was ineligible during the time periods prescribed in her HAMP TPP Agreement.

155.     During Ms. Licata's trial period, attorneys acting on behalf of Chase continued foreclosure proceedings against her home.  Like other Class members in this matter, Ms. Licata

has been living in a state of limbo and stressful anxiety, without any assurances that she can save her home, despite their compliance with HAMP requirements and the TPP Agreement.

**13.    Susan Mason and Evan Burkholder (MI)**

156.    Chase is the servicer of a loan made to Susan Mason and Evan Burkholder in 2002.  Sometime after taking out the loan, Mr. Burkholder and Ms. Mason began experiencing hardships that caused them to have difficulty making monthly payments on their mortgage.

157.    Mr. Burkholder and Ms. Mason applied for a HAMP modification in May 2009. Based on information supplied by Mr. Burkholder and Ms. Mason as well as information already in Chase's possession, Mr. Burkholder and Ms. Mason were determined eligible for HAMP by Chase and sent a HAMP TPP Agreement in February 2010 that is substantially identical to the form HAMP TPP Agreement described in section V.A.2, *supra*.  Mr. Burkholder and Ms. Mason accepted, executed and returned the HAMP TPP Agreement to Chase.

158.    Mr. Burkholder and Ms. Mason's HAMP TPP Agreement described a trial period that was to run from March through May 2010.  Mr. Burkholder and Ms. Mason made each of the payments described in the HAMP TPP Agreement, as well as additional payments beyond the trial period, which were accepted by Chase.

159.    Since the trial period began, and at all times relevant, Mr. Burkholder and Ms. Mason have responded to all document requests made by Chase by timely supplying the requested documents.  Mr. Burkholder and Ms. Mason supplied information to Chase that was truthful to the best of their knowledge throughout the HAMP process.

160.    Despite their full compliance with the HAMP TPP Agreement, Mr. Burkholder and Ms. Mason were not tendered a permanent loan modification that complied with HAMP rules, during the time period prescribed in their HAMP TPP Agreement.

161.    Mr. Burkholder and Ms. Mason have recently been threatened with foreclosure. Like other Class members in this matter, Mr. Burkholder and Ms. Mason have been living in a state of limbo and stressful anxiety, without any assurances that their home will not be foreclosed, despite their compliance with HAMP requirements and their HAMP TPP Agreement.

**14.     Dianna Montez (CA)**

162.    Chase is the servicer of a loan made to Dianna Montez.  Sometime after taking out the loan, Ms. Montez began experiencing hardships that caused her to have difficulty making monthly payments on her mortgage.

163.    Ms. Montez applied for a HAMP modification in 2009.  Based on information supplied by Ms. Montez as well as information already in Chase's possession, Ms. Montez was determined eligible for HAMP by Chase and sent a number of HAMP TPP Agreements between August and November 2009 that are substantially identical to the form HAMP TPP Agreement described in section V.A.2, *supra*.  Ms. Montez accepted, executed and returned the November 2009 HAMP TPP Agreement to Chase.

164.    Ms. Montez's HAMP TPP Agreement described a trial period that was to run from November 2009 through January 2010.  Ms. Montez made two of the payments described in the HAMP TPP Agreement, before being sent a different agreement with nearly identical payments.  She was instructed to pay according to this new agreement and did so, making additional payments beyond the trial period, which were accepted by Chase.

165.    Since the trial period began, and at all times relevant, Ms. Montez has responded to all document requests made by Chase by timely supplying the requested documents.  Ms. Montez supplied information to Chase that was truthful to the best of her knowledge throughout the HAMP process.

166.     Ms. Montez received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that she was ineligible during the time periods prescribed in her HAMP TPP Agreement.[15]

167.     Like other Class members in this matter, Ms. Montez received from Chase repeated threats to foreclose during the time that the modification was under consideration. Further, the terms of the permanent modification that she was tendered were less advantageous than they would have been had Chase met its promises in a timely manner.

### 15.     Arsenia Rodrigues (MA)

168.     Chase is the servicer of a loan made to Arsenia Rodrigues.  Sometime after taking out the loan, Ms. Rodrigues began experiencing hardships that caused her to have difficulty making monthly payments on her mortgage.

169.     Ms. Rodrigues applied for a HAMP modification in 2009.  Based on information supplied by Ms. Rodrigues as well as information already in Chase's possession, Ms. Rodrigues was determined eligible for HAMP by Chase and sent a HAMP TPP Agreement in May 2009 that is substantially identical to the form HAMP TPP Agreement described in section V.A.2, *supra*.  Ms. Rodrigues accepted, executed and returned the HAMP TPP Agreement to Chase.

170.     Ms. Rodrigues's HAMP TPP Agreement described a trial period that was to run from June 2009 through August 2009.  Ms. Rodrigues made each of the payments described in the HAMP TPP Agreement, as well as additional payments beyond the trial period, which were accepted by Chase.

---

[15] In September 2010, Chase finally offered Ms. Montez a permanent modification; however, the permanent modification tendered to Ms. Montez did not comply with HAMP rules and was not in compliance with her HAMP TPP Agreement.

171.     Since the trial period began, and at all times relevant, Ms. Rodrigues has responded to all document requests made by Chase by timely supplying the requested documents.  Ms. Rodrigues supplied information to Chase that was truthful to the best of her knowledge throughout the HAMP process.

172.     Despite her full compliance with the HAMP TPP Agreement, Ms. Rodrigues received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that she was ineligible during the time periods prescribed in her HAMP TPP Agreement.

173.     Like other Class members in this matter, Ms. Rodrigues has been living in a state of limbo and stressful anxiety, without any assurances that she can save her home, despite their compliance with HAMP requirements and the HAMP TPP Agreement.

**16.     Ronald Ryan (NV)**

174.     Chase is the servicer of a loan made to Ronald Ryan.  Sometime after taking out the loan, Mr. Ryan began experiencing hardships that caused him to have difficulty making monthly payments on his mortgage.

175.     Mr. Ryan applied for a HAMP modification in 2009.  Based on information supplied by Mr. Ryan as well as information already in Chase's possession, Mr. Ryan was determined eligible for HAMP by Chase and sent a HAMP TPP Agreement in March 2010 that is substantially identical to the form HAMP TPP Agreement described in section V.A.2, *supra*. Mr. Ryan accepted, executed and returned the HAMP TPP Agreement to Chase.

176.     Mr. Ryan's HAMP TPP Agreement described a trial period that was to run from May 2010 through July 2010.  Mr. Ryan made each of the payments described in the HAMP

TPP Agreement, as well as additional payments beyond the trial period, which were accepted by Chase.

177.     Since the trial period began, and at all times relevant, Mr. Ryan has responded to all document requests made by Chase by timely supplying the requested documents.  Mr. Ryan supplied information to Chase that was truthful to the best of his knowledge throughout the HAMP process.

178.     Despite his full compliance with the HAMP TPP Agreement, Mr. Ryan received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that he was ineligible during the time periods prescribed in his HAMP TPP Agreement.

179.     During Mr. Ryan's trial period, attorneys acting on behalf of Chase commenced foreclosure proceedings against his home.  Like the other Class members in this matter, Mr. Ryan has been living in a state of limbo and stressful anxiety, without any assurances that he can save his home, despite his compliance with HAMP requirements and his right to a permanent HAMP modification.

**17.     Michael and Audra Schmierer (CA)**

180.     Chase is the servicer of a loan made to Michael and Audra Schmierer in 2007. Sometime after taking out the loan, Mr. and Mrs. Schmierer began experiencing hardships that caused them to have difficulty making monthly payments on their mortgage.

181.     Based on information supplied by Mr. and Mrs. Schmierer as well as information already in Chase's possession, Mr. and Mrs. Schmierer were determined eligible in May 2009 when Chase offered Plaintiffs a Trial Period Plan that is substantially identical to the form

HAMP TPP Agreement described in section V.A.2, *supra*.  Mr. and Mrs. Schmierer accepted and entered into the HAMP TPP Agreement with Chase.

182.    Mr. and Mrs. Schmierer's HAMP TPP Agreement described a trial period that was to run from June 2009 through August 2009.  Mr. and Mrs. Schmierer made each of the payments described in the HAMP TPP Agreement, as well as additional payments beyond the trial period, which were accepted by Chase.

183.    Since the trial period began, and at all times relevant, Mr. and Mrs. Schmierer have responded to all document requests made by Chase by timely supplying the requested documents.  Mr. and Mrs. Schmierer supplied information to Chase that was truthful to the best of their knowledge throughout the HAMP process.

184.    Despite their full compliance with the HAMP TPP Agreement, Mr. and Mrs. Schmierer received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that they were ineligible during the time period prescribed in their HAMP TPP Agreement.

185.    During the modification process, Chase commenced foreclosure against the Schmierers' home.  Like other Class members in this matter, Michael and Audra Schmierer have been living in a state of limbo and stressful anxiety, without any assurances that they can save their home, despite their compliance with HAMP requirements and their HAMP TPP Agreement.

**18.    Anthony Taylor (IN)**

186.    Chase is the servicer of a loan made to Anthony Taylor in 1994.  Sometime after taking out the loan, Mr. Taylor began experiencing hardships that caused him to have difficulty making monthly payments on his mortgage.

187.    Mr. Taylor applied for a HAMP modification in 2009.  Based on information supplied by Mr. Taylor as well as information already in Chase's possession, Mr. Taylor was determined eligible for HAMP by Chase and sent a HAMP TPP Agreement in August 2009 that is substantially identical to the form HAMP TPP Agreement described in section V.A.2, *supra*. Mr. Taylor accepted, executed and returned the HAMP TPP Agreement to Chase.

188.    Mr. Taylor's HAMP TPP Agreement described a trial period that was to run from September through November 2009.  Mr. Taylor made each of the payments described in the HAMP TPP Agreement, as well as additional payments beyond the trial period, which were accepted by Chase.

189.    Since the trial period began, and at all times relevant, Mr. Taylor has responded to all document requests made by Chase by timely supplying the requested documents.  Mr. Taylor supplied information to Chase that was truthful to the best of his knowledge throughout the HAMP process.

190.    Despite his full compliance with the HAMP TPP Agreement, Mr. Taylor received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that he was ineligible during the time periods prescribed in his HAMP TPP Agreement.

191.    Like the other Class members in this matter, Mr. Taylor has been living in a state of limbo and stressful anxiety, without any assurances that he can save his home, despite his compliance with HAMP requirements and his right to a permanent HAMP modification.

**19.     Donald and Heather Treannie (MA)**

192.     Chase is the servicer of a loan made to Donald and Heather Treannie in 2006. Sometime after taking out the loan, Mr. and Mrs. Treannie began experiencing hardships that caused them to have difficulty making monthly payments on their mortgage.

193.     Mr. and Mrs. Treannie applied for a HAMP modification in May 2009.  Based on information supplied by Mr. and Mrs. Treannie as well as information already in Chase's possession, Mr. and Mrs. Treannie were determined eligible for HAMP by Chase and sent a HAMP TPP Agreement in May 2009 that is substantially identical to the form HAMP TPP Agreement described in section V.A.2, *supra*.  Mr. and Mrs. Treannie accepted, executed and returned the HAMP TPP Agreement to Chase.

194.     Mr. and Mrs. Treannie's TPP Agreement described a trial period that was to run from July 2009 through September 2009.  Mr. and Mrs. Treannie made each of the payments described in the HAMP TPP Agreement, as well as additional payments beyond the trial period, which were accepted by Chase.

195.     Since the trial period began, and at all times relevant, Mr. and Mrs. Treannie have responded to all document requests made by Chase by timely supplying the requested documents.  Mr. and Mrs. Treannie supplied information to Chase that was truthful to the best of their knowledge throughout the HAMP process.

196.     Despite their full compliance with the HAMP TPP Agreement, Mr. and Mrs. Treannie received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that they were ineligible during the time period prescribed in their HAMP TPP Agreement.

197.   Like other Class members in this matter, Donald and Heather Treannie have been living in a state of limbo and stressful anxiety, without any assurances they can save their home, despite their compliance with HAMP requirements and their TPP Agreement.

**20.   Kelly Turbeville (CA)**

198.   Chase is the servicer of a loan made to Kelly Turbeville in 2006.  Sometime after taking out the loan, Ms. Turbeville began experiencing hardships that caused her to have difficulty making monthly payments on her mortgage.

199.   Ms. Turbeville applied for a modification in 2009.  Based on information supplied by Ms. Turbeville as well as information already in Chase's possession, Ms. Turbeville was determined eligible for HAMP by Chase and sent a CHAMP TPP Agreement in February 2010 that is substantially identical to the form CHAMP TPP Agreement described in section V.A.2, *supra*.  Ms. Turbeville accepted, executed and returned the CHAMP TPP Agreement to Chase.

200.   Ms. Turbeville's CHAMP TPP Agreement described a trial period that was to run from March through May 2010.  Ms. Turbeville made each of the payments described in the CHAMP TPP Agreement, as well as additional payments beyond the trial period, which were accepted by Chase.

201.   Since the trial period began, and at all times relevant, Ms. Turbeville has responded to all document requests made by Chase by timely supplying the requested documents.  Ms. Turbeville supplied information to Chase that was truthful to the best of her knowledge throughout the HAMP process.

202.   Despite her full compliance with the CHAMP TPP Agreement, Ms. Turbeville received neither the tender of a permanent loan modification that complied with HAMP rules,

nor notification that she was ineligible during the time periods prescribed in her CHAMP TPP Agreement.

203.    Like other Class members in this matter, Ms. Turbeville has been living in a state of limbo and stressful anxiety, without any assurances that she can save her home, despite their compliance with HAMP requirements and the CHAMP TPP Agreement.

**21.    Daniel Ware (CA)**

204.    Chase is the servicer of a loan made to Daniel Ware.  Sometime after taking out the loan, Mr. Ware began experiencing hardships that caused him to have difficulty making monthly payments on his mortgage.

205.    Mr. Ware applied for a HAMP modification in 2009.  Based on information supplied by Mr. Ware as well as information already in Chase's possession, Mr. Ware was determined eligible for HAMP by Chase and sent a HAMP TPP Agreement in September 2009 that is substantially identical to the form HAMP TPP Agreement described in section V.A.2, *supra*.  Mr. Ware accepted, executed and returned the HAMP TPP Agreement to Chase.

206.    Mr. Ware's HAMP TPP Agreement described a trial period that was to run from September through November 2009.  Mr. Ware made each of the payments described in the HAMP TPP Agreement, as well as additional payments beyond the trial period, which were accepted by Chase.

207.    Since the trial period began, and at all times relevant, Mr. Ware has responded to all document requests made by Chase by timely supplying the requested documents.  Mr. Ware supplied information to Chase that was truthful to the best of his knowledge throughout the HAMP process.

208.    Despite his full compliance with the HAMP TPP Agreement, Mr. Ware received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that he was ineligible during the time periods prescribed in his HAMP TPP Agreement.[16]

209.    Like the other Class members in this matter, Mr. Ware has been living in a state of limbo and stressful anxiety, without any assurances that his home will not be foreclosed, despite his compliance with HAMP requirements and his right to a permanent HAMP modification.

**22.    Jean Wilcox (CA)**

210.    EMC is the servicer of a loan made to Jean Wilcox in 2007.  Sometime after taking out the loan, Ms. Wilcox began experiencing hardships that caused her to have difficulty making monthly payments on her mortgage.

211.    Ms. Wilcox applied for a HAMP modification in 2009.  Based on information supplied by Ms. Wilcox as well as information already in EMC's possession, Ms. Wilcox was determined eligible for HAMP by EMC and sent an EMC TPP Agreement in October 2009 that is substantially identical to the form EMC TPP Agreement described in section V.A.2, *supra*. Ms. Wilcox accepted, executed and returned the EMC TPP Agreement to EMC.

212.    Ms. Wilcox's EMC TPP Agreement described a trial period that was to run from October through December 2009.  Ms. Wilcox made each of the payments described in the EMC HAMP TPP Agreement, as well as additional payments beyond the trial period, which were accepted by EMC.

---

[16] Chase finally offered Mr. Ware a permanent modification; however, the permanent modification tendered to Mr. Ware did not comply with HAMP rules and was not in compliance with her HAMP TPP Agreement.

213.     Since the trial period began, and at all times relevant, Ms. Wilcox has responded to all document requests made by EMC by timely supplying the requested documents.  Ms. Wilcox supplied information to EMC that was truthful to the best of her knowledge throughout the HAMP process.

214.     Despite her full compliance with the EMC TPP Agreement, Ms. Wilcox received neither the tender of a permanent loan modification that complied with HAMP rules, nor notification that she was ineligible during the time periods prescribed in her EMC TPP Agreement.

215.     During Ms. Wilcox's modification process, attorneys acting on behalf of EMC continued foreclosure proceedings against her home.  Like other Class members in this matter, Ms. Wilcox has been living in a state of limbo and stressful anxiety, without any assurances that she can save her home, despite their compliance with HAMP requirements and the HAMP TPP Agreement.

## VI.   PART 1 CLASS ALLEGATIONS AND CLASS DEFINITIONS

216.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

217.     Pursuant to FED. R. CIV. P. 23(a) and 23(b), the above-named Plaintiffs bring the claims in Part 1 of this Consolidated Complaint on behalf of themselves and the following classes of similarly situated individuals.  Plaintiffs reserve the right to modify or amend the Classes' definitions at or before the time Plaintiffs brief the issue of class certification.

## A.   Class Definitions.

### 1.   National TPP Class.

218.     Individuals residing in all 50 states whose home mortgage loans have been serviced by Chase and who, since January 1, 2008, have entered into a TPP Agreement with

Chase and made the trial payments expressly identified by their TPP Agreement, other than borrowers to whom Chase timely tendered either:

  A.  A final modification agreement that complied with HAMP, CHAMP or other similar program in which the TPP Agreement was made; or

  B.  A timely written denial of eligibility consistent with the terms of the TPP Agreement.

  **2.**  **Statewide TPP Classes.**

219.  In the alternative and for the purposes of certain claims, the named plaintiffs identified in this Part I seek to represent statewide classes under the corresponding state laws of the following states: California, Florida, Illinois, Indiana, Massachusetts, Michigan, Minnesota, Missouri, Nevada, Pennsylvania, and Washington.  For each of the eleven states listed above, each statewide class is defined respectively as follows:  Individuals residing in the respective state whose home mortgage loans have been serviced by Chase and who, since January 1, 2008, have entered into a TPP Agreement with Chase and made the trial payments expressly identified by their TPP Agreement, other than borrowers to whom Chase timely tendered either:

  A.  A final modification agreement that complied with HAMP, CHAMP or other similar program in which the TPP Agreement was made; or

  B.  A timely written denial of eligibility consistent with the terms of the HAMP TPP Agreement.

**B.**  **Exclusions.**

220.  Excluded from the proposed Classes are (i) Defendants, any entity in which any Defendant has a controlling interest, and Defendants' officers, directors, legal representatives,

predecessors, successors, and assigns; (ii) the judicial officers to whom this case is assigned; and (iii) any member of the immediate families of excluded persons.

**C.      Numerosity/Impracticability of Joinder.**

221.    Plaintiffs do not know the exact size or identities of the members of the proposed classes, since such information is in the exclusive control of Chase. Plaintiffs believe that the classes encompass many thousands of individuals whose identities can be readily ascertained from Chase's books and records. Therefore, the proposed classes are each so numerous that joinder of all members is impracticable.

222.    Based on the size of the modifications at issue, Plaintiffs believe the amount in controversy exceeds $5 million.

**D.      Commonality and Predominance.**

223.    All members of the respective classes have been subject to and affected by the same conduct.  The claims are based on form contracts and uniform loan modification processing requirements.  There are questions of law and fact that are common to the class, and predominate over any questions affecting only individual members of the class. These questions include, but are not limited to the following:

A.      the nature, scope and operation of Chase's obligations to homeowners under HAMP;

B.      whether Chase's receipt of an executed TPP Agreement, along with supporting documentation and required monthly payments, creates a binding contract or otherwise legally obligates Chase to offer Class members a permanent HAMP modification;

C.    whether Chase's failure to provide permanent HAMP modifications in these circumstances amounts to a breach of contract and/or a breach of the covenant of good faith and fair dealing; and

D.    whether the Court can order Chase to pay damages and what the proper measure of damages is, and also whether the Court can enter injunctive relief.

**E.    Typicality.**

224.    The claims of the individual named Plaintiffs are typical of the claims of the respective classes and do not conflict with the interests of any other members of the classes in that the Plaintiffs and the other members of the class were subject to the same conduct, signed the same or similar agreements and were met with similar unsatisfactory responses.

**F.    Adequacy.**

225.    The individual named Plaintiffs will fairly and adequately represent the interests of the respective classes. They are committed to the vigorous prosecution of the class' claims and have retained attorneys who are qualified to pursue this litigation and have experience in class actions – in particular, consumer protection actions.

**G.    Certification under Rule 23(b).**

226.    Class certification is proper under FED. R. CIV. P. 23(b)(1)(A) because the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes and establish incompatible standards of conduct for Defendants.

227.    Class certification is proper under FED. R. CIV. P. 23(b)(1)(B) because the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to individual Class members which would, as a practical matter, be dispositive of

the interest of the other members not parties to these adjudications and/or substantially impair their ability to protect these interests.

228.    Class certification is proper under FED. R. CIV. P. 23(b)(3) because common issues of law and fact predominate over any questions affecting only individual members of the Classes, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

229.    Class adjudication is superior to individual litigation, which would foreclose the ability of most members of the proposed Classes to litigate their claims, impose an undue burden on the courts, and result in inconsistent determination of common issues.  The Court may employ issue certification under FED. R. CIV. P. 23(c)(4)(B) to address any variation of law, fact, or interest from the standpoint of fairness, efficiency, and economy, in order to avoid denial of class treatment which would require reversion to repetitive and piecemeal individual litigation.

## VII.   PART 1 CAUSES OF ACTION

### COUNT 1 – Breach of Contract/Breach of Duty of Good Faith and Fair Dealing
*By the Nationwide TPP Classes, or in the alternative, by the respective Statewide TPP Classes*

230.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

231.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the classes described above.

232.    The TPP Agreements sent by Chase to Plaintiffs constitute a valid offer.

233.    By executing the TPP Agreements and returning it to Chase, along with the supporting documentation, Plaintiffs accepted Chase's offers.

234.     Alternatively, Plaintiffs' return of the TPP Agreements constituted offers. Acceptances of these offers occurred when Chase accepted Plaintiffs' payments during the trial period and beyond.

235.     Plaintiffs' trial period payments to Chase constitute consideration. By making those payments, Plaintiffs gave up the ability to pursue other means of saving their homes, and Chase received payments it might otherwise not have received.

236.     There is additional consideration in the form of agreements to undergo financial counseling and the provision of substantial financial documentation by Plaintiffs as a condition of the contract.  This allowed Chase to evaluate its options under the security agreement including the costs and benefits of foreclosure to it.  Plaintiffs were also required to make payments into a new escrow account.

237.     In the alternative, the TPP Agreement is a type of binding Agreement for which the law does not require consideration.

238.     Plaintiffs and Chase formed valid contracts.

239.     To the extent that the TPP Agreements were subject to a condition subsequent that required Plaintiffs and Class members to submit additional documents for Chase's review, Plaintiffs and Class members complied with that condition.  In the alternative, the condition subsequent was waived by Chase in that it failed to timely raise it.  Further, Chase is estopped from raising non-compliance with that condition by its conduct, including, without limitation, continued acceptance of payments after expiration of the deadline for performance of the condition.

240.    To the extent that Plaintiffs rendered any defective performance under the contract, this condition was waived and, therefore, excused by Chase and/or it is estopped to assert it as a defense to Plaintiffs' claims.

241.    By failing to grant Plaintiffs permanent modifications by the close of the trial period defined in the contracts, Chase breached those contracts and any further obligations by Plaintiffs remaining under the contract was excused.

242.    Plaintiffs remain ready, willing and able to perform under the contracts by continuing to make trial period payments and provide documentation.

243.    Plaintiffs have suffered harm and are threatened with additional harms from Chase's breach.  Plaintiffs' harm is measured by the difference between their current circumstances and the circumstances they would have been in but for Chase's breach.

244.    To the extent a Plaintiff in Part 1 of this Consolidated Complaint accepted permanent modification, that modification does not comply with the provisions of HAMP.

245.    By making payments both during and after the TPP Agreements, Plaintiffs forewent other remedies that might be pursued to save their homes, such as restructuring their debts under the bankruptcy code, or pursuing other strategies to deal with their defaults, such as selling their homes.  In light of the declining real estate market in the United States since July 2009, failure to market and sell the property at that time has reduced the amount that Plaintiffs can recover from such sale.  In addition, Plaintiffs built up substantial and unmanageable delinquency in an amount exceeding that which otherwise would have accrued absent the breach.

246.    In addition to the lost opportunity cost of pursuing other means of dealing with their defaults, when a permanent modification is not granted at the close of the TPP, the borrower's permanent modification terms and other options may be adversely affected and

additional fees and charges may be applied.  On information and belief, Chase has imposed on

Plaintiffs improper fees and costs related to loans in default during and after their trial period.

247.     Plaintiffs also suffered additional harm in the form of foreclosure and collection

activity against their homes.

248.     Plaintiffs have suffered the additional harm of adverse credit reporting, thus

undermining their credit standing for lower cost refinancing and other necessary credit

transactions.

249.     Plaintiffs have lived in a state of stressful anxiety because of the limbo in which

the Chase has placed them.

250.     Members of the putative class have experienced damages in forms similar or

identical to the Plaintiffs. Some members of the putative class also suffered additional harm in

the form of foreclosure/collection activity against their homes.

251.     Chase is obligated by contract and common law to act in good faith and to deal

fairly with each borrower.

252.     The purpose of the covenant is to guarantee that the parties remain faithful to the

intended and agreed expectations of the parties in their performance.

253.     Chase routinely and regularly breaches this duty by:

A.     failing to perform loan servicing functions consistent with its responsibilities to

Plaintiffs;

B.     failing to supervise its agents and employees properly including, without

limitation, its loss mitigation and collection personnel and its foreclosure attorneys;

C.     routinely demanding information it has already received;

D.      making inaccurate calculations and determinations of Plaintiffs' eligibility for HAMP;

E.      failing to follow through on written and implied promises;

F.      failing to follow through on contractual obligations; and

G.      failing to give permanent modifications and other foreclosure alternatives to qualified borrowers.

254.    These actions constitute bad faith by Chase.

255.    On information and belief, Chase financially benefits from its breaches in a variety of ways, including but not limited to not hiring sufficient staff to meet their obligations under HAMP and CHAMP, the imposition of fees and charges on borrowers' accounts during and after their trial periods, and obtaining greater fees from foreclosing than from modifying loans it services.

256.    As a result of these failures to act in good faith and the absence of fair dealing, Chase caused Plaintiffs harm as described above.

**COUNT 2 --  Promissory Estoppel, in the Alternative**
*By the Nationwide TPP Class, or in the alternative, by the respective Statewide TPP Classes*

257.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

258.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Classes described above.  To the extent necessary to preserve these claims, Plaintiffs also hereby incorporate by reference, and plead in the alternative herein, the promissory estoppel claims set forth in Part 2 below.

259.    Chase, by way of its TPP Agreements, made a representation to Plaintiffs that if they returned the TPP Agreements executed and with supporting documentation, and made their TPP payments, they would receive permanent modifications.

260.    Chase's TPP Agreements were intended to induce Plaintiffs to rely on them and make monthly TPP payments.

261.    Plaintiffs did indeed rely on Chase's representation, by submitting TPP payments.

262.    Given the language in the TPP Agreements, Plaintiffs' reliance was reasonable.

263.    Plaintiffs' reliance was to their detriment. Plaintiffs have yet to receive a permanent modification.  By making TPP payments both during and after the TPP, Plaintiffs forewent other remedies that might be pursued to save their homes, such as restructuring their debts under the bankruptcy code, or pursuing other strategies to deal with their defaults, such as selling their homes.  In light of the declining real estate market in the United States since July 2009, failure to market and sell the property at that time has reduced the amount that Plaintiffs can recover from such sale.

264.    In addition to the lost opportunity cost of pursuing other means of dealing with their defaults, when a permanent modification is not offered at the close of the TPP, but rather is offered at a later date, the modification does not comply with HAMP or the other TPP Agreements, the borrower's permanent modification terms are adversely affected, and additional fees and charges are applied.  On information and belief, Defendant has imposed improper fees and costs on Plaintiffs during and after the Trial Period.

265.    Plaintiffs have also suffered detriment in the form of foreclosure and collection activity against their homes.

266.     Plaintiffs have also incurred damages in reliance on the TPP Agreements, *i.e.*, Chase's failure to provide permanent modifications, means that Plaintiffs are now further in arrears than they would have otherwise been.

267.     Plaintiffs have been living in a state of stressful anxiety because of Defendant's conduct and in light of the ongoing risk of foreclosure.

268.     Members of the putative class have experienced harm in forms similar or identical to the Plaintiffs. Some members of the putative class also suffered additional harm in the form of foreclosure/ collection activity against their homes.

### COUNT 3 -- Violations of State Unfair and Deceptive Acts and Practices Statutes
*By the respective Statewide TPP Classes*

269.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

270.     Plaintiffs bring the following Consumer Claims under the consumer protection and unfair and deceptive acts and practices laws of their respective states, on their own behalf and on behalf of each member of the designated Class described within the Count, against Chase. When greater details regarding the conduct of each Defendant become known, Plaintiffs will amend this Consolidated Complaint, as necessary.  To the extent necessary to preserve these claims, Plaintiffs also hereby incorporate by reference, and plead in the alternative herein, the Consumer Claims set forth in Part 2 below.

271.     The acts and practices described in this Consolidated Complaint occurred while Chase was engaged in trade, business or commerce with Plaintiffs and putative Class members.

272.     Chase has violated the consumer protection and unfair and deceptive acts and practices laws of California, Florida, Illinois, Indiana, Massachusetts, Michigan, Minnesota, Missouri, Nevada, Pennsylvania and Washington through the following acts and omissions:

A.      Chase engages in a widespread practice of instructing mortgagors to stop making mortgage payments under the false pretense that doing so will not hurt credit scores and is necessary for them to obtain a loan modification.

B.      Chase induces mortgagors' reasonable reliance on Chase to modify their mortgage loans upon successful completion of performance pursuant to agreements, including making payments and submitting documentation.

C.      Chase fails to grant permanent HAMP or CHAMP loan modifications or advise individuals of their ineligibility pursuant to the terms of the form TPP Agreement.

D.      Chase engages in the widespread misrepresentation of the status of loan modification applications.

E.      Chase fails to hire, retain, employ, and supervise adequately trained staff, including knowingly designing and maintaining a loan modification system that was riddled with flaws and intentionally staffed with employees who lacked the training, experience, education or skill to properly perform their obligations;

F.      Chase employs policies and practices that incentivize employees to rush customers off of the telephone as quickly as possible so as to frustrate customers, the intended result being that instead of complaining, the customers would give up and accept Chase's faulty eligibility determinations.  Chase ensures further frustration by implementing a "one call resolution" policy under which customers would never speak to the same service representative twice;

G.      Chase routinely loses mortgagors' loan documents, modification papers, and other necessary materials to evaluate eligibility and routinely rejects these customers' completely performed obligations on false and incorrect grounds;

H.      Chase routinely requires borrowers to submit and re-submit duplicative financial information or documents already in Chase's possession, claiming that it would not review a borrower for eligibility until and unless these documents are submitted time and again;

I.       Chase fails to keep accurate records of mortgagor accounts, including accounting for fees, payments, credits, arrearages, and amounts owed;

J.      Chase routinely and systematically makes incorrect calculations and determinations at improper times during the loan modification process, falsely claiming that Chase was permitted to do so under applicable directives and that they were unable to achieve target income to payment ratios, and routinely provides customers with other false, pre-textual reasons for refusing to extend eligible borrowers their offers for permanent modification;

K.      Chase engages in a widespread practice of causing improper interest and fees to accrue;

L.      Chase expels Plaintiffs and others from its modification programs despite the fact that these Plaintiffs and others complied with all of the terms and requirements thereof;

M.      Chase engages in a widespread practice of making improper reports to credit reporting agencies;

N.      Chase engages in a widespread practice of unlawfully proceeding with foreclosures based on mortgagors' failure to meet impossible and shifting demands.

273.    These acts and omissions constitute bad faith.

274.    Chase's conduct described in this Consolidated Complaint is willful and knowing and constitutes intentional misrepresentations, false promises, and concealment, suppression, and omission of material facts, and further constitutes an unfair business practice.

275.     Chase's unconscionable, unfair, and deceptive acts, practices, omissions, and representations as set forth in this Consolidated Complaint are material in that they relate to matters which are important to consumers or are likely to affect the purchasing decisions or conduct of consumers.

276.     Chase's unconscionable, unfair, and deceptive acts and practices set forth in this Consolidated Complaint are likely and reasonably foreseeable to mislead Plaintiff and members of the classes acting reasonably and to their detriment.

277.     Plaintiffs have suffered injury as a result of Chase's conduct described in this Consolidated Complaint.  Plaintiffs have suffered financial harm by paying money to Chase that they would not have paid but for Chase's conduct.  Some of Chase's borrowers were further injured by being subject to unnecessary or improper foreclosure processes.  Moreover, Plaintiffs have suffered undue psychological stress and damaged credit, while enduring Chase's unlawful, unfair, and/or fraudulent practices.  They are threatened with additional harm as a direct and proximate result of Chase's violations.  By making payments under TPP Agreements and by continuing to make mortgage payments, Plaintiffs and members of the Class forgo other remedies that might be pursued to save their homes and their precious cash resources, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with their defaults, e.g., selling or renting the homes.  In light of the declining real estate market in the United States since July 2009, failure to market and sell the property at that time has reduced the amount that Plaintiffs can recover from such sale.  Plaintiffs and members of the Class have also given up valuable time and effort to meet Chase's demands.

278.     With respect to the California statewide class, by the conduct described in this Consolidated Complaint, Chase has engaged in unlawful business practices within the meaning

of CAL. BUS. & PROF. CODE §§ 17200, *et seq.* By the conduct described in this complaint, Chase has violated both the "unfair" (by engaging in the bad faith practices alleged herein) and the "unlawful" prongs of the UCL (by violating the Rosenthal Fair Debt Collection Practices Act, CAL. CIV. CODE § 1788.2(c)). The practices described in this Consolidated Complaint offend the public policy of California, and are unethical, oppressive, unscrupulous, or substantially injurious to consumers.

279. Further, with respect to the California statewide class, a business act or practice is "fraudulent" under the Unfair Competition Law if it actually deceives or is likely to deceive members of the consuming public. Chase's acts and practices as described herein have deceived and/or are likely to deceive members of the public. Specifically, Chase invited Plaintiffs to participate in a loan modification program, promising that if Plaintiffs complied with the terms of the various payment plans and otherwise qualified, Chase would permanently modify their loans, enabling them to avoid foreclosure, and at a minimum provide them with a timely decision regarding whether or not to grant them a permanent modification. Plaintiffs relied on these representations in forgoing other options and instead entering the trial program and making trial payments and have suffered monetary loss as a result. These statements not only deceived Plaintiffs but are also likely to deceive a reasonable, similarly situated person into believing the same.

280. Further, with respect to the California class, Chase is a "debt collector" engaging in "debt collection" practices under the Rosenthal Fair Debt Collection Practices Act (the "Rosenthal Act"). *See* CAL. CIV. CODE § 1788.2(c). Chase's communications with Plaintiffs about their loan modification applications routinely state that Chase and its agents are

"attempting to collect a debt" or that one or more of Chase's agents is a "debt collector." *See, e.g.*, EXS. 6, 7.

281.    With respect to the Florida statewide class, Chase's conduct as described throughout this Consolidated Complaint constitutes deceptive, unfair, immoral and unscrupulous business practices that harmed not only the representative named plaintiff and the Florida Class members, but the general public as well.  Chase's deceptive practices constitute multiple, separate violations of FLA. STAT. ANN. § 501.204(1).

282.    With respect to the Illinois statewide class, Chase's conduct as described throughout this Consolidated Complaint constitutes unfair or deceptive acts or practices in the conduct of trade or commerce that harmed not only the representative named plaintiff and the Illinois Class members, but the general public as well. Chase's unfair or deceptive acts or practices constitute multiple, separate violations of 815 ILL. COMP. STAT. 505/2.

283.    With respect to the Massachusetts statewide class, on March 4, 2010, prior plaintiffs in the underlying action sent Chase a demand for relief pursuant to MASS. GEN. LAWS ch. 93A, on their own behalf and on behalf of a group of similarly situated individuals.  Although Chase made individual offers of settlement to the original named plaintiffs, it made no offer of settlement to the class of similarly situated individuals identified in the March 4, 2010 letter in accordance with MASS. GEN. LAWS ch. 93A, § 9(2).

284.    Further, with respect to the Massachusetts statewide class, by the conduct described in this Consolidated Complaint, Chase has violated and continues to violate the Massachusetts Consumer Protection Act, MASS. GEN. LAWS ch. 93A, §2 and applicable regulations promulgated by the Massachusetts Attorney General pursuant to MASS. GEN. LAWS

c. 93A, §2(c) including, without limitation: (1) 940 MASS. CODE REGS. § 3.16; (2) 940 MASS. CODE REGS. § 3.05; (3) 940 MASS. CODE REGS. § 8.06; and (4) 940 MASS. CODE REGS. § 25.03.

285.    With respect to the Michigan statewide class, by engaging in the conduct described in this Consolidated Complaint, Chase has violated the MBLSA, MICH. COMP. LAWS §§ 445.1651, *et seq.*, under which Chase Home Finance LLC and JPMorgan Chase Bank, N.A. were licensed or registered or required to be licensed or registered.

286.    With respect to the Minnesota statewide class, by engaging in the conduct described in this Consolidated Complaint, Chase has violated the Minnesota Prevention of Consumer Fraud Act, MINN. STAT. §§ 325F.68, *et seq*. Chase's acts and/or practices constitute fraud, misrepresentations, misleading statements, and/or deceptive practices in connection with the sale of merchandise. MINN. STAT. § 325F.68, subd. 2).

287.    Further, with respect to the Minnesota statewide class, Chase's conduct as described throughout this Consolidated Compliant constitutes a deceptive trade practice in the course of business that harmed not only the representative named plaintiff and the Minnesota Class members, but the general public as well. Chase's deceptive trade practices created a likelihood of confusion or misunderstanding that constitute multiple, separate violations of the Minnesota Deceptive Trade Practices Act. MINN. STAT. § 325D.44, *et seq*.).

288.    Further, with respect to the Minnesota statewide class, by engaging the in the conduct described in this Consolidated Complaint, Chase has violated the Minnesota False Advertising Act, MINN. STAT. § 325F.67. Chase's act of publishing, disseminating, and/or circulating an advertisement containing material assertions, representations or statements of facts that are untrue, deceptive or misleading are an unlawful practice under the Act. MINN. STAT. § 325F.67.

289.    Further, with respect to the Minnesota statewide class, Chase's conduct as described throughout this Consolidated Complaint constitutes a violation of the Minnesota Residential Mortgage Originator and Servicer Licensing Act, MINN. STAT. § 58.01, *et seq*., that harmed not only the representative named plaintiff and the Minnesota Class members, but the general public as well.

290.    With respect to the Missouri statewide class, by engaging in the conduct described in this Consolidated Complaint, Chase has violated MO. REV. STAT. § 407.020.  Such conduct was and is wanton, willful and outrageous, and manifests a reckless disregard for the consequences of Chase's actions and for the rights of Plaintiffs and members of the Missouri Class and warrants an award of punitive damages to deter Chase, and others in similar circumstances, from committing such actions in the future.

291.    With respect to the Nevada statewide class, the conduct described in this Consolidated Complaint constitutes deceptive, unfair, immoral and unscrupulous business practices that harmed not only the representative plaintiff and the Nevada Class, but the general public as well.  Chase's deceptive practices constitute multiple, separate violations of NEV. STAT. § 598.0915(15).

292.    Further, with respect to the Nevada statewide class, the representative plaintiff and members of the Nevada Class are victims of consumer fraud, including the deceptive trade practices engaged in by Chase set forth in this Consolidated Complaint, within the meaning of NEV. STAT. § 41.600.

293.    With respect to the Pennsylvania statewide class, Chase's conduct as described throughout this Consolidated Complaint constitutes unfair methods of competition and/or unfair or deceptive acts or practices that harmed not only the representative named plaintiff and the

Pennsylvania Class members, but the general public as well. Chase's unfair methods of competition and/or unfair or deceptive acts or practices constitute multiple, separate violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"). 73 Pa. CONS. STAT. ANN. § 201-1, *et seq.*

294.    With respect to the Washington statewide class, the conduct described in this Consolidated Complaint constitutes a violation of WASH. REV. CODE § 19.86, *et seq.* and had and continue to have the capacity to deceive a substantial portion of the public—namely all Washington mortgagors whose mortgage loans are serviced by Chase.  Plaintiffs' claims arise from "consumer transactions" that impact the "public interest" within the meaning of WASH. REV. CODE § 19.86.093 because they violated multiple provisions of the Consumer Loan Act, WASH. REV. CODE § 31.04, *et seq.*, as well as WASH. REV. CODE § 19.144.080.  Alternatively, Plaintiffs' claims are "private disputes" that impact the "public interest" within the meaning of WASH. REV. CODE § 19.86.093.

295.    Further, with respect to the Washington statewide class, Plaintiffs will provide or already have provided any required notice to appropriate entities regarding Chase's unfair and deceptive trade practices.

296.    The acts and practices described in this Consolidated Complaint constitute violations of each respective state's unfair and deceptive acts and practices statute(s), as laid out above.

297.    These acts or practices proximately or actually caused injury to the plaintiffs and putative Class members in the manner described above in section V. As a result, Plaintiffs seek recovery as outlined below in the Prayer for Relief.

*        *        *

**PART 2 – Modification Process – Facts, Classes and Claims**

## VIII.   PART 2 FACTS

298.     Chase's misconduct does not end with failure to honor TPPs.  It also fails to honor its promises to consider borrowers for temporary and permanent modifications.  Its processes for communicating with borrowers who seek modifications and for acting on their applications is so defective as to constitute actionable unfair and deceptive acts and practices and to require related common law remedies for the affected borrowers.

299.     Mortgagors seeking a modification have found themselves caught in a seemingly endless cycle in which Chase promises modification, or timely consideration of an application for a modification, and then fails to honor those promises.  In particular, Chase induces borrowers to keep paying modified payments—*i.e.*, amounts that are not the same as what was owed under their original Notes—based on various misrepresentations and deceptive statements. In the course of accepting borrowers' modified payments month after month, Chase repeatedly requests documentation necessary to determine homeowner eligibility for modifications, which Chase systematically mishandles when received—either losing or destroying borrowers' documents and loan files.  Meanwhile, fees accrue on mortgagor accounts, as they are driven deeper into debt.  Even after complying in good faith with all of Chase's requests for months or even years, homeowners often never receive a modification and carry far more debt than they would have had they known that Chase would fail to properly consider the merits of their modification applications.

300.     The stories of homeowners who have experienced this pattern and practice—and the results (or lack ) thereof after many months or years following Chase's instructions— demonstrate that Chase's business practices are deceptive, fraudulent, and misleading.

301.     What speaks the loudest in this case is the similarity between the Named

Plaintiffs' experiences with Chase.  They have experienced profound unfairness in a strikingly

uniform way, with nearly identical results, common consequences, and a shared injury that they

seek to redress on behalf of the Classes they seek to represent.

**A.      Chase's Modification Process Consists of a Common Course of Conduct.**

302.     Plaintiffs and members of the Classes have experienced the following common

course of conduct by Chase:

303.     **Hardship and Default**.  Plaintiffs and members of the proposed Classes have all

experienced some form of hardship that has caused them to (1) fall behind on their mortgage

payments, and/or (2) alert Chase that they may have difficulty making payments in the future

before ever missing a payment, to which Chase routinely responds by *directing* mortgagors to

become delinquent by intentionally missing payments.

304.     **Forbearance/Modification Packages**.  Chase uses oral and written temporary

agreements or payment plans, coupled with verbal assurances as described below, to induce

mortgagors to make modified payments, send documentation, and otherwise participate in its

mortgage modification process.  Instead of receiving timely results, mortgagors find themselves

in an endless process, while their debt increases by the day.  In response to promises of

forbearance, an eventual modification, and/or a timely review of a modification application,

mortgagors follow Chase's verbal and written payment plans, including after the completion of

written agreements or payment plans—such as TPPs, Forbearance Agreements, and Repayment

Agreements—demonstrating their genuine reliance on Chase's illusory promises.

305.     **Verbal Assurances**.  Chase encourages mortgagors to participate in its temporary

payment plans by making standard and uniform verbal promises regarding its modification

programs, including that modification will be granted upon completion of certain payment plans and other compliance by the homeowner, that Chase will timely review and process loan modification applications, that Chase will halt foreclosure proceedings during the modification process, and that certain written materials which otherwise do not reference a modification *are* part of the modification process.

306.     **A Protracted Process**.  Plaintiffs and members of the proposed Classes uniformly fail to obtain the relief they seek from Chase in a timely manner—and sometimes never do.  Chase promises to borrowers that their applications will be reviewed in 90-120 days. However, even when Chase does offer a modification, Chase grossly delays modifications, thereby increasing its servicing fees by increasing principal balances, imposing late charges, and imposing other expenses.  Chase pursues foreclosure and hangs foreclosure over mortgagors' heads as it drags them through the modification process.

307.     **"Lost" or Destroyed Documents**.  Plaintiffs and members of the proposed Classes have experienced a remarkably uniform pattern of repeatedly sending the same documents to Chase, receiving confirmation that documents are received and adequate, and then being told that the documents are lost, missing, incomplete, or otherwise defective.  This causes repeated provision of the same or similar documents by Plaintiffs and members of the proposed Classes—a waste of their time, a drain on their resources, and a continual source of stress and frustration.

308.     **Unexplained and/or Unreasonable Fees and Interest**.  Plaintiffs and members of the proposed Classes have been charged late fees while they are making timely, regular monthly payments, foreclosure-related fees that are excessive and/or inadequately disclosed, and wholly unexplained "other" fees, including Western Union or telephone payment fees.

Additionally, Plaintiffs and members of the Classes have been penalized by having interest imposed on paid principal amounts, because Chase refused to properly apply payments.

309.   **Plaintiffs' Good Faith Performance and Compliance**.  Plaintiffs and members of the Classes have in good faith sought to save their homes from foreclosure and obtain permanent loan modifications so that they can move on with their lives.  They have asked for help, followed up, and attempted to navigate Chase's impenetrable bureaucracy.  They have sent in countless payments requested by Chase.  They have sent in the same documents many times over.  Chase has wasted hours of their time, inexplicably ignored their performance, accepted their regular and voluminous mortgage payments, and taken advantage of mortgagors who have little or no bargaining power.

310.   **Damaged Credit**.  Plaintiffs and members of the Classes have faced prolonged damaged credit as a result of Chase's failures to promptly process their loan modification applications and payments.  They have also been damaged by instructions to go into default.

**B.   Chase's Documentation of Loan Modification Agreements and Its Accompanying Written and Verbal Representations.**

311.   Chase uses several types of written temporary agreements and payment plans as part of its modification process.  These plans require the homeowner to make payments different than their original payment for some period of months.  They are routinely the platform for Chase's instructions to continue making the same payments even after the written plans or agreements have concluded.

**1.   Promises and Representations Contained in TPP Cover Letters.**

312.   While Plaintiffs have brought contract and other claims arising out of the TPP document alone, as set forth in Part 1, essential to Plaintiffs' allegations in Part 2 is that Chase extracts payments *beyond* those due under the HAMP, Chase, or EMC TPP Agreement by

promising homeowners that a modification is forthcoming and they should continue making payments as if pursuant to their TPP even after the trial period has ended.  Indeed, Plaintiffs routinely made more TPP payments than were required by their TPP Agreement.

313.    HAMP TPPs are typically accompanied by a "Trial Period Cover Letter."  An example of such a letter is attached hereto as Exhibit 8. The "Trial Period Cover Letter" contains assurances that there "are no fees under the Home Affordable Modification program." and that "[i]f you fulfill the terms of the trial period including, but not limited to, making the trial period payments, we will waive ALL unpaid late charges at the end of the trial period." *See* Exhibit 8. On information and belief, Chase charged and collected fees in connection with its mortgage modification scheme.

314.    The "Trial Period Cover Letter" states that "[i]t may take up to 30 days for us to receive and review your documents.  We will process your modification request as quickly as possible." *See* Exhibit 8.  The cover letter also states that "[a]s long as you comply with the terms of the Trial Period Plan, we will not start foreclosure proceedings or conduct a foreclosure sale if foreclosure proceedings have started." *See* Exhibit 8.

## 2.    Forbearance Agreements and Repayment Agreements.

315.    Chase offers some homeowners who have requested and applied for a modification temporary agreements or payment plans, which come in two primary forms: Forbearance Agreements and Repayment Agreements.  These plans require payments of varying amounts, ranging from zero dollars per month, to more than the homeowner's original payment. They do not on their face promise modifications—and may not even mention modifications—but that is not the point.  Homeowners who have requested and applied for a modification are often sent temporary payment plans as part of Chase's Forbearance/Modification Package and told by

Chase representatives that they will be given a modification—or at least a decision—upon completion of the plans.  Thus, while temporary payment plans usually do not explicitly reference HAMP or modifications at all, they are unquestionably used in conjunction with verbal promises of a modification to engage homeowners in Chase's modification scheme. Furthermore, internal Chase documents obtained by Plaintiffs reflect that it is Chase policy to promise modifications upon completion of both types of temporary payment plans.

> ### a.    Forbearance Agreements.

316.    Forbearance Agreements (also called Forbearance Plans, Special Forbearance Plans, or Reduced Payment Plans) supposedly allow borrowers to make reduced payments for a period of time, without risk of foreclosure or negative credit reporting.  However, Plaintiffs who have been offered and have entered into Forbearance Agreements, including Sandra and Frank Fischer, and Michael Sabouhi, found that shortly after entering in and complying with Forbearance Agreements, Chase began to pursue foreclosure against them and negatively report their credit.

317.    Examples of Forbearance Agreements are attached hereto as Exhibits 9, 10 and 11.  On information and belief, Forbearance Agreements are standard forms—the terms of which were drafted entirely by Chase—that Chase used and continues to use with mortgagors to whom Chase promises loan modifications.  While Chase's Forbearance Agreements have evolved over time, they have generally had the same requirements, made the same promises, and, most importantly, served the same purpose within Chase's modification scheme, regardless of what version of Forbearance Agreement is used.

318.    In the context of Chase's Forbearance/Modification Packages, Forbearance Agreements are offered to homeowners who have applied for or requested a modification.  Chase

makes verbal assurances that the Forbearance Agreements *are* part of the modification program and that completion of a Forbearance Agreement will lead to a modification. Some versions of Chase's Forbearance Agreements reflect this, explicitly stating that forbearance agreements are part of HAMP. *See* Ex. 11 ("The attached forbearance agreement is a pre-qualification agreement[s] for the Home Affordable Modification Program (HAMP).").

319.    Oral representations regarding modification, foreclosure, and credit reporting are an instrumental part of Chase's Forbearance/Modification Packages and routinely accompany Forbearance Agreements. Homeowners pursuing a modification who enter into these Forbearance Agreements are relying on simultaneous promises from Chase representatives that the agreements will: (1) help the homeowner obtain a modification; (2) not put the homeowner into foreclosure; and (3) not affect the homeowner's credit.

320.    Chase extracts payments beyond those due under Chase's Forbearance Agreements by promising homeowners that a modification is forthcoming and that they should continue making payments as if pursuant to their Forbearance Agreement, even after the period outlined on the written document has ended. Indeed, Plaintiffs who enrolled in a Forbearance Agreement made more payments than required under the Agreement.

> **b.    Repayment Agreements.**

321.    Repayment Agreements (also called Repayment Plans) supposedly allow homeowners to repay some or all of their arrearage by making payments greater than their original payment. However, Plaintiffs who have been offered Repayment Agreements, including Basilisa Pacheco and Joyce Clapham, have found that, instead of reducing their arrearage, Repayment Agreements often cause arrearage to *increase*.

322.     Examples of Repayment Agreements are attached hereto as Exhibits 12 and 13. On information and belief, Repayment Agreements are standard forms—the terms of which were drafted entirely by Chase—that Chase used and continues to use with mortgagors to whom Chase promises loan modifications.  While Chase's Repayment Agreements have evolved over time, they have generally had the same requirements, made the same promises, and, most importantly, served the same purpose within Chase's modification scheme, regardless of what version of Repayment Agreement is used.

323.     In the context of Chase's Forbearance/Modification Packages, Repayment Agreements are offered to homeowners who have applied for or requested a modification.  Chase makes verbal assurances that the forbearance agreements *are* part of the modification program and that completion of a Repayment Agreement will lead to a permanent modification.

324.     Oral representations regarding modification are an instrumental part of Chase's Forbearance/Modification Packages and routinely accompany Repayment Agreements. Homeowners pursuing a modification who enter into these agreements are relying on simultaneous promises from Chase representatives that the agreements will help the homeowner obtain a modification.

325.     Chase extracts payments beyond those due under Chase's Repayment Agreements by promising homeowners that a permanent modification is forthcoming and that they should continue making payments as if pursuant to their Repayment Agreement, even after the period outlined on the written document has ended.  Indeed, each Plaintiff who enrolled in a Repayment Agreement made more payments than required under the Agreement.

3.     **Temporary Payment Plans and Trial Modifications are Systematically Used In Forbearance/Modification Packages.**

326.     Internal Chase documents obtained by Plaintiffs reflect that promises of a modification are used by Chase to encourage homeowners to enroll in Forbearance Agreements and Repayment Agreements.  Exhibits 14 and 15 are documents from Chase's loan file for plaintiff Basilisa Pacheco.  They are "worksheets" used by Chase employees to enroll Ms. Pacheco in her Repayment Agreements.  Exhibit 14 is the worksheet used to enroll her in her Repayment Agreement dated July 20, 2009 (Exhibit 12), and Exhibit 15 is the worksheet used to enroll her in her repayment agreement dated September 9, 2009 (Exhibit 13).  Both worksheets are called "Forbearance Agreement Worksheet[s]" reflecting that, although Chase may claim that Forbearance Agreements and Repayment Agreements serve different purposes, they are in fact interchangeable.

327.     Most importantly, the worksheets contain an "exit strategy" section, in which Chase selects from a number of possible ways for the plan to conclude.  Among these options are "Stip[ulated] Repay to Modify" and "Stip[ulated] Special Forbearance to Modify."  *See* Exs. 14 and 15.  These "exit strategies" reflect a clear policy on Chase's part to tell homeowners that their Forbearance Agreement or Repayment Agreement would lead to a modification.  The worksheets are also clear evidence that the language on the written agreements themselves was *not* the entirety of the agreement.  In Ms. Pacheco's case, the "Stip Repay to Modify" was checked for one of her agreements, and the "Stip Special Forbearance to Modify" was checked for the other, although both were supposedly Repayment Agreements.

328.     As another example of how intertwined Forbearance Agreements are with Chase's modification process, Plaintiff Amy Keller was instructed, after completion of three payments under a Forbearance Agreement, to continue making modified payments to secure a

permanent modification.  During the period in which she was making those modified payments, she received a letter that stated, "[t]hank you for making your payments during your trial mortgage modification period – we would very much like to make your modification permanent…"  *See* Ex. 16.

### 4.    Final Modifications.

329.    When Chase does eventually modify mortgages after its protracted modification process, these final Loan Modification Agreements "freeze" interest and fees accrued during months or years of delay.  After stretching out the modification process for months and sometimes years, Chase adds these accrued balances onto the principal balance of the loan in final modifications, as happened to the Fischers and Mr. Leopold.  In doing so, it increases its "servicing fee" and the value of its mortgage servicing rights for the life of the loan, thereby benefitting Chase.  *See infra* section VII.D.  Furthermore, by offering homeowners Final Modifications as a "take it or leave it" deal, Chase forces homeowners to choose between losing their home or accepting a loan that in many cases will take the rest of the their lives to pay off and contains capitalized fees, interest, and arrearages.

## C.    Chase's Common Course of Conduct is a Result of Its Policies and Practices.

330.    On information and belief, Chase loss mitigation and underwriting personnel are inadequately supervised and mismanaged.

331.    On information and belief, Chase routinely, and as a matter of policy, sometimes instructs borrowers—falsely—that they must fall behind on their mortgage payments in order to be eligible for a loan modification.

332.    On information and belief, Chase employees actively seek to place mortgagors in Trial Modifications, Forbearance Agreements, Repayment Agreements, or other Temporary

Payment Plans while routinely promising that Chase will consider them for loan modifications, because both Chase and its employees stand to reap profits when mortgagors continue making payments and/or start multiple new payment plans or agreements.  These profits include large bonuses to individual employees who bring in immediate payments pursuant to arrangements that allow Chase to charge fees and grow mortgagor debt while delaying permanent modifications or pursuing foreclosure.

333.     As part of its Forbearance/Modification Packages, Chase makes repeated assurances, both in writing and verbally, that forbearance will continue and that permanent modifications will be forthcoming *in a timely manner*.  On information and belief, Chase employees routinely promise, pursuant to Chase policy, that review of mortgage modification applications will occur in 90-120 days.  Promises of timely review are routinely broken, and mortgagors remain in modification holding patterns for many months or years.

334.     On information and belief, the verbal promises and assurances described herein are administered by Chase employees pursuant to scripts and written policies created and distributed by Chase that are designed to coach employees on how to uniformly respond to mortgagor inquiries and loan modification applications.

335.     On information and belief, Chase misleads mortgagors about the status of their applications and whether it has received or retained requested documentation.

336.     On information and belief, Chase was and is incapable of processing borrower applications in the promised timeframe.  To the extent that Chase lacks the capacity to deal with the influx of borrower documents it requests, Chase has failed to establish an appropriate infrastructure, hire adequate staff, properly train staff, and purchase sufficient equipment or technology to competently and efficiently manage borrower loan files and documentation.

Chase has instead chosen to profit from the up-front savings this inadequacy provides, as well as from the additional cashflow from protracted modifications that result from Chase's structural failures.

337.    On information and belief, Chase's refusal to invest in infrastructure, staffing, and training includes a shortage of underwriters, poorly trained or untrained underwriters, inadequate procedures for handling contacts made to call centers related to delinquent loans, a deficient and non-functional document management system, an inability to keep track of borrower faxes or communications, and the long-term use of fax machines to receive tens of thousands of borrower documents from around the country.  Chase failed to organize and track documents, misplaced them, and allowed them to stagnate.  On information and belief, Chase had inadequate backup systems.

338.    On information and belief, Chase not only negligently handled mortgagor documents, frequently losing them or incompetently processing them, Chase also created an environment where intentional destruction of documents flourished.  On information and belief, underwriting employees tampered with file start dates, destroyed loan files, and pretended to lose documents.  On information and belief, Chase *intentionally destroyed or cancelled* thousands of mortgagor loan modification files, causing modification denials en masse and wreaking havoc on thousands of mortgagors' lives.

**D.    A Prolonged Modification Process Leads to Unfair Outcomes for Mortgagors Which in Turn Benefit Chase.**

339.    In Plaintiffs' experiences, described more fully throughout the Consolidated Complaint, Chase repeatedly stalls and delays making a final decision on modification applications in the promised timeframe by, among other things, claiming it is missing documentation necessary to evaluate the homeowners' eligibility for a modification, claiming

documentation already provided has become outdated, and claiming that the file is "on the underwriter's desk."  Meanwhile, Chase prods homeowners into continuing to make modified payments, promising that a modification will be forthcoming.  Chase also dual tracks mortgagors—initiating and actively pursuing foreclosure to pressure borrowers into making payments during an illusory and misleading modification process.

340.    Plaintiffs' experiences demonstrate Chase's pattern and practice of deceptive and misleading conduct.  And while Chase's motives are not an element of any of Plaintiffs' claims, Chase profits from its protracted and misleading loan modification practices.  This may help explain why the experiences of the Plaintiffs are so common, repeated across the country, with devastating impacts on their financial situations, and, more importantly, why Chase has not meaningfully changed its servicing practices

### 1.    Chase Profits From Increased Principal Balances and Extended Loan Terms.

341.    A mortgage servicer's primary source of income and primary asset is its collection of "Mortgage Servicing Rights" ("MSRs").  John McConnell, *Valuation of a Mortgage Company's Servicing Portfolio*, 11 J. OF FIN. & QUANTITATIVE ANALYSIS 433, 433 (1976).  These are contracts with investors in mortgage loans, typically through mortgage backed securities, that: (a) require the mortgage servicer to perform servicing duties such as collecting monthly payments from homeowners and transmitting them to the investor, sending notices and correspondence to homeowners, maintaining homeowner documentation, and managing homeowner escrow accounts; and (b) entitle the mortgage servicer to certain fees from the investor and the homeowner for performing these duties.  *Id.*

342.    The most important fee a mortgage servicer collects and its largest source of revenue is the "servicing fee."  The servicing fee is a fixed percentage, typically 0.25-0.5%, of

the principal balance of a mortgage loan, which the servicer collects on a monthly basis when it receives the mortgage payment from the homeowner.  Simon Aldrich et al, *A Capital Markets View of Mortgage Servicing Rights*, 11 J. FIXED INCOME 37, 37 (2001).

343.    Academics who have studied mortgage servicing rights have found that, as a result of the structure of the servicing fee, the most important factor in determining the value of a servicer's Mortgage Servicing Rights is the principal balance of the loans in its MSR portfolio. *See* McConnell, at 442 ("…the capitalized value of servicing increases as the original face amounts of the loans increase…").  As a result, "the value of a portfolio composed of larger loans is substantially greater than the value of a portfolio of smaller loans…" *Id*.

344.    Another important factor in valuing mortgage servicing rights is the remaining term of the serviced loans.  The reason for this is twofold: a servicer can expect to receive the servicing fee on a new loan for longer, and will receive a larger servicing fee in the present, since the servicing fee approaches zero as the principal is paid off.  *See* McConnell, at 442 ("…the value of servicing new loans is greater than the value of servicing older loans…").

345.    Thus, by increasing the principal balance of any given loan, or by extending the term of any given loan, a mortgage servicer can profit immediately by increasing the value of its Mortgage Servicing Rights.

346.    When it does finally grant loan modifications after extensive delays, Chase's mortgage modification process results in both larger principal balances and longer loan terms than it would otherwise have on the same loans.

## 2.    Delaying Foreclosure is Advantageous to Chase.

347.    According to the *New York Times*, industry insiders say that extending the foreclosure process can actually allow a servicer to profit off of an eventual foreclosure: "the

road to foreclosure is lined with fees, especially if it's prolonged."  Peter Goodman, *Lucrative Fees May Deter Efforts to Alter Loans*, N.Y. TIMES, July 30, 2009, at A1.  The article explains:

> Even when borrowers stop paying, mortgage companies that service the loans collect fees out of the proceeds when homes are ultimately sold in foreclosure.  So *the longer borrowers remain delinquent, the greater the opportunities for these mortgage companies to extract revenue*—fees for insurance, appraisals, title searches and legal services.
>
> …[a]s a home slides toward foreclosure, mortgage companies pay for many services required to take control of the property and resell it.  They typically funnel orders for title searches, insurance policies, appraisals and legal filings to companies they own or share revenue with.

*Id.*  (emphasis added).

348.    Indeed, servicers' motivation to accrue fees is further increased by the fact that "servicer[s] often own[] a share in companies which can be billed for ancillary services during the foreclosure process, and charge[] above market rates on these services."  National Mortgage Servicing Standards and Conflicts of Interest, 112th Cong., at 10 (May 12, 2011) (written testimony of Laurie Goodman, Senior Director at Amherst Securities Group).

349.    Thus, While Chase receives up to $1,600 from the U.S. Government for each HAMP modification it processes, *see supra* section V.A.1, it stands to make thousands more by collecting fees and interest on loans that are past due, in default, or otherwise troubled.

**3.    Mortgagors Suffer Whether or Not They Are Eligible for a Modification.**

350.    While Chase purportedly offers varying types of temporary payment plans to homeowners as a means to obtaining a modification, in practice they allow Chase to extend the duration of the homeowner's delinquency, whether Chase intends to modify or not.

351.    For homeowners who *are not* eligible for a modification, Chase benefits by delaying the eventual foreclosure while continuing to receive payments.  *See supra* section VIII.D.2.

352.    On the other hand, for homeowners who *are* eligible for a modification, Chase benefits by increasing the homeowner's accrued arrearage.  Final modifications that Chase belatedly offered to mortgagors had principal balances much higher than the principal balances on the mortgages when the mortgage application process began.

353.    In this context, Treasury's finding that Chase is the slowest servicer at responding to requests for modification is especially significant.  *See supra* section IV.4.

**E.    Plaintiffs' Common Experiences.**

354.    Plaintiffs' experiences set forth below illustrate Chase's pattern of deceptive, misleading, unfair, fraudulent and unlawful business practices.  While the timing and sequence of phone calls, emails, letters, and numerous Forbearance/Modification Packages and other promises may vary slightly among Class members, the underlying conduct is the same.  Chase drags out the mortgage modification process.  This unlawful conduct preys on the most vulnerable homeowners in their time of greatest stress, anxiety and desperation.

**1.    Janet Cureton (WA)**

355.    Chase is the servicer on a home mortgage loan made to Plaintiff Janet Cureton for her home in Port Orchard, Washington.  At all times relevant, this loan has been serviced by Chase.  In early 2009, Ms. Cureton began experiencing hardships that made it difficult for her to make her mortgage payments.

356.    In May 2009, Ms. Cureton contacted Chase to inquire about a loan modification. Although she was current on her loan at the time, she was instructed by several different Chase representatives to fall behind by three months in order to qualify for a modification.  Ms. Cureton repeatedly objected that she had good credit and did not want to jeopardize her credit score, but she was told by several Chase representatives that her credit score would not be impacted.

Accordingly, in June 2009, Ms. Cureton stopped making her mortgage payments. She also submitted a complete modification application, using forms available on Chase's website.

357. On or about July 27, 2009, Mrs. Cureton called Chase and talked to an employee who identified himself as "Stephen Pecorno," who said all of her paperwork looked good.

358. On or about August 10, 2009, Mrs. Cureton was told by a Chase employee who identified herself as "Keasha" that she was being put on a "forbearance plan" that required three consecutive monthly payments of $1,776.00. Following this conversation, Ms. Cureton timely submitted her first payment pursuant to the forbearance program, as well as $210 to pay off late fees which had been charged to her account during the months in which she had been instructed by Chase representatives to miss payments.

359. On or about September 1, 2009, Mrs. Cureton was told by a Chase employee who identified herself as "Linda" that Chase had no record of a forbearance plan. Following that conversation, Mrs. Cureton resent to Chase every form she had previously sent in June of 2009.

360. The Curetons received a letter from Chase dated November 6, 2009 urging them to "Act Now to Avoid Foreclosure," offering to help them "save your home" and offering a "variety of workout options." The letter stated that the Curetons owed $5,310.87 in past due payments.

361. In December 2009, Ms. Cureton received a written Forbearance Plan from Chase. *See* Ex. 10. Upon receiving this plan, she promptly signed and returned it to Chase.

362. The December Forbearance Plan required three monthly payments, in January, February, and March 2010. Ms. Cureton timely made all three of these payments.

363.     Believing that a modification was forthcoming, Ms. Cureton continued making payments pursuant to the December Forbearance Plan for an additional three months beyond what was required by the written agreement.

364.     Throughout August of 2010, Mrs. Cureton called and/or faxed documents to Chase ten times. On or about August 30, 2010 a Chase employee who identified herself as "Bianca Gutierrez" told Mrs. Cureton that because "this is a new program," things "are falling through the cracks."

365.     In September 2010, Ms. Cureton received an apparently final and permanent modification from Chase.  The modification was called a "Loan Modification Agreement." Although it increased her principal balance by over $11,000, Ms. Cureton promptly signed and returned the agreement to Chase, and began making payments.

366.     Since the Loan Modification Agreement was not specific about Ms. Cureton's escrow requirement under the modification, Ms. Cureton contacted Chase to find out what her full payment was.  She was told that the payment amount listed on the Loan Modification Agreement—$1153.70—would be her entire payment.

367.     Since entering into her first repayment agreement in February 2009, and at all times relevant, Ms. Cureton has responded to all document requests made by Chase by timely submitting the requested documents.  Throughout this process Chase requested duplicative documentation and delayed making a final decision on Ms. Cureton's modification by claiming it was "missing documentation.

368.     Documents obtained by Plaintiffs reflect that the following types of fees were charged to Ms. Cureton's account during the modification scheme: G Speedpay Fee, Corp.

Advance Adjustment, Late Charge, Misc. F/C and B/R Expenses, Misc. Corporate

Disbursement, and Property Preservation.

369.    Several months after the September 2010 modification, Ms. Cureton received a

phone message from Chase claiming that she had defaulted on her mortgage.  Although she had

attempted to give Chase permission to automatically withdraw her payments from her account,

and had confirmed several times that she was paying the correct amount, Chase was claiming

that the payments she had been making were too low.

370.    Chase's scheme caused Ms. Cureton to rely to her detriment on Chase's promises

of a modification.  Instead of receiving a modification, Ms. Cureton now has far more debt than

when the process began, much of which is due to accrued interest and bogus fees that Chase

imposed for its own benefit and which could have been avoided had Ms. Cureton not been

subject to the modification scheme.  Had Ms. Cureton known that Chase did not intend to modify

her loan in an affordable or timely manner and would destroy her credit and continue charging

fees during the modification scheme, Ms. Cureton would have used her resources differently and

would not have relied on Chase's illusory promises.

371.    Pursuant to a Forbearance Agreement and a Loan Modification Agreement, Ms.

Cureton made at least eight modified payments, yet now owes thousands more than she did when

the process began.  Ms. Cureton's experiences illustrate Chase's pattern of deceptive and

misleading practices.

### 2.    Frank & Sandra Fischer (MI)

372.    Chase is the servicer on a home mortgage loan made to Plaintiffs Sandra and

Frank Fischer for their home in Croswell, Michigan.  At all times relevant, this loan has been

serviced by Chase.  In early 2009, the Fischers began experiencing hardships that made it difficult for them to continue making their monthly mortgage payments.

373.    In early 2009, the Fischers contacted Chase to inquire about a loan modification. Although they were current at the time and had very good credit, they were instructed by a Chase representative to intentionally miss payments in order to qualify for a loan modification.  They were told that they would be enrolled in a forbearance agreement which would require no payments, that their credit would not be damaged, and they would not be charged any fees.  They were told that the Forbearance Agreement would lead to a modification of their loan terms that would make their mortgage payments more affordable.

374.    In April 2009, the Fischers received from Chase a "Forbearance Agreement," which was a "pre-qualification agreement for the Home Affordable Modification Program." *See* Ex. 11.  The Fischers signed and returned this agreement to Chase along with all of the requested documentation.

375.    The Forbearance Agreement required the Fischers *not to pay* for six months. Accordingly, the Fischers stopped making their payment at this time.

376.    In July 2009, after discovering that, despite earlier promises by Chase representatives, they were not only being charged fees while under the forbearance plan, but that their credit score was being affected as well, the Fischers requested a new Forbearance Plan which allowed them to continue making payments.  In early August 2009, they received the Forbearance Plan, which was substantially similar to Exhibit 10.  They promptly signed and returned the document to Chase.

377.    The plan required a "good faith" down payment, followed by three monthly payments, beginning in September 2009.  The Fischers were told by a Chase representative that

their monthly payment under this plan would become their payment under a final modification upon completion of the plan.  The Fischers made all of the payments required by the plan.

378.    Believing assurances by Chase representatives that a modification was forthcoming, the Fischers continued making payments pursuant to the August Forbearance agreement for several months beyond what was required by the written agreement.

379.    In a letter dated November 27, 2009, Chase informed the Fischers that it needed more documents for their file, specifically a "completed and signed hardship affidavit form," which the Fischers had already sent in several times.  The letter also threatened that "[i]f the complete information is not received within ten (10) business days from the date of this letter, you will not receive any further notices, and the Homeowner's Assistance Department will close its file regarding your request for assistance." Since the Fischers did not receive this letter until several days after it was dated, they had a very short window in which to provide the requested information. They contacted Chase and were told that it would be okay if their paperwork was not received within the 10- day limit outlined by the letter. Even so, and despite the fact that the Fischers had already sent Chase a completed and signed hardship affidavit form several times, the Fischers promptly sent to Chase the requested documentation.

380.    Following timely submission of their final payment under the August 2009 Forbearance Agreement, the Fischers sent to Chase a letter that confirmed that both of the Forbearance Agreements had been completed. In the letter, they inquired about unexplained fees that had appeared on their account. They also called Chase to inquire about the status of their final modification. They were told that it would be finalized in January of 2010 and that they could stop making payments until they received the final modification.

381.    The Fischers received no modification in January of 2010. They contacted Chase and were told that their final modification was "on the investors desk," waiting to be signed. Throughout the first seven months of 2010, the Fischers repeatedly contacted Chase to inquire as to the status of their modification, and were repeatedly told that a final modification was "forthcoming."

382.    In a letter dated August 4, 2010, Chase again requested additional documentation. The first sentence of the letter stated, "[t]hank you for participating in the Making Home Affordable ("MHA") Loan Modification program."  The letter went on to claim that "[y]ou have requested consideration for a Trial Period Plan; however, you have not provided all of the documentation we previously requested."  This was patently false, as the Fischers had not expressed interest in a "Trial Period Plan."  They had requested a loan modification, and had been told by Chase that they needed to complete a "Forbearance Agreement."  Moreover, whether a "Forbearance Agreement" was technically in furtherance of a "Trial Period Plan" or some other plan to achieve a permanent loan modification was immaterial to the Fischers.  All they wanted was a modification.  Furthermore, the Fischers had provided all of the documentation Chase had previously requested, including bank statements, pay stubs, and hardship affidavits—all of which Chase was requesting again.  Nonetheless, they resent all of the requested documentation to Chase.

383.    In September 2010, 16 months after beginning their HAMP "pre-qualification" Forbearance Agreement the Fischers received a HAMP TPP.  Although the TPP required payments far higher than the payment that the Fischers had been promised pursuant to their Forbearance Agreements, the Fischers felt they had no choice but to comply, as at that time

Chase was threatening to foreclose on the Fischers' home, and told the Fischers that the TPP was a "take it or leave it" deal.  The Fischers signed the TPP and returned it to Chase.

384.    The HAMP TPP required three monthly payments beginning in September 2010. The Fischers timely made all three payments.

385.    Since first applying for a modification in 2009, and at all times relevant, the Fischers have responded to all document requests made by Chase by timely submitting the requested documents.  Throughout this process Chase requested duplicative documentation and delayed making a final decision on the Fischers' modification by claiming it was "missing documentation."  On information and belief, Chase mishandled, lost, or destroyed documents timely provided to Chase by the Fischers.

386.    Throughout the modification process, the Fischers received verbal assurances from Chase representatives that they would receive a final modification with payments substantially lower than the payment due under their original mortgage.  They were also repeatedly promised that their credit would not be damaged by participating in Chase's various modification related programs.  All of these promises were misleading and deceptive, and used the possibility of a HAMP modification to engage the Fischers in Chase's modification scheme.

387.    Chase threatened the Fischers with foreclosure throughout the modification process.  It repeatedly sent "notices of intent to foreclose" demanding ever increasing sums of money, and eventually referred the Fischers account to a foreclosure attorney, who then began threatening that foreclosure was imminent.

388.    Documents obtained by Plaintiffs reflect that the following types of fees were charged to the Fischers' account during the modification scheme: corporate adv statutory exp disb, corp adv - attorney advance disb, and late charges.

389.     In February 2011, the Fischers received a final modification from Chase.  This modification decreased the Fischers' payment by just fifteen dollars, while increasing their principal balance by over $8,000.  The modification terms were not consistent with the promises Chase made to the Fischers.

390.     In early June, 2011, Mrs. Fischer spoke with a Chase representative who identified herself as "Jeannine."  Jeannine said that there had been mistakes made on the Fischers' file and that it had been given to her to "straighten it out." She did not specify which mistakes she was referring to, and, thus far, Chase has taken no action to correct any kind of mistakes.

391.     Chase's scheme caused the Fischers to rely to their detriment on Chase's promises of a modification.  Instead of receiving a modification, the Fischers now have far more debt than when the process began, much of which is due to accrued interest and fees that Chase imposed for its own benefit and which could have been avoided had the Fischers not been subject to the modification scheme.  Had the Fischers known that Chase did not intend to modify their loan in an affordable or timely manner and would continue pursuing foreclosure, charging fees, and negatively reporting their credit during the modification scheme, the Fischers would have used their resources differently and would not have relied on Chase's illusory promises.

392.     Pursuant to a HAMP "pre-qualification" Forbearance Agreement, a second Forbearance Agreement, and a HAMP TPP, the Fischers made at least eight modified monthly payments, and sent Chase countless batches of documentation.  They now owe at least $8,000 more than they did when they began this process, and contrary to multiple promises by Chase representatives, their credit has been ruined.

### 3.     Sharie Green (CA)

393.     In September 2008, Sharie Green obtained a mortgage loan on her personal residence in Marina Del Ray, California.  This loan was later purchased by Chase.  At all times relevant, Ms. Green's loan was serviced by Defendant EMC.

394.     Beginning in September 2007, Ms. Green began to suffer severe health problems. In February 2008, Ms. Green was diagnosed with an auto-immune disorder that has rendered her disabled.  As a result of her disability, Plaintiff was only been able to work part-time and began having difficulty making her monthly loan payments.

395.     In February 2009, Plaintiff submitted a loan modification package to EMC requesting a loan modification.

396.     In April 2009, following and pursuant to her initial request for modification, Plaintiff received a Forbearance Agreement.  In a separate phone conversation, Ms. Green was told that she had a trial payment plan starting in May 2009.

397.     The April 2009 Forbearance Agreement required Ms. Green to make monthly payments in May, June, July, and August 2009.  Ms. Green timely made all of the required payments as required by the Forbearance Agreement, which EMC accepted.

398.     After these initial payments were successfully made, EMC instructed Ms. Green to continue to make the same payments each month, telling her that they were processing her loan modification.  Ms. Green complied with this instruction and made additional monthly payments in the same manner through February 2010, which were accepted by EMC without qualification or protest.

399.    In February 2010, Ms. Green was informed by a EMC representative that she had not been approved for a loan modification but that she should renew her application and enter into a new forbearance agreement.

400.    On or about March 22, 2010, Ms. Green requested another loan modification from EMC.

401.    Ms. Green received a second Forbearance Agreement in March 2010, which was dated March 11, 2010.  This agreement was substantially similar to Exhibit 10.

402.    The March 2010 Forbearance Agreement required Ms. Green to make an initial payment in March 2010 followed by monthly payments.  Ms. Green timely made all of the payments required by this agreement, which EMC accepted.

403.    Ms. Green continued to make, and EMC continued to accept, the required monthly payments through August 2010.

404.    Since beginning the April 2009 Forbearance Agreement, and at all times relevant, Ms. Green has responded to all document requests made by EMC by timely submitting the requested documents.  Throughout this process EMC requested duplicative documentation and delayed making a final decision on Ms. Green's modification by claiming that it was "missing" documentation.  On information and belief, EMC mishandled, lost or destroyed documents timely provided to EMC by Ms. Green.

405.    Ms. Green received multiple verbal promises that if she completed her Forbearance Agreements, she would be given a final modification.  These assurances were deceptive and used the possibility of a HAMP modification to engage the Greens in EMC's modification scheme.

406.     In June 2010, shortly after entering her second Forbearance Agreement, Ms. Green was told in a telephone conversation with a EMC representative that she was terminated from the program.  Despite this conversation, EMC continued to accept Ms. Green's payments under the Forbearance Agreement for many months, and continued to discuss the possibility of a loan modification with Ms. Green.  Ms Green has yet to receive a final modification or a written notice that she has been denied.  As such, fees and interest on her account continue to accumulate.

407.     EMC's scheme caused Ms. Green to rely to her detriment on EMC's promises of a modification.  Instead of receiving a modification, Ms. Green now has far more debt than when the process began, much of which is due to accrued interest and bogus fees that EMC imposed for its own benefit and which could have been avoided had Ms. Green not been subjected to the modification scheme.  Had Ms. Green known that EMC did not intend to modify in an affordable or timely manner and would continue pursuing foreclosure during the modification scheme, Ms. Green would have used her resources differently and would not have relied on EMC's illusory promises.

408.     Pursuant to two Forbearance Agreements, Ms. Green made at least nine modified payments and sent to Chase multiple batches of the same documentation.  She has yet to receive a final modification, and now owes considerably more than when this process began.

**4.     Amy Keller (NJ)**

409.     Chase is the servicer of a loan made to Amy Keller on her personal residence in Highlands, New Jersey in 2006.  At all times relevant, this loan has been serviced by Chase. Sometime after taking out the loan, Ms. Keller began experiencing hardships that caused her to have difficulty making monthly mortgage payments.

410.   Beginning in approximately December 2008, Ms. Keller contacted Chase[17] to discuss available alternatives to her mortgage payments.

411.   In December 2008 or January 2009, a Chase representative told Ms. Keller that she would only be considered for a modification if she defaulted on her loan by failing to make three monthly payments.  In reliance on Chase's representations and pursuant to Chase's instructions, Ms. Keller stopped making her mortgage payments.

412.   On May 29, 2009, Ms. Keller received a Notice of Intention to Accelerate and Foreclose from Chase, together with a letter stating that Chase believed her loan may be eligible for a loan modification program.  She received substantially similar correspondence throughout the period that she was actively pursuant a loan modification, on February 4, 2010, June 29, 2010, and July 6, 2010.

413.   Ms. Keller submitted documentation in support of a mortgage modification request a total of eight times between June of 2009 and February of 2011.  Chase confirmed receipt of the paperwork on various occasions.

414.   A Chase representative verbally offered Ms. Keller a modified payment of $500.00 in June 2009, but Chase never sent Ms. Keller paperwork regarding a trial modification plan after the offer was made.  Although it failed to finalize a trial modification with Ms. Keller, by letter dated November 3, 2009, Chase advised Ms. Keller that it was cancelling her request for a "loan workout" because of a broken "trial plan" for the period August 2009 through October 2009.

415.   In February 9, 2010, Chase advised Ms. Keller that she was approved for a "Special Forbearance Agreement" (which Ms. Keller did not previously request) whereby she

---

[17] Ms. Keller's initial communication for her loan modification was with WaMu, Chase's predecessor.

would make three modified monthly payments beginning in March 2010.  *See* Ex. 9.  Ms. Keller

signed and returned the Forbearance Agreement in February 2010.

416.    The Forbearance Agreement required three monthly payments, in March, April,

and May of 2010.  Ms. Keller timely made all of the payments required by the agreement, as

well as numerous additional monthly payments, which Chase accepted.

417.    In a letter dated July 14, 2010, Chase stated that "[t[]he first step to your Chase

mortgage modification is almost complete." Although Ms. Keller had been making payments

under a "Special Forbearance Agreement," the letter went on to say "[t]hank you for making

your payments during your trial mortgage modification period – we would very much like to

make your modification permanent."  *See* Ex. 16.

418.    Indeed, Ms. Keller received multiple verbal promises that if she completed her

Forbearance Agreement, she would be given a final modification.  These assurances were

deceptive and used the possibility of a permanent modification to engage Ms. Keller in Chase's

modification scheme.

419.    Ms. Keller entered into the Forbearance Agreement in the hopes of securing a

permanent modification and as a result of Chase's assurances that her compliance would result in

a permanent loan modification.

420.    Chase confirmed Ms. Keller's participation in a "trial mortgage modification"

twice in July 2010 (after she had completed making payments under the "Special Forbearance

Agreement"), simultaneously requesting information in order to make Ms. Keller's modification

"permanent."

421.    At all times relevant, Ms. Keller has responded to Chase's numerous document

requests by timely supplying the requested documents, even if it meant duplicating previous

efforts.  Ms. Keller consistently supplied information to Chase that was truthful to the best of her knowledge.  Throughout this process Chase requested duplicative documentation and delayed making a final decision on Ms. Keller's modification by claiming it was "missing" documentation.  On information and belief, Chase mishandled, lost, or destroyed documentation that was timely provided by Ms. Keller.

422.     During the same period that Ms. Keller was making trial payments and providing Chase with documentation in support of a loan modification, Ms. Keller received numerous notices from Chase on the one hand threatening her with the possibility of foreclosure and on the other hand stating that she may be eligible for a loan modification.

423.     On August 3, 2010, Ms. Keller contacted Chase to inquire about the status of a permanent loan modification.  She advised Chase that she had complied with the terms of the Special Forbearance Agreement and had made additional modified payments thereafter consistent with Chase's directions.

424.     On August 25, 2010, Chase returned Ms. Keller's payment for the month of August, stating that the funds were insufficient to cure the purported default.

425.     On February 15 and 16, 2011, notwithstanding that she had submitted documentation to Chase a total of eight times, Ms. Keller received identical letters from Chase stating that it could not offer her a modification under HAMP or any Chase modification programs because she had purportedly failed to provide Chase with requested documents.  Ms. Keller has yet to receive a final modification or any explanation of the status of her original modification application.  As a result, the fees and interest on her account continue to accumulate.

426.     Documents obtained by Ms. Keller reflect that her modified payments were erroneously categorized as "unapplied funds" and that she was improperly charged late fees during the modification scheme.

427.     Chase's scheme caused Ms. Keller to rely to her detriment on Chase's promises of a modification.  Instead of receiving a modification, Ms. Keller now has far more debt than when the process began, much of which is due to accrued interest and bogus fees that Chase imposed for its own benefit and which could have been avoided had Ms. Keller not been subject to the modification scheme.  Had Ms. Keller known that Chase did not intend to modify her loan in an affordable or timely manner and would continue pursuing foreclosure, charging fees, and negatively reporting her credit during the modification scheme, Ms. Keller would have used her resources differently and would not have relied on Chase's illusory promises.

428.     Pursuant to a Forbearance Agreement, Ms. Keller made six modified payments (one of which was inexplicably returned by Chase) over the course of six months, and sent in at least eight batches of documentation, yet she now owes more than she did before.  Her experiences illustrate Chase's pattern of deceptive and misleading practices.

**5.     Thomas Leopold (WA)**

429.     Plaintiff Thomas Leopold entered into a mortgage loan for his residence in Duvall, Washington in 2007.  Defendant Chase Home Finance LLC is and was at all times relevant the servicer for this mortgage.

430.     In April of 2008, Mr. Leopold's wife was diagnosed with a very severe type of lung cancer.  After nearly a year of struggling with this disease, she passed away in March of 2009.  The resultant medical bills and loss of income made it difficult for Mr. Leopold to continue making his mortgage payments.

431.    In early 2009, Mr. Leopold applied for a modification.  Although he was current on his mortgage payments when he originally requested to be considered for a mortgage modification, he was instructed by Chase to stop making his payments.

432.    In May 2009, Chase sent Mr. Leopold a Home Affordable Modification Trial Period Plan and Cover letter, which were substantially similar to Exhibits 5 and 8, respectively.

433.    The TPP required three payments, in June July, and August of 2009.  Mr. Leopold timely made all three of these payments to Chase.

434.    Believing multiple assurances from Chase representatives that a modification was forthcoming and he should therefore continue making payments pursuant to his TPP, Mr. Leopold made 18 additional monthly payments in the trial amount, which were accepted by Chase.

435.    On or about June 1, 2009, Mr. Leopold received a letter that included "Temporary Coupons for Making Payments during your Trial Modification Period." The letter stated,

> [i]f you make all [3] trial period payments on time and comply with all of the applicable program guidelines, *you will have qualified for a final modification*. However, there may be a period of time between your last trial payment and your first modification payment as we finalize the documents and get them back from you. During that interval, you should make a continuation payment at the trial period amount, and an extra coupon has been provided for that purpose. *This payment will be applied as a principal reduction payment on your loan after your final modification is effective.*

(emphasis added).  Mr. Leopold made far more than one additional TPP payment, yet none of these were applied as "principal reduction payments."

436.    In a letter dated September 17, 2009— over a month and a half after the Trial Period Plan was supposed to be complete, and over four months since Mr. Leopold had sent in his initial application—Chase notified Mr. Leopold that Chase was missing documentation required to complete his modification. The letter said "YOUR MODIFICATION IS AT RISK –

URGENT RESPONSE NEEDED!" The supposedly missing documents included: "[i]ncome documentation . . . [p]roof you occupy your home as your primary residence . . . [m]ost recent signed and filed tax return . . . [s]igned IRS Form 4506-T … Signed Hardship Affidavit," and a "Signed Trial Period Plan."  This was the exact same set of documents Mr. Leopold had previously sent in May 2009.

437.    Mr. Leopold immediately contacted Chase, and after insisting that he had already sent the required documentation, re-sent everything they asked for. This began an extended period of time during which Mr. Leopold would fax documentation to Chase, only to have Chase request that same documentation months, weeks, or even mere days later, claiming it had never been received, often in direct contradiction of Chase's own confirmatory letters.

438.    From approximately October of 2009 through approximately April of 2010, Mr. Leopold was subjected to a campaign of telephone harassment by Chase. He would receive up to three telephone calls per day on both his cell phone and his home phone. Chase repeatedly called him at work on his cell phone. Chase called at all hours of the day and night—including frequent calls as early as 5:00 a.m. and as late as 11:00 p.m. Mr. Leopold received calls from a call center in Costa Rica, as well as other foreign locations, in addition to numerous locations throughout the United States. The purpose of these harassing calls was to repeatedly request documents from Mr. Leopold that he had already sent to Chase. He would in turn send the documents yet again.

439.    In March 2010, Mr. Leopold attended an event for struggling homeowners, hosted by Chase.  At that event, he gave all of his documentation to a Chase representative, who told him that Chase then had everything it needed and that Mr. Leopold's modification would be finalized.

440.     In a letter addressed to Mr. Leopold and Ms. Lavery, dated May 11, 2010, Chase

claimed that, "We are unable to offer you a Home Affordable Modification because you did not

provide us with the documents we requested. A notice, which listed the specific documents we

needed and the time frame required to provide them, was sent to you previously." This letter was

received almost a year to the day after Mr. Leopold accepted Chase's offer to modify his loan if

he followed their instructions and signed his TPP. It was the first letter that stated his Home

Affordable Modification application had been denied. The denial was on a basis completely

contrary to the facts, claiming that he had not sent requested documentation, which, in fact, he

had sent completely and repeatedly.

441.     In June 2010, Chase offered Mr. Leopold a permanent "Loan Modification

Agreement."  This document promised a permanent modification to Mr. Leopold's loan,

pursuant to terms determined by Chase's own proprietary modification program, and not by

HAMP.  While this was not the modification Mr. Leopold had applied for and was due upon

completion of his TPP, Mr. Leopold signed and returned this modification to Chase without

qualification, thereby entering into the agreement.  Mr. Leopold signed the document in his local

Chase branch, and had it notarized by a Chase employee.  He was told by this Chase

representative that he would be receiving confirmatory paperwork soon.

442.     The Loan Modification Agreement significantly changed the major terms of Mr.

Leopold's loan.  Among other things, it reduced his monthly principal and interest payment and

reduced his interest rate.

443.     The Loan Modification Agreement gave Chase no right to cancel the agreement.

Instead, it very clearly stated "I understand that after I sign and return two copies of this

Agreement to the Lender, the Lender will send me a signed copy of this Agreement."

444.     The Loan Modification Agreement did give Chase the right to "correct the terms and conditions of this Plan if an error is detected after execution of this Agreement."  However, in that circumstance, Chase would be required to provide a "corrected Agreement," not an entirely new agreement with new terms.

445.     When Mr. Leopold did not receive confirmatory paperwork within a month after completing the Loan Modification Agreement, he contacted Chase to find out what was going on.  He was told that there had been a mistake on his Loan Modification Agreement, and that Chase was working to correct it.

446.     Mr. Leopold never received a corrected modification agreement.  Instead, he continued to receive calls from Chase claiming he owed ever increasing sums of money to cure his supposed default.

447.     Since the TPP period began, and at all times relevant, Mr. Leopold has responded to all document requests made by Chase by timely submitting the requested documents. Throughout this process Chase requested duplicative documentation and delayed making a final decision on Mr. Leopold' s modification by claiming it was "missing documentation."  On information and belief, Chase mishandled, lost, or destroyed many of documents that Mr. Leopold provided, and which Chase claimed to be missing.

448.     Throughout the modification process, Mr. Leopold received repeated assurances from Chase employees that he would soon receive a modification if he continued following their instructions.  These assurances were deceptive and used the possibility of a HAMP modification to engage Mr. Leopold in Chase's modification scheme.

449.     Documents obtained by Plaintiffs reflect that Mr. Leopold was charged the following types of fees throughout the modification process: corporate advance, "corp adv – prop preservation disb," and late charges.

450.     In February 2011, nearly two years after entering into his TPP, Mr. Leopold received a final modification from Chase.  The modification terms were not consistent with the promises Chase made to Mr. Leopold.  Nor was it consistent with HAMP or his HAMP TPP Agreement.

451.     The terms of the permanent modification tendered to Mr. Leopold were less advantageous than they would have been had Chase met its promises in a timely and proper manner

452.     As a result of fees and interest accrued during Chase's extended modification process, the principal balance on this modification was approximately $30,000 higher than the previous principal balance.  While the modification guarantees that unpaid late fees will not be added to the principal balance of the loan, it does not make the same guarantee about other types of fees, such as the "prop preservation disb" described above.  Mr. Leopold has requested but has not received a full accounting of his loan, and therefore cannot determine how much his principal balance was inflated as a result of fees charged during Chase's modification process.

453.     Chase's scheme caused Mr. Leopold to rely to his detriment on Chase's promises of a modification.  Although Mr. Leopold received a modification, Mr. Leopold now has far more debt than when the process began, much of which is due to accrued interest and bogus fees that Chase imposed for its own benefit and which could have been avoided had Mr. Leopold not been subject to the modification scheme.  Had Mr. Leopold known that Chase did not intend to modify his loan in an affordable or timely manner and would destroy his credit and continue

pursuing foreclosure and charging fees during the modification scheme, Mr. Leopold would have used his resources differently and would not have relied on Chase's illusory promises.

454.    Pursuant to two separate final contracts—a trial period and an "Alternative Modification"—Mr. Leopold made 21 modified payments over a period of 21 months.  He now owes approximately $30,000 more than he did when he began this process.  Mr. Leopold's experiences illustrate Chase's pattern of deceptive and misleading practices.

**6.    Basilisa Pacheco (WA)**

455.    Chase is the servicer of a loan made to Plaintiff Lisa Pacheco in 2003.  At all times relevant, this loan has been serviced by EMC.  In late 2008, Ms. Pacheco began experiencing hardships that caused her to have difficulty making her monthly mortgage payments.

456.    When Ms. Pacheco initially contacted Chase regarding her hardship, she was offered several Repayment Agreements that had payments higher than her original loan.  Since she was already struggling to make her normal payment, it was difficult for her to meet the terms of these agreements.

457.    Ms. Pacheco initially requested a modification in July 2009.  In October 2009 and November of 2010, she submitted completed HAMP modification applications.  She also submitted paperwork requested by Chase at other times throughout 2009 and 2010.

458.    In July 2009, following and pursuant to her initial request for a modification, Ms. Pacheco received a "Repayment Agreement."  *See* Ex. 12.  Ms. Pacheco signed and returned this agreement to Chase.

459.     The July 2009 Repayment Agreement required Ms. Pacheco to make a "down payment" in July 2009, and an additional monthly payment in September 2009. Ms. Pacheco timely made the down payment and began making timely payments under this plan.

460.     Shortly after entering the July 2009 Repayment Agreement, Ms. Pacheco called Chase to follow up on her paperwork. She was told by a male Chase employee who did not give his name to Ms. Pacheco that in three months she would qualify for a permanent modification "granted by the government." Chase thus dangled HAMP in front of Ms. Pacheco, assuring her that she would be put into a "government" modification program.

461.     In September 2009, before she was able to complete the July 2009 Repayment Agreement, Ms. Pacheco received another Repayment Agreement.  *See* Ex. 13.  Ms. Pacheco signed and returned this document to Chase.

462.     The September 2009 Repayment Agreement required Ms. Pacheco to make a down payment in September 2009, followed by six monthly payments, in beginning in October 2009.  Ms. Pacheco timely made all of the payments required by this plan.

463.     Believing assurances by Chase representatives that a modification was forthcoming and that she should continue making payments, Ms. Pacheco made the six additional monthly payments in the modified amount, which Chase accepted.

464.     Specifically, Ms. Pacheco was told by EMC representatives, including an employee who identified himself as "Reed Smithson," on numerous occasions that a permanent loan modification would be finalized in March of 2010, at the end of the September 2009 Repayment Agreement repayment agreement.

465.     Since beginning the July 2009 Repayment Agreement, and at all times relevant, Ms. Pacheco has responded to all document requests made by Chase by timely submitting the

requested documents.  Throughout this process Chase requested duplicative documentation and delayed making a final decision on Ms. Pacheco's modification by claiming it was "missing documentation.  On information and belief, Chase mishandled, lost or destroyed documents timely provided to Chase by Ms. Pacheco.

466.    Ms. Pacheco received multiple verbal promises that if she completed her Repayment Agreements, she would be given a final modification.  Indeed, internal Chase documents reflect that an agreement to modify was the stipulated "exit strategy" for the repayment agreements.  These assurances were deceptive and used the possibility of a HAMP modification to engage Ms. Pacheco in Chase's modification scheme.

467.    Documents obtained by Plaintiffs reflect that the following types of fees were charged to Ms. Pacheco's account during the modification scheme: attorney advances, corp. advance adjustment[s], late charges, misc. F/C and B/R expenses, misc. repayment, property preservation, and statutory expenses.

468.    A letter dated September 24, 2010, which Ms. Pacheco did not receive until Chase sent it at her request on November 29, 2010, states that her "Making Home Affordable Modification Trial Period Plan Offer" had "expired" because Ms. Pacheco purportedly "did not provide us with the documents we requested."  The letter further states: "A notice, which listed the specific documents we needed and the time frame required to provide them, was sent to you previously." Ms. Pacheco never received any such "notice," and no copy was subsequently provided to her. While Ms. Pacheco never received a written "Trial Period Plan Offer" from Chase, it is clear from this letter that Chase did not internally differentiate between Repayment Agreements and TPPs. Ms. Pacheco has yet to receive a final modification or any explanation of

the status of her original modification application.  As a result, the fees and interest on her account continue to accumulate.

469.    Chase's scheme caused Ms. Pacheco to rely to her detriment on Chase's promises of a modification.  Instead of receiving a modification, Ms. Pacheco now has far more debt than when the process began, much of which is due to accrued interest and bogus fees that Chase imposed for its own benefit and which could have been avoided had Ms. Pacheco not been subjected to the modification scheme.  Had Ms. Pacheco known that Chase did not intend to modify her loan in an affordable or timely manner and would continue pursuing foreclosure and charging fees during the modification scheme, Ms. Pacheco would have used her resources differently and would not have relied on Chase's illusory promises.

470.    Pursuant to at least two Repayment Agreements with a "stip to modify" exit strategy, multiple verbal promises of a modification, and two HAMP applications, Ms. Pacheco made 23 consecutive modified monthly payments. Yet as of January 2011, when she filed her original complaint against Chase in federal court, Ms. Pacheco owed according to Chase over $20,000 more than she did when the process began.  Ms. Pacheco's experiences illustrate Chase's pattern of deceptive and misleading practices.

**7.    Michael Sabouhi (CA)**

471.    Chase is the servicer on a home mortgage loan made to Plaintiff Michael Sabouhi for his home in Rancho Cucamonga, California.  At all times relevant, this loan has been serviced by Chase.  In 2008 and 2009, Mr. Sabouhi began experiencing hardships that made it difficult for him to continue making his monthly mortgage payments.

472.    In late 2009 Mr. Sabouhi contacted Chase to ask about a modification.  He was told that he needed to be three months behind in order to qualify for a modification.

Accordingly, he followed Chases' directions and did not make payments in January, February, or March of 2010.

473.    In March 2010, Mr. Sabouhi was told that he would be put on a "Reduced Payment Plan."  This plan consisted of three months of reduced payments, in April, May, and June 2010.

474.    Mr. Sabouhi made all three of the payments required by this plan.

475.    In July 2010, Mr. Sabouhi received a letter thanking him for his request for a HAMP modification, and instructing him to complete an enclosed application.  Among other things, the letter said that "[a]t Chase, we will do everything we can to make your mortgage payment affordable and help you keep your home."

476.    Mr. Sabouhi sent to Chase all the requested documentation necessary to complete his application, with the exception of a form regarding his unemployment insurance, which the State of California had not yet sent to him.  He was expecting that document soon and was told by Chase representatives that he could send it to them as soon as he received it.  Among the documents Mr. Sabouhi sent to Chase was a signed hardship affidavit which required him to agree to several conditions including that

> I understand that while my request is being evaluated, the Servicer may suspend any scheduled foreclosure sale, but may continue to send legal notices related to foreclosure. Any pending foreclosure action will not be dismissed and may be immediately resumed from the point at which it was suspended if I fail to comply with the terms and conditions of the Making Home Affordable program . . . .

At no point during or after Mr. Sabouhi's participation in the modification process has he been informed that he "fail[ed] to comply with the terms and conditions of the Making Home Affordable program."

477.     In July 2010, Mr. Sabouhi received a notification that his home was to be sold at a foreclosure auction on in August 2010.  Upon receipt of this notice, Mr. Sabouhi immediately contacted Chase.  He was told by a Chase representative that by law, his house could not be sold as long as he was under consideration for a modification, and that, because he was currently "in a modification," he did not need to worry about the upcoming sale date.  The Chase representative told him that the sale date could be put on hold and instructed Mr. Sabouhi to call him back in a few days to confirm that the sale was on hold.  Mr. Sabouhi followed up several days later and was told that the sale was on hold.

478.     Mr. Sabouhi told the Chase representative that with support from his family he could come up with the funds to bring the mortgage current if necessary.  Surprisingly, he was instructed *not* to pay, as doing so would ruin his chance at a modification.  Additionally, he was told that if he was denied for a modification, he could bring the loan current at that point, and if he received a permanent modification, his missed payments may be added to the end of the modified loan.  In either event, the Chase representative told him, it would be in his best interest *not to pay anything to bring his mortgage current* before a decision on his pending mortgage modification application.  Accordingly, Mr. Sabouhi did not make a payment in July or August of 2010.

479.     Starting on September 13, 2010, Mr. Sabouhi sent to Chase at least five complete modification packets.  By that time he had received the missing form from the State of California, and when he contacted Chase to inform Chase that he had received it and would be forwarding it to them, he was told to send not only that form, but the entire application packet he had sent previously.  He faxed the entire packet to them several times, but each time Chase lost or destroyed it, claiming to have no record of it.

480.     On Tuesday, September 21, 2010, Mr. Sabouhi contacted Chase one more time to

confirm that his packages had been received.  He was told that Chase now had all of his

documents on file, but that it did not matter because his house *had already been sold* at a

foreclosure auction.

481.     By September 13, 2010, Chase had, without sufficient notification or warning to

Mr. Sabouhi—and in direct contravention of Chase's assurances to Mr. Sabouhi that Chase

would not and could not sell his house while he was under consideration for a modification—

sold his home to Fannie Mae.  The foreclosure sale had occurred just over one month after the

July 27, 2010 letter in which Chase stated "we will do everything we can to make your mortgage

payment affordable and help you keep your home."  Mr. Sabouhi never received any notification

from Chase or the trustee that the sale would occur on September 13, 2010.  Mr. Sabouhi's home

was sold while he was in good faith pursuing a loan modification from Chase, after he had relied

on multiple assurances by Chase representatives that (a) his loan modification would be

processed in a timely manner, (b) that as long as he was under consideration for a modification,

his house could not be sold in a foreclosure action, and (c) that he should not bring his loan

current to maintain his chances of receiving an affordable loan modification.

482.     Shortly after learning his home had been sold, Mr. Sabouhi contacted Chase in

order to prove to skeptical family members that he had originally been instructed to skip

payments, and had been repeatedly instructed not to bring the loan current.  Mr. Sabouhi reached

a Chase representative, who opened Mr. Sabouhi's file.  While on speaker phone, Mr. Sabouhi

asked if he could bring his loan current, and the Chase representative—apparently unaware that

the home had already been sold—again told him that he should not bring his loan current while it

was under consideration for a modification because it would cause the underwriters to deny the

modification.  Mr. Sabouhi then informed the Chase representative that his house had been sold, which was news to the person on the other end of the line who was looking at Mr. Sabouhi's loan file on a computer screen.

483.    Mr. Sabouhi pursued a rescission of his foreclosure for several months, as his eviction hearing approached.  At one point, he spoke to a Chase manager named "Courtney Kendal."  She told Mr. Sabouhi that Chase should be able to help him, and told him that she would call him back in an hour.  When she called back, she stated that he didn't qualify for a rescission, because he had never been in a modification, because he supposedly had not sent Chase everything Chase needed to process a modification.  Ms. Kendall stated that Mr. Sabouhi had failed to send his 2008 tax forms.  When he pointed out that these had never been requested, she stated that he had failed to send everything before September 12, 2010, an apparently arbitrary date, which happened to fall the day before the foreclosure sale of which Mr. Sabouhi had received no adequate notification.  Finally she stated that Mr. Sabouhi hadn't made a payment in six months prior to the foreclosure, which was not only false (he had made at least three under the "Reduced Payment Plan" he had been put on by Chase, and had repeatedly offered to bring his loan current), but was only remotely plausible because he had been instructed by Chase to *miss payments*.

484.    Chase was clearly unable to function or communicate critical information internally months after selling Mr. Sabouhi's home.  In a letter dated December 27, 2010, Chase informed Mr. Sabouhi that "[w]e have determined that you do not qualify for a modification through the federal government's Home Affordable Modification Program (HAMP) at this time."  The letter went on to state that "[w]e are unable to complete your evaluation for a HAMP modification due to your unemployment status."  More than three months *after* the house had

been sold, Chase's loss mitigation and/or mortgage modification department was, apparently, unaware that Chase had taken Mr. Sabouhi's home away from him, and was still processing his modification.  Furthermore, the letter stated that the denial was because he was unemployed—a fact Chase had been aware of over a year earlier, when Chase representatives had told Mr. Sabouhi that the guidelines had changed, and had encouraged him to miss several payments to qualify for a modification. Tragically, this same letter stated:

> If you want to keep the property:
>
> You will need to pay off your past due balance and bring your account current, or refinance your loan with another bank.

Had Chase sent this letter to Mr. Sabouhi before selling his house, he would have brought the loan current and might still be living in his home today.

485.    In a letter dated January 21, 2011, Chase wrote Mr. Sabouhi to let him know that "[w]e strive to give you excellent service.  This includes letting you know what to do if you have any problems with your mortgage account."  Mr. Sabouhi received this letter less than ten days before his eviction hearing and long after his house had been sold.

486.    On February 1, 2011, Mr. Sabouhi's eviction hearing was held in the County of San Bernadino Superior Court.  Although the judge was sympathetic, stating that Mr. Sabouhi's home clearly should not have been sold while he was seeking a modification, the judge did not have the authority to rescind the foreclosure.  He did, however, give the Sabouhis two weeks to move out, and denied Fannie Mae's request that Mr. Sabouhi and his family pay Fannie Mae $50 per day for the time spent in the house after the sale had been completed—approximately $7,000.00.

487.    In mid-February 2011, Mr. Sabouhi, his wife, and their two children moved out of their home of over eight years.  They currently reside with Mr. Sabouhi's parents.

488.     Since first requesting a modification in 2009, and at all times relevant, Mr. Sabouhi has responded to all document requests made by Chase by timely submitting the requested documents.  Throughout this process Chase requested duplicative documentation and delayed making a final decision on Mr. Sabouhi's modification by claiming it had not received his documents.  On information and belief, Chase mishandled, lost, or destroyed documents timely provided to Chase by Mr. Sabouhi.

489.     Throughout the modification process, Mr. Sabouhi was repeatedly told that his home would not be sold at a foreclosure as long as he was in compliance with the modification program.  Indeed, Mr. Sabouhi was instructed that he *should not bring his loan current*, even though, with assistance from family members, he would have been able to, because doing so would hurt his chances of getting a modification.

490.     Chase's scheme caused Mr. Sabouhi to rely to his detriment on Chase's promises of a modification.  Not only did Mr. Sabouhi not receive a modification, Chase foreclosed on Mr. Sabouhi and sold his house, allowing Chase to collect bogus fees imposed during its scheme from the foreclosure sale proceeds.  This result could have been avoided had Mr. Sabouhi not been subject to the modification scheme.  Had Mr. Sabouhi known that Chase did not intend to modify his loan in an affordable or timely manner and would continue pursuing foreclosure during the modification scheme, Mr. Sabouhi would have used his resources differently and would not have relied on Chase's illusory promises.

491.     Pursuant to a repayment agreement and multiple verbal assurances that he would be fairly considered for a final modification, Mr. Sabouhi made several modified monthly payments, and sent Chase multiple batches of documentation.  Yet, despite the fact that he was promised a foreclosure would not proceed during the modification process, and despite the fact

that he would have been able to remedy his delinquency if given fair notice, Mr. Sabouhi's house

was sold by Chase in a foreclosure.  Mr. Sabouhi's experiences illustrate Chase's pattern of

deceptive and misleading practices.

## IX.   PART 2 CLASS ACTION ALLEGATIONS AND CLASS DEFINITIONS

492.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

493.   Pursuant to FED. R. CIV. P. 23(a) and 23(b), the above-named Plaintiffs whose

facts are described in Part 2 bring the claims in Part 2 of this Consolidated Amended Complaint

on behalf of themselves and the following classes of similarly situated individuals.  Plaintiffs

reserve the right to modify or amend the Classes' definitions at or before the time Plaintiffs brief

the issue of class certification.

## A.   Class Definitions.

### 1.   Statewide Modification Promises Class.

494.   Plaintiffs seek to represent the following statewide classes for purposes of their

consumer protection and unfair and deceptive acts and practices claims ("Consumer Claims")

asserted in this Part 2 under the corresponding state laws of California, Michigan, New Jersey,

and Washington:

> All mortgagors whose home mortgage loans are serviced by Defendants and who,
> since January 1, 2008:
>
> (a) have attempted to obtain loan modifications and were instructed by
> Defendants to default on their mortgages to become eligible for a modification,
> but who have not yet received a permanent modification, have been notified by
> Defendants that their request is denied, or had their house sold in a foreclosure
> sale while awaiting a modification; and/or
>
> (b) have attempted to obtain permanent loan modifications and have made
> payments during their modification application process but who have not yet
> received a permanent modification, have been belatedly notified by Defendants
> that their request is denied, have received a final modification that includes fees or
> charges purportedly incurred during the modification application process, or who

have had their house sold in a foreclosure sale while awaiting a modification agreement pursuant to a pending application.

495.     Plaintiffs Sharie Green and Michael Sabouhi seek to represent the California Class and make claims on its behalf herein.

496.     Plaintiffs Sandra and Frank Fischer seek to represent the Michigan Class and make claims on its behalf herein.

497.     Plaintiff Amy Keller seeks to represent the New Jersey Class and make claims on its behalf herein.

498.     Plaintiffs Janet Cureton, Thomas Leopold, and Basilisa Pacheco seek to represent the Washington Class and make claims on its behalf herein.

**2.     Nationwide Modification Promises Class.**

499.     Plaintiffs Janet Cureton, Sandra and Frank Fischer, Sharie Green, Amy Keller, Thomas Leopold, Basilisa Pacheco, Michael Sabouhi, seek to represent the following Nationwide Class for purposes of their common law promissory estoppel and injunctive claims asserted in this Part 2:

> All mortgagors Nationwide whose home mortgage loans are serviced by Defendants and who, since January 1, 2008:
>
> (a) have attempted to obtain loan modifications and were instructed by Defendants to default on their mortgages to become eligible for a modification, but who have not yet received a permanent modification, have been notified by Defendants that their request is denied, or had their house sold in a foreclosure sale while awaiting a modification; and/or
>
> (b) have attempted to obtain permanent loan modifications and have made payments during their modification application process but who have not yet received a permanent modification, have been belatedly notified by Defendants that their request is denied, have received a final modification that includes fees or charges purportedly incurred during the modification application process, or who have had their house sold in a foreclosure sale while awaiting a modification agreement pursuant to a pending application.

500.     In the alternative to a Nationwide Modification Promises Class, Plaintiffs Janet Cureton, Sandra and Frank Fischer, Sharie Green, Amy Keller, Thomas Leopold, Basilisa Pacheco, Michael Sabouhi, seek to represent such mortgagors in their home states of California, Michigan, New Jersey, and Washington as defined above (Statewide Modification Promises Class).

**B.     Exclusions.**

501.     Excluded from the proposed Classes are (i) Defendants, any entity in which any Defendant has a controlling interest, and Defendants' officers, directors, legal representatives, predecessors, successors, and assigns; (ii) the judicial officers to whom this case is assigned; and (iii) any member of the immediate families of excluded persons.

**C.     Numerosity/Impracticability of Joinder.**

502.     The proposed Classes consist of hundreds if not thousands of persons throughout the States of California, Michigan, New Jersey, and Washington, making individual joinder of all proposed members of the Classes impractical.  The precise number of members can be ascertained through discovery, which will include Defendants' records.

**D.     Commonality and Predominance.**

503.     All members of the proposed Classes share a united interest in the fair, just, and consistent determination of the questions of law and fact necessary to the adjudication of Defendants' liability, which predominate over questions affecting only individual members.  The proposed Classes share a common interest in the determination of all factual and legal issues pertinent to Defendants' liability.  The proposed Classes also share a common interest in the disgorgement and restitution of revenue unjustly obtained by Defendants.

504.     Key common liability questions include:

A.      Whether and when Defendants engaged in a pattern or practice of bad faith negotiations with mortgagors seeking home mortgage loan modifications;

B.      Whether and when Defendants knew or should have known that mortgagors would be damaged and/or Defendants would be enriched by Defendants' loan modification practices;

C.      Whether Defendants omitted and concealed material facts in their communications and disclosures to Plaintiffs and members of the Classes regarding their home mortgage loan modification practices;

D.      Whether Defendants omitted and concealed material facts in their communications and disclosures to Plaintiffs and the Classes regarding fees charged to mortgagors engaged in performance pursuant to Defendants' written or verbal plans promising a permanent modification and/or a timely review of modification applications;

E.      Whether Defendants omitted and concealed material facts in communications and disclosures to Plaintiffs and the Classes regarding the status of their loan modification applications;

F.      Whether Defendants requested and accepted payments as a condition for promised permanent loan modifications and/or a timely review of modification applications, without any intention to timely and permanently modify the loans, or any reasonable basis to believe that the loans would be timely and permanently modified, and without taking diligent or reasonable steps to implement timely permanent loan modifications;

G.      Whether Defendants misrepresented to mortgagors seeking modifications the terms of and the balances of the loans being serviced, including arrearages, interest owed, and fees;

H.      Whether Defendants improperly applied mortgage payments to accounts, failed to acknowledge receipt of payments, and/or held mortgage payments in "suspense," resulting in escalated debt obligations, including additional fees, interest, and other charges;

I.      Whether Defendants improperly initiated, caused to be initiated, or pursued existing foreclosure proceedings against mortgagors who were attempting to obtain home loan modifications;

J.      Whether Defendants routinely mishandled, "lost," or destroyed documents that mortgagors mailed, faxed, or emailed to Defendants at Defendants' request;

K.      Whether Defendants' conduct violated the consumer protection and/or unfair and deceptive acts and practices laws of the states at issue;

L.      Whether Defendants promised permanent home mortgage loan modifications to mortgagors, inducing their reasonable and detrimental reliance;

M.      Whether Defendants promised timely review of applications for permanent home mortgage loan modifications to mortgagors, inducing their reasonable and detrimental reliance; and

N.      Whether Defendants' practices warrant equitable, injunctive, and/or monetary relief.

505.    The proposed Classes are also united on fundamental questions regarding their members' entitlement to damages and equitable relief, including:

A.      Whether members of the proposed Classes are entitled to damages and/or equitable relief based on their payments to Defendants and related harm and costs incurred as a result of doing business with Defendants;

B.      If members of the proposed Classes are so entitled, what is the appropriate scope, extent and measure of damages and equitable relief that should be awarded;

C.      Whether the degree of reprehensibility of Defendants' conduct warrants the imposition of punitive or exemplary damages under applicable, controlling authority; and

D.      Whether members of the proposed Classes are entitled to attorneys' fees, pre- and post-judgment interest, and costs of suit.

**E.      Typicality.**

506.      The claims and defenses of the Named Class Representative are typical of the claims and defenses applicable the proposed Classes because Defendants uniformly misrepresented their intent with respect to home mortgage loan modifications, as well as fees charged to mortgagors, the status of loan modification applications, and the balances of the loans being serviced. Defendants uniformly and actively suppressed, concealed, and failed to disclose the material risks associated with their protracted loan modification scheme and foreclosure proceedings. Defendants' uniform conduct deprived Plaintiffs and all members of the proposed Classes of their ability to make an informed decision about whether to negotiate with Defendants, seek permanent loan modifications from Defendants, or pursue other alternatives instead. Plaintiffs, like all members of the Classes, requested and/or applied for permanent loan modifications with Chase, sent documentation requested by Chase, made payments pursuant to Defendants' written or verbal plans promising a permanent modification and/or a timely review of modification applications, and suffered losses due to Defendants' misconduct. Plaintiffs, like all members of the Classes, have experienced these injuries and remain exposed to the likelihood of further illegal conduct by Defendants; nor have their ongoing injuries been remedied or compensated.

**F.      Adequacy.**

507.    Plaintiffs and their counsel will fairly and adequately assert and protect the interests of all members of the proposed Classes.  Plaintiffs are committed to the vigorous prosecution of this action and have retained competent and experienced counsel.  Plaintiffs have no interests adverse to those of any absent members of the Classes with respect to the key common issues of Defendants' home mortgage loan modification practices, fees, deficient disclosures, and breaches.

**G.      Certification Under Rule 23(b).**

508.    Class certification is proper under FED. R. CIV. P. 23(b)(1)(A) because the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes and establish incompatible standards of conduct for Defendants.

509.    Class certification is proper under FED. R. CIV. P. 23(b)(1)(B) because the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to individual Class members which would, as a practical matter, be dispositive of the interest of the other members not parties to these adjudications and/or substantially impair their ability to protect these interests.

510.    Class certification is proper under FED. R. CIV. P. 23(b)(3) because common issues of law and fact predominate over any questions affecting only individual members of the Classes, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

511.    Class adjudication is superior to individual litigation, which would foreclose the ability of most members of the proposed Classes to litigate their claims, impose an undue burden

on the courts, and result in inconsistent determination of common issues.  The Court may employ

issue certification under FED. R. CIV. P. 23(c)(4)(B) to address any variation of law, fact, or

interest from the standpoint of fairness, efficiency, and economy, in order to avoid denial of class

treatment which would require reversion to repetitive and piecemeal individual litigation.

## X.    PART 2 CAUSES OF ACTION – CONSUMER CLAIMS

512.    Plaintiffs bring the following Consumer Claims under the consumer protection

and unfair and deceptive acts and practices laws of their respective states, on their own behalf

and on behalf of each member of the designated Classes described within the Count, against all

Defendants.  When greater details regarding the conduct of each Defendant become known,

Plaintiffs will amend this Consolidated Complaint, as necessary.   To the extent necessary to

preserve these claims, Plaintiffs also hereby incorporate by reference, and plead in the alternative

herein, the Consumer Claims set forth in Part 1 above.

513.    Defendants have violated the consumer protection and unfair and deceptive acts

and practices laws of California, Michigan, New Jersey, and Washington through the following

acts and omissions, which were implemented so as to extract as much money as possible from

borrowers Defendants identified as being at risk for default prior to foreclosure or whom

Defendants instructed to become delinquent in order to be eligible for a loan modification:

A.    Engaging in bad faith negotiations as to home mortgage loan modifications;

B.    Instructing mortgagors to stop making mortgage payments under the false

pretense that doing so will not hurt credit scores and is necessary for them to obtain a loan

modification;

C.    Presenting mortgagors with packages of information, documents, and promises

that offer to (a) forbear on foreclosure proceedings, and (b) provide mortgagors with an

opportunity to obtain a permanent loan modification without the intention and/or ability to

provide such forbearance or permanent loan modifications;

D.      Leading mortgagors to reasonably believe that Defendants will permanently

modify their mortgage loans if they submit requested documentation and make payments without

the intention and/or ability to provide such permanent loan modifications;

E.      Failing to inform ineligible mortgagors of their denial for permanent loan

modifications within a reasonable period of time following temporary modified payment plans

and payments made pursuant to such plans;

F.      Failing to take reasonable steps to work with eligible mortgagors to generate

terms for permanent modifications;

G.      Unilaterally deciding to treat the written and verbal agreements or plans pursuant

to which Plaintiffs performed as if they were null and void and instead threatening foreclosure;

H.      Steering mortgagors into temporary modified payment plans with illusory

promises to permanently modify—increasing profits to Chase without providing genuine efforts

to move mortgagors into timely permanent mortgage modifications;

I.      Misrepresenting the status of loan modification applications;

J.      Misrepresenting the status of mortgagor accounts;

K.      Erecting artificial obstacles in the evaluation process to obstruct, delay, and/or

prevent permanent loan modifications;

L.      Failing to retain, employ, and supervise adequately trained staff, including by

knowingly designing and maintaining a loan modification system that was riddled with flaws and

intentionally staffed with employees who lacked the training, experience, education or skill to

accurately perform their obligations;

M.      Incentivizing employees to rush customers off of the telephone as quickly as possible so as to frustrate customers, the intended result being that instead of complaining, the customers would give up and accept Chase's faulty eligibility determinations;

N.      Ensuring further frustration by implementing a "one call resolution" policy under which customers would never speak to the same service representative twice;

O.      Routinely losing mortgagors' loan documents, modification papers, and other necessary materials to evaluate eligibility and routinely rejecting these customers' completely performed obligations on false and incorrect grounds;

P.      Routinely requiring borrowers to submit and re-submit duplicative financial information or documents already in Defendants' possession, claiming that it would not review a borrower for eligibility until and unless these documents are submitted time and again;

Q.      Failing to keep accurate records of mortgagor accounts, including accounting for fees, payments, credits, arrearages, and amounts owed;

R.      Refusing to put statements in writing when asked;

S.      Failing or refusing to provide adequate explanations of fees charged to mortgagors;

T.      Failing to properly disclose and/or concealing fees and other charges in whole or in part;

U.      Charging excessive, unlawful, and unreasonable fees;

V.      Inexplicably or arbitrarily increasing debt obligations;

W.      Failing to properly apply mortgagor payments in whole or in part;

X.      Rejecting, returning, or refusing payments without justification or explanation;

Y.      Expelling Plaintiffs and others from its modification programs despite the fact that these Plaintiffs and others complied with all of the terms and requirements thereof;

Z.      Sending monthly letters threatening mortgagors with foreclosure, even though these borrowers were complying with Chase's written and verbal instructions to modify mortgages;

AA.     Demanding modified trial payments in lieu of the original mortgage payments and misrepresenting to mortgagors that doing so will not adversely impact their mortgage accounts or credit scores,

BB.     Misrepresenting their credit reporting policies for loans in active temporary payment programs; and

CC.     Concealing that Defendants report mortgagors as delinquent to credit reporting agencies, even when they are following Defendants' instructions and making modified payments.

514.    Defendants accomplish the foregoing by presenting Plaintiffs and members of the Statewide Modification Promises Classes with instructions to stop paying their mortgages to become eligible for a modification and/or assurances of an eventual permanent modification.

### COUNT 4 -- "Unlawful," "Unfair," and/or "Fraudulent" Business Practices in Violation of the California Unfair Competition Law ("UCL"), CAL. BUS. & PROF. CODE §§ 17200, *et seq.*
*By the California Modification Promises Class*

515.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

516.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the California Class describe above.

517.    The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. CAL. BUS. & PROF. CODE § 17200.

518.    A business act or practice is "unlawful" if it violates any established state or federal law.

519.    Defendants have violated, and continue to violate the "unlawful" prong of the UCL by violating the Rosenthal Fair Debt Collection Practices Act, CAL. CIV. CODE § 1788.2(c). Defendants have also breached direct contracts with Plaintiffs and the proposed Class and have breached their duties of good faith and fair dealing, as well as engaged in other common law violations (promissory estoppel and unjust enrichment).  Defendants further violate the unlawful prong of the UCL by violating the Consent Orders issued by the OCC and the Federal Reserve, discussed supra, in numerous ways and by continuing to engage in the practices that are prohibited by the Orders and/or failing to implement the changes demanded by regulators. Defendants have engaged, and continue to be engaged, in unlawful business practices within the meaning of CAL. BUS. & PROF. CODE §§ 17200, *et seq*.

520.    A business act or practice is "unfair" under the UCL if the reasons, justifications and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

521.    Defendants have and continue to violate the "unfair" prong of the UCL by inviting Plaintiffs and California Class members to participate in loan modification programs, and by taking their trial payments without the intention of permanently modifying their loans or to timely evaluate Plaintiffs and the California Class for permanent modifications.  Among other things, Defendants have, in bad faith, engaged in all of the acts and omissions described in

section VIII, *supra*.[18]  These practices offend the public policy of California, and are unethical, oppressive, unscrupulous, or substantially injurious to consumers.

522.    The gravity of the harm to members of the Class resulting from such unfair acts and practices outweighs any conceivable reasons, justifications and/or motives of Defendants for engaging in such deceptive acts and practices.

523.    A business act or practice is "fraudulent" under the Unfair Competition Law if it actually deceives or is likely to deceive members of the consuming public.

524.    Defendants' acts and practices as described herein have deceived and/or are likely to deceive members of the public.  Specifically, Defendants invited Plaintiffs to participate in a loan modification program, promising that if Plaintiffs complied with the terms of the various payment plans and otherwise qualified, Defendants would permanently modify their loans, enabling them to avoid foreclosure, and at a minimum provide them with a timely decision regarding whether or not to grant them a permanent modification.  Plaintiffs relied on these representations in forgoing other options and instead entering the trial program and making trial payments and have suffered monetary loss as a result.  These statements not only deceived Plaintiffs but are also likely to deceive a reasonable, similarly situated person into believing the same.

525.    As a result of the conduct described above, Defendants have been, and will continue to be, unjustly enriched at the expense of Plaintiffs and members of the California Class.

---

[18] Plaintiffs do not seek to state a claim asserting a private right of action under HAMP or to enforce any contract between Chase and the United States (Fannie Mae).  Rather, Plaintiffs' causes of action reference the relevant terms of the HAMP in conjunction with other underlying claims, e.g., UCL violations.

526.     By committing the acts and practices alleged above, Defendants have engaged, and continue to be engaged, in unfair business practices within the meaning of CAL. BUS. & PROF. CODE §§ 17200, *et seq*.

527.     Defendants' omissions and misrepresentations as set forth in this Consolidated Complaint are material in that they relate to matters which are important to consumers or are likely to affect the purchasing decisions or conduct of consumers, including Plaintiff and members of the California Class.

528.     Plaintiffs and members of the California Class relied on and/or their decisions were influenced by the misrepresentations and omissions by Defendants to their detriment.

529.     As a direct and proximate result of Defendants' violations of the UCL, Plaintiffs and the other members of the California Class have been injured.  Because they have suffered financial harm, they have "suffered injury in fact and ha[ve] lost money or property as a result of the unfair competition."  CAL. BUS. & PROF. CODE § 17204.  Moreover, they have suffered undue psychological stress and damaged credit, while enduring Defendants' unlawful, unfair, and/or fraudulent practices.  They are threatened with additional harm as a direct and proximate result of Defendants' violations of the UCL.  By making payments under temporary modification programs and by continuing to make mortgage payments, Plaintiffs and members of the Class forwent other remedies that might be pursued to save their homes and their cash resources, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with their defaults, e.g., selling or renting the homes.  Plaintiffs and members of the Class have also given up valuable time and effort to meet Defendants' demands.

530.     Members of the California Class have been further harmed by the foreclosure of their homes after making payments under temporary modification programs that they would not

have made had they known that Defendants would refuse to permanently modify their loans and/or foreclose in any event.

531.     Through their unlawful, unfair, and/or fraudulent acts and practices, Defendants have obtained, and continue to unfairly obtain, money from Plaintiffs and members of the California Class that far exceeds and is separate from their debt obligations under their existing mortgages.  Plaintiffs' excessive payments and additional debt incurred have been directly caused by their reliance on Defendants' representations described herein.  As such, Plaintiffs request that this Court cause Defendants to restore this money to Plaintiffs and all California Class members, and to enjoin Defendants from continuing to violate the Unfair Competition Law as discussed herein.  In addition, Plaintiffs request that this Court cause Defendants to refund all excessive and unlawful fees or other charges assessed to Plaintiffs and the California Class in the course of its scheme.  Otherwise, Plaintiffs and the California Class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

**COUNT 5 -- Unfair Debt Collection Practices in violation of the Rosenthal Fair Debt Collection Practices Act ("Rosenthal Act"), CAL. CIV. CODE § 1788, *et seq*.**
*By the California Modification Promises Class*

532.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

533.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the California Class describe above.

534.     Defendants are "debt collectors" engaging in "debt collection" practices under the Rosenthal Fair Debt Collection Practices Act (the "Rosenthal Act").  See CAL. CIV. CODE § 1788.2(c).

535.    Defendants' and their agents' communications with Plaintiffs about their loan modification applications routinely state that Defendants are "attempting to collect a debt" or that one or more of the Defendants is a "debt collector."  *See* Exs. 8, 9.

536.    Defendants violated the Rosenthal Act by using false, deceptive, and misleading statements and deceptive omissions in connection with its collection of Plaintiffs' and the California Class's mortgage debt, as alleged herein.  *See* CAL. CIV. CODE § 1788.17 (incorporating 15 U.S.C. §1692(e)).  Specifically, Defendants invited Plaintiffs to participate in a loan modification program, promising that if Plaintiffs complied with the terms of the various payment plans and otherwise qualified, Defendants would (a) forbear on the right to foreclose, (b) consider Plaintiffs for permanent modifications in a timely manner, and/or (c) permanently modify their loans.  Plaintiffs relied on these representations in forgoing other options and instead entering the trial program and making trial payments and have suffered monetary loss as a result.  These statements not only deceived Plaintiffs but are also likely to deceive the least sophisticated debtor and/or any reasonable, similarly situated person into believing the same.

537.    The Rosenthal Act allows for class actions to the same extent permitted under the federal Fair Debt Collection Practices Act ("FDCPA").  *See* CAL. CIV. CODE § 1788.17; *Gonzales v. Arrow Fin. Servs., LLC*, 233 F.R.D. 577, 581 (S.D. Cal. 2006).

538.    As a direct and proximate result of Defendants' violations of the Rosenthal Act, Plaintiffs and the other members of the California Class have been injured.  They have suffered financial harm, as well as undue psychological stress and damaged credit, while enduring Defendants' unlawful practices.  They are threatened with additional harm as a direct and proximate result of Defendants' violations of the Rosenthal Act.  By making payments under temporary modification programs and by continuing to make mortgage payments, Plaintiffs and

members of the California Class forwent other remedies that might be pursued to save their homes and their cash resources, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with their defaults, *e.g.*, selling or renting the homes.  Plaintiffs and members of the California Class have also given up valuable time and effort to meet Defendants' demands.

539.    Members of the California Class have been further harmed by the foreclosure of their homes after making payments under temporary modification programs that they would not have made had they known that Defendants would refuse to permanently modify their loans and/or foreclose in any event.

540.    Plaintiffs and members of the California Class have been damaged and are entitled to all of the damages, remedies, and penalties available under the Rosenthal Act, including attorneys' fees and costs.  Through their unfair acts and deceptive practices, Defendants have improperly obtained, and continue to improperly obtain, money from Plaintiffs and members of the California Class.  As such, Plaintiffs seek the following remedies as provided for in California Civil Code § 1788.30:

A.    Actual damages pursuant to CAL. CIV. CODE § 1788.30(a);

B.    A penalty in such amount as the court may allow pursuant to CAL. CIV. CODE § 1788.30(b);

C.    Attorneys' fees and costs pursuant to CAL. CIV. CODE § 1788.30(c); and

D.    Any other relief which the Court deems proper.

**COUNT 6 -- Violation of the Michigan Mortgage Brokers, Lenders and Servicers Lending Act ("MBLSA"), MICH. COMP. LAWS §§ 445.1651, *et seq*.**
*By the Michigan Modification Promises Class*

541.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

542.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Michigan Class described above.

543.    Upon information and belief, Defendants Chase Home Finance LLC, EMC Mortgage Corporation, The Bear Stearns Companies, Inc. and JPMorgan Chase Bank, N.A. were licensed or registered or required to be licensed or registered under the MBLSA, MICH. COMP. LAWS §§ 445.1651, *et seq.*

544.    It is a violation of the MBLSA to fail to conduct business in accordance with the law, or to engage in fraud, deceit, or material misrepresentation in connection with any transaction governed by the Act.  MICH. COMP. LAWS § 445.1672(a)-(b).

545.    It is a violation of the MBLSA to, directly or indirectly, make a false, misleading, or deceptive advertisement regarding mortgage loans.  MICH. COMP. LAWS § 445.1672a(1).

546.    Defendants have violated and continue to violate the MBLSA by engaging in the acts and omissions described in section VIII, *supra.*

547.    Defendants' unfair or deceptive acts or practices have been undertaken as part of a generalized course of conduct, pattern, and practice affecting numerous mortgagors in Michigan.

548.    Plaintiffs and members of the Michigan Class justifiably relied on Defendants' representations regarding the loan modification process, Defendants' handling of mortgagor documents, and mortgagors' ability to qualify for such modifications.  Defendants' failure to properly and timely approve modifications resulted in damages to Plaintiffs and members of the Michigan Class.

549.    Had Plaintiffs and the other members of the Michigan Class known that they would pay excessive, unlawful, or unreasonable fees, would accrue needless additional debt, may never obtain a mortgage loan modification from Defendants, and could face foreclosure in any event following a protracted and illusory modification process, they would have pursued other options to save their homes and allocate their financial resources and/or would not have engaged in negotiations with Defendants, much less paid (or incurred further debt regarding) the excessive fees and other charges assessed to their accounts by Defendants.

550.    Had Defendants not engaged in the unfair or deceptive conduct described above, the Plaintiffs and the other members of the Class would have pursued other options to save their homes and allocate their financial resources and/or would not have engaged in negotiations with Defendants, much less paid (or incurred further debt regarding) the excessive fees and other charges assessed to their accounts by Defendants.

551.    As a direct and proximate result of Defendants' violations of the MBLSA, Plaintiffs and the other members of the Michigan Class have been injured.  They have suffered financial harm, as well as undue psychological stress and damaged credit, while enduring Defendants' unlawful practices.  They are threatened with additional harm as a direct and proximate result of Defendants' violations of the MBLSA.  By making payments under temporary modification programs and by continuing to make mortgage payments, Plaintiffs and members of the Michigan Class forwent other remedies that might be pursued to save their homes and their cash resources, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with their defaults, *e.g.*, selling or renting the homes.  Plaintiffs have also given up valuable time and effort to meet Defendants' demands.

552.     Members of the Michigan Class have been further harmed by the foreclosure of their homes after making payments under temporary modification programs that they would not have made had they known that Defendants would refuse to permanently modify their loans and/or foreclose in any event.

553.     The Michigan Plaintiffs and members of the Michigan class are entitled to $250.00 per violation or actual damages, whichever is greater, together with attorneys' fees and costs, injunctive relief, and any other relief available under the MBLSA.

### COUNT 7 -- Violations of the New Jersey Consumer Fraud Act ("CFA"), N.J. STAT. ANN. § 56.8-1, *et seq.*
*By the New Jersey Modification Promises Class*

554.     Plaintiffs repeat and re-allege the allegations contained in section VIII, *supra*, as if fully set forth herein.

555.     Plaintiff brings this claim on her own behalf and on behalf of each member of the New Jersey Subclass described above.

556.     The New Jersey Consumer Fraud Act ("CFA") is codified at N.J. STAT. ANN. §§ 56.8-1, *et seq.* The statute provides consumers with a comprehensive procedure for redressing the violations of applicable law.

557.     The CFA, N.J. STAT. ANN. § 56:8-2, provides in part, as follows:

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice . . .

558. Defendants' conduct, described above, falls within the scope of the CFA. Defendants have a statutory duty to refrain from unfair or deceptive acts or practices in servicing home mortgage loans.

559. Defendants' mortgage loans servicing activities had and continue to have the capacity to deceive a substantial portion of the public—namely all New Jersey mortgagors whose mortgage loans are serviced by Defendants.

560. Throughout the class period, Defendants engaged in a mass advertising and marketing campaign regarding its participation in HAMP and offers of other loan modification and hardship assistance programs, its commitment to helping customers prevent mortgage default and foreclosure through loan modifications, and boasted about its success in helping customers under HAMP and other loan modification programs on a nationwide basis, including in New Jersey.  In making and disseminating these advertisements, Defendants knew or should have known that the statements are false, misleading and likely to deceive the public because they falsely represent the nature of the modification programs and concealed material information about the risks, as described above.

561. Defendants engaged in its advertising and marketing with the intent to directly and indirectly solicit homeowners to inquire and apply for mortgage loan modifications under the various programs.

562. After soliciting homeowners to apply for modification of their mortgages, Defendants have, in the course of their business and undertaking in the course of trade and commerce, engaged in unfair or deceptive acts or practices in their dealings with New Jersey homeowners through the acts and omissions described in Section VIII, *supra*.

563.    Defendants' intentional misrepresentations, deception, suppression, knowing concealment, fraud, false promise, and omission of aforementioned material facts false with the intent that others rely upon such concealment, suppression, or omission, constitute prohibited conduct under the CFA.

564.    Defendants' unfair or deceptive acts or practices have been undertaken as part of the generalized course of conduct, pattern and practice affecting numerous homeowners in New Jersey.

565.    The facts concealed and/or not disclosed by Defendants to Plaintiff and New Jersey Class members are material facts that a reasonable person would have considered important in deciding whether or not to engage with Defendants in a loan modification process.

566.    Plaintiffs and members of the New Jersey Class justifiably acted or relied to their detriment on the concealment and/or non-disclosed facts as evidenced by their continued negotiations with Defendants to secure a modified mortgage agreement.

567.    As a direct result and proximate result of Defendants violations of the CFA, Plaintiff and members of the New Jersey Class have been injured in their property, in addition to facing undue psychological stress and damaged credit scores while enduring Defendants' unlawful practices.

568.    Moreover, had Plaintiff and members of the New Jersey Class known that they would have to pay excessive, unlawful or unreasonable fees, would accrue needless additional debt, may never obtain a mortgage loan modification from Defendants, and likely would face foreclosure in any event following a protracted and illusionary modification process, they would have pursued other options to save their homes and allocate their financial resources and/or

would not have engaged in negotiating with Defendants, much less paid (or incurred further debt regarding) the excessive fees and other charges assessed to their accounts by Defendants.

569.     By pursuing the modification process, Plaintiff and members of the New Jersey Class lost time and opportunity to pursue other avenues for saving their home and credit, e.g., selling or renting the homes, restructuring their debt under bankruptcy, short sales etc.  Plaintiff and members of the New Jersey Class also gave up valuable time and effort to meet Defendants' demands.

570.     Many members of the New Jersey Class have been further harmed by the foreclosure of their homes after making payments to secure a modified mortgage agreement. Plaintiff and members of the New Jersey Class would not have made these payments had they known that Defendants would foreclose their homes and not provide any modification of their mortgage.

571.     Plaintiff and members of the New Jersey Class have been further harmed by paying excessive premiums and fees for force-placed insurance.  These excessive charges have contributed to their financial problems, making it even more difficult to meet the unreasonable obligations imposed by Defendants' unfair and deceptive mortgage modification scheme.

572.     Thus, the acts and practices of Defendants as set forth above, have directly, foreseeably, and proximately caused ascertainable damages and injury to Plaintiff and members of the New Jersey Class in amounts yet to be determined as described in greater detail above, including but not limited to having been compelled to pay amounts in excess of their legal obligations to retain their properties and avoid foreclosure, paying excessive premiums and fees for force-placed insurance, having to retain counsel to challenge inaccurate and otherwise illegal impositions and charges, incurring additional late fees and charges while the improper fees and

charges are challenged, being reported to credit bureaus without cause and/or defending foreclosure lawsuits that are a direct result of following the Defendants' instructions.

573.   Plaintiff and the members of the New Jersey Class have been damaged and are entitled to damages, remedies, fees, and costs available under the CFA, including attorneys' fees, costs, and treble damages.  Defendants should be enjoined from continuing to engage in these unlawful, deceptive, unreasonable, and unlawful practices.  Through their unfair acts and deceptive practices, Defendants have improperly obtained, and continue to improperly obtain, money from the members of the New Jersey Class.  As such, Plaintiff requests that the Court grant the relief enumerated below.

574.   Defendants' unlawful practices set forth above and throughout the Consolidated Amended Complaint was and is wanton, willful and outrageous, and manifests a reckless disregard for the consequences of Defendants' actions and for the rights of Plaintiff and members of the Subclass and warrants an award of punitive damages to deter Defendants from committing such acts in future.

### COUNT 8 -- Violations of the Washington Consumer Protection Act ("CPA"), WASH. REV. CODE § 19.86, *et seq.*
*By the Washington Modification Promises Class*

575.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

576.   Plaintiffs bring this claim on their own behalf and on behalf of each member of the Washington Class described above.

577.   The CPA is codified at WASH. REV. CODE § 19.86, *et seq*.  The statute provides consumers with a comprehensive procedure for redressing the violations of applicable law.  The conduct at issue in this case falls within the scope of the CPA.

578.     The CPA declares "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" unlawful.  WASH. REV. CODE § 19.86.020. The CPA further provides a private right of action to any person "injured in his or her business or property."  WASH. REV. CODE § 19.86.090.

579.     Defendants' conduct, described above, falls within the scope of the CPA. Defendants had a statutory duty to refrain from unfair or deceptive acts or practices in servicing home mortgage loans.

580.     Defendants' mortgage loan servicing activities had and continue to have the capacity to deceive a substantial portion of the public—namely all Washington mortgagors whose mortgage loans are serviced by Defendants.

581.     Defendants have, in the course of their business and undertaken in the course of trade or commerce, engaged in unfair or deceptive acts or practices in their dealings with Washington mortgagors by engaging in the acts described in section VIII, *supra*.

582.     Defendants' unfair or deceptive acts or practices have been undertaken as part of a generalized course of conduct, pattern, and practice affecting numerous mortgagors in Washington.

583.     Plaintiffs' claims arise from "consumer transactions" that impact the "public interest" within the meaning of WASH. REV. CODE § 19.86.093.

584.     Defendants have repeated the same conduct with mortgagors other than Plaintiffs and are likely to repeat this conduct in the future, as part of a generalized course of conduct, pattern, and practice that is undertaken in the course of Defendants' business.

585.     Alternatively, Plaintiffs' claims are "private disputes" that impact the "public interest" within the meaning of WASH. REV. CODE § 19.86.093.

586.    Defendants advertise to the public in general, including on their website, with respect to their mortgage loan servicing operations and options available to struggling homeowners.

587.    Defendants actively solicited Plaintiffs to attempt to obtain permanent loan modifications, which indicates potential solicitation of others.

588.    Defendants and Plaintiffs occupy unequal bargaining positions.

589.    Defendants' acts or practices have been "injurious to the public interest" within the meaning of WASH. REV. CODE § 19.86.093, as well because they violated multiple provisions of the Consumer Loan Act, WASH. REV. CODE § 31.04, *et seq.*  E.g., WASH. REV. CODE §§ 31.04.027 (prohibited acts, including misleading, deceptive, or fraudulent practices); 31.04.035 (mortgage loan servicer licensing requirement); 31.04.102 (requirements for advanced disclosures as required under TILA); 31.04.290 (requirements for mortgage loan servicers relating to fees and fee disclosures, accepting and crediting payments, disclosures regarding credits, responses to borrower inquiries, correction of errors, identification and itemization of fees and charges, and temporal scope of disclosures).  The Consumer Loan Act specifically incorporates the Consumer Protection Act and contains a legislative finding that the practices governed by the Consumer Loan Act "are matters vitally affecting the public interest."  WASH. REV. CODE § 31.04.208.

590.    Defendants' acts or practices have been "injurious to the public interest" within the meaning of WASH. REV. CODE § 19.86.093, as well because they violated WASH. REV. CODE § 19.144.080.  WASH. REV. CODE § 19.144.080 makes it "unlawful for any person in connection with . . . modifying a residential mortgage loan" to engage in fraudulent or misleading activity during the "lending process" or to make, use, or facilitate "any misstatement, misrepresentation,

or omission" with the "intention that it be relied on by a mortgage . . . borrower."  Chapter

19.144, *et seq.* (Mortgage Lending and Homeownership) contains a specific legislative statement

that the chapter is "necessary to encourage responsible lending, protect borrowers, and preserve

access to credit in the residential real estate lending market."  WASH. REV. CODE § 19.144.005.

591.    The Washington State Attorney General's current investigatory and enforcement

action involving mortgage servicing and mortgage modification abuses indicates that the conduct

alleged herein pertains to matters of great public importance and with the potential to be highly

injurious to the public interest:

> The Attorney General's Office is working to help Washington residents by
> cracking down on mortgage fraud and deceptive offers to help those in need.  We
> are strengthening Washington's laws and reaching out to the public to warn them
> about equity skimmers, bogus "foreclosure rescue" scammers and deceptive loan
> modification programs before they end up in a worse situation.

Washington State Attorney General, Foreclosure Assistance Page, at

http://www.atg.wa.gov/foreclosure.aspx (emphasis added) (last visited Apr. 18, 2011).

592.    The facts concealed and/or not disclosed by Defendants to Plaintiffs and the other

members of the Class are material facts that a reasonable person would have considered

important in deciding whether or not to engage with Defendants in a loan modification

negotiation.

593.    Plaintiffs and the other members of the Class justifiably acted or relied to their

detriment on the concealment and/or non-disclosed facts as evidenced by their continued

negotiations with Defendants attempting to secure mortgage loan modifications.

594.    Had Plaintiffs and the other members of the Class known that they would pay

excessive, unlawful, or unreasonable fees, would accrue needless additional debt, may never

obtain a mortgage loan modification from Defendants, and likely would face foreclosure in any

event following a protracted and illusory modification process, they would have pursued other options to save their homes and allocate their precious financial resources and/or would not have engaged in negotiations with Defendants, much less paid (or incurred further debt regarding) the excessive fees and other charges assessed to their accounts by Defendants.

595.   Had Defendants not engaged in the unfair or deceptive conduct described above, the Plaintiffs and the other members of the Class would have pursued other options to save their homes and allocate their precious financial resources and/or would not have engaged in negotiations with Defendants, much less paid (or incurred further debt regarding) the excessive fees and other charges assessed to their accounts by Defendants.

596.   Similarly, had Defendants not engaged in the unfair or deceptive conduct described above, and had Plaintiffs and Class members known they would be forced to pay excessive premiums and fees for force-placed insurance, Plaintiffs and Class members would have pursued other options, such as independently finding and purchasing insurance policies.

597.   Defendants' unfair or deceptive representations and material omissions to mortgagors and the public regarding the true nature of Defendants' intent not to modify, the true scope of fees that mortgagors would accrue, and the true nature of Defendants' intent to foreclose after months or years of building additional fees and/or interest owed by Plaintiffs and the other members of the Class constituted unfair and deceptive acts and practices in violation of WASH. REV. CODE § 19.86, *et seq.*

598.   As a direct and proximate result of Defendants' violations of the CPA, Plaintiffs and the other members of the Class have been injured in their property, in addition to facing undue psychological stress and damaged credit while enduring Defendants' unlawful practices.

599.     By making payments under temporary modification programs and by continuing to make mortgage payments, Plaintiffs and members of the Class forwent other remedies that might be pursued to save their homes and their cash resources, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with their defaults, *e.g.*, selling or renting the homes.  Plaintiffs have also given up valuable time and effort to meet Defendants' demands.

600.     Many members of the Class have been further harmed by the foreclosure of their homes after making payments under temporary modification programs that they would not have made had they known that Defendants would refuse to permanently modify their loans and/or foreclose in any event.

601.     Plaintiffs and members of the Class have been damaged and are entitled to all of the damages, remedies, fees, and costs available under the CPA, including attorneys' fees, costs, and treble statutory damages.  *See* WASH. REV. CODE § 19.86.090.  Defendants should be enjoined from continuing to engage in these unlawful, deceptive, unreasonable, and unlawful practices.  Through their unfair acts and deceptive practices, Defendants have improperly obtained, and continue to improperly obtain, money from members of the Class.  As such, Plaintiffs request that this Court grant the relief enumerated below.  Otherwise, Plaintiffs and members of the Class may be irreparably harmed and/or denied an effective and complete remedy if such relief is not granted.

602.     Plaintiffs will provide or already have provided any required notice to appropriate entities regarding Defendants' unfair and deceptive trade practices.

## XI.   PART 2 CAUSES OF ACTION – PROMISSORY ESTOPPEL CLAIM

603.    Plaintiffs bring the following Promissory Estoppel Claim under the common law, on their own behalf and on behalf of each member of the designated Class described within the Count, against all Defendants.  When greater details regarding the conduct of each Defendant become known, Plaintiffs will amend this Consolidated Complaint, as necessary.  To the extent necessary to preserve these claims, Plaintiffs also hereby incorporate by reference, and plead in the alternative herein, the promissory estoppel set forth in Part 1 above.

### COUNT 9 -- Promissory Estoppel – Modification Promises
*By the National Modification Promises Class, or in the Alternative, by the respective Statewide Modification Promises Classes*

604.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

605.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Modification Promises Class described above.

606.    Defendants made representations to Plaintiffs and members of the Modification Promises Class that if they performed under and/or following the conclusion of temporary agreements and payment plans, including the components thereof in the form of written agreements and plans, they would receive a permanent loan modification.

607.    Defendants intended to induce Plaintiffs and members of the Modification Promises Class to rely on these representations and make both down payments and subsequent monthly payments pursuant to Defendants' verbal and written promises of permanent modifications, timely review of modification applications, and/or forbearance.

608.     Plaintiffs and members of the Modification Promises Class did in fact reasonably rely on Defendants' representations, by submitting payments, as well as documentation requested by Defendants.

609.     Reliance by Plaintiffs and members of the Modification Promises Class was reasonable.

610.     Reliance by Plaintiffs and members of the Modification Promises Class was to their detriment.  Plaintiffs and members of the Modification Promises Class have lost opportunities to fund other strategies to deal with their default ant avoid foreclosure, such as restructuring their debt under the bankruptcy code, or pursuing other options to deal with their defaults, such as selling or renting the homes.  In light of the declining real estate market in the United States since July 2009, failure to market and sell the property at that time has reduced the amount that Plaintiffs can recover from such sale.  Plaintiffs and members of the Classes have faced financial harm, as well as undue psychological stress and damaged credit, and have given up valuable time and effort to meet Defendants' demands.

611.     Plaintiffs and members of the Modification Promises Class have yet to receive permanent loan modifications and/or forbearance in foreclosure processing.  For Plaintiffs and the Modification Promises Class who relied to their detriment on Chase's promises to modify, even a belated permanent modification does not cure their losses.

612.     Members of the Modification Promises Class have been further harmed by the foreclosure of their homes after making payments under temporary modification programs that they would not have made had they known that Defendants would refuse to permanently modify their homes and/or foreclose in any event.

## XII.   PART 2 CAUSES OF ACTION – INJUNCTIVE RELIEF

613.    Plaintiffs bring the following claim for injunctive relief, on their own behalf and on behalf of each member of the designated Class described within the Count, against all Defendants.  When greater details regarding the conduct of each Defendant become known, Plaintiffs will amend this Consolidated Complaint, as necessary.

### COUNT 10 -- Injunctive Relief – Reformation of Accounts, Correction of Credit Reporting, and Reformation of final Loan Modification Agreements
*By the National Modification Promises Class, or in the Alternative, by the respective Statewide Modification Promises Classes*

614.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

615.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Nationwide Modification Promises Class described above.

**Fees and Interest.**

616.    Plaintiffs have paid fees and incurred debt in the form of fees and interest in the course of the modification process.

617.    Defendants incorrectly applied Plaintiffs' payments, causing them to incur additional fees and interest in the course of the modification process.

618.    Had Defendants provided modifications to Plaintiffs on the timetable promised, Plaintiffs' debts would be lower than they are now.  By delaying the modification process, Chase can augment the new principal balance amounts if it ever does modify Plaintiffs' loans by adding all the missed payments (including both principal and interest), excessive fees and other costs as capitalized amounts due.

619.    Plaintiffs and the Class have been injured and will be irreparably injured in the future by Defendants' improper accounting, inflated debt, and lost property interests.

**Damaged Credit.**

620.    Defendants have negatively and incorrectly reported to credit bureaus that Plaintiffs are delinquent during the modification process.

621.    Defendants have instructed Plaintiffs to become delinquent to become eligible for a modification, resulting in negative credit reporting and damage to their credit scores.

622.    Had Defendants provided modifications to Plaintiffs on the timetable promised, Plaintiffs' debts would be lower than they are now.

623.    Had Defendants not instructed Plaintiffs to stop paying their mortgages or to refrain from making payments they could and would have otherwise made, in order to be eligible for a modification, Plaintiffs' would not have suffered damaged and/or negatively reported credit.

624.    Plaintiffs and the Class have been injured and will be irreparably injured in the future by Defendants' improper negative credit reporting and lost property interests.

**Final Modifications.**

625.    Where Chase granted final Loan Modification Agreements after a protracted modification process, the terms of the final Loan Modification Agreements under which Plaintiffs are currently performing are unfair because they resulted from a fundamentally unfair and unequal negotiation process.

626.    Plaintiffs signed and agreed to comply with the Final Loan Modifications under duress, and with the threat of foreclosure hanging over their heads, having gone through months or years of compliance with Defendants' demands in reliance on promises of a timely modification of their mortgage loans.

627.     Defendants agreed to provide Plaintiffs with final Loan Modification Agreements long before Plaintiffs ever received them.

628.     Instead, Defendants unnecessarily delayed the process, lost or destroyed Plaintiffs' documentation and application materials, and falsely promised that their modifications would be forthcoming in a timely manner.

629.     As demonstrated by their eventual receipt of final Loan Modification Agreements, Plaintiffs were eligible for such modifications.

630.     Had Defendants provided final Loan Modification Agreements to Plaintiffs on the timetable promised, Plaintiffs' debts would be lower than they were at the time Plaintiffs received, entered into, and started performing under the final Loan Modification Agreements they eventually received.  By delaying the modification process, Chase improperly augmented the new principal balance amounts by adding all the missed payments (including both principal and interest), excessive fees and other costs as capitalized amounts due.

631.     Defendants are obligated to comply with the terms of the modifications they promised Plaintiffs months or years before they tendered written Loan Modification Agreements to them, as described above.

632.     While Defendants have not yet repudiated Plaintiffs' Loan Modification Agreements as alleged in Part 3 below, Defendants breached their prior promises to timely provide Plaintiffs with loan modifications.

633.     As a result of these breaches, Plaintiffs and the Class have been injured and will be irreparably injured in the future.  Among other things, Chase's failure to implement its prior promises and repeated practice of referring homeowners to collections and foreclosure as it promised them modifications will result in homeowners paying more than they should be

obligated to pay under the Loan Modification Agreements, had such Loan Modification Agreements been timely provided and without delay.

**Injunctive Relief Requested.**

634.    Plaintiffs and the Class do not have a plain, adequate, speedy, or complete remedy at law to address the wrongs alleged in this Consolidated Amended Complaint, and will suffer irreparable injury as a result of Chase's misconduct unless injunctive relief is granted to reform the contracts Plaintiffs currently are performing under.

635.    Plaintiffs and the Class are therefore entitled to an injunction requiring Chase to:

A.    reform their accounts to eliminate fees and interest improperly accrued as a result of the modification process;

B.    correct all improper negative credit reporting and promptly inform credit bureaus that Plaintiffs' loans are current;

C.    reform the terms of their Loan Modification Agreements and correct Plaintiffs' and Class members' loan accounts consistent with the terms that would have been in the Loan Modification Agreements had they been timely provided, without the inflation of debt caused by Defendants' delay and other unfair and deceptive practices.

                    *       *       *

### PART 3 – Final Modifications – Facts, Classes and Claims

636.    Even when Chase agrees to final or permanent modification agreements, it has unilaterally canceled them or failed to properly implement them, sending homeowners back into delinquency and forcing them to restart the modification process.

637.    Plaintiffs in Part 3 are homeowners whose mortgage loans were contractually modified by Chase through HAMP or CHAMP permanent Loan Modification Agreements

(collectively "Loan Modification Agreements"). The Loan Modification Agreements permanently modified Plaintiffs' mortgages by changing terms of the loan contract including, without limitation, interest rates, principal balances, number and/or timing of required payments, and payment amounts.

638.     Plaintiffs accepted these Loan Modification Agreements by submitting a notarized copy and making the contractually due monthly mortgage payments in the revised amounts that were required under their Loan Modification Agreements. For its part, Chase accepted the payments.

639.     Despite the Plaintiffs' performance, and following the effective dates of the Loan Modification Agreements, Chase made demands for payment that violated the terms of the Loan Modification Agreements.

640.     Chase has failed to honor the permanent modifications it offered members of the putative classes. As a result, Plaintiffs and thousands of homeowners are wrongfully being deprived of an opportunity to pay their mortgage loans and save their homes from foreclosure. Defendants' actions breach the Loan Modification Agreements, thwart the purpose of HAMP or CHAMP programs, and are illegal under state law.

## XIII.   PART 3 FACTS

A.            **The Form Final Loan Modification Agreements.**

1.                   **HAMP Loan Modification Agreements.**

641.     Chase, in some cases, gives a HAMP Loan Modification Agreement to homeowners who have completed a HAMP Trial Period Plan. An example of a HAMP Loan Modification Agreement is attached hereto as Exhibit 17. Chase determines the terms of HAMP

modifications using HAMP guidelines, including a requirement that the monthly payment is equal to approximately 31% of the homeowner's gross income.

642.     Under HAMP guidelines, the Loan Modification Agreements can alter the borrower's interest rate, principal balance, number and/or timing of required payments, and/or payment amount.  The principal balance can, in some cases, change upward as past due fees and interest are capitalized.  In other cases, the principal can go down because repayment of principal amounts are forgiven. Escrow accounts may also be required, even where none existed before.

643.     A HAMP Loan Modification Agreement is clear in its finality.  Section 3 of the Agreement clearly provides that the terms of this agreement "shall supersede any provision to the contrary in the Loan Documents [mortgage and note]."  *See* Ex. 17.  The lender is allowed to cancel the modification only if "prior to the modification effective date … the Lender determines that any of [the homeowner's] representations" regarding his/her financial state, living situation, and participation in a TPP "are no longer true and correct."  *See* Ex. 17.

**2.         Chase Loan Modification Agreements.**

644.     Chase offers some homeowners who have requested and applied for a modification a Chase Loan Modification Agreement (also known as a CHAMP Modification, an Alternative Modification, an Alt Mod, or a Loan Modification Agreement).  An example of a Chase Loan Modification Agreement is attached hereto as Exhibit 18.  Chase Loan Modification Agreements are nearly identical to HAMP Loan Modification Agreements, the difference being that the terms of Chase Loan Modification Agreement are completely under Chase's control.

645.     A Chase Loan Modification Agreement can alter the borrower's interest rate, principal balance, number and/or timing of required payments, and/or payment amount.  The principal balance can, in some cases, change upward as past due fees and interest are capitalized.

In other cases, the principal can go down because repayment of principal amounts is forgiven. Escrow accounts may also be required, even where none existed before.

646.    A Chase Loan Modification Agreement is clear in its finality.  Section 2 specifically states that "The Loan Documents are hereby modified as of [the date the first payment is due or the Modification Effective Date] . . . and all unpaid late charges are waived". This agreement sets forth a new maturity date, modified principal balance amount, the deferred principal balance, and a new payment plan at specified interest rates.  The new principal balance can include unpaid and deferred interest, fees, escrow advances and other costs, but generally excludes unpaid late charges.

647.    A Chase Loan Modification Agreement contains an itemized chart listing the various interest rates, monthly principal and interest payment, estimated escrow amounts and the total number of payments.  Chase Loan Modification Agreements further clarify that these terms "supersede any provisions to the contrary in the Loan Documents." *See* Ex. 18.

648.    On information and belief, Chase sometimes offers a Chase Loan Modification Agreement instead of HAMP Loan Modification Agreement to homeowners who have completed HAMP TPPs or are otherwise eligible for HAMP Loan Modification Agreement in order to lock the homeowners into terms that are more favorable to Chase or to the investor on the loan.  This practice allows Chase to circumvent HAMP requirements that ensure a modification is affordable to homeowners while still being profitable for investors.

649.    According to Chase's 2010 Annual Report, it completed approximately 285,000 permanent loan modifications in the years 2009-2010, including approximately 54,500 under HAMP.  Of these 285,000 permanent modifications, 55% of permanent loan modifications have

included interest rate reductions, 49% have included term or payment extensions, 9% have included principal deferment and 22% have included principal forgiveness.  *Id.*

**B.**        **Chase Routinely Breaches Final Loan Modification Agreements.**

650.    While Loan Modification Agreements purport to allow for the production of a "corrected Agreement" if an "error is detected" after the execution of a Loan Modification Agreement, they do not allow for unilateral cancellation of the modification.

651.    Chase routinely breaches the Loan Modification Agreements in one or more of the following ways:

A.    Chase fails to capitalize arrearage amounts for past due payments, interest, fees and escrow balances into homeowners' modified principal balances when required under the Loan Modification Agreements.  Rather, it carries through some or all of these amounts as immediately due and owing in full on homeowners' loan accounts after the Loan Modification Agreements become effective.  Where Chase does capitalize amounts required under the Loan Modification Agreements, it double-charges homeowners for the capitalized funds by simultaneously treating the funds as immediately due and owing in full.  Chase also does not implement the modified interest rates and other loan terms provided for under the Loan Modification Agreements.

B.    Chase attempts to collect and in fact collects amounts that are not contractually due under the Loan Modification Agreements, including, without limitation, past due payments, interest, late fees, default-related fees and costs such as property inspection fees, property preservation fees, appraisal fees, title report fees, recording fees and/or subordination fees, foreclosure fees and costs and escrow account charges.

C.     Failing to credit payments made pursuant to the requirements of the Loan Modification Agreement, thereby generating account errors including, without limitation, past due payments, interest, late fees, default-related fees and costs such as property inspection fees, property preservation fees, appraisal fees, title report fees, recording fees and/or subordination fees, foreclosure fees and costs and escrow account charges.

D.     Chase issues notices of foreclosure and initiates foreclosures against homeowners who are in compliance with the terms of the Loan Modification Agreement, thus generating additional foreclosure related fees and inducing stress and anxiety in the affected homeowners.

E.     Unilaterally substituting different, less advantageous terms for borrowers than those contained in the Loan Modification Agreement, often without notice to borrowers.

F.     Unilaterally cancelling the Loan Modification Agreement, often without notice to the borrower.

652.     Chase's failure to comply with the terms of the Loan Modification Agreements is reflected in its monthly statements and other correspondence sent to homeowners which contain incorrect information about the terms of the modified loans including, without limitation, payment amounts due, and the principal amount homeowners are contractually obligated to pay.

653.     Chase is on notice of the aforementioned breach of the Loan Modification Agreements.  Plaintiffs and, on information and belief, other Class Members have contacted and continue to contact Chase by telephone and in writing to notify Chase of the errors on their accounts in an effort to get them corrected.

654.     As a result of Chase's breaches, Plaintiffs and thousands of homeowners have been and will continue to be damaged.

**C.**        **Chase Breached Plaintiffs' Final Modifications.**

**1.**        **Kathy Kurtzner (NY)**

655.    Chase is the servicer on a home mortgage loan made to Plaintiff Kathy Kurtzner for her home in Albany, New York.  At all times relevant, this loan has been serviced by Chase.

656.    In 2009, Ms. Kurtzner began experiencing a hardship that made it difficult for her to make her monthly mortgage payment.

657.    Ms. Kurtzner applied for, and after nearly one year of repeated efforts to satisfy Chase, qualified for a permanent HAMP-based loan modification.

658.    In February 2010, Chase offered Ms. Kurtzner a final modification, which she signed and returned to Chase.  Shortly thereafter, however, she was informed that Chase had made an "error" on the modification, and that she would be receiving another, corrected version.

659.    In March 2010, Ms. Kurtzner and Chase entered into a corrected final modification.  The modification was not a HAMP modification, and was instead called a "Loan Modification Agreement."  *See* Ex. 18.

660.    While this was not the modification Ms. Kurtzner had applied for and was due at the completion of her HAMP TPP, Ms. Kurtzner signed and returned this modification to Chase without qualification, thereby entering into the Loan Modification Agreement.

661.    The Loan Modification Agreement amended and supplemented the terms of Ms. Kurtzner's loan.  Among other things, Ms. Kutzner's loan is modified as follows:

- The modified principal and interest payment for the first five years is $571.33, for year six is $663.75, year seven is $761.31, and eight through forty is 876.37.

- The effective date of the Loan Modification Agreement is March 1, 2010, which was when the first payment was due.

- The interest rate was modified to 2% for the first five years, 3% for year six, 4% for year seven, and 5.125% for years eight through forty.

- The new principal balance was assessed as $202,166.86, which included capitalized past due interest, taxes and insurance (excluding unpaid late charges), and, of this amount, $13,500.00 was deferred and no interest or monthly mortgage payments were to be made on this amount.

662.    Ms. Kurtzner began making payments under this modification, including, on instructions from Chase, a double payment to make up for the fact that Chase had sent her the modification after the first payment was due.  The modified monthly mortgage payment of $571.33 was and continues to be affordable to Ms. Kurtzner.

663.    In October 2010, after Ms. Kurtzner had been paying under her final modification for several months, she discovered via her online Chase account that on October 21, 2010, Chase had retroactively reversed all of her payments since the modification.  Shortly thereafter, Ms. Kurtzner began receiving letters claiming that she was delinquent and threatening foreclosure.  In the subsequent months, Ms. Kurtzner contacted Chase frequently, but received no explanation as to why Chase breached her Loan Modification Agreement.

664.    Chase continues to claim that she is delinquent as of several months before October 2010, and that fees and interest continue to accumulate on her account.   For example, on December 28, 2010, Chase issued a notice of intent to foreclose on the ground that Ms. Kurtzner has been in default since June 1, 2009 and must make a payment of $27,963.33, which is inclusive of fees and other charges, to cure the default.   The notice of foreclosure further advises that all late fees, NSF fees, and other fees and advances are still valid and need to be repaid.  A copy of this notice of intent to foreclose is attached hereto as Exhibit 19.

665.    On several occasions, Chase representatives have contacted Ms. Kurtzner, claiming some desire to correct the "mistakes" made on her account, yet no such corrections have been made to date.

666.     Chase offered Ms. Kurtzner a final modification agreement, which she accepted, and with which she complied.  Yet Chase unilaterally canceled this agreement several months later.  Chase now claims Ms. Kurtzner is delinquent, which, among other things, has damaged her credit score.  Not only has Chase breached its modification contract with Ms. Kurtzner, her experiences illustrate Chase's pattern of deceptive and misleading practices with regard to permanent loan modifications.

### 2.        Thomas and Felicia Minerva (NY)

667.     In June 1995, Plaintiffs Thomas and Felicia Minerva obtained a mortgage on their personal residence in Bellmore, New York.  At all times relevant, this loan has been serviced by Chase.

668.     In 2009, Plaintiffs began experiencing hardships that caused them to have difficulty making monthly mortgage payments.

669.     The Minervas applied and qualified for a permanent loan modification from Chase.  The application process took some time to be processed and the Minervas expended a significant amount of time and resources to ensure they did everything Chase required of them to be evaluated for a loan modification.

670.     Chase determined that the Minervas qualified for a permanent loan modification.

671.     On or about June 3, 2010, the Minervas received a Loan Modification Agreement from Chase.  A copy of this Agreement is attached hereto as Exhibit 20.  The Minervas signed and returned this modification to Chase without qualification, thereby entering into the agreement.  The Loan Modification Agreement significantly changed the terms of the Minervas' loan.  Among other things, the Minervas' mortgage is modified as follows:

- The modified principal and interest payment is $1622.79.

- The effective date of the Loan Modification Agreement is July 1, 2010, which was when the first payment was due.

- The interest rate was modified to fixed rate of 5.5% annually.

- The new principal balance was assessed as $179,779.72, which included capitalized past due interest, taxes and insurance (excluding unpaid late charges).

672. The Loan Modification Agreement did not give Chase any right to cancel the agreement. It stated, "The Loan Documents are hereby modified as of July 01, 2010."

673. Since executing and returning the Loan Modification Agreement, Plaintiffs have abided by all of its terms and conditions and have made monthly payment amounts of $1,622.79 to Chase. The modified monthly mortgage payment of $1,622.79 was and continues to be affordable to the Minervas.

674. In July 2010, approximately six weeks after they had executed and returned the Loan Modification Agreement to Chase, the Minervas began to receive correspondence from Chase claiming that their loan was in default. For example, on July 16, 2010, Chase issued a notice of intent to foreclose on the ground that the Minervas are in default since December 1, 2009 and must make a payment of $16,909.10, which is inclusive of fees and other charges, to cure the default. The notice of foreclosure further advises that the amount of late fees, NSF fees, and other fees and advances are valid and need to be repaid. A copy of this notice of intent to foreclose is attached hereto as Exhibit 21.

675. Because the Minervas had not missed a payment since entering into the Loan Modification Agreement, it was clear that Chase was not honoring the Loan Modification Agreement. Chase continues to claim the Minervas are delinquent, and falsely claim that fees and interest continue to accumulate on their account.

676.     Chase offered the Minervas a final Loan Modification Agreement, which they accepted, and with which they complied in full.  Yet Chase has failed to honor this agreement. Chase now claims the Minervas are delinquent, which has damaged their credit score and resulted in other damages.  Not only has Chase breached its modification contract with the Minervas, their experiences illustrate Chase's pattern of deceptive and misleading practices with regard to permanent loan modifications.

### 3.        Donna Follmer (OH)

677.     Chase is the servicer on a home mortgage loan made to Plaintiff Donna Follmer for her home in Clermont County, Ohio.  In 2002, Ms. Follmer entered into a mortgage loan at the initial interest rate of 9.45% with Long Beach Mortgage Company, a subsidiary of Washington Mutual Bank ("WaMu").  Ms. Follmer began experiencing hardships that caused her to have difficulty making monthly mortgage payments.

678.     To address the missed payments, Ms. Follmer entered into a Loan Modification Agreement effective October 1, 2008 with WaMu, all assets of which (including Ms. Follmer's loan) was acquired by Chase in September 2008.  *See* Press Release, Federal Deposit Insurance Company, *JPMorgan Chase Acquires Banking Operations of Washington Mutual* (Sept. 25, 2008).[19]  Ms. Follmer signed and returned this modification without qualification, thereby entering into the agreement with WaMu, which was assumed by Chase as successor-in-interest to WaMu.  A copy of this agreement is attached hereto as Exhibit 22.

679.     The Loan Modification Agreement significantly changed the major terms of Ms. Follmer's loan.  Among other things, her mortgage is modified as follows:

- The modified principal and interest payment is $782.

---

[19] *Available at* http://www.fdic.gov/news/news/press/2008/pr08085.html.

- The effective date of the Loan Modification Agreement is October 1, 2008, which was when the first payment was due.

- Lowered the interest rate to 6.92% fixed rate through August 1, 2032.

- The new principal balance was assessed as $90,300.28, which included capitalized past due interest, taxes and insurance.

680. The Loan Modification Agreement did not give Chase the right to cancel the agreement under any circumstances.

681. Ms. Follmer made several payments under this agreement, remaining fully current, until January 2009, when Chase unexpectedly and without explanation breached the loan modification agreement and increased her payment by 30%.

682. Ms. Follmer was unable to afford this higher payment and thus once again fell behind, at which point a foreclosure action was filed against her. As the servicer of her loan, Chase pursued this foreclosure. This foreclosure action failed to reference the 2008 Loan Modification Agreement. Subsequently, Chase offered Ms. Follmer a HAMP TPP, with which Ms. Follmer fully complied. *See* Ex. 23. Ms. Follmer made additional payments by certified check and also tried to continue making a phone payment, which payment Chase refused to accept.

683. Chase/WaMu offered Ms. Follmer a final modification agreement, which she accepted, and with which she complied. Yet, Chase breached this agreement several months later. Not only has Chase breached its modification contract with Ms. Follmer, Chase is now claiming Ms. Follmer is delinquent, which, among other things, has damaged her credit score, resulted in additional foreclosure proceedings, and resulted in increased expenses stemming from the mandatory certified monthly payments. Ms. Follmer's experiences illustrate Chase's pattern of deceptive and misleading practices with regard to permanent loan modifications.

## XIV.   PART 3 CLASS ACTION ALLEGATIONS AND CLASS DEFINITIONS

684.    Plaintiffs bring this action on behalf of themselves and all other persons similarly

situated, under Federal Rule of Civil Procedure 23.  Plaintiffs reserve the right to modify or

amend the Classes' definitions at or before the time Plaintiffs brief the issue of class certification.

The Classes that Plaintiffs seek to represent are defined as follows:

**A.            Statewide Final Modification Classes.**

685.    Plaintiffs seek to represent the following statewide classes for purposes of their

consumer protection and unfair and deceptive acts and practices claims ("Consumer Claims")

asserted in this Part 3 under the corresponding state laws of New York and Ohio:

> All mortgagors whose home mortgage loans are serviced by Defendants and who:
>
> (a) since January 1, 2008, have received a "HAMP" or "CHAMP" Loan
> Modification Agreement from the Defendants; and (b) accepted the Loan
> Modification Agreement by submitting a fully executed copy of the Loan
> Modification Agreement and/or making required payments; and (c) following the
> Effective Date of the Loan Modification Agreement, received demands for
> payment from Defendants that were inconsistent with the terms of the Loan
> Modification Agreement.

686.    Plaintiffs Kathy Kurtzner and Thomas and Felicia Minerva seek to represent the

New York Class and make claims on its behalf herein.

687.    Plaintiff Donna Follmer seeks to represent the Ohio Class and make claims on its

behalf herein.

**B.            Nationwide Final Modification Class.**

688.    Plaintiffs Kathy Kurtzner, Thomas and Felicia Minerva, and Donna Follmer, seek

to represent the following class for purposes of certain common law contract and promissory

estoppel claims:

> All homeowners Nationwide whose residential mortgage loans are or have been
> serviced by Defendants and who: (a) since January 1, 2008, received a "HAMP"

or "CHAMP" Loan Modification Agreement from the Defendants; (b) complied with the terms of the Loan Modification Agreement by submitting fully executed copy of the Loan Modification Agreement and/or making payment; and (c) following the Effective Date of the Loan Modification Agreement, received demands for payment from Defendants that were inconsistent with the terms of the Loan Modification Agreement.

**C.          Exclusions.**

689.    Excluded from the proposed Classes are (i) Defendants, any entity in which any Defendant has a controlling interest, and Defendants' officers, directors, legal representatives, predecessors, successors, and assigns; (ii) the judicial officers to whom this case is assigned; and (iii) any member of the immediate families of excluded persons.

690.    Plaintiffs reserve the right to modify or amend the Classes' definitions at or before the time Plaintiffs brief the issue of class certification.

**D.          Numerosity/Impracticability of Joinder.**

691.    Plaintiffs do not know the exact size or identities of the members of the proposed classes, since such information is in the exclusive control of Chase. Plaintiffs believe that the classes encompass many thousands of individuals whose identities can be readily ascertained from Chase's books and records. Therefore, the proposed classes are each so numerous that joinder of all members is impracticable.

692.    Based on the size of the modifications at issue, Plaintiffs believe the amount in controversy exceeds $5 million.

**E.          Commonality and Predominance.**

693.    All members of the respective classes have been subject to and affected by the same conduct.  The claims are based on form Loan Modification Agreements, uniform loan modification processing requirements, and Chase's automated systems for maintaining loan account records and Chase's policies and procedures.  There are questions of law and fact that

are common to the class, and predominate over any questions affecting only individual members of the class.

694.    All members of the proposed Classes share a united interest in the fair, just, and consistent determination of the questions of law and fact necessary to the adjudication of Chase's liability, which predominate over questions affecting only individual members.  The proposed Classes share a common interest in the determination of all factual and legal issues pertinent to Chase's liability.

695.    Questions of law and fact that are common to the entire Class predominate over individual questions because Chase's actions are generally applicable to the entire Class.  These legal and factual questions include, but are not limited to:

A.    The nature, scope and operation of Chase's obligations to homeowners under the permanent Loan Modification Agreements;

B.    Whether Chase's conduct after the execution of the permanent Loan Modification Agreements is a breach of contract and/or a breach of the covenant of good faith and fair dealing;

C.    Whether Chase should be required under the doctrine of promissory estoppel to honor Loan Modification Agreements;

D.    Whether Chase engaged in a pattern or practice of bad faith with mortgagors who have executed and complied with the terms of Loan Modification Agreements; and

E.    Whether Chase's practices warrant equitable, injunctive, and/or monetary relief.

696.    The proposed Classes are also united on fundamental questions regarding their members' entitlement to damages and equitable relief, including:

A.    Whether members of the proposed Classes are entitled to damages and/or equitable relief including, without limitation, reformation of their accounts, based on their

payments to Chase and related harm and costs incurred as a result of misapplication or refusal of payments;

B.      If members of the proposed Classes are so entitled, what is the appropriate scope, extent and measure of damages and equitable relief that should be awarded;

C.      Whether the degree of reprehensibility of Chase's conduct warrants the imposition of punitive or exemplary damages under applicable, controlling authority; and

D.      Whether members of the proposed Classes are entitled to attorneys' fees, pre- and post-judgment interest, and costs of suit.

**F.        Typicality.**

697.    The claims of the individual named Plaintiffs are typical of the claims of the class and do not conflict with the interests of any other members of the class. Plaintiffs and members of the class were subject to the same conduct by Chase, i.e. after executing permanent loan modification agreements, Chase breached the Loan Modification Agreements by failing to implement the terms thereof and by attempting to collect or collecting amounts from Plaintiffs and others that were not due and owing under the Loan Modification Agreements.

**G.        Adequacy.**

698.    Plaintiffs and their counsel will fairly and adequately assert and protect the interests of all members of the proposed Classes.  Plaintiffs are committed to the vigorous prosecution of this action and have retained competent and experienced counsel.  Plaintiffs have no interests adverse to those of any absent members of the Classes with respect to the key common issues of Chase's home mortgage loan modification practices, fees, deficient disclosures, and breaches.

**H.        Certification Under Rule 23(b).**

699.    Class certification is proper under FED. R. CIV. P. 23(b)(1)(A) because the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes and establish incompatible standards of conduct for Defendants.

700.    Class certification is proper under FED. R. CIV. P. 23(b)(1)(B) because the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to individual Class members which would, as a practical matter, be dispositive of the interest of the other members not parties to these adjudications and/or substantially impair their ability to protect these interests.

701.    Class certification is proper under FED. R. CIV. P. 23(b)(3) because common issues of law and fact predominate over any questions affecting only individual members of the Classes, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

702.    Class adjudication is superior to individual litigation, which would foreclose the ability of most members of the proposed Classes to litigate their claims, impose an undue burden on the courts, and result in inconsistent determination of common issues.  The Court may employ issue certification under FED. R. CIV. P. 23(c)(4)(B) to address any variation of law, fact, or interest from the standpoint of fairness, efficiency, and economy, in order to avoid denial of class treatment which would require reversion to repetitive and piecemeal individual litigation.

## XV.   PART 3 CAUSES OF ACTION

### BREACH OF CONTRACT

703.     Plaintiffs bring the following Contract Claim under the common law, on their

own behalf and on behalf of each member of the designated Class described within the Count,

against all Defendants.  When greater details regarding the conduct of each Defendant become

known, Plaintiffs will amend this Consolidated Complaint, as necessary.  To the extent necessary

to preserve these claims, Plaintiffs also hereby incorporate by reference, and plead in the

alternative herein, the contract claims set forth in Part 1 above.

### COUNT 11 -- Breach of Contract / Breach of the Duty of Good Faith and Fair Dealing – Loan Modification Agreements
*By the Nationwide Final Modification Class, or in the alternative, by the respective
Statewide Final Modification Classes*

704.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

705.     Plaintiffs Kathy Kurtzner, Thomas and Felicia Minerva, and Donna Follmer bring

this claim on their own behalf and on behalf of each member of the Class described above.

706.     The permanent Loan Modification Agreements described above are valid and

enforceable contracts under the contract law of all 50 states.   The elements of contract law in

every state are materially identical.

707.     The Loan Modification Agreements Defendants sent to Plaintiffs constitute valid

offers.

708.     Plaintiffs accepted Chase's permanent Loan Modification Agreement offers by

executing and returning the Loan Modification Agreements and making the required payments.

709.     The Loan Modification Agreements are supported by consideration in that they

provide both a benefit to Chase—for reasons including, without limitation, that Chase receives

payments on loans that would otherwise default and because it obtains financial information

from homeowners for the purposes of re-underwriting loans in its servicing portfolio—and a

detriment to Plaintiffs and the permanent Loan Modification Class, insofar as they are required

to take actions—such as providing documentation to Chase of their current income and making legal representations about their personal circumstances—that they otherwise had no legal duty to undertake.  There is additional consideration in circumstances where the Loan Modification Agreement is an agreement to capitalize fees and costs such that interest thereafter becomes due on those amounts.

710.   In the alternative, Loan Modification Agreements are the type of contracts which are found binding under the common law without consideration.

711.   By making the payments as specified in the Loan Modification Agreement, Plaintiffs and members of the Class gave up the ability to pursue other means of saving their homes from foreclosure and allocating their financial resources.  Further, the Loan Modification Agreements specifically reference the fact that they replace contradictory terms in a homeowner's original loan documents, evidencing the receipt of valid consideration by Chase and valid performance by Plaintiffs and the Class.

712.   Alternatively, return of Loan Modification Agreement by Plaintiffs and members of the Class to Chase, constitute valid offers.  Acceptance of these offers occurred when Chase accepted payments from Plaintiffs and members of the Class as specified in these documents, continued to engage Plaintiffs and members of the Class in modification discussions and/or continued to request documentation from Plaintiffs and Class members.

713.   Chase routinely and regularly breached Loan Modification Agreements and/or their duties of good faith and fair dealing under those contracts as described herein.

714.   Plaintiffs and members of the Class have demonstrated their willingness to perform under the Loan Modification Agreements.

715.     Plaintiffs and members of the Class have suffered harm, including financial harm, actual or threatened loss of a property interest by foreclosure, stress and anxiety, and/or damaged credit, and they are threatened with additional harm as a direct and proximate result of Chase's breaches.

716.     By making payments and continuing to make mortgage payments under the Loan Modification Agreements, Plaintiffs and members of the Class had to forgo other remedies that they might have pursued to save their homes and their cash resources, such as restructuring their debt under the bankruptcy code, or pursuing other strategies such as selling or renting their homes.  In light of the declining real estate market in the United States since July 2009, failure to market and sell the property at that time has reduced the amount that Plaintiffs can recover from such sale.  Plaintiffs have also given up valuable time and effort to meet Chase's demands.

717.     Plaintiffs have suffered harm and are threatened with additional harm resulting from Chase's breaches.  Chase has imposed and assessed improper default-related fees and costs, past due payments, escrow charges, corporate advances and other amounts that remain pending on homeowners' loan accounts.  On information and belief, Plaintiffs and others like them have paid amounts not contractually due and owing under the Loan Modification Agreements.

718.     In some cases, Chase has begun foreclosure proceedings on Plaintiffs' and Class members' homes.  On information and belief, putative Class members have lost their homes in foreclosure, and have been damaged in the form of a lost property interest.

719.     Plaintiffs have been damaged by Chase's reporting of inaccurate payment information and status of their modified loans under the Loan Modification Agreements to the credit reporting bureaus.  Chase's inaccurate reporting has negatively affected Plaintiffs' credit scores, preventing them from being able to obtain credit.

720.    Plaintiffs have been further damaged because they have had to incur out-of-pocket costs and been forced to take time off from work in attempts to resolve these issues with Chase.

## PROMISSORY ESTOPPEL

721.    Plaintiffs bring the following Promissory Estoppel Claim under the common law, on their own behalf and on behalf of each member of the designated Class described within the Count, against all Defendants. When greater details regarding the conduct of each Defendant become known, Plaintiffs will amend this Consolidated Complaint, as necessary.  To the extent necessary to preserve these claims, Plaintiffs also hereby incorporate by reference, and plead in the alternative herein, the promissory estoppel claims set forth in Parts 1 and 2 above.

### COUNT 12 -- Promissory Estoppel, in the Alternative
*By the Nationwide Final Modification Class, or in the alternative, by the respective Statewide Final Modification Classes*

722.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

723.    Plaintiffs Kathy Kurtzner, Thomas and Felicia Minerva, and Donna Follmer bring this claim on their own behalf and on behalf of each member of the Class described above.

724.    Chase made representations to Plaintiffs and members of the Class that if they executed and performed under the Loan Modification Agreements, Chase would execute and perform under the Loan Modification Agreement.

725.    Chase intended to induce Plaintiffs and members of the Class to rely on these representations and make the monthly mortgage payments as specified in the Loan Modification Agreements.

726.     Plaintiffs and members of the Loan Modification Class did in fact reasonably rely on Chase's representations, by submitting payments and an executed Loan Modification Agreement.

727.     Reliance by Plaintiffs and members of the Class was reasonable in light of the definiteness of the promise and their need to prevent foreclosure of their homes.

728.     Reliance by Plaintiffs and members of the Class was to their detriment.  Pursuant to Chase's misrepresentations, Plaintiffs and members of the Class have lost opportunities to fund other strategies to avoid foreclosure, such as restructuring their debt under the bankruptcy code, or pursuing other options to deal with their defaults, such as selling or renting the homes. In light of the declining real estate market in the United States since July 2009, failure to market and sell the property at that time has reduced the amount that Plaintiffs can recover from such sale.  Plaintiffs and members of the Class have faced financial harm, as well as undue psychological stress and damaged credit, and have given up valuable time and effort to meet Defendants' demands.

729.     Chase is attempting to collect and collecting amounts that are not due and owing under the Loan Modification Agreement.  Further, Chase is improperly applying mortgage payments to accounts, failing to acknowledge receipt of payments, misrepresenting the terms of and the balances of the loans being serviced, referring loans that are contractually current under the Loan Modification Agreement to foreclosure, beginning foreclosure proceedings and/or foreclosing on homeowners' mortgages, and converting the terms of homeowners' Loan Modification Agreement back to the terms of the original Note and Security Instrument.

730.     Plaintiffs have been damaged thereby.

## CONSUMER PROTECTION ACT CLAIMS

731.     Plaintiffs bring the following Consumer Protection Act Claims under the consumer protection and unfair and deceptive acts and practices laws of their respective states, on their own behalf and on behalf of each member of the designated Class described within the Count, against all Defendants.  When greater details regarding the conduct of each Defendant become known, Plaintiffs will amend this Consolidated Complaint, as necessary.  To the extent necessary to preserve these claims, Plaintiffs also hereby incorporate by reference, and plead in the alternative herein, the Consumer Claims set forth in Parts 1 and 2 above.

732.     Chase has violated and continues to violate the consumer protection and unfair and deceptive acts and practices laws of New York and Ohio through the following acts and omissions:

A.     Chase induces mortgagors to believe that upon their successful performance of any and all modification agreements, requirements and procedures, that their loans will be favorably modified;

B.     Chase fails to honor permanent HAMP or Chase Loan Modification Agreements;

C.     Chase engages in a widespread practice of improperly applying mortgage payments to accounts, failing to acknowledge receipt of payments, and/or holding mortgage payments in 'suspense' accounts, resulting in escalated debt obligations, including additional fees, interest and other charges;

D.     Chase engages in a widespread practice of improperly assessing fees, charges and costs to homeowners' modified loans in a manner that is inconsistent with the terms of the Loan Modification Agreements, including, without limitation, imposing late fees and other default-related fees and costs on homeowners' accounts, and by mismanaging escrow accounts;

E.      Chase engages in a widespread practice of misrepresenting the terms of and the balances of the loans being serviced;

F.      Chase engages in the widespread misrepresentation of the status of loan modifications;

G.      Chase fails to keep accurate records of mortgagor accounts, including accounting for fees, payments, credits, arrearages, and amounts owed;

H.      Chase engages in a widespread practice of making improper reports to credit reporting agencies;

I.      Chase engages in a widespread practice of unlawfully proceeding with foreclosures, beginning foreclosure proceedings and/or foreclosing on homeowners' mortgages that are contractually current under the Loan Modification Agreement;

J.      Chase engages in a widespread practice of unlawfully converting the terms of homeowners' Loan Modification Agreement back to the terms of the original Note and Security Instrument;

K.      Chase engages in a widespread practice of willfully and knowingly acting to delay, prolong, or otherwise frustrate the Loan Modification Agreements by failing to follow through on written and implied promises or honor its terms.

733.    These acts and omissions constitute bad faith.

734.    Chase's conduct described in this Consolidated Complaint is willful and knowing and constitutes intentional misrepresentations, false promises, and concealment, suppression, and omission of material facts.

735.    Chase's unconscionable, unfair, and deceptive acts, practices, omissions, and representations as set forth in this Consolidated Complaint are material in that they relate to

matters which are important to consumers or are likely to affect the purchasing decisions or conduct of consumers.

736.    Chase's unconscionable, unfair, and deceptive acts and practices set forth in this Consolidated Complaint are likely and reasonably foreseeable to mislead Plaintiffs and other Class Members acting reasonably and to their detriment.

737.    Plaintiffs have suffered injury as a result of Chase's conduct described in this Consolidated Complaint.

### COUNT 13 -- Violation of the New York Consumer Protection From Deceptive Acts and Practices Act, N.Y. GEN. BUS. LAW § 349, *et seq*.
*By the New York Statewide Final Modification Class*

738.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

739.    Plaintiffs Kathy Kurtzner and Thomas and Felicia Minerva bring this claim on their own behalf and on behalf of each member of the New York Class described above.

740.    Pursuant to N.Y. GEN. BUS. LAW § 349(a), deceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state are unlawful.

741.    Chase engaged in the deceptive acts or practices, including failing to disclose, concealing, suppressing, or omitting material facts, as set forth in this Consolidated Complaint, in the conduct of business, trade, or commerce.

742.    Chase's act of informing Plaintiffs and members of the New York Class that they would receive a fully executed permanent loan modification agreement once they complied with the terms of the permanent loan modification agreement is a "deceptive" practice under the Act. Rather than extending a fully executed permanent loan modification agreement to the Plaintiffs

and the New York Class members, Chase, improperly and without justification, ultimately decided to treat the permanent loan modification agreements as if they were null and void, ultimately threatening foreclosure.

743.    Chase's conduct as described throughout this Consolidated Complaint constitutes unfair, immoral and unscrupulous business practices that harmed not only the Plaintiff and the New York Class members, but the general public as well.

744.    Chase's failure to provide a fully executed permanent loan modification agreement to Plaintiffs and members of the New York Class for a permanent modification within a reasonable period of time following their performance of the permanent loan modification agreement is an "unfair business practice" under the Act.

745.    Chase's act of extending an offer of a Loan Modification Agreement and then refusing to honor the terms of that modification is a "deceptive" practice under the Act.  Rather than extending genuine offers for permanent modification to the Plaintiff and the Class members, Defendants, improperly and without justification, ultimately decide to treat the Loan Modification Agreements as if they are null and void, threatening foreclosure.

746.    Chase's unfair or deceptive acts or practices have been undertaken as part of a generalized course of conduct, pattern, and practice affecting numerous mortgagors in New York.

747.    As a direct and proximate result of Chase's violations of New York Law, Plaintiffs and the other members of the New York Class have been injured.  They have suffered financial harm, as well as undue psychological stress and damaged credit, while enduring Chase's unlawful practices.  They are threatened with additional harm as a direct and proximate result of Chase's violations of the New York Consumer Protection from Deceptive Acts and

Practices Act.  By making payments under Loan Modification Agreements, Plaintiffs and

members of the Class forwent other remedies that might be pursued to save their homes and their

cash resources, such as restructuring their debt under the bankruptcy code, or pursuing other

strategies to deal with their defaults, e.g., selling or renting the homes.  Plaintiffs and the New

York Class have also given up valuable time and effort to meet Defendants' demands.  Thus,

Chase's deceptive acts or practices caused injury and damages to the Plaintiffs and members of

the New York Class, including improper refusal to honor permanent Loan Modification

Agreements.  Plaintiffs and members of the New York Class spent monies on a plan that could

have gone towards other potential remedies that they might otherwise have pursued to save their

homes. On information and belief, some putative Class members have suffered additional harm

and expense in the form of defending foreclosures of their homes when they should have

received permanent modifications, and in some cases, losing their homes.

748.    Plaintiffs seek to recover their actual damages, injunctive relief, costs and

reasonable attorney's fees, pursuant to N.Y. GEN. BUS. LAW § 349(h).

### COUNT 14 -- Violation of the Ohio Consumer Sales Practices Act ("CSPA"), OHIO REV. CODE ANN. § 1345.01, *et seq.*
*By the Ohio Statewide Final Modification Class*

749.    Plaintiffs repeat and re-allege each and every allegation contained above as if

fully set forth herein.

750.    Plaintiff Donna Follmer brings this claim on her own behalf and on behalf of each

member of the Ohio Class described above.

751.    Plaintiff asserts this cause of action on behalf of herself, all other members of the

Ohio Class.  The Ohio Consumer Sales Practices Act ("CSPA") is codified at OHIO REV. CODE

ANN. § 1345.01, *et seq.*  The statute is broad, as it pertains to consumer transactions, which are

defined as "a sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, a franchise, or an intangible, to an individual for purposes that are primary personal, family, or household or solicitation to supply any of these things."  OHIO REV. CODE ANN. § 1345.01(A).  Accordingly, the conduct at issue in this case falls within the scope of the CSPA.

752.    The CSPA prohibits unfair, deceptive, and unconscionable practices in consumer sales transactions.  OHIO REV. CODE ANN. § 1345.02(A).  The CSPA further provides that "a consumer" has a private cause of action for violations of the statute.  OHIO REV. CODE ANN. § 1345.09.

753.    Courts have held that entities engaging in the collection of consumer debts, including mortgage servicers, are suppliers within the meaning of OHIO REV. CODE ANN. § 1345.01(C).

754.    Pursuant to the Ohio Homebuyer's Protection Act, including specifically but not limited to OHIO REV. CODE ANN. § 1345.091, assignees and purchasers for value of mortgage loans may properly be held responsible as suppliers for their unfair and deceptive acts and practices violating OHIO REV. CODE ANN. § 1345.02.

755.    The acts and omissions described herein constitute violations of the Ohio Consumer Sales Practices Act, including but not limited to unfair and deceptive acts and practices in violation of OHIO REV. CODE ANN. § 1345.02(A), (B), and (F) and unconscionable acts in violation of OHIO REV. CODE ANN. § 1345.031.

756.    Chase violated the CSPA by engaging in the acts and practices described in section XIII, *supra*.

757.    Chase's unconscionable, unfair, and deceptive acts, practices, omissions, and misrepresentations as set forth in this Consolidated Complaint are material in that they relate to

matters which are important to consumers or are likely to affect the purchasing decisions or conduct of consumers, including Plaintiff and members of the Ohio Class regarding Chase's products and services.

758.     The Ohio Plaintiff and the other members of the Ohio Class acted or relied to their detriment on Chase's omissions and misrepresentations.

759.     Had Chase not engaged in the unfair or deceptive conduct described above, Plaintiff and the other members of the Ohio Class would not have purchased, paid for, and/or used the mortgage modification programs offered to them but instead their money and time could have been used to pursue other avenues of relief and to save their credit.

760.     As a proximate result of Chase's deceptive trade practices, set forth in this Consolidated Complaint, Plaintiff and members of the Ohio Class were injured and are entitled to recover their actual damages, costs, and declaratory and injunctive relief, together with other appropriate relief, including restitution, pursuant to Ohio law, including OHIO REV. CODE ANN. § § 45.09.

761.     Additionally, Chase willfully and knowingly committed the deceptive trade practices and Plaintiff and members of the Ohio Class are entitled to reasonable attorneys' fees pursuant to OHIO REV. CODE ANN. § 1345.09(F)(2).

762.     Chase's actions as alleged herein are substantially similar to acts and/or practices that have previously been found to violate the Ohio Consumer Sales Practices Act by one of the methods identified in OHIO REV. CODE ANN. 1345.09(B) and which were available for public inspection in accordance with OHIO REV. CODE ANN. 1345.05(A)(3) before the transactions at issue herein, including but not limited to, regulations set forth in OHIO ADMIN. CODE 109:4-3-19, 109:4-3-26 and 109:4-3-27 and in *State ex. rel. Dann v. Senate Banc, Inc.*, 2007 CV 5093 (Public

Information File No. 10002666) and *State ex. rel. Rogers v. F.A.S., LLC*, 07 CVH 08-921 (Public Information File No. 10002694).

763.    Plaintiff will provide or already has provided any required notice to appropriate entities regarding the unfair and deceptive trade practices

### COUNT 15 -- Violation of OHIO REV. CODE ANN. § 4165, *et seq.*
*By the Ohio Statewide Final Modification Class*

764.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

765.    Plaintiff Donna Follmer brings this claim on her own behalf and on behalf of each member of the Ohio Class described above.

766.    Chase is a person as defined by OHIO REV. CODE § 4165.01.

767.    Chase engaged in the deceptive acts or practices discussed herein in the course of Chase's business and in the course of trade or commerce.

768.    Chase engaged in deceptive trade practices when, in the course of their business, they caused the likelihood of confusion or misunderstanding as to the approval of a permanent loan modification in violation of OHIO REV. CODE § 4165.02(A)(2).

769.    Chase engaged in deceptive trade practices when they used deceptive representations in connection with their services in violation of OHIO REV. CODE § 4165.02(A)(4).

770.    Chase engaged in deceptive trade practices when they represented that their services, i.e., a loan modification, had sponsorship, approval and characteristics that they did not have in violation of OHIO REV. CODE § 4165.02(A)(7).

771.    Chase engaged in deceptive trade practices when they made false statements of fact concerning the reasons for, or existence of, permanent loan modifications resulting in lowered monthly payments for borrowers in violation of OHIO REV. CODE § 4165.02(A)(12).

772.    Chase violated the ODTPA by engaging in the acts and practices described in section XIII, *supra*.

773.    Chase's deceptive trade practices, including omissions and misrepresentations as set forth in this Consolidated Complaint are material in that they relate to matters which are important to consumers or are likely to affect the purchasing decisions or conduct of consumers, including Plaintiff and members of the Ohio Class.

774.    Plaintiff and the other members of the Ohio Class acted or relied to their detriment on the omissions and misrepresentations.

775.    Had Chase not engaged in the unfair or deceptive conduct described above, Plaintiff and the other members of the Ohio Class would not have purchased, paid for, and/or used the mortgage modification programs offered to them but instead their money and time could have been used to pursue other avenues of relief and to save their credit.

776.    As a proximate result of Chase's deceptive trade practices, set forth in this Consolidated Complaint, Plaintiffs and members of the Ohio Class were injured and are entitled to recover their actual damages, costs, and declaratory and injunctive relief, together with other appropriate relief, including restitution, pursuant to Ohio law, including OHIO REV. CODE § 4165.03.

777.    Additionally, Chase willfully and knowingly committed the deceptive trade practices and Plaintiff and members of the Ohio Class are entitled to reasonable attorneys' fees pursuant to OHIO REV. CODE § 4165.03(B).

## INJUNCTIVE RELIEF

778.   Plaintiffs bring the following claims for injunctive relief, on their own behalf and on behalf of each member of the designated Class described within the Count, against all Defendants.

### COUNT 16 -- Injunctive Relief – Reformation of Accounts
*By the Nationwide Final Modification Class, or in the alternative, by the respective Statewide Final Modification Classes*

779.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

780.   Plaintiffs Kathy Kurtzner, Thomas and Felicia Minerva, and Donna Follmer bring this claim on their own behalf and on behalf of each member of the Classes described above.

781.   Chase is obligated to comply with the terms of the final Loan Modification Agreements it enters into with homeowners.

782.   Chase breached and continues to breach final Loan Modification Agreements.

783.   As a result of Chase's breaches, Plaintiffs and the Class will be irreparably injured in the future.  Among other things, Chase's repudiation of final Loan Modification Agreements and practice of referring homeowners to collections and foreclosure will result in unnecessary and wrongful foreclosures, homeowners paying more interest and fees than they are legally obligated to pay, improper negative credit reporting, and lost property interests.  Further, additional loan costs will prevent the Plaintiffs' accounts from properly amortizing such that additional interest will accrue long into the future.

784.   Plaintiffs and the Class do not have a plain, adequate, speedy, or complete remedy at law to address the wrongs alleged in this Consolidated Complaint, and will suffer irreparable injury as a result of Chase's misconduct unless injunctive relief is granted.

785. Plaintiffs and the Class are therefore entitled to an injunction requiring Chase to reform and correct Plaintiffs' and Class members' loan accounts consistent with the terms of the final Loan Modification Agreements, without the inflation of debt caused by Defendants' breach, mishandling of payments, imposition of fees delay and other unfair and deceptive practices.

786. Plaintiffs are further entitled to an accounting under their respective state's laws.

**COUNT 17 -- Injunctive Relief – Reformation of Final Modification Agreements**
*By the Nationwide Final Modification Class, or in the alternative, by the respective Statewide Final Modification Classes*

787. Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

788. Plaintiffs Kathy Kurtzner, Thomas and Felicia Minerva, and Donna Follmer bring this claim on their own behalf and on behalf of each member of the Classes described above.

789. Chase is obligated to comply with the terms of the modifications they promised Plaintiffs months or years before they tendered final Loan Modification Agreements to them, as described above. Among other things, Chase has failed to properly credit prior payments made, and timely to adjust the interest rates as required by TPP contracts or other payment plans, thereby generating additional fees, and excess interest charges on Plaintiffs' accounts. In addition, Chase has commenced foreclosure processes when it was legally required to forebear. Had Chase provided the final Loan Modification Agreements to Plaintiffs on the timetable promised, Plaintiffs' debts would be lower than they were at the time Plaintiffs received, entered into, and started performing under the final Loan Modification Agreements they eventually received.

790. Plaintiffs and the Class have been injured and will be irreparably injured in the future because the terms of their final Loan Modifications are less favorable than they should have been according to prior promises made by Chase.

791.    Plaintiffs and the Class have been further injured and will be irreparably injured in the future by Chase's improper negative credit reporting and lost property interests.

792.    Plaintiffs and the Class do not have a plain, adequate, speedy, or complete remedy at law to address the wrongs alleged in this Consolidated Complaint, and will suffer irreparable injury as a result of Chase's misconduct unless injunctive relief is granted to reform Plaintiffs' contracts. Plaintiffs and the Class are therefore entitled to an injunction requiring Chase to reform the terms of the Loan Modification Agreements, without the inflation of debt caused by Defendants' breaches of TPP agreements, imposition of improper costs and fees, mishandling of payments, delay and unfair and deceptive practices.

*       *       *

## PART 4 – Unfair Debt Collection Practices – Facts, Classes and Claims

## XVI.   PART 4 FACTS

793.    In 2002, Plaintiff Donna Follmer entered into a mortgage loan at the initial interest rate of 9.45% with Long Beach Mortgage Company, a subsidiary of Washington Mutual Bank ("WaMu").  WaMu became the servicer of Ms. Follmer's loan.

794.    Sometime during 2008, while Washington Mutual was still her mortgage servicer, Ms. Follmer suffered a hardship that caused her to have trouble making her mortgage payments. As a result she missed several payments on her loan.

795.    As described in section III, *supra*, Chase acquired WaMu's servicing rights on September 25, 2008.  Included in this deal was Ms. Follmer's loan.

796.    Ms. Follmer was delinquent on her mortgage payments at the time Chase acquired the servicing of her loan.

797.   On October 1, 2008, Ms. Follmer entered into a "Loan Modification Agreement" with defendant Chase.  The modification, which was supposedly final, fixed and lowered Ms. Follmer's interest rate and reduced her monthly payment. *See* section XIII.C.3, *supra*.

798.   In January 2009, after paying under her modified loan for three months, Chase inexplicably raised her monthly mortgage payment by over 30%.

799.   This new payment amount was unaffordable to Ms. Follmer, and as such she was unable to continue making her monthly payment.

800.   In May 2009, a foreclosure was filed on Ms. Follmer's home.

801.   Ms. Follmer reapplied for a modification.  In March 2010, Chase sent Ms. Follmer a Chase TPP.  *See* Ex. 23.  Ms. Follmer signed the TPP and returned it to Chase, along with all of the required documentation.

802.   Ms. Follmer timely made all three of the payments required by the TPP, all of which Chase accepted.  Yet following completion of the TPP, she was sent neither a modification, nor notification that she was denied.

803.   The Chase TPP stated, "Chase Home Finance LLC is attempting to collect a debt, and any information obtained will be used for that purpose." *Id.*

804.   Following completion of her Trial Period, Ms. Follmer contacted Chase.  She was instructed to make another payment in the trial period amount, which she did.  Chase accepted this payment.

805.   In September 2010, despite her fulfillment of all of the requirements of her TPP, a Chase representative told Ms. Follmer by phone that her modification application had been denied.  No reason for this denial was given.

## XVII.  PART 4 CLASS ACTION ALLEGATIONS AND CLASS DEFINITION

806.    Plaintiffs bring this action on behalf of themselves and all other persons similarly situated, under Federal Rule of Civil Procedure 23.  Plaintiffs reserve the right to modify or amend the Class's definition at or before the time Plaintiffs brief the issue of class certification. The Class that Plaintiff seek to represent for purposes of this Part 4 is defined as follows:

**A.      Nationwide Debt Collection Practices Class.**

807.    Plaintiff Donna Follmer seeks to represent the following class:

All homeowners Nationwide whose residential mortgage loans are or have been serviced by Defendants and (a) whose home mortgage debt was acquired by Defendants at a time when it was in default; (b) who received demands for payment from Defendants during the loan modification process; and (c) who are members of one or more of the Part 1, 2, and/or 3 Classes above.

**B.      Exclusions.**

808.    Excluded from the proposed Classes are (i) Defendants, any entity in which any Defendant has a controlling interest, and Defendants' officers, directors, legal representatives, predecessors, successors, and assigns; (ii) the judicial officers to whom this case is assigned; and (iii) any member of the immediate families of excluded persons.

809.    Plaintiffs reserve the right to modify or amend the Classes' definitions at or before the time Plaintiffs brief the issue of class certification.

**C.      Numerosity/Impracticability of Joinder.**

810.    Plaintiffs do not know the exact size or identities of the members of the proposed classes, since such information is in the exclusive control of Defendants. Plaintiffs believe that the classes encompass many thousands of individuals whose identities can be readily ascertained from Defendants' books and records. Therefore, the proposed classes are each so numerous that joinder of all members is impracticable.

**D.      Commonality and Predominance.**

811.     All members of the respective classes have been subject to and affected by the same conduct.  The claims are based on form Loan Modification Agreements, uniform loan modification processing requirements, and Defendants' automated systems for maintaining loan account records and Defendants' policies and procedures.  There are questions of law and fact that are common to the class, and predominate over any questions affecting only individual members of the class.

812.     All members of the proposed Classes share a united interest in the fair, just, and consistent determination of the questions of law and fact necessary to the adjudication of Defendants' liability, which predominate over questions affecting only individual members.  The proposed Classes share a common interest in the determination of all factual and legal issues pertinent to Defendants' liability.

813.     Questions of law and fact that are common to the entire Class predominate over individual questions because the actions of Defendants complained of herein were generally applicable to the entire Class.  These legal and factual questions include, but are not limited to:

A.      The nature, scope and operation of Defendants' obligations to homeowners undergoing Defendants' loan modification process;

B.      Whether Defendants engaged in a pattern or practice of bad faith with mortgagors who have executed and complied with the terms of the modification process;

C.      Whether Defendants engaged in abusive and oppressive conduct, in violation of 15 U.S.C. § 1692d;

D.      Whether Defendants engaged in false and misleading representations to collect a debt in violation of 15 U.S.C. § 1692e;

E.  Whether Defendants engaged in unfair and unconscionable means to collect a debt in violation of 15 U.S.C. § 1692f;

F.  Whether a class and/or other subclasses, is superior, within the requirements of Rule 23(b)(3), on Plaintiffs' claims;

G.  Whether Defendants' practices warrant monetary relief; and

H.  Whether the proposed Classes and/or other subclasses, are superior, within the requirements of Rule 23(b)(3), on Plaintiffs' claims.

814.  The proposed Classes are also united on fundamental questions regarding their members' entitlement to damages, including:

A.  Whether members of the proposed Classes are entitled to damages based on their payments to Defendants and related harm and costs incurred as a result of doing business with Defendants and experiencing Defendants' debt collection practices;

B.  If members of the proposed Classes are so entitled, what is the appropriate scope, extent and measure of damages that should be awarded;

C.  Whether members of the proposed Classes are entitled to attorneys' fees, pre- and post-judgment interest, and costs of suit.

**E.    Typicality.**

815.  The claims of the individual named Plaintiffs are typical of the claims of the class and do not conflict with the interests of any other members of the class in that all the Plaintiffs and the other members of the class were subject to the same debt collection conduct by Defendants in connection with the mortgage modification process, and they all were promised loan modifications while Defendants attempted to collect and collected amounts from Plaintiffs and others that were not due and owing.

**F.      Adequacy.**

816.     Plaintiffs and their counsel will fairly and adequately assert and protect the interests of all members of the proposed Classes.  Plaintiffs are committed to the vigorous prosecution of this action and have retained counsel who are competent and experienced in complex class action litigation, including consumer litigation.  Plaintiffs have no interests adverse to those of any absent members of the Classes with respect to the key common issues of Defendants' home mortgage loan modification practices, fees, deficient disclosures, and breaches.

**G.      Certification Under Rule 23(b).**

817.     Class certification is proper under FED. R. CIV. P. 23(b)(1)(A) because the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes and establish incompatible standards of conduct for Defendants.

818.     Class certification is proper under FED. R. CIV. P. 23(b)(1)(B) because the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to individual Class members which would, as a practical matter, be dispositive of the interest of the other members not parties to these adjudications and/or substantially impair their ability to protect these interests.

819.     Class certification is proper under FED. R. CIV. P. 23(b)(3) because common issues of law and fact predominate over any questions affecting only individual members of the Classes, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

820.     Class adjudication is superior to individual litigation, which would foreclose the ability of most members of the proposed Classes to litigate their claims, impose an undue burden on the courts, and result in inconsistent determination of common issues.  The Court may employ issue certification under FED. R. CIV. P. 23(c)(4)(B) to address any variation of law, fact, or interest from the standpoint of fairness, efficiency, and economy, in order to avoid denial of class treatment which would require reversion to repetitive and piecemeal individual litigation.

## XVIII.     PART 4 CAUSE OF ACTION

### COUNT 18 -- Violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq.*

*By the Nationwide Debt Collection Practices Class*

821.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

822.     Plaintiff Donna Follmer brings this claim on her own behalf and on behalf of each member of the Class described above.

823.     Defendants and their counsel in the foreclosure actions, are and were at all times material hereto "debt collectors" as defined by 15 U.S.C. § 1692a(6).

824.     Chase acquired Plaintiff's loan in September 2008 at a time when it was in default.  Under the Fair Debt Collection Practices Act ("FDCPA"), as consistently applied by the Federal Courts, an assignee such as the Chase is a "debt collector" if the debt sought to be collected was in default when it was acquired by the assignee.   In fact, the TPP specifically acknowledges that the Chase Defendants are acting as debt collectors.  It states in bold print "Chase Home Finance LLC is attempting to collect a debt, and any information obtained will be used for that purpose."

825.     Donna Follmer is a consumer as defined by 15 U.S.C. § 1692a(3).

826.     The mortgage loan at issues here is a debt incurred primarily for personal, family or household purposes as provided in 15 U.S.C.§ 1692a(5).

827.     The foregoing acts or omissions of the Defendants, and their counsel and their agents, constitute violations of FDPCA, including but not limited to, abusive and oppressive conduct, in violation of 15 U.S.C. § 1692d, false and misleading representations to collect a debt in violation of 15 U.S.C. § 1692e, and unfair and unconscionable means to collect a debt in violation of 15 U.S.C. § 1692f.

828.     The abusive and oppressive conduct, the false and misleading representations, and the unfair or unconscionable means used to collect a debt, employed by the Defendants and their counsel and/or their agents include specifically, but are not limited to:

A.     Designing and implementing a purposeful scheme to obtain additional amounts from distressed borrowers on the false promise and/or misleading representation that completion of trial period payments would result in a permanent modification and/or that the final modification agreement will be binding on Defendants, when Defendants had no intention actually to offer such a loan modification or honor any such final modification, whether not one is tendered for Class members' signatures;

B.     Soliciting Ms. Follmer and similarly situated borrowers to seek loan modifications through participation in trial plans on the false representation that "if you make these payments successfully and fulfill all the trial period conditions we will permanently modify your mortgage loan."  The Defendants made this representation to Ms. Follmer and members of the Class for the purpose of obtaining payments on their consumer debts knowing that it was false;

C.     Falsely representing to Ms. Follmer and similarly situated borrowers that after successful completion of the TPP payment, "Chase will send you a modification agreement for your signature which will modify your loan as necessary to reflect this new payment amount." The Defendants made this representation to Ms. Follmer and members of the Class for the purpose of obtaining payments on their consumer debts knowing that it is false."

D.     Designing and implementing an opaque and confusing process to obtain TPP and permanently modified payments from distressed borrowers such as Plaintiff Follmer and members of the class based on the false and misleading impression, purposefully created and nurtured by the Defendants, that completion of the TPP payments would lead to a permanent loan modification when no such intention existed, all in order to obtain TPP payments and stretch out the delinquency in order to maximize service fees and late fees, interest and other payments recoverable by Defendants in the eventual foreclosure, sale or other disposition of the property;

E.     Filing foreclosure actions such as those described herein despite the borrowers' fulfillment of the terms of the TPP and final Loan Modification Agreement.

829.   The Defendants' above described conduct violated the FDCPA, including specifically but not limited to:

A.     15 U.S.C. § 1692d (prohibiting conduct the natural consequence of which is to harass, oppress or abuse any person);

B.     15 U.S.C. § 1692e (prohibiting false, deceptive or misleading representations or means in connection with collection of a debt);

C.     15 U.S.C. § 1692e(2)(A) (prohibiting false representation of the character, amount, or legal status of any debt);

D.      15 U.S.C. § 1692e(10) (prohibiting the use of any false representation or deceptive means to collect or attempt to collect a debt or to obtain information concerning a consumer);

E.      15 U.S.C. § 1692f (prohibiting the use of unfair and unconscionable means to collect or attempt to collect any debt, generally);

F.      15 U.S.C. § 1692l (prohibiting the collection of any amount, including any interest, fee, charge or expenses, not expressly authorized by the agreement creating the debt or permitted by law).

830.    The Defendants' scheme to extract trial payments from distressed borrowers and increase servicing and late fees based on the false promise of permanent modification is rife with false and misleading representations and constitutes a fundamentally abusive, unfair, deceptive and unconscionable means for the collection of a debt in violation of 15 U.S.C. §§ 1692d, 1692e and 1692f.

831.    The trial payments obtained by the Defendants as a result of their deceptive scheme are not expressly authorized by the agreement creating the debt (i.e., the original note). Accordingly, Defendants directly violated § 1692f(1) through their unfair and deceptive trial modification scheme.

832.    The Defendants' communications with Ms. Follmer include express requests for payments, including but not limited to the following:

A.      "The first required payment of $772.10 must be made using the payment coupons enclosed, sent in the form of certified funds payable to CHASE PAYMENT PROCESSING, and mailed to the following address by MAY 01, 2010." *See* Exhibit 23 (emphasis in original).

B.        "Please note that the Trial Plan will not be valid until the first payment is received by Chase as indicated above." *Id*.

C.        The FDCPA places limitations on all types of communications between debt collectors (such as Defendants) and consumers regarding a debt and is not limited to express requests for payment, such as those identified in the preceding paragraphs.  Specifically, a covered communication constitutes the conveying of information regarding a debt directly or indirectly to any person through any medium.   In addition, the FDCPA's prohibitions are not limited to covered communications, but also applies to all violative "means" employed to collect a covered debt, including inter alia deceptive schemes such as employed by the Defendants herein.

833.    Actual injury or damages are not necessary to sustain an action under the express language of the FDCPA.  Nevertheless, Plaintiff and similarly situate Class members have been directly damaged as a result of the conduct of the Defendants, their counsel and/or their agents. Among other things, Plaintiff and similarly situate Class members have been wrongfully induced to make trial payments using certified funds, provide detailed representations and documentation about their financial circumstances, agree to commit to credit counseling if requested by the Defendants, waive their right to receive notices of foreclosure proceedings and agree to execute any additional documents as may be necessary to participate in the HAMP and CHAMP modifications.  Plaintiff and several similarly situate Class members have suffered anxiety and serious emotional distress as a direct and proximate result of Defendants' unlawful conduct.

834.    The Defendants' violation of the FDCPA alleged herein were complete and discernable violations of the statute within one year of the filing of this action.  Such complete and discernable violations include, but are not limited to, the Defendants' September 2010

advisement that Ms. Follmer's loan modification was denied even though Ms. Follmer fully complied with the terms of the trial payment plan and the Defendants' filing of second foreclosure action in December 2010 despite Ms. Follmer's successful completion of the trial payment plan.

835.    As a result of Defendants' violation of the FDCPA, Ms. Follmer and members of the Class are entitled to actual damages pursuant to 15 U.S.C. §§ 1692k(a)(1), statutory damages in the amount of $1,000.00 pursuant to 15 U.S.C. §§ 1692k(a)(2)(A), and reasonable attorney fees and costs pursuant to 15 U.S.C. §§ 1692k(a)(3).

*       *       *

## XIX.   PRAYER FOR RELIEF

836.    WHEREFORE, Plaintiffs, for themselves and all others similarly situated, respectfully request that this Court enter a judgment against Defendants and in favor of Plaintiffs and the Classes, and grant the following relief:

A.      Determine that this action may be maintained as a class action pursuant to the appropriate subsections of Rule 23 of the Federal Rules of Civil Procedure; that the Court certify a Class, Classes or Subclasses with respect to particular issues if appropriate; that the Court designate and appoint the named Plaintiffs to serve as Class Representatives, designate and appoint Class Counsel, and designate and appoint Interim Co-Lead Counsel for Plaintiffs as Lead Class Counsel pursuant to the rule;

B.      Determine that Defendants are jointly and severally liable for the conduct alleged herein;

C.      Enter a judgment declaring the acts and practices of Chase complained of herein to constitute a breach of contract and a breach of the covenant of good faith and fair dealing, as

well as a declaration that they are required by the doctrine of promissory estoppel to offer

permanent modifications to class members on the terms promised in class members' temporary

modifications, together with an award of monetary damages and other available relief on those

claims;

D.     Enjoin Chase's agents and employees, affiliates and subsidiaries, from continuing

to harm Plaintiffs and the members of the Class;

E.     Order Chase to adopt and enforce a policy that requires appropriate training of

their employees and agents regarding their duties under all its loan modification programs,

including HAMP;

F.     Order specific performance of Chase's contractual obligations together with other

relief required by contract and law;

G.     Order appropriate injunctive relief, including without limitation, reformation of

contracts, restitution, accounting, underwriting of loans for Plaintiffs and members of the Class

whose homes were foreclosed on, permanent loan modifications, reformation of accounts, and

disgorgement of illegal profits;

H.     Enjoin Defendants from ignoring or failing to process loan modification

applications in a timely manner;

I.     Enjoin Defendants from collecting or continuing to attempt to collect fees, costs,

interests and overcharges placed on accounts in violation of contract and/or applicable law;

J.     Enjoin Defendants from continuing to process foreclosures in violation of contract

and/or applicable law;

K.     Require Defendants to set aside foreclosures in violation of contract and/or

applicable law;

L.      Require Chase to institute corrective credit reporting procedures as required by law;

M.      Require Defendants to submit to outside audits and oversight, paid for by Defendants, on a regular basis to ensure that their mortgage loan modification procedures are fair, reasonable, and in compliance with applicable law including, without limitation, HAMP, HAMP TPP agreements, Loan Modification Agreements, laws governing debt collection, and state consumer protection laws;

N.      Award actual, multiple, exemplary, statutory and/or statutory minimum damages, as appropriate;

O.      Award and prejudgment and postjudgment interest;

P.      Award Plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees; and

Q.      Grant Plaintiffs and the Class such other and further relief as this Court finds necessary and proper.

## XX.   JURY TRIAL DEMANDED

837.    Plaintiffs hereby demand a jury trial on all issues so triable.

DATED this 20th day of January, 2012.

| KLEIN KAVANAGH COSTELLO, LLP | KELLER ROHRBACK L.L.P. |
|---|---|
| By: /s/Gary E. Klein<br>Gary E. Klein<br>klein@kkcllp.com<br>Shennan Alexandra Kavanagh<br>kavanagh@kkcllp.com<br>Kevin Costello<br>costello@kkcllp.com<br>85 Merrimac Street, 4th Floor<br>Boston, MA  02114<br>Tel: (617) 357-5500<br>Fax: (617) 357-5030 | By: /s/ Lynn Lincoln Sarko<br>Lynn Lincoln Sarko<br>lsarko@kellerrohrback.com<br>Gretchen Freeman Cappio<br>gcappio@kellerrohrback.com<br>Gretchen S. Obrist<br>gobrist@kellerrohrback.com<br>1201 Third Avenue, Suite 3200<br>Seattle, WA 98101-3052<br>Tel: 206-623-1900<br>Fax: 206-623-3384 |
| LEVIN FISHBEIN SEDRAN & BERMAN | CUNEO GILBERT & LADUCA, LLP |
| By: /s/ Charles E. Schaffer<br>Charles E. Schaffer<br>cschaffer@lfsblaw.com<br>510 Walnut Street, Suite 500<br>Philadelphia, PA  19106<br>Tel: (215) 592-1500<br>Fax: (215) 592-4663 | By: /s/ Jonathan W. Cuneo<br>Jonathan W. Cuneo<br>jonc@cuneolaw.com<br>Charles J. LaDuca<br>charlesl@cuneolaw.com<br>Matthew L. Wiener<br>mwiener@cuneolaw.com<br>Brendan S. Thompson<br>brendant@cuneolaw.com<br>Mark Malone<br>markjmalone@cuneolaw.com<br>507 C Street, N.E.<br>Washington, D.C.  20002<br>Tel: (202) 789-3960<br>Fax: (202) 789-1813 |
| KELLER ROHRBACK L.L.P. | CUNEO GILBERT & LADUCA, LLP |
| By: /s/ Sharon T. Hritz<br>Sharon T. Hritz<br>shritz@kellerrohrback.com<br>1129 State St, Ste 8<br>Santa Barbara, CA  93101-6760<br>Tel: (805) 456-1496<br>Fax: (805) 456-1497 | By: /s/ Preetpal Grewal<br>Preetpal Grewal<br>pgrewal@cuneolaw.com<br>Rockefeller Center<br>620 Fifth Avenue<br>New York, NY  10020<br>Tel: (212) 698-4504<br>Fax: (212) 698-4505 |

| | |
|---|---|
| CUNEO GILBERT & LADUCA, LLP<br><br>By: /s/ Alexandra C. Warren<br>Alexandra C. Warren<br>awarren@cuneolaw.com<br>106-A South Columbus Street<br>Alexandria, VA  22314<br>Tel: (202) 789-3960<br>Fax: (202) 789-1813 | |

*Interim Co-Lead Counsel for Plaintiffs*

| | |
|---|---|
| Christopher M. Ellis<br>cellis@brelaw.com<br>Shane M. Mendenhall<br>smendenhall@brelaw.com<br>BOLEN, ROBINSON & ELLIS, LLP<br>202 South Franklin Street, 2nd Floor<br>Decatur, IL  62523<br>Tel: (217) 429-4296<br>Fax: (217) 329-0034 | Charles M. Delbaum<br>cdelbaum@nclc.org<br>Stuart T. Rossman<br>srossman@nclc.org<br>NATIONAL CONSUMER LAW CENTER<br>7 Winthrop Square, 4th Floor<br>Boston, MA  02110<br>Tel: (617) 542-8010<br>Fax: (617) 542-8033 |
| J. Barton Goplerud<br>jbgoplerud@hudsonlaw.net<br>HUDSON MALLANEY SHINDLER &<br>ANDERSON<br>5015 Grand Ridge Drive, Suite 100<br>West Des Moines, IA  50265<br>Tel: (515) 223-4567<br>Fax: (515) 223-8887 | Eric D. Holland<br>eholland@allfela.com<br>Gerard B. Schneller<br>gschneller@allfela.com<br>Steven Stolze<br>stevenstolze@yahoo.com<br>Randall Seth Crompton<br>scrompton@allfela.com<br>HOLLAND GROVES SCHNELLER &<br>STOLZE<br>300 N. Tucker Blvd., Suite 801<br>St. Louis, MO  63101<br>Tel: (314) 241-8111<br>Fax: (314) 241-5554 |
| Joseph J. DePalma<br>jdepalma@litedepalma.com<br>Katrina Carroll<br>kcarroll@litedepalma.com<br>Mayra Velez Tarantino<br>mtarantino@litedepalma.com<br>LITE DEPALMA GREENBERG, LLC | Michael Raabe<br>mraabe@nlsma.org<br>NEIGHBORHOOD LEGAL SERVICES<br>170 Common Street, Suite 300<br>Lawrence, MA  01840-1507<br>Tel: (978) 686-6900 |

| | |
|---|---|
| Two Gateway Center, 12th Floor<br>Newark, NJ  07102-5585<br>Tel:  (973) 623-3000 | |
| Anthony L. Lanza<br>tony@lanzasmith.com<br>Brodie Hugh Smith<br>brodie@lanzasmith.com<br>LANZA & SMITH, PLC<br>3 Park Plaza, Suite 1650<br>Irvine, CA  92614-8540<br>Tel: (949) 221-0490<br>Fax: (949) 221-0027 | Lynda J. Grant<br>lgrant@grantfirm.com<br>THE GRANT LAW FIRM, LLC<br>521 Fifth Avenue, 17th Floor<br>New York, NY  10175<br>Tel: (212) 292-4441<br>Fax: (212) 292-4442 |
| Robert K. Shelquist<br>rkshelquist@locklaw.com<br>LOCKRIDGE GRINDAL NAUEN, P.L.L.P.<br>100 Washington Avenue South, Suite 2200<br>Minneapolis, MN  55401-2179<br>Tel: (612) 339-6900<br>Fax: (612) 339-0981 | Thomas D. Mauriello<br>tomm@maurlaw.com<br>MAURIELLO LAW FIRM, APC<br>1181 Puerta Del Sol, Suite 120<br>San Clemente, CA  92673<br>Tel: (949) 542-3555<br>Fax: (949) 606-9690 |
| Michael J. Flannery<br>James J. Rosemergy<br>mflannery@careydanis.com<br>jrosemergy@careydanis.com<br>CAREY DANIS & LOWE<br>8235 Forsyth Blvd., Suite 1100<br>St. Louis, MO 63105<br>Tel: (314) 725-7700<br>FaX: (314) 721-0905 | Lawrence John Friscia<br>lawrence.friscia@friscialaw.com<br>Jonathan Minkove<br>jon.minkove@friscialaw.com<br>FRISCIA & ASSOCIATES, LLC<br>17 Academy Street, Penthouse<br>Newark, NJ  07102<br>Tel: (973) 500-8024<br>Fax: (888) 809-3747 |
| **Members of Plaintiffs' Executive Committee** | |
| Michael D. Braun<br>mdb@braunlawgroup.com<br>BRAUN LAW GROUP, P.C.<br>10680 West Pico Boulevard, Suite 280<br>Los Angeles, CA  90064<br>Tel: (310) 836-6000<br>Fax: (310) 836-6010<br>***Counsel for Plaintiffs Dianna Montez, Daniel Ware, Michael Sabouhi, Kiersten Hajnal, Sandra Fischer, Frank Fischer and Kathy Kurtzner*** | Daniel E. Gustafson<br>dgustafson@gustafsongluek.com<br>David A. Goodwin<br>dgoodwin@gustafsongluek.com<br>Daniel C. Hedlund<br>dhedlund@gustafsongluek.com<br>Michelle J. Looby<br>mlooby@gustafsongluek.com<br>GUSTAFSON GLUEK PLLC<br>650 Northstar East<br>608 Second Avenue South |

| | Minneapolis, MN 55402 |
|---|---|
| | Tel: (612) 333-8844 |
| | Fax: (612) 339-6622 |
| | |
| | **Counsel for Plaintiff Julie Karnes** |
| Jayne A. Goldstein | William T. Dowd |
| jgoldstein@sfmslaw.com | bill@dowdlaw.net |
| Nathan C. Zipperian | Alex R. Lumaghi |
| nzipperian@sfmslaw.com | alex@dowdlaw.net |
| SHEPHERD FINKELMAN MILLER & | DOWD & DOWD, P.C. |
| SHAH LLP | 100 North Broadway, Ste. 1600 |
| 1640 Town Center Circle, Suite 216 | St. Louis, MO 63102 |
| Weston, FL 33326 | Tel: (314) 621-2500 |
| Tel: (954) 515-0123 | Fax: (314) 621-2503 |
| Fax: (954) 515-0124 | |
| | **Counsel for Plaintiffs Thomas P. Hayes and** |
| **Counsel for Plaintiffs Mindy B. Senter and** | **Sharon M. Hayes** |
| **Gustavo Franco** | |
| John J. Driscoll | Andrea Bierstein |
| THE DRISCOLL FIRM, P.C. | abierstein@hanlyconroy.com |
| 211 N. Broadway, Ste. 2440 | Mitchell Breit |
| St. Louis, MO 63102 | mbreit@hanlyconroy.com |
| Tel: (314) 932-3232 | HANLY CONROY BIERSTEIN SHERIDAN |
| Fax: (314) 932-3233 | FISHER & HAYES LLP |
| | 112 Madison Avenue, 7th Floor |
| **Counsel for Plaintiffs Thomas P. Hayes and** | New York, NY 10016 |
| **Sharon M. Hayes** | Tel: (212) 784-6400 |
| | Fax: (212) 213-5949 |
| | |
| | **Counsel for Plaintiff Linda Ross** |
| Derek Y. Brandt | Jeffrey S. Goldenberg |
| dbrandt@simmonsfirm.com | jgoldenberg@gsglegal.com |
| SIMMONS BROWDER GIANARIS | Todd B. Naylor |
| ANGELIDES & BARNERD LLC | tnaylor@gsglegal.com |
| One Court Street | GOLDENBERG SCHNEIDER & GROH, |
| Alton, IL 62002 | L.P.A. |
| Tel: (618) 259-2222 | 35 East Seventh Street, Suite 600 |
| Fax: (618) 259-2251 | Cincinnati, OH 45202 |
| | Tel: (513) 345-8291 |
| **Counsel for Plaintiff Linda Ross** | Fax: (513) 345-8294 |
| | **Counsel for Plaintiffs Donna and Michael** |
| | **Follmer** |

| | |
|---|---|
| Christian A. Jenkins<br>cjenkins@minnillojenkins.com<br>Paul J. Minnillo<br>pjminnillo@minnillojenkins.com<br>MINNILLO & JENKINS CO. L.P.A.<br>7324-A Kingsgate Way<br>West Chester, OH 45069<br>Tel: (513) 723-1600<br>Fax: (513) 723-1620<br><br>***Counsel for Plaintiffs Donna and Michael Follmer*** | Leonard A. Bennett<br>lenbennett@cox.net<br>CONSUMER LITIGATION ASSOCIATES,<br>PC<br>12515 Warwick Blvd., Suite 100<br>Newport News, VA  23606<br>Tel: (757) 930-3660<br>Fax: (757) 930-3662<br><br>***Counsel for Plaintiff Michelle Bourdelais*** |