UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CASE NO. 11-md-02290-RGS

IN RE: JPMORGAN CHASE
MORTGAGE MODIFICATION LITIGATION

MEMORANDUM AND ORDER ON DEFENDANT
JPMORGAN CHASE'S MOTION TO DISMISS

July 27, 2012

STEARNS, D.J.

In March of 2009, the United States Department of the Treasury announced the

details of the Home Affordable Modification Program (HAMP), a component of the

optimistically styled "Making Home Affordable Program." Under the provisions of

HAMP, mortgage loan servicers contract with Fannie Mae, the designated financial

agent of the United States, to modify certain mortgage loans in their portfolios in

exchange for financial incentives. This multi-district litigation (MDL) consolidates

homeowner lawsuits brought in a number of jurisdictions alleging that JPMorgan Chase

Bank, N.A. (Chase), breached the terms of plaintiff's trial mortgage modification

agreements, made false and misleading promises to homeowners about the prospects

of a mortgage modification, managed the modification process with gross ineptitude,

and, in some cases, foreclosed on homes despite promises to homeowners that they

could remain in their homes while negotiating new payment terms with Chase.[1]

On October 11, 2011, the MDL was formalized, and on March 5, 2012, Chase filed a motion to dismiss certain claims set out in the consolidated Amended Complaint (CAC) for lack of subject matter jurisdiction, failure to state a claim upon which relief can be granted, and failure to join necessary parties. Fed. R. Civ. P. 12(b)(1), (6) & (7). The court heard oral argument on the motion to dismiss on July 12, 2012.

## BACKGROUND[2]

Plaintiffs have set out their claims under four group headings. Group 1 plaintiffs allege that Chase "systemically breached obligations set forth in form contracts that it sent to its borrowers pursuant to HAMP,"[3] despite the fact that plaintiffs kept their end

---

[1] JPMorgan Chase Bank, N.A. is, on information and belief, a national banking association with headquarters in New York. It is a wholly owned subsidiary of JPMorgan Chase & Co. JPMorgan Chase Bank, N.A. directed, controlled, formulated, and/or participated in the loan servicing activities of EMC Mortgage Corp., Bear Stearns Companies LLC, and Chase Home Finance LLC. JPMorgan Chase & Co. purchased the banking operations of Washington Mutual Bank (WaMu) in 2008, while JPMorgan Chase Bank, N.A., absorbed the loan servicing portfolio of WaMu. Consolidated Am. Compl. ¶¶ 45-46. Plaintiffs are citizens of California, Florida, Illinois, Indiana, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, Nevada, New York, Ohio, Pennsylvania, and Washington. *Id.* ¶ 6.

[2] In the context of a motion to dismiss, plaintiffs' plausible allegations of facts are assumed to be true. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-556 (2007).

[3] "As a participating servicer in HAMP, Chase entered into written agreements with its borrowers, known as Trial Period Plan (TPP) Agreements. In these Agreements, Chase agreed to a finite 'trial period,' and promised that borrower

of the bargain by submitting the required documentation and making the adjusted

mortgage payments. *Id.* ¶ 2.[4]  Group 2 plaintiffs, alleging State consumer protection

statute violations and a theory of promissory estoppel, claim that "Chase deceived,

strung along, and misled [them]." *Id.* ¶ 3.  The Group 3 plaintiffs maintain that Chase

breached their negotiated "Loan Modification Agreements."

> These agreements are clear in their finality and permanence and give
> Chase no right to unilaterally renege on the terms.  Yet Chase has failed
> to honor these modifications, either by continuing to treat the
> homeowner's account as if no modification had occurred, or by cancelling
> the modification without notice several months after the modification,
> throwing the homeowner back into delinquency. In these instances, Chase
> has failed to meet its contractual obligation to honor the terms of its
> modification agreements.

*Id.* ¶ 4.[5]  Finally, Group 4, represented by a single plaintiff, asserts a claim under the

---

compliance with the TPP Agreement would result in the tender of a permanent loan
modification under HAMP rules or, at the very least, a timely decision that such a
modification was not forthcoming." CAC ¶ 2.

   [4] Group 1 plaintiffs claim breach of contract and breach of the duty of good faith
and fair dealing, promissory estoppel, and state consumer protection violations. *Id.* ¶
63.

   [5] Plaintiffs in Group 3 are borrowers who cleared the TPP hurdle and received
permanent Loan Modification Agreements.  The Agreements modified plaintiffs'
mortgages by recalculating the interest rates, principal balances, the number and/or
timing of the required payments, and the payment amounts. *Id.* ¶ 637. Despite the fact
that the Group 3 plaintiffs kept current on their adjusted mortgages, Chase continued
to demand payments in amounts that exceeded those stipulated in the Loan
Modification Agreements.  As a result, plaintiffs allege that thousands of homeowners
are in danger of losing their homes from foreclosure. *Id.* ¶¶ 639-640.  Chase is not

federal Fair Debt Collection Practices Act (FDCPA), alleging that Chase has engaged in unfair, deceptive, and abusive debt collection practices. *Id.* ¶ 5.

**Part I - TPPs[6]**

In 2008, Chase received $25 billion from the United States Government as part of the Troubled Asset Relief Program (TARP), 12 U.S.C. § 5211. In July of 2009, Chase agreed to participate in HAMP. A Service Participation Agreement signed with the Department of Treasury obligated Chase to follow all HAMP guidelines, procedures, and directives. CAC ¶ 67-68. Among these was the requirement that mortgage servicers "use a uniform loan modification process to provide a borrower with sustainable monthly payments." *Id.* ¶ 68, citing HAMP, Supplemental Directive 09-01, 4/6/2009, at 1 (HAMP SD). Servicers were also required to suspend foreclosure proceedings during the HAMP evaluation process and during any ensuing trial modification period. CAC ¶ 69.

A HAMP modification (as envisioned) consists of two stages. In the first, a Participating Servicer accepts applications from borrowers, and, if they meet certain

---

moving to dismiss the claims of the Group 3 plaintiffs.

[6] The named plaintiffs identified in Part I are citizens of the following states: California, Florida, Illinois, Indiana, Massachusetts, Michigan, Minnesota, Missouri, Nevada, Pennsylvania, and Washington. *Id.* ¶ 219.

criteria, offers them a TPP.[7]  The TPP initiates a three-month period during which the homeowner is to make the modified mortgage payments.  If the homeowner successfully completes the TPP, at the second stage of the process, the servicer offers the homeowner a permanent mortgage modification.  The goal of the HAMP modification is to give the homeowner-occupant a five-year breathing space in which to reorganize his or her finances and avoid foreclosure.  *Id.* ¶ 70.

The first sentence of the form HAMP TPP Agreement states:

[i]f I am in compliance with this Trial Period Plan (the "Plan") and my representations in Section 1 continue to be true in all material respects, then the Servicer will provide me with a Home Affordable Modification Agreement ("Modification Agreement"), as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage.

*Id.* ¶ 74.  Section 3 of the form HAMP TPP Agreement iterates:

[i]f I comply with the requirements in Section 2 and my representations in Section 1 continue to be true in all material respects, the Servicer will send me a Modification Agreement for my signature which will modify my Loan Documents as necessary to reflect this new payment amount and waive any unpaid late charges accrued to date.

---

[7] The servicer is required to ascertain that the holder of the underlying note has agreed to participate in HAMP.  The servicer must then determine the terms of the modification under the HAMP "Waterfall" calculation (a HAMP-mandated formula for determining whether the homeowner's monthly payment can be lawfully reduced to the target 31% of monthly income).  *Id.* ¶ 71.  If the Waterfall calculation yields the monthly income target, and if the modification provides a net present benefit to the mortgage holder, the servicer must offer the borrower a TPP Agreement.  *Id.* ¶ 72.

*Id.* ¶ 75.

The TPP Agreement requires borrowers to undertake duties that are outside the ordinary covenants of a mortgage.   The borrower must agree to undergo credit counseling, submit additional financial information, establish escrow accounts, and divulge details of his or her personal economic circumstances.  *Id.* ¶ 77.  With some minor exceptions, HAMP directs that "[i]f the borrower complies with the terms and conditions of the Trial Period Plan, the loan modification will become effective on the first day of the month following the trial period as specified in the Trial Period Plan." *Id.* ¶ 78, quoting HAMP SD 09-01.[8]

### Part II - Modification Process and Oral Assurances

The crux of the Group 2 complaint is the allegation that Chase engaged in unfair and deceptive conduct while processing modification applications.   According to

---

[8] In addition to the HAMP program, Chase also maintains a modification program of its own, styled as the Chase Modification Program or "CHAMP." CHAMP issues "Chase TPP" documents that are modeled on the HAMP TPPs. EMC has a similar program that also uses "EMC TPP" documents modeled on the  HAMP analogues. The Chase and EMC TPP Agreements mimic HAMP in stating that "[a]fter successful completion of the Trial Period Plan, Chase will send you a Modification Agreement for your signature which will modify the Loan as necessary to reflect this new payment amount." *Id.* ¶ 81.  Given their similarities, unless otherwise specified, the HAMP, CHAMP, and EMC TPP Agreements will be referred to collectively as the TPP Agreements. *Id.* ¶¶ 79-82.

plaintiffs,

> Chase induces borrowers to keep paying modified payments – i.e., amounts that are not the same as what was owed under their original Notes – based on various misrepresentations and deceptive statements. In the course of accepting borrowers' modified payments month after month, Chase repeatedly requests documentation necessary to determine homeowner eligibility for modifications, which Chase systematically mishandles when received – either losing or destroying borrowers' documents and loan files.   Meanwhile, fees accrue on mortgagor accounts, as they are driven deeper into debt.  Even after complying in good faith with all of Chase's requests for months or even years, homeowners often never receive a modification and carry far more debt than they would have had they known that Chase would fail to properly consider the merits of their modification applications.

*Id.* ¶ 299.

Instead of receiving TPPs, the plaintiffs in Group 2 were sent either a Forbearance Agreement or a Repayment Agreement. Chase employees allegedly represented to the plaintiffs that upon completion of the preliminary "plans" outlined in these Agreements, they would be notified as to whether they qualified for a mortgage modification. *Id.* ¶ 315. Despite Chase's assurances that plaintiffs could make reduced payments for a period of time without risk of foreclosure or negative credit reporting, foreclosure proceedings were begun against them. *Id.* ¶¶ 316, 482-489.

According to plaintiffs, even in those instances in which Chase modified their mortgages, the Loan Modification Agreements captured the interest and fees that had accrued over the months or sometimes years during which Chase had procrastinated

7

in processing the applications, while adding the accrued balances onto the principal balance of plaintiffs' loans. Chase also assessed inexplicable fees that it refused to explain other than with gibberish like "corporate adv statutory exp disb, corp adv – attorney advance disb," *see id.* ¶ 388, and "G Speedpay Fee, Corp., Advance Adjustment, Late Charge, Misc. F/C and B/R Expenses, Misc. Corporate Disbursement, and Property Preservation." *See id.* ¶ 368.

### *Part IV - Fair Debt Collection Practices Act (FDCPA)*

In 2002, Donna Follmer took a mortgage loan at a 9.45% interest rate from Long Beach Mortgage Company, a subsidiary of WaMu. Chase acquired the servicing rights to Follmer's loan on September 25, 2008. *Id.* ¶ 793. At the time, Follmer was delinquent on her mortgage payments. *Id.* ¶ 796. She entered into a Loan Modification Agreement with Chase in October of 2008. The modification agreement lowered Follmer's fixed interest rate and reduced the amount of her monthly payment. *Id.* ¶ 797.

However, "in January 2009, after paying under her modified loan for three months, Chase inexplicably raised her monthly mortgage payment by over 30%." *Id.* ¶ 798. In May of 2009, when Follmer stopped making the monthly payments, Chase initiated a foreclosure proceeding. In response, Follmer reapplied for a loan

modification. In March of 2010, Chase sent Follmer a TPP.[9] *Id.* ¶ 801. Follmer signed

it and returned it to Chase, together with the required documentation. *Id.* "Follmer

timely made all three of the payments required by the TPP, all of which Chase

accepted. Yet following completion of the TPP, she was sent neither a modification,

nor notification that she was denied." *Id.* ¶ 802. When Follmer inquired of Chase,

she was told to make another TPP payment, which she did. Chase accepted the

payment. However, in September of 2010, a Chase employee telephoned Follmer to

tell her that her modification application had been denied. No explanation was ever

given. *Id.* ¶¶ 804-805.

## DISCUSSION

"A motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ.

P. 12(b)(1) is appropriate when the plaintiff lacks standing to bring the claim."

*Edelkind v. Fairmont Funding, Ltd.*, 539 F. Supp. 2d 449, 453 (D. Mass. 2008)

(citation omitted).

> When faced with motions to dismiss under both 12(b)(1) and 12(b)(6), a
> district court, absent good reason to do otherwise, should ordinarily
> decide the 12(b)(1) motion first. . . . It is not simply formalistic to decide
> the jurisdictional issue when the case would be dismissed in any event for

---

[9] The Chase TPP stated, "Chase Home Finance LLC is attempting to collect a debt, and any information obtained will be used for that purpose." *Id.* ¶ 803.

> failure to state a claim. Different consequences flow from dismissals under 12(b)(1) and 12(b)(6): for example, dismissal under the former, not being on the merits, is without res judicata effect.

*Katz v. Pershing, LLC*, 806 F. Supp. 2d 452, 456 (D. Mass. 2011), quoting *Ne. Erectors Ass'n of the BTEA v. Sec'y of Labor, Occupational Safety & Health Admin.*, 62 F.3d 37, 39 (1st Cir. 1995).

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp.*, 550 U.S. at 559. "While a complaint attacked by a Rule 12(b)(6) motion does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (internal citations omitted). *See also Rodriguez-Ortiz v. Margo Caribe, Inc.*, 490 F.3d 92, 95-96 (1st Cir. 2007). The court may also look to documents, the authenticity of which are not disputed by the parties, to documents central to the plaintiff's claim, and to documents referenced in the complaint. *Watterson v. Page*, 987 F.2d 1, 3-4 (1st Cir. 1993).

### *Subject Matter Jurisdiction – Financial Institution Supervisory Act (FISA)*

In April of 2011, Chase entered into a Consent Order with the Office of the Comptroller of the Currency (OCC), the Board of Governors of the Federal Reserve,

and the Office of Thrift Supervision (OTS), pursuant to 12 U.S.C. § 1818(b).[10]  The

Consent Order, which covers Chase and thirteen other mortgage loan servicers, is

meant to remedy questionable  mortgage servicing and foreclosure practices like those

alleged in the CAC.[11]  The "comprehensive action plan" laid out in the Consent Order

requires Chase to provide

> financial resources to develop and implement an adequate infrastructure
> to support existing and/or future loss mitigation[12] and foreclosure
> activities . . . organizational structure, managerial resources, and staffing
> to support [those activities] . . . metrics to measure and ensure the
> adequacy of staffing levels relative to existing and/or future loss
> mitigation and foreclosure activities, such as limits for the number of
> loans assigned to a loss mitigation employee, including a single point of
> contact . . . and deadlines to review loan modification documentation,
> make loan modification decisions, and provide responses to borrowers .
> . . governance and controls to ensure compliance with all applicable
> federal and state laws . . . including those required by HAMP . . . .

---

[10] The statute gives the OCC the authority to address by consent orders "unsafe
or unsound" practices or violations of law by financial institutions.  12 U.S.C. §§
1818(b), 1813(q).

[11] The Comptroller's findings included, inter alia, that Chase "[had] failed to
devote sufficient financial, staffing, and managerial resources to ensure proper
administration of its foreclosure processes; [and had] failed to devote to its foreclosure
processes adequate oversight, internal controls, policies, and procedures, compliance
risk management, internal audit, third party management, and training." Consent Order
at 3, Pls.' Opp'n – Ex. 1.

[12] Loss mitigation "shall include, but not be limited to, activities related to special
forbearances, modifications, short refinances, short sales, cash-for-keys, and deeds-in-
lieu of foreclosure." Id. at 5.

*Id.* at 5-6. The Consent Order also required Chase to

> submit to the Deputy Comptroller and the Examiner-in-Charge a plan, acceptable to the OCC, to remediate all financial injury to borrowers caused by any errors, misrepresentations, or other deficiencies identified in the Foreclosure Report, by (a) reimbursing or otherwise appropriately remediating borrowers for impermissible or excessive penalties, fees, or expenses, or for other financial injury identified in accordance with this Article; and (b) taking appropriate steps to remediate any foreclosure sale where the foreclosure was not authorized as described in this Article.

*Id.* at 17.

In the motion to dismiss, Chase offered assurances that "[w]ork is well under way on the actions necessary to comply with the consent orders." Def.'s Mot. at 10, citing Dep't of the Treasury, Comptroller of the Currency, Interim Status Report: Foreclosure Related Consent Orders, at 4 (Nov. 2011). According to the motion, "the OCC expects servicers to [have] complete[d] [the process] during the first half of 2012." Def.'s Mot. at 14. The expectation proved aspirational at best. At the July 12 hearing, Chase's counsel, by way of extenuation, explained that an independent consultant, Deloitte & Touche, has been commissioned to review all of the fourteen servicers' high risk loans to make individual determinations of those loans for which financial remediation is required. This "lengthy and detailed process" requires "legions of individuals" who are now, according to Chase, expected to finish their work by September 30, 2012.

In response, plaintiffs' counsel provided the court with an OCC publication,

entitled Financial Remediation Framework ("Framework") Frequently Asked Questions

("FAQ"). *See* Dkt # 91. The Framework is the OCC-approved mechanism for

implementing the mandated action plan. The document is written for borrowers and

explains the remediation process. It states that the Framework was developed

> to provide examples of situations where compensation or other
> remediation is required for financial injury due to servicer errors,
> misrepresentations, or other deficiencies. The independent consultants
> will use the Framework to recommend remediation for financial injury
> identified during the Independent Foreclosure Review. . . . The categories
> included in the Framework are not intended to be exhaustive or to cover
> all possible situations or remediation options for borrowers who may
> require compensation or other remediation for financial injury.

FAQ ¶ 1.[13] The FAQ explains that the Framework's fixed dollar payments are intended

as approximations of the

---

[13] The Framework, *see* Dkt # 92, Ex. 1, lists categories under which borrowers are eligible to receive a fixed dollar amount (or have corrections made to the servicer's records deducting erroneously accrued interest charges) as compensation for financial injury incurred as a result of the servicer's processing errors. The categories include: (1) Servicemembers Civil Relief Act violations; (2) Borrower Not in Default when foreclosure occurred or in default as direct result of servicer error; (3a) Error after Trial Loan Modification Completed; (3b) Error after Trial Loan Modification Approved; (4) Foreclosure completed when borrower performing under documented Forbearance Plan; (5) Loan Modification Application (denied in error or no decision where borrower would have qualified); (6) Loan Modification Application (no follow-up); (7) Loan Modification Application (never solicited loan modification); and (8) Loan Modification Application (failed to approve modification in the prescribed time frame).

> direct financial injury that borrowers may have suffered as a result of a
> specific error.   The regulators believe that payments of designated
> amounts . . . will avoid the need for borrowers to provide proof of the
> amount of the injury suffered and will avoid the delay and expense
> associated with an examination of the particular circumstances involved
> in each borrower's case. . . . Nevertheless, there may be some cases
> where a borrower believes that additional compensation is warranted.  In
> those cases, borrowers may pursue other available legal remedies.

*Id.* ¶ 5.  Finally, the FAQ makes clear that the review process is final and that there is

no appeal.  As a consequence, "[t]he results of the Independent Foreclosure Review

are not intended to have an impact on any other options the borrower may pursue

related to their mortgage loan." *Id.* ¶ 42.  More specifically, the borrowers were told

that "[s]ubmitting a request for an Independent Foreclosure Review will not preclude

borrowers from pursuing any other legal remedies available related to their

foreclosure." *Id.* ¶ 33.

> Servicers may not ask a borrower voluntarily to release any claims in
> order to receive remediation payments.  However, servicers may assert in
> any separate litigation, or as part of future settlements related to the
> servicer's foreclosure and servicing practices, any right that may exist
> under applicable law to offset the amounts received from the servicer
> under the Independent Foreclosure Review, but they may only assert it in
> those other matters.

*Id.* ¶ 34.

Chase argues that FISA precludes subject matter jurisdiction over the claims in

Part I, II, and IV of the CAC because FISA § 1818 prohibits any action that "could

14

affect" the enforcement of an OCC consent order.[14]   Chase argues that a review by this court of plaintiffs' claims may well yield a result inconsistent with the Consent Order and its purpose of proving a uniform remediation process applicable to all fourteen servicers, a result which Congress intended to avoid.

The jurisdictional bar of § 1818(i)(1) must, however, be read in the context of the entire statute, the primary purpose of which is to prevent federal courts from usurping the OCC's power to enforce its own consent orders *against parties to the orders*.   Congress did not intend to also prohibit non-parties from exercising their separate remedies at law. *See Ridder v. Office of Thrift Supervision*, 146 F.3d 1035, 1039 (D.C. Cir. 1998) ("To prevent regulated parties from interfering with the comprehensive powers of the federal banking regulatory agencies, Congress severely limited the jurisdiction of courts to review ongoing administrative proceedings brought by banking agencies.").

> Under 12 U.S.C. § 1818(h) and (i), review may be sought in the federal courts by certain parties of orders issued after hearings to obtain cease

---

[14] "[N]o court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any notice or order under any such section, or to review, modify, suspend, terminate, or set aside any such notice or order." 12 U.S.C. § 1818(i)(l). Chase notes that it is not challenging Part 3 of the CAC in the motion to dismiss because the claims of the Group 3 plaintiffs, "which allege[] that Chase breached agreed-upon permanent modifications . . challenge post-modification conduct beyond the scope of the OCC's Order." Def.'s Reply at 6.

and desist orders under § 1818(b)(1), but only in specified circumstances. First, a permanent cease and desist order may be reviewed by a court of appeals at the request of either party. § 1818(h)(2). Second, a bank may seek relief in a court of appeals from a temporary cease and desist order issued under § 1818(c)(1) before the completion of cease and desist proceedings. § 1818(c)(2). Finally, the appropriate federal banking agency may apply to a district court for enforcement of a cease and desist order. § 1818(d), (i)(1). To assure the speed and efficiency of the administrative scheme, judicial interference in the proceedings is limited to these specified situations. The bar against untimely judicial intervention is made explicit in § 1818(i)(1).

*E. Nat'l Bank v. Conover*, 786 F.2d 192, 193 (3d Cir. 1986). It is significant that there is no provision in the statute for a non-party to a consent order to challenge findings made pursuant to the Order. It follows that the jurisdictional bar is not meant to displace a non-party's right to present its claims to a federal court, or the jurisdiction of the court to hear those claims – an interpretation buttressed by the OCC's own FAQ publication, which assures borrowers that participation in the Review process does *not* result in a waiver of their right to pursue legal remedies.[15] The OCC further warns borrowers that the Review process "will not necessarily affect, stop, or delay the foreclosure sale date. . . . [B]orrowers should continue to work with their servicer to prevent a foreclosure sale using every avenue possible." FAQ ¶ 43. This warning

---

[15] Although the court is not bound by the OCC's interpretation of § 1818 (as read in its FAQ document), the court will accord "appropriate deference to the agency's interpretation of the governing statute." *Sok v. Mukasey*, 526 F.3d 48, 53 (1st Cir. 2008).

would hardly be necessary if the OCC thought that Congress's intent was to block off the avenue leading to the state and federal courts.

It is telling that Chase can point to no case that lends support to its reading of the statute. The cases Chase does cite are readily distinguishable as they each involve a party attempting an end run around a consent order.[16] The most relevant of the cases cited by the parties is *Am. Fair Credit Ass'n v. United Credit Nat'l Bank*, 132 F. Supp. 2d 1304 (D. Colo. 2001). In that case, a non-party to an OCC consent order sued two parties (parent and subsidiary companies) for breach of contract. The consent order prohibited the parent company from making any payments to the plaintiff, but also required the subsidiary to assume all of the parent company's contingent liabilities. When defendants raised § 1818 as a jurisdictional bar, the court determined that the plaintiff could proceed against the subsidiary because a monetary award assessed against the subsidiary would not be inconsistent with the OCC order. The court did, however, dismiss the claims brought against the parent company because "[i]f this case went forward as currently pled and Plaintiff prevailed, Defendant [parent] would be

---

[16] Chase relies on *DeNaples v. Office of Comptroller of Currency*, 404 Fed. App'x 609, 612-613 (3d Cir. 2010); *Hindes v. Fed. Deposit Ins. Corp.*, 137 F.3d 148, 164 (3d Cir. 1998); and *Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin.*, 502 U.S. 32, 43-44 (1991). Each of those cases focused on the fact that as parties to the administrative orders at issue, the litigants were afforded an adequate substitute avenue of review by the statute itself.

17

required to pay money damages included in the judgment in direct contravention of the [consent order]." *Id.* at 1312.

As emphasized in *American Fair Credit*, federal courts have jurisdiction to enforce contracts,[17] and can do so even where a party is subject to a consent order – so long as the enforcement action does not "affect" (or upset) the underlying order. Here, where plaintiffs allege that Chase breached the TPP agreements, § 1818 does not preclude the court from acting to remedy the breach as the result would not be inconsistent with the Consent Order. With respect to the state consumer protection act claims, the Order is clear that its enforcement is not affected by compliance with state laws – indeed, the Order requires Chase to comply with all applicable federal and state laws. The Order (and the OCC's FAQ) make abundantly clear that the Framework and the Review process do not establish an exclusive remedy for plaintiffs' financial injuries. All they prohibit is a borrower obtaining a duplicative recovery,[18] an issue that

---

[17] The court in *American Fair Credit* highlighted a separate agreement that defendants had entered into with each other, obligating themselves to comply with mutually binding consent orders. The court determined that enforcement of this private agreement was well within its jurisdiction. *Id.* at 1311.

[18] Chase argues that since the Consent Order requires remediation for "*all* financial injury," if the court were to award supplemental relief, it would be "tantamount to setting aside" determinations made in the course of the OCC Review process. Def.'s Reply at 5, citing *Henry v. Office of Thrift Supervision*, 43 F.3d 507, 513 (10th Cir. 1994). As the FAQ publication makes clear, this position is rejected by the OCC itself.

18

will not arise until the claims here are finally adjudicated and any off-set can be calculated.[19]

### *Failure to State a Claim – 12(b)(6)*

### *Part I - TPPs*

"To state a claim for breach of contract under Massachusetts law, a plaintiff must allege, at a minimum, that there was a valid contract, that the defendant breached its duties under its contractual agreement, and that the breach caused the plaintiff damage."[20]   *Guckenberger v. Boston Univ.*, 957 F. Supp. 306, 316 (D. Mass. 1997) (citations omitted). To establish a breach, a plaintiff has the burden of proving the failure of the defaulting party to conform to one or more of the contract's material terms. A term is material when it involves "an essential and inducing feature" of the

---

[19] There is one caveat to the court's finding of jurisdiction. The court agrees that several of the plaintiffs' prayers for injunctive relief potentially conflict with the terms of the Consent Order. As Chase argues, a principal goal of the Consent Order is to impose uniform practices on the fourteen affected mortgage servicers. Thus, it would be improper for this court (assuming that plaintiffs prevail) to award any injunctive relief that relates to *prospective* servicing practices that are anticipated by the OCC's Order. This understanding, of course, does not apply to determinations as to whether *past* servicing practices violated a particular State's consumer protection law.

[20] As an alternative to the breach of contract theory, plaintiffs plead promissory estoppel.

19

contract. *Buchholz v. Green Bros. Co.*, 272 Mass. 49, 52 (1930).[21]

Plaintiffs allege that the form TPP Agreement constituted an offer by Chase that plaintiffs accepted by executing the Agreements and returning them to Chase, along with the supporting documentation.[22] The subsequent breach of the TPP contract by Chase cost plaintiffs the opportunity to pursue other options in the effort to salvage their homes (such as restructuring their debts under the bankruptcy code), or remedying the default by renting or selling the home or looking elsewhere for cash. To add insult to injury, Chase compounded plaintiffs' predicament by tacking improper fees and servicing costs on loans that already were in default. CAC ¶ 246.[23]

Chase concedes (as it must) that in *Durmic v. J.P. Morgan Chase Bank, NA*, 2010 WL 4825632 (D. Mass. Nov. 24, 2010), this court rejected Chase's arguments against a similar theory of lost opportunity damages. *See id.*, at *3-4 (holding that plaintiffs had set forth a viable claim for breach of contract where as consideration

---

[21] The court will rely principally on Massachusetts state contract law as it rarely differs in substance from the law of the several states at issue (any material differences will be duly noted). *See In re Bank of Am. Home Affordable Modification Program (HAMP) Contract Litig.*, 2011 WL 2637222, at *3 n.3 (July 6, 2011).

[22] Alternatively, plaintiffs posit that their return of the TPP Agreements constituted offers, and that an exchange of consideration (acceptance) took place when Chase accepted the trial period payments.

[23] Other asserted harms include the risk of foreclosure, collection activity, and adverse credit reporting. *Id.* ¶¶ 247-248.

plaintiffs had agreed to assume duties beyond their preexisting legal obligations, such as agreeing to undergo credit counseling). This court also held that the TPP Agreements were sufficiently definite to survive a motion to dismiss, as any missing material terms were "easily determinable through the mathematical formulas set out in the HAMP regulations and are thus 'not open to negotiation or discretionary alteration by either side.'" *See id.* (citation omitted).[24]

Instead, Chase moves to dismiss a discrete set of those claims "in light of the relevant recent decisions by California, Florida,[25] and Pennsylvania[26] courts." Def.'s

---

[24] "It is not required that all terms of the agreement be precisely specified, and the presence of undefined or unspecified terms will not necessarily preclude the formation of a binding contract." *Situation Mgmt. Sys., Inc. v. Malouf, Inc.*, 430 Mass. 875, 878 (2000). If the "parties specify formulae and procedures that, although contingent on future events, provide mechanisms to narrow present uncertainties to rights and obligations, their agreement is binding." *Lafayette Place Assocs. v. Boston Redev. Auth.*, 427 Mass. 509, 518 (1998).

[25] At oral argument plaintiffs' counsel represented to the court that Franco, the Florida plaintiff at issue, had settled with Chase and would be dismissed with prejudice from the case. The court will therefore not address the Florida issues.

[26] Chase cites *Ishler v. Chase Home Fin. LLC*, 2011 WL 744538 (M.D. Pa. Feb. 23, 2011), as supporting the argument that Pennsylvania state law would not admit of a contract claim based on the TPP Agreement. In *Ishler*, however, the court did not find a pleading deficiency based on Pennsylvania contract law. Rather, it found that plaintiff had failed to plead a breach of contract claim in the first place: "Plaintiff's contract argument lacks merit because Plaintiff made no contract claim in her complaint." *Id.*, at *7. Plaintiffs, for their part, point to a more recent case, *Cave v. Saxon Mortg. Servs., Inc.*, 2012 WL 1957588, at *4-7 (E.D. Pa. May 30, 2012), where the district court denied a motion to dismiss a breach of contract claim identical to the

Mot. at 37. Chase relies on *Nungaray v. Litton Loan Servicing, LP*, 200 Cal. App. 4th

1499 (Cal. Ct. App. 2011), for the argument that under California law the form TPP

Agreements are not to be interpreted as potentially binding contracts. *Id.* at 1504-1505

(dismissing breach of contract and promissory estoppel claims where the form TPP

Agreement relied on was identical to the one at issue here). There is, however, an

important distinction between *Nungaray* and this case. *Nungaray* was decided on a

motion for summary judgment after the undisputed evidence established that plaintiffs

had failed to provide the financial documentation required by the TPP Agreement, and

thus, they had not satisfied the terms of the offer. A district judge in the Central

District of California recently pointed to the same distinction. *See In re Citimortgage,*

*Inc. Home Affordable Modification Program (HAMP) Litig.*, 2012 WL 1931030, at *3

(C. D. Cal. Apr. 17, 2012) (in *Nungaray*, "the plaintiffs/borrowers did not satisfy all

of their obligations under the loan modification contract. [citation omitted]. Therefore,

although lack of the lender's signature is listed as a failed condition, [the court] did not

address the question of whether withholding of the lender's signature, by itself, renders

a modification contract unenforceable where the borrower had completely

performed."). The district court also rejected an argument for dismissal identical to the

---

one at issue here.

one Chase is making here. *See id.* ("It is certainly a reasonable interpretation of the TPP that it is intended to be a binding 'test' agreement – if Plaintiff performs the conditions in the TPP then Defendant will provide a permanent modification."). Absent clearer direction from the California state courts, the contract claims based on California law will not be dismissed.[27]

### Part II - Modification Process and Oral Promise Plaintiffs

Chase challenges the consumer protection and promissory estoppel claims brought by the Group 2 plaintiffs. At issue are the statutes of four states – Michigan, Washington, New Jersey, and California. Chase asserts that the unfair or deceptive acts and practices (UDAP) claims brought under these statutes are either preempted by the National Bank Act (NBA), or, in the alternative, plaintiffs' fail to state a claim

---

[27] Plaintiffs also allege violations of the consumer protection statutes of their various home states. In this regard, plaintiffs contend that Chase engaged in numerous acts and omissions that amounted to bad faith and sharp dealing, including: instructing them to stop making mortgage payments with false assurances that their credit scores would not be harmed as a result, ostensibly because nonpayment was a condition precedent of a loan modification; misrepresenting the status of their loan modification applications; retaining employees who lacked the skills or training to competently administer a mortgage modification program; implementing a telephone routing system that deliberately prevented complaining homeowners from ever speaking with the same service representative; and negligently failing to keep accurate records of plaintiffs' accounts. CAC ¶ 272. Chase is not presently moving to dismiss the statutory consumer protection claims.

because of their inability to show an "economic loss."[28] Finally, Chase asserts that the

Group 2 plaintiffs have failed to adequately plead a theory of promissory estoppel.

### *UDAP Claims - Preemption Under NBA*

A "state law may be preempted by the National Bank Act when it frustrates or

limits the ability of a national bank to exercise its statutorily granted powers." *SPGGC,*

*LLC v. Ayotte*, 488 F.3d 525, 531 (1st Cir. 2007), citing *Barnett Bank of Marion Cnty.*

*v. Nelson*, 517 U.S. 25, 33-34 (1996). The OCC is charged with promulgating

regulations under the NBA, including regulations that are intended to constrain

interference by States with a national bank's federal lending powers. *See* 12 C.F.R. §

34.4(a)-(b).[29] Chase contends that plaintiffs' claims constitute a backdoor attempt to

---

[28] California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq.; New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56.8-1, et seq.; and, the Washington Consumer Protection Act, Wash. Rev. Code § 19.86, et seq. Plaintiffs represent that they are voluntarily dismissing the Group 2 Michigan consumer protection claims. *See* Pls.' Opp'n at 14 n.21.

[29] In pertinent part:

(a) Except where made applicable by Federal law, state laws that obstruct, impair, or condition a national bank's ability to fully exercise its Federally authorized real estate lending powers do not apply to national banks. Specifically, a national bank may make real estate loans under 12 U.S.C. § 371 and § 34.3, without regard to state law limitations concerning: (10) Processing, origination, servicing, sale or purchase of, or investment or participation in, mortgages; . . .

(b) State laws on the following subjects are not inconsistent with the real

regulate Chase's "processing, origination, [and] servicing" of mortgages in contravention of the NBA. *See id.*

It is well settled that the NBA does not preempt all state consumer protection laws.[30] National banks remain "subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or the general purposes of the NBA." *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 11 (2007) (citation omitted). In *Wigod*, the Seventh Circuit rejected Wells Fargo's argument that litigation of a borrower's consumer protection claim would impede Wells Fargo's

---

estate lending powers of national banks and apply to national banks to the extent that they only incidentally affect the exercise of national banks' real estate lending powers: (1) Contracts; (2) Torts; . . . (5) Rights to collect debts; . . . [and] (9) Any other law the effect of which the OCC determines to be incidental to the real estate lending operations of national banks or otherwise consistent with the powers and purposes set out in § 34.3(a).

[30] It is undisputed that the NBA and the attendant OCC regulations do not preempt the "field of banking." *Martinez v. Wells Fargo Home Mortg., Inc.*, 598 F.3d 549, 555 (9th Cir. 2010). *See also* OCC Interpretive Letter No. 1005, 2004 WL 3465750 (June 10, 2004) (The NBA "rule only preempts the types and features of state laws pertaining to making loans and taking deposits that are specifically listed in the regulation."). The field preemption doctrine operates within carefully defined constraints. "The Supreme Court has 'found implied conflict pre-emption where' either (1) 'it is impossible for a private party to comply with both state and federal requirements,' or (2) 'where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 577-578 (7th Cir. 2012), citing *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995).

25

ability to process residential mortgage loans or to carry out the objectives of the Home

Owners' Loan Act (HOLA).[31] The Court observed that some state law causes of action

complement the purposes of HOLA (such as breach of contract and fraud), while others

are in conflict, and are thus preempted (such as allegations of "exorbitant and usurious

mortgages"). *Wigod*, 673 F.3d at 578-579, citing *In re Ocwen Loan Servicing, LLC*

*Mortg. Servicing Litig.*, 491 F.3d 638, 643-644, 647 (7th Cir. 2007). The Court further

held the consumer protection claim was not preempted because "[a]llowing these

claims to proceed against Wells Fargo would not create state-law duties for servicing

home mortgages, let alone ones that 'actually conflict' with HOLA 'or federal

standards promulgated thereunder.'" *Wigod*, 673 F.3d at 579, quoting *Geier v. Am.*

*Honda Motor Co.*, 529 U.S. 861, 869 (2000). *See also Wigod*, 673 F.3d at 579,

quoting *Ocwen*, 491 F.3d at 645 ("Wigod's [Illinois Consumer Protection statute]

claims 'sound[ ] like conventional fraud charge[s],' the prosecution of which appears

---

[31] HOLA is directed to federal savings associations (thrifts), and is usually regarded as a sister statute to its brother NBA. *See* 12 U.S.C. §§ 1461-1470. Through HOLA, Congress established the OTS to prescribe regulations for thrifts. 12 U.S.C. § 1462a. The OTS and OCC regulations are similar, but "there are subtle differences between the regulation of savings and loan institutions and national bank associations." *Aguayo v. U.S. Bank*, 653 F.3d 912, 921 (9th Cir. 2011). "The OTS, unlike the OCC, has explicit full field preemption." *Id.* at 921. *See also id.* at 921-922 (The "OCC has explicitly avoided full field preemption in its rulemaking and has not been granted full field preemption by Congress.").

perfectly consistent with federal mortgage rules.").

The Seventh Circuit also rejected Wells Fargo's contention that consumer protection suits brought under differing state laws have the potential effect of subjecting mortgage servicers to differing standards of conduct, a contention that Chase repeats here.

> So long as state laws do not impose substantive duties that go beyond HAMP's requirements, loan servicers need only comply with the federal program to avoid incurring state-law liability. This is not a case in which the federal requirements leave much room for interpretation, but to the extent Wigod's case hinges on construing Treasury directives, they "present questions of law for the court to decide, not questions of fact for a jury to decide."

*Wigod*, 673 F.3d at 580, *citing Bausch v. Stryker Corp.*, 630 F.3d 546, 556 (7th Cir. 2010).[32]

Plaintiffs argue (and Chase agrees), that national laws do not preempt state laws "that are predicated on the duty not to deceive." *Altria Grp., Inc. v. Good*, 555 U.S.

---

[32] "Treasury's own HAMP directive states that servicers must implement the program in compliance with state common law and statutes. . . . 'Each servicer . . . must be aware of, and in full compliance with, all federal state, and local laws (including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions). . . .' This would be an odd provision if Treasury had anticipated that HAMP would preempt state-law claims, especially ones that mirror its own directives." *Wigod*, 673 F.3d at 580

70, 91 (2008).[33] To the extent that plaintiffs' consumer protection claims are based on

alleged conduct that would be deemed fraudulent in any business context, the claims

do not undermine the uniform "processing, origination, and servicing" of mortgages

among national banks. Indeed, it would be a matter of no small surprise if the business

practices of Chase or any other national bank were found to be predicated on fraudulent

conduct formally sanctioned by bank officials.

In recognition of this point, Chase does not contest plaintiffs' claims that sound

in fraud or misrepresentation. It instead attacks those allegations that stem from the

procedures that Chase has devised to service its mortgage loans (for example, the

---

[33] *See, e.g., Jefferson v. Chase Home Fin.*, 2008 WL 1883484, at *10 (N.D. Cal. Apr. 29, 2008) ("[L]aws of general application which merely require all businesses (including banks) to refrain from misrepresentations and abide by contracts and representations to customers do not impair a bank's ability to exercise its lending powers."); *Scott v. Wells Fargo Bank N.A.*, 2011 WL 3837077, at *5 (D. Minn. Aug. 29, 2011) ("Plaintiff's claims all stem from the theory that Defendants acted in a fraudulent manner in dealing with Plaintiff's attempts to modify his mortgages. Plaintiff's claims arise from laws which are generally applicable to all businesses, and as such these claims only incidentally affect Defendants' lending powers."); *Baldanzi v. WFC Holdings Corp.*, 2008 WL 4924987, at *2 (S.D.N.Y. Nov. 14, 2008) ("In contrast to findings of federal preemption in cases involving specific state regulations that conflict with the NBA, causes of action sounding in contract, consumer protection statutes and tort have repeatedly been found by federal courts not to be preempted."); *Gerber v. Wells Fargo Bank, N.A.*, 2012 WL 413997, at *9, (D. Ariz. Feb. 9, 2012), citing OCC Advisory Letter AL 2002-3, 2002 WL 521380 (Mar. 22, 2002) ("[T]he OCC has warned national banks that statutory torts like those created by the Consumer Fraud Act could apply to them, implying that the requirements of such laws 'only incidentally affect the exercise of national banks' real estate lending powers.'").

training that it gives to account representatives who handle telephone calls, file documents, and send out documentation requests). *See* Def.'s Mot. at 19, citing CAC ¶¶ 306-310, 504. With respect to a number of Chase's examples (like the ones just recited), the preemption argument is sound. But not as to all. In this regard, it is easier for the court to list what is not preempted than to specify what is. The practices that are not preempted (as culled from the CAC) are:

(1) instructing mortgagors to stop making mortgage payments with the false assurance that doing so will not hurt their credit scores and is a necessary step in obtaining a loan modification;

(2) misrepresenting the status of loan modification applications;

(3) misrepresenting the status of mortgagors' accounts;

(4) refusing to put statements in writing when asked;

(5) failing or refusing to explain fees and other assessments charged to mortgagors;

(6) concealing or failing to disclose these same fees and other charges;

(7) arbitrarily increasing debt obligations without any meaningful explanation;

(8) rejecting, returning, or refusing payments without justification or explanation; and

(9) misrepresenting credit reporting policies for loans in active TPPs.

*See* CAC ¶¶ 512-514.

29

*UDAP Claims - Economic Loss*

Chase next argues that even if not preempted, plaintiffs have not made out UDAP claims under New Jersey, California, and Washington law, each of which requires a showing of economic loss caused by Chase's conduct. While the court agrees with Chases's description of the statutory requirements,[34] it is not persuaded by the argument. The Group 2 plaintiffs allege that they owe more to Chase now, after participating in the modification process, than they would have owed had they not participated. Plaintiffs allege that numerous additional fees were assessed and added to the balance of their loans as a result of fraudulent conduct by Chase employees, while payments were made (or not made) in vain based on erroneous advice offered by these same employees. Even more aggrieved were plaintiffs who allege that they would have fared better economically had their homes been foreclosed by Chase at the outset instead of at the end of a drawn-out and ultimately futile modification process

---

[34] New Jersey Consumer Fraud Act, N.J.S.A. § 56.8-1 requires plaintiffs to allege, inter alia, "an ascertainable loss on the part of the plaintiff" and "a causal relationship between the defendants' unlawful conduct and the plaintiff's ascertainable loss." *Indian Brand Farms, Inc. v. Novartis Crop Prot. Inc.*, 617 F.3d 207, 219 (3d Cir. 2010). The California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq., requires that a plaintiff plead lost "money or property." The Washington Consumer Protection Act, ch. 19.86 RCW, also requires that "a causal link be established between the unfair or deceptive act complained of and the injury suffered." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 535 (Wash. 1986).

that Chase had no real intention of honoring.[35] These are, of course, allegations – but

for present purposes, the court must credit them. *See Rivera v. Rhode Island*, 402 F.3d

27, 33 (1st Cir. 2005).

## *Promissory Estoppel*

Chase also contends that the Group 2 plaintiffs have not pled viable claims of

promissory estoppel (based on the alleged verbal promises made by Chase employees

that plaintiffs were imminently eligible for permanent modifications of their mortgages).

Generally, the doctrine of promissory estoppel is applicable when a promise has been

made, but there is no tangible consideration offered in return; instead, detrimental

reliance acts as a substitute for actual consideration. *See* Restatement (Second) of

Contracts § 2 (1981).[36] Chase first argues that the Statute of Frauds bars plaintiffs'

claims in Michigan and Washington. The Michigan Statute of Frauds states:

---

[35] Plaintiffs also contend that in some cases the modification exercise cost them
the opportunity to short-sell or rent out their homes.

[36] "Circumstances that may give rise to an estoppel are (1) a representation
intended to induce reliance on the part of a person to whom the representation is made;
(2) an act or omission by that person in reasonable reliance on the representation; and
(3) detriment as a consequence of the act or omission." *Bongaards v. Millen*, 440
Mass. 10, 15 (2003) (citation omitted). "When a promise is enforceable in whole or
in part by virtue of reliance, it is a 'contract,' and it is enforceable pursuant to a
'traditional contract theory' antedating the modern doctrine of consideration."
*Loranger Constr. Corp. v. E.F. Hauserman Co.*, 376 Mass. 757, 760-761 (1978)
(citation omitted).

31

[a]n action shall not be brought against a financial institution to enforce any of the following promises or commitments of the financial institution unless the promise or commitment is in writing and signed with an authorized signature by the financial institution.

[such as]

(b) A promise or commitment to renew, extend, modify, or permit a delay in repayment or performance of a loan, extension of credit, or other financial accommodation.

Mich. Comp. Laws Ann. § 566.132(2). A "financial institution" is defined, in part, as

a "national chartered bank." *Id.* § 566.132(3). The only Michigan case plaintiffs cite

in response is *Darcy v. CitiFinancial, Inc.*, 2011 WL 3758805 (W.D. Mich. Aug. 25,

2011). In that case, the court refused to dismiss a claim as barred by the Statute of

Frauds, but as the decision makes clear, it did so because the estoppel claim was in fact

based on "a writing" – the TPP. *Id.*, at *8. Here, the estoppel claims do not stem from

a writing, but from the alleged verbal promises. The court thus agrees with Chase that

the Michigan Group 2 estoppel claims (brought by the Fischer plaintiffs) must be

dismissed on Statute of Frauds grounds.[37]

---

[37] On the other hand, the State of Washington's Statute of Frauds, RCW § 64.04.010-020, does not explicitly bar the estoppel claims, nor does the case that Chase cites, *Berg v. Ting*, 886 P. 2d 564 (Wash. 1995), hold otherwise. The Washington Supreme Court in *Berg* held that partial performance can overcome the Statute of Frauds bar with respect to a transaction involving land (although on the facts, the exception did not save the plaintiff in *Berg*). *Id.* at 574. Here, plaintiffs by making the modified trial mortgage payments performed (at least in part) on their end of the oral

With respect to the remaining Group 2 estoppel claims, Chase asserts that the alleged promises were devoid of any definite terms and, as a result, plaintiffs cannot show reasonable reliance. As Chase points out, roughly half of the Group 2 plaintiffs did eventually receive permanent modifications of their mortgages, and thus, the estoppel claims are necessarily premised on alleged inconsistencies between the oral statements made by Chase representatives and the terms of the modifications that plaintiffs ultimately received. As these inconsistencies (as pled) are either unspecified or unprovable, Chase contends that there is no oral agreement to enforce. *See Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 100 F. Supp. 2d 1086, 1095 (C.D. Cal. 1999) ("[T]o be enforceable under a theory of promissory estoppel, the promise must be clear and unambiguous.").

Plaintiffs' estoppel claims follow the same general pattern. Plaintiffs Cureton and Leopold sought modifications from Chase in 2009. They were each told by a Chase representative to stop making payments on their mortgages to make themselves HAMP-eligible. What followed was a sea of frustration and confusion that spawned modification agreements boosting rather than lowering the principal balance of plaintiffs' mortgages, while tacking on ballooning charges and fees (including late fees

---

bargain.

for the missed payments that Chase representatives told plaintiffs not to make).
Nonetheless, these two plaintiffs did eventually receive the promised modifications, and
although the principal balances of their mortgages may have increased, the monthly
payments did decrease, as promised. While Chase's conduct may have been deceptive
and unfair, these plaintiffs (and others with similar complaints who also received
permanent mortgage modifications) have not shown that a sufficiently definite promise
was made, relied upon, and then broken.

The result is no different with respect to plaintiffs who were orally promised
mortgage modifications and never received them (Green, Keller, Pacheco, and
Sabouhi). Again the factual patterns are almost identical: plaintiff requests a mortgage
modification; he or she is told to miss payments to become HAMP-qualified; he or she
eventually receives a forbearance or "repayment" agreement;[38] plaintiff complies with

---

[38] Samples of such agreements are attached to the CAC as Exhibits 10-11. The
agreement states, in part:

"[t]he attached forbearance agreement is a pre-qualification agreement for
the [HAMP] program. In order to further review your case for *a possible
modification of your mortgage loan(s) under the new plan or any other
workout available,* you must complete [this form, include the requisite
documents, sign the forbearance agreement, and include your first
forbearance payment.] Once we receive the supporting documentation. .
. we will be able to finalize the review [of modification programs] . . . *and
you will receive a new agreement outlining the terms of the program for
which you qualify.*

34

the agreement; he or she contacts Chase at the end of the forbearance period; he or she

is again promised a permanent modification; plaintiff continues to make (and Chase

accepts) at least some of the modified payments; and plaintiff never receives the

promised modification. The law in California, New Jersey, and Washington with

respect to estoppel claims is similar enough (for present purposes) to merge the

analysis.[39]

---

. . .

> [a]fter the final forbearance payment, regular payments will become due
> in addition to any delinquent payments, fees and/or charges. *If your
> account is not current once the forbearance period has ended,
> collections and/or foreclosure activity will resume.* At the conclusion of
> this plan, if your account remains in default, your file may be reviewed for
> other workout options. *If you are interested in these additional workout
> options, it is necessary that you contact Chase Homeowners Assistance
> prior to the conclusion of the forbearance period to discuss.*

CAC – Ex. 11. (emphasis added).

A second type of agreement, entitled a "Special Forbearance Agreement," CAC, Ex.
9, stated that "[i]f all payments are made as scheduled, we will reevaluate your
application for assistance and determine if we are able to offer you a permanent
workout solution to bring your loan current."

[39] Under California law, to assert a claim of promissory estoppel, a plaintiff must
allege: "(1) a clear and unambiguous promise, (2) reasonable and foreseeable reliance
by the party to whom the promise was made, (3) substantial detriment or injury caused
by the reliance on the promise, and (4) damages measured by the extent of the
obligation assumed and not performed." *Ortiz v. Am.'s Servicing Co.*, 2012 WL
2160953, at *6 (C.D. Cal. June 11, 2012). "Washington has adopted the theory of

Although the forbearance agreements clearly instruct borrowers to contact Chase representatives by telephone in order to discuss other "workout" options, the agreements offer no specifics as to the terms or even the nature of the "workout" option for which a particular borrower might be eligible. Moreover, plaintiffs provide no specifics about the oral promises Chase representatives are alleged to have made, other than the vague assurance that some kind of modification would be forthcoming. This falls far short of the pleading necessary to make out an estoppel claim. *See Mejias v. Am. Boychoir Sch.*, 2011 WL 3235711, at *5 (D.N.J. Jul. 27, 2011) ("Indefinite promises or promises subject to change by the promisor are not 'clear and definite' and cannot give rise to a claim for promissory estoppel.") (citations omitted). *See also Erickson v. Long Beach Mortg. Co.*, 2011 WL 830727, at *6 (W.D. Wash., Mar. 2, 2011) (the "first element requires a 'clear and definite' promise" – "Plaintiffs have not

---

promissory estoppel contained within the Restatement (Second) of Contracts § 90 which reads: '(1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.'" *Green v. Wachovia Mortg. FSB*, 2012 WL 993586, at *7 (E.D. Wash. Mar. 22, 2012) (internal citations omitted). In order to state a claim for promissory estoppel under New Jersey law, a plaintiff must plead: "(1) that the defendant made a clear and definite promise; (2) with the expectation that the plaintiff would rely upon it; (3) that the plaintiff reasonably relied on the promise; and (4) that the reliance resulted in definite and substantial detriment." *Capers v. FedEx Ground*, 2012 WL 2050247, at *2 (D.N.J. June 6, 2012) (citation omitted).

provided specific evidence sufficient to establish a service agent made a promise over the phone.").

Although the reasonableness of a plaintiffs' reliance on an alleged promise is typically treated as a question of fact for the jury, this is one of those exceptional cases where, based on the pleadings and their attachments, the court can conclude that any reliance by the borrower-plaintiffs on the alleged oral representations of Chase representatives was unreasonable as a matter of law. This is because the forbearance agreements that Chase mailed to plaintiffs specifically stated that any permanent modification plan would be forwarded in a writing that would "outlin[e] the terms of the program for which you qualify."[40] *See* CAC, Ex. 11.

### *Rosenthal Fair Debt Collection Practices Act*

"California has adopted a state version of the FDCPA, called the Rosenthal Act. *See* Cal. Civ. Code § 1788, et seq. The Rosenthal Act mimics or incorporates by reference the FDCPA's requirements, . . . and makes available the FDCPA's remedies for violations. *Id.* § 1788.17." *Riggs v. Prober & Raphael*, 681 F.3d 1097, 1100 (9th

---

[40] Notwithstanding the court's decision to dismiss the promissory estoppel claims, it recognizes that Judge Carter's decision to the contrary in *Wilcox v. EMC Mortg. Corp.*, No. SACV 10-1923 DOC (JCG), (C.D. Cal. July 25, 2011) (Dkt # 49), is binding as the law of the case in that action.

Cir. 2012).[41]

> [U]nder the Rosenthal Act, a "debt collector" is defined as "any person who, in the ordinary course of business, regularly, on behalf of himself or herself or others, engages in debt collection." Cal. Civ. Code § 1788.2(c). A number of [California district] courts have recognized that the definition of "debt collector" is broader under the Rosenthal Act than it is under the FDCPA, as the latter excludes creditors collecting on their own debts.

*Gomez v. Wells Fargo Home Mortg.*, 2012 WL 1189439, at *5 n.8 (N.D. Cal. Apr. 9, 2012), citing *Austero v. Aurora Loan Servs., Inc.*, 2011 WL 1585530, at *8 (N.D. Cal. Apr. 27, 2011); *Herrera v. LCS Fin. Servs. Corp.*, 2009 WL 5062192, at *2 (N.D. Cal. Dec. 22, 2009); *Izenberg v. ETS Servs., LLC*, 589 F. Supp. 2d 1193, 1199 (C.D. Cal. 2008). *See also Austero*, 2011 WL 1585530, at *8 ("Thus, a mortgage servicer may be a 'debt collector' under the Rosenthal Act even if it is the original lender, whereas, such an entity would be excluded from the definition of debt collector under the federal act.").

The California plaintiffs base their claims on the conduct previously described, namely, that Chase violated the Act by using false, deceptive, and misleading

---

[41] "A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. *See Gonzales v. Arrow Fin. Servs., LLC*, 660 F.3d 1055, 1062 n.4 (9th Cir. 2011), citing Cal. Civ. Code § 1788.17 (incorporating by reference the prohibitions in 15 U.S.C. § 1692e).

statements and omissions in connection with the collection of their mortgage loan debts. *See* CAC ¶¶ 532-540.   Chase argues that the claims fail because in each instance the borrowers contacted Chase (as opposed to Chase initiating communication with the borrowers).  Plaintiffs admit that they contacted Chase representatives, but only after first being prompted to do so by communications from Chase bruiting the possibility of obtaining a mortgage loan modification.  These notices specifically stated that "we are attempting to collect a debt, and any information [provided by you] will be used for that purpose."  *See* CAC, Ex.'s 8-9. The notices continued:  "More importantly, if you have any questions please don't hesitate to call us directly at [ ]."  *See id.* When plaintiffs did so they would typically be sent a forbearance agreement that stated:  "If the signed agreement and/or payment are not received by the due date indicated, the forbearance plan will be declined and all foreclosure activity will resume."  *See* CAC, Ex. 10.

"[W]hether [an] initial communication violates the FDCPA [and the Rosenthal Act] depends on whether it is likely to deceive or mislead a hypothetical 'least sophisticated debtor.'"  *Riggs*, 681 F.3d at 1102 (citations omitted).  "In [the Ninth Circuit], a debt collector's liability under § 1692e of the FDCPA is an issue of law."  *Gonzales*, 660 F.3d at 1061 (citation omitted).

The "least sophisticated debtor" standard is "lower than simply examining

whether particular language would deceive or mislead a reasonable debtor." . . . The standard is "designed to protect consumers of below average sophistication or intelligence," or those who are "uninformed or naive," particularly when those individuals are targeted by debt collectors.

*Id.* at 1061-1062 (citations omitted). Here, as a matter of law, the court can reasonably conclude that the phrasing of the initial "invitations" to participate in the HAMP process, coupled with the overt threat set out in the forbearance agreements sent to respondents, namely that if payment or a signed agreement was not forthcoming, the foreclosure process would be initiated or resumed, could have misled the recipients as to the true range of options available to them. *See Gaudin v. Saxon Mortg. Servs., Inc.*, 2011 WL 5825144, *4 (N.D. Cal. Nov. 17, 2011) (finding no basis to dismiss the Rosenthal claim where facts alleged demonstrated that the "TPP [document] was at a minimum misleading," because the loan servicer "utilized the TPP . . . to induce her to make payments.").[42]

---

[42] *But see In re Citimortgage,* 2012 WL 1931030, at *5 ("[C]ontact by a lender or loan servicer for the purpose of restructuring payments on a debt is not 'collection of a debt' for the purposes of the FDCPA (or Rosenthal Act) when the lender or servicer does not demand payment for past amounts owed.") (citations omitted). The court disagrees with this reasoning because it depends on the FDCPA's more narrow definition of a "debt collector," as indicated by the reliance on *Bailey v. Sec. Nat. Serv. Corp.*, 154 F.3d 384, 387 (7th Cir. 1998). The Court in *Bailey* held that the defendant servicer was not subject to the FDCPA because "the plain meaning of the statute require[s] that we distinguish between an individual who comes collecting on a defaulted debt and one who seeks collection on a debt owed under a brand new payment plan, or forbearance agreement that is current . . . ."

### Part IV – Violation of Fair Debt Collection Practices Act (FDCPA)

The CAC asserts one claim of an FDCPA violation on the part of an Ohio resident (plaintiff Follmer). *See* CAC ¶¶ 677-683.   Chase responds with its same Rosenthal Act arguments. These, however, are precluded by the Sixth Circuit's holding in *Bridge v. Ocwen Fed. Bank, FSB*, 681 F.3d 355, 359 (6th Cir. 2012), that an entity such as Chase, when acting as a loan servicer, is either a creditor or a debtor and cannot "define itself out of either category" in order to avoid being subject to the FDCPA's prohibitions.[43]

> For an entity that did not originate the debt in question but acquired it and attempts to collect on it, that entity is either a creditor or a debt collector depending on the default status of the debt at the time it was acquired. The same is true of a loan servicer, which can either stand in the shoes of a creditor or become a debt collector, depending on whether the debt was assigned for servicing before the default or alleged default occurred.

*Id.* (citations and footnote omitted). "Although there is no statutory definition of 'loan servicer' under the Act, a loan servicer will become a debt collector under § 1692a(6)(F)(iii) if the debt was in default or treated as such when it was acquired." *Id.*, at 360 n.4. *See also Schlosser v. Fairbanks Capital Corp.*, 323 F.3d 534, 536 (7th Cir. 2003) ("In other words, the Act treats assignees as debt collectors if the debt sought to

---

[43] Because Follmer is a citizen of Ohio, the court is guided by Sixth Circuit law in her case, although recognizing that the Sixth Circuit's gloss on the FDCPA in *Bridge* may not necessarily be representative of the views of all the other circuit courts.

be collected was in default when acquired by the assignee, and as creditors if it was not."); *FTC v. Check Investors, Inc.*, 502 F.3d 159, 171-173 (3d Cir. 2007) (same).[44]

Chase argues in the alternative that because it did not "hound" Follmer with dunning notices, its conduct does not fall within the purview of the FDCPA. As support, Chase cites the Seventh Circuit's *Bailey* decision. In *Bailey*, the Court held that the FDCPA did not apply where the loan servicer's communications with plaintiffs related to the forbearance agreement, and not the original loan (which was in default). *Bailey*, 154 F.3d at 387. The Court took specific note of the fact that the servicer had not attempted to collect (or threaten to take action) on the underlying note. *See id.* at 388 ("[I]f [the defendants] had tried to collect a different amount – perhaps the amount owed under the original loan in default – surely the Baileys would have (correctly) pointed to the terms in the superseding forbearance agreement."). *Bailey* on its facts is inapplicable as Follmer specifically alleges that Chase attempted to collect an amount in excess of that agreed to in her forbearance agreement (or the subsequent modification agreement).[45]

---

[44] The CAC alleges that "Ms. Follmer was delinquent on her mortgage payments *at the time Chase acquired the servicing of her loan.*" CAC ¶ 796 (emphasis added). Chase does not dispute the allegation.

[45] Follmer alleges that Chase "unexpectedly and without explanation" increased her loan payments by 30%. CAC ¶¶ 679-680.

***Failure to Join Necessary Parties pursuant to Fed. R. Civ. P. 12(b)(7)***

Finally, Chase moves to dismiss nine named plaintiffs for failure to join their co-borrowers who it asserts are necessary parties pursuant to Fed. R. Civ. P. 19(a).[46] At the motion hearing, plaintiffs' counsel agreed and represented to the court that the co-borrowers would promptly be added to the CAC as named plaintiffs.

## ORDER

For the foregoing reasons, Chase's motion to dismiss is <u>DENIED</u> with respect to the Part I claims; <u>DENIED</u> with respect to the Washington, New Jersey, and California UDAP claims and the Rosenthal Act claims set out in Part II ; <u>ALLOWED</u> as to the Part II claims identified by the court as preempted by the National Banking Act; <u>ALLOWED</u> with respect to the Part II promissory estoppel claims (except as to plaintiff Green); and <u>DENIED</u> with respect to the Part IV FDCPA claim.  Plaintiffs will within fourteen (14) days voluntarily dismiss the Part II Michigan UDAP claims and all claims brought by plaintiff Franco.  Plaintiffs will also comply with their undertaking with respect to

---

[46] Lloyd Clapham, co-borrower with Joyce Clapham; Delano Cureton, co-borrower with Janet Cureton; Bryan Ellis, co-borrower with Christine Ellis; J. James Dana and Laura Struble,  co-borrowers with Sharie Green; Bernard Karnes, co-borrower with Julie Karnes; Scott Keller, co-borrower with Amy Keller; Linda Larkin, co-borrower with Gary Larkin; and Constanza Cardenas,  co-borrower with Gustavo Franco. (Whether Cardenas is a co-borrower is moot, as Franco's Part I claims, *see supra*, footnote 25, are to be voluntarily dismissed).  Plaintiff Hajnal is also required to join her parents, the Shourds, who are parties to the note and TPP.

adding the unnamed necessary parties to the CAC.  As of the date of this Order, the stay

on discovery deadlines is lifted.  The parties will within ten (10) days of today's date

jointly submit a proposed revised scheduling order.

SO ORDERED.

/s/ Richard G. Stearns

UNITED STATES DISTRICT JUDGE