## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE: JPMORGAN CHASE | ) | |
| MORTGAGE MODIFICATION | ) | No. 1:11-md-02290-RGS |
| LITIGATION | ) | |
| | ) | |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| All Actions | ) | |
| | ) | |

# REDACTED
## MEMORANDUM IN SUPPORT OF PLAINTIFFS'
## MOTION FOR CLASS CERTIFICATION

### [Leave to file granted February 5, 2013]

### FILED PROVISIONALLY UNDER SEAL

### CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

# TABLE OF CONTENTS

**Page**

Table of Authorities ...................................................................................................... iii

I.  INTRODUCTION ............................................................................................... 1

II.  BACKGROUND .................................................................................................. 1

III.  ARGUMENT ...................................................................................................... 14

  A.  The Group 1 Class Should Be Certified ...................................................... 14

    1.  The Group 1 Plaintiffs Satisfy the Requirements of Rule 23(A) ................... 14

      a.  The Group 1 Class is Sufficiently Numerous ........................................... 14
      b.  The Court's Interpretation of Uniform Contractual Language Would Yield a
         Common Answer as to Group 1 ............................................................ 14
      c.  The Claims of the Group 1 Plaintiffs are Typical ................................... 18
      d.  The Proposed Group 1 Class Representatives Have and Will Fairly and
         Adequately Protect the Interests of Absent Class Members. ...................... 19

    2.  Rule 23(b) Standards Are Also Met by the Group 1 Plaintffs ...................... 20

      a.  The Group 1 Plaintiffs Meet Rule 23(b)(3) Standards ............................ 21

         i.  Common Questions Predominate For The Group 1 Class Claims Because
            They Are Based On A Form Contract That Was Breached In The Same
            Way For Each Class Member ..................................................... 21
         ii.  Class Treatment for Group 1 is Superior ......................................... 25

      b.  The Group 1 Plaintiffs Satisfy the Requirements of Rule 23(b)(2) ............ 27

    3.  The Group 1 Class is Ascertainable .......................................................... 28

  B.  The Group 2 Class Should Be Certified ...................................................... 30

    1.  The Group 2 Plaintiffs Satisfy The Requirements of Rule 23(a) .................. 30

      a.  The Group 2 Class is Sufficiently Numerous ........................................... 30
      b.  The Group 2 Presents Common Questions of Law and Fact ...................... 30
      c.  The Group 2 Plaintiffs are Typical and Adequate ................................... 32

    2.  The Group 2 Plaintiffs Satisfy the Standards of Rule 23(b) ......................... 33

      a.  Group 2 Plaintiffs Have Satisfied the Standards of Rule 23(b)(3). ............ 33

i.    Common Questions of Law or Fact Predominate for Group 2 ...................... 33
ii.   Group 2 Satisfies the Superiority and Manageability Prongs ........................ 35

a)    Violations of the Rosenthal Act Merit a Group 2 California Sub-Class ... 36
b)    Certification of a Rule 23(b)(2) Group 2 Class is Appropriate................ 36
c)    The Group 2 California Sub-Class May Also Be Certified
Under Rule 23(b)(2)......................................................................... 38

3.   The Group 2 Class is Ascertainable............................................................. 39

C.   The Group 3 Classes Should be Certified....................................................... 40

1.   Numerosity is Satisfied as to Group 3 .......................................................... 40
2.   The Group 3 Class Satisfies The Commonality Requirement...................... 41
3.   Group 3 Typicality and Adequacy................................................................ 43
4.   The Group 3 Classes Meet the Requirements of Rule 23(B)........................ 45
5.   The Group 3 Class is Ascertainable.............................................................. 45

D.   The Group 4 Class Should Be Certified ......................................................... 46

1.   The Group 4 Plaintiff Has Satisfied the Requirements of Rule 23(a) .......... 46

a.   The Group 4 Class is Sufficiently Numerous ......................................... 46
b.   The Group 4 Claims Present Common Questions of Law and Fact......... 46
c.   The Group 4 Plaintiff Meets Typicality and Adequacy Requirements..... 47

2.   The Group 4 Plaintiff Has Satisfied the Standards of Rule 23(b)(3)............ 48

a.   Group 4 Predominance ............................................................................ 48
b.   Group 4 Superiority ................................................................................. 48

3.   The Group 4 Class is Ascertainable .............................................................. 49

IV.   CONCLUSION ..................................................................................................... 50

# TABLE OF AUTHORITIES

## Cases

*Amchem Prods. Inc. v. Windsor*, 521 U.S. 59 (1997) ............................................................ 21, 35

*American Airlines, Inc. v. Wolens*, 513 U.S. 219 (1995) ............................................................ 16

*Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 133 S. Ct. 1184 (2013) ............. 15

*Andrews v. Bechtel Power Corp.,* 780 F. 2d 124 (1st Cir. 1985). ................................................. 19

*Barry v. Moran*, No. 05-10528-RCL, 2008 WL 7526753 (D. Mass. Apr. 7, 2008).................... 18

*Bridge v. Ocwen Federal Bank*, 681 F.3d 355 (6th Cir. 2012)...................................................... 50

*Comcast v. Behrend*, No. 11-864, 2013 WL 1222646 (March 27, 2013)........................ 23, 24, 33

*Connor B., ex rel. Vigurs v. Patrick*, 278 F.R.D. 30 (D. Mass. 2011) ......................................... 14

*Danvers Motor Co. v. Ford Motor Co.*, 543 F.3d 141 (3d Cir. 2008). ......................................... 35

*Del Campo v. American Corrective Counseling Services, Inc.,* 254 F.R.D. 585
(N.D. Cal. 2008)............................................................................................................................. 28

*Donovan v. Philip Morris USA, Inc.,* No. 06-12234-DJC, 2012 WL 957633
(D. Mass. March 21, 2012) ..................................................................................................... 14, 28

*Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29 (E.D.N.Y. 2008)........................................... 15

*Ellis v. General Revenue Corp.*, 274 F.R.D. 53 (D. Conn. 2011)................................................. 48

*Garcia-Rubiera v. Calderon*, 570 F.3d 443 (1st Cir. 2009) ........................................................ 30

*General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147 (1982)................................... 18, 25

*George v. National Water Main Cleaning Co.*, 286 F.R.D. 168 (D. Mass. 2012) ..... 14, 23, 25, 32

*Gonzales v. Arrow Fin. Servs. LLC*, 449 F.Supp. 2d 1140 (S.D. Cal. 2007) ........................ 32, 36

*Gordon v. Corporate Receivables, Inc.*, No. 09-230S, 2010 U.S. Dist. LEXIS 6671
(D.R.I. Jan. 27, 2010).............................................................................................................. 46, 47

*Green v. Wolf Corp.*, 406 F.2d 291 (2d Cir. 1968). .................................................................... 36

*Holmes v. Continental Can Co.*, 706 F.2d 1144 (11th Cir. 1983) ............................................... 20

*In re Bank of America Home Affordable Modification Program (HAMP) Contract Litigation,* No. 10–md–02193–RWZ, 2011 WL 2637222 (D. Mass. July 6, 2011). .................... 16

*In re Lupron Mkt. Practices Litig.*, 228 F.R.D. 75 (D. Mass. 2005) ............................................. 32

*In re Neurontin Mktg. & Sale Practices Litig.*, 244 F.R.D. 89 (D. Mass. 2007) ......................... 19

*In re Tyco Int'l, Ltd. Multidistrict Litig.*, MDL 02-1335-PB, 2007 WL 1703067 (D.N.H. June 12, 2007) ................................................................................................................ 18

*In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124 (2d Cir. 2001) ............................ 48

*Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich*, 271 F.R.D. 572 (N.D. Ohio 2010) ......... 49

*Keele v. Wexler*, 149 F.3d 589  (7th Cir. 1998) ............................................................................. 15

*Kent v. SunAmerica Life Ins. Co.*, 190 F.R.D. 271 (D. Mass. 2000) ..................................... 28, 39

*Klay v. Humana, Inc.*, 382 F.3d 1241 (11th Cir. 2004) ................................................................. 16

*Kleiner v. First Nat'l Bank of Atlanta*, 97 F.R.D. 683 (N.D. Ga. 1983) ................................ 15, 16

*Lemon v. Int'l Union of Operating Eng'rs*, 216 F.3d 577 (7th Cir. 2000) ................................... 20

*Leszczynski v. Allianz Ins.,* 176 F.R.D. 659 ( S.D. Fla. 1997) ..................................................... 16

*Lewis v. LVNV Funding, LLC*, No. 2:09-cv-1041, 2011 U.S. Dist. LEXIS 100139 (M.D. Ala. Sept. 6, 2011) ............................................................................................................. 49

*Linsley v. FMS Investment Corp.*, No. 3:11cv961, 2013 U.S. Dist. LEXIS 3908 (D. Conn. Jan. 10, 2013) .............................................................................................................. 48

*Manno v. Healthcare Revenue Recovery Group, LLC.*, No. 11-61357, 2013 WL 1283881 (S.D. Fla. March 26, 2013) ............................................................................................................ 48

*McLaughlin v. Liberty Mut. Ins. Co*., 224 F.R.D. 304 (D. Mass. 2004) ...................................... 18

*Midland Funding, LLC v. Brent*, No. 3:08 CV 1434, 2010 U.S. Dist. LEXIS 117501 (N.D. Ohio Nov. 4, 2010). ............................................................................................................ 48

*Neighborhood Assistance Corp. of America v. First One Lending Corp.*, No. SACV 12–463 DOC(MLGx), 2012 WL 1698368 (C.D. Cal. May 12, 2013) ...................................................... 26

*Otte ex rel. Estate of Reynolds v. Life Ins. Co. of North America*, 275 F.R.D. 50 (D. Mass 2011) ............................................................................................................................ 21, 23

*Pawelczak v. Financial Recovery Servs., Inc.*, No. 11 C 2214, 2012 U.S. Dist. LEXIS 153914 (N.D. Ill. Oct. 26, 2012)........................................................................ 49

*Quiroz v. Revenue Prod. Management, Inc.*, 252 F.R.D. 438 (N.D. Ill. 2008) ........................... 49

*Randolph v. IMBS, Inc.*, 368 F.3d 726 (7th Cir. 2004). ................................................................ 48

*Small v. Lorillard Tobacco Co.*, 94 N.Y. 2d 43 (N.Y. 1999) ....................................................... 42

*Smilow v. Southwestern Bell Mobile Systems, Inc.*, 323 F.3d 32 (1st Cir. 2003) .............. 21, 23, 24

*Stephenson v. Bell Atl. Corp.*, 177 F.R.D. 279 (D.N.J. 1997). .................................................... 35

*Stutman v. Chemical Bank,* 95 N.Y.2d 24  (2000)..................................................................... 42, 43

*Tardiff v.Knox County,* 365 F.3d 1 (1st Cir. 2004) ................................................................. 24, 25

*Wagner v. NutraSweet Co.,* 95 F.3d 527 (7th Cir. 1996)............................................................. 19

*Wal–Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541 (2011)................................................... 14, 16, 18

*Walters v. Reno,* 145 F.3d 1032 (9th Cir.1998) ........................................................................... 27

*Waste Mgmt. Holdings v. Mowbray,* 208 F.3d 288 (1st Cir. 2000)............................................. 22

*Weber v. Goodman,* 9 F. Supp. 2d 163 (E.D.N.Y. 1998) ............................................................ 49

*Yaffe v. Powers,* 454 F.2d 1362 (1st Cir. 1972).......................................................................... 27

*Young v. County of Cook,* No. 06-522, 2007 U.S. Dist. LEXIS 31086 (N.D. Ill. Apr. 25, 2007) .................................................................................................... 48

**Statutes**

15 U.S.C.
    § 1692(e)(2) ........................................................................................................ 47
    § 1692(k).......................................................................................................... 38, 39
    § 1692k(a)(2)(A)................................................................................................. 48

California Unfair Competition Law, Cal. Bus. & Prof. Code
    §§ 17200, *et seq.*.............................................................................................. 34

Cal. Civ. Code
    § 1788.17 ............................................................................................................. 38

N.Y. Gen. Bus. Law.
    § 349 ................................................................................................................... 43

New Jersey Consumer Fraud Act, N.J. Stat. Ann.
   § 56.8-1, *et seq* ..................................................................................................................... 34

Washington Consumer Protection Act, Wash. Rev. Code
   § 19.86, *et seq.* ...................................................................................................................... 34

**Other Authorities**

Williston on Contracts
   § 63:9 ....................................................................................................................................... 15

## I.   INTRODUCTION

This Multi-District Litigation is a set of cases about enforcement of agreements made between JP Morgan Chase Bank, N.A. and affiliated Defendants (together, "Chase") and mortgage borrowers.  Like all banks, Chase does not hesitate to enforce contracts against borrowers when doing so is in its interest.  In so doing, Chase regularly relies on the plain text of its loan contracts to collect payments, to charge fees, to adjust interest rates, or to foreclose on borrowers' homes.

Here, it is borrowers who seek to enforce the plain text of agreements against Chase.  The agreements, as written, form a common basis for the claims.  What did Chase promise?  Did Chase breach its promise by failing to act in a timely way?  Did Chase violate consumer protection law by failing to honor its commitments?

This Court has before it fifteen complaints, consolidated through the MDL process, encompassing the claims of tens of thousands of homeowners nationwide.  This Court can and should afford these homeowners their day in court, represented by the named plaintiffs.  As described below, class treatment under Rule 23 presents the most efficient means to deal with these claims.  Certification is warranted.

## II.   BACKGROUND

The Court is well versed in the factual background of this matter. *See Durmic* Docket No. 50 at 2-4, Docket No. 97 at 4-6.[1]  This section therefore sets forth only the facts necessary for the Court to certify the proposed classes.  The organization of this memorandum is consistent with

---

[1] Unless otherwise noted, references herein to "Docket No." refer to the docket of this multi-district litigation, Case No. 11-md-02290-RGS (D. Mass.).  References to "*Durmic*" are to *Durmic v. J.P. Morgan Chase Bank, N.A.*, No. 1:10-CV-10380-RGS (D. Mass.).

the Consolidated Amended Complaint, Docket No. 28, describing four distinct "Groups" under

which Plaintiffs' claims fall.

### Group 1 Background

The Group 1 Plaintiffs bring claims to enforce contracts made under HAMP and Chase's

internal counterpart program, known as CHAMP.  Chase voluntarily agreed to participate in

HAMP.  *Durmic* Docket No. 50 at 2.[2]  This program was designed to modify residential home

mortgage loans of homeowners struggling to meet their monthly payment obligations.  *Id.*  The

modification process under HAMP as originally implemented by Chase has two steps.  In the

first step, Chase determined eligibility based on information currently existing in its records and

provided orally by the borrower.  *Id.*  If a borrower was eligible on the basis of this information,

Chase sent the borrower a Trial Period Plan ("TPP") Agreement – a form contract spelling out

the borrower's responsibilities, including making reduced monthly mortgage payments for three

or four months, after which time Chase was required to decide whether to grant or deny a

permanent loan modification.  *Id.*; Docket No. 97 at 5.

After the borrower executed and returned the TPP Agreement, Chase began the process

of verifying the information used to determine eligibility.  *See* Ex. 21 at 140.[3]  The discovery

record shows that Chase maintained a policy of ███████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████      *See* Ex. 43 at 1 (Chase policy stating

---

[2] Importantly, Chase did not agree to participate in HAMP out of charity or good intentions.
Rather, it was persuaded to do so after receiving taxpayer-funded bailout money in 2008, *see
Durmic* Docket No. 50 at 2, and because it runs a "Net Present Value" ("NPV") test that allows
modifications to go forward only where they yield a financial benefit to Chase and/or the
investors in the loan.  *Id.* at 2 n.3.
[3] Unless otherwise noted, references to "Ex." in this memorandum refer to the exhibits attached
to the Declaration of Kevin Costello (filed contemporaneously herewith).

████████████████████████████████████████████

███████████████████ (emphasis added).  The successful completion of the Trial Period

triggers the second stage of HAMP – the tender of a permanent loan modification; otherwise, if a

borrower defaulted on their Trial Period responsibilities or the initial finding of ineligibility

could not be verified, the borrower should have received a written denial at the close of the Trial

Period, as described in the TPP Agreements.

The TPP Agreements that lie at the center of Plaintiffs' Group 1 allegations are form

contracts between Plaintiffs and Chase.  *See* Ex. 26 (2009 HAMP TPP).[4]  The Court has already

twice reviewed the terms of the form TPP Agreement and ruled that the TPP is an enforceable

contract, supported by consideration.  *Durmic* Docket No. 50 at 5-9; Docket No. 97 at 19-24.

Left to decide at the merits stage of this litigation is the nature and timing of the performance

required of Chase under the TPP Agreement. These are common questions governed by form

contract language.

The promise on which Plaintiffs' claims rest is made explicit from the very first sentence

of the TPP Agreement:

> If I am in compliance with this Trial Period Plan, and my representations in

---

[4] The discovery record indicates that Chase utilized a handful of different versions of the form HAMP TPP Agreement throughout the class period, and a handful of different CHAMP TPP Agreements as well.  The minor additions to the 2009 HAMP TPP Agreement form over time present no material differences in light of Plaintiffs' legal claims because none of the promises contained in the TPP Agreement were removed.  *See* Ex. 26 – Ex. 28 (exemplars of three 2009 HAMP TPP Agreements).  After Treasury issued Supplemental Directive 09-07, effective starting in March 2010, Chase began utilizing a different form of Trial Period Plan.  Although that form was different in appearance, it still promised: "[a]fter all trial period payments are timely made and you continue to meet all program eligibility requirements, your mortgage would then be permanently modified."  *See Durmic* Docket at 43-2 (exemplar of 2010 HAMP Trial Period Plan) (also attached as Ex. 29). The CHAMP TPP Agreement form also contained some variations over time, although the affirmative promissory language is consistent through each version.  *See* Ex. 30-32 (exemplars of different CHAMP TPP Agreements). To the extent that it is appropriate, Plaintiffs therefore reserve the right to propose subclasses.

Section 1 [regarding verification of information] continue to be true in all material respects, then the Lender will provide me with a Home Affordable Modification Agreement ("Modification Agreement"), as set forth in Section 3. . . .

Ex. 26 at 1; *Durmic* Docket No. 50 at 3.

The TPP Agreement is, by its unequivocal written terms, a contract of finite duration. The "Trial Period" is expressly defined on page 2 as "the period (the 'Trial Period') commencing on the Trial Period Effective Date and ending on *the earlier of*: (i) the first day of the month following the month in which the last "Trial Period" Payment is due (the 'Modification Effective Date') or (ii) the termination of this Plan . . . ." Ex. 26 at § 2 (emphasis added). The only conclusion that can be drawn from this language is that the "Trial Period" closed on a date certain – the Modification Effective Date. Underscoring this point, the TPP Agreement provides that "TIME IS OF THE ESSENCE." *Id.* at §§ 2, 2(A) (emphasis in original). Moreover, the defined term "Trial Period" is used throughout the TPP as a time limit applicable to both the borrowers' and lenders' contractual duties. *Id*. at §§ 2, 2(D), 2(E), 3.[5]

The performance required by Chase within this finite period is also stated in the TPP Agreement. Chase is to provide a signed copy of the Plan and Modification Agreement by the Modification Effective Date *or* "a written notice that [the borrower] do[es] not qualify for the Offer." *Id.* at 1. Consistent with this language, Chase may not wait for some indeterminate number of months after the close of the contractual "Trial Period" to inform Plaintiffs whether or

---

[5] The contractual time limitation is conceptually consistent with the primary purpose of having a Trial Period at all, *i.e.*, to provide a finite underwriting period for Chase. Underwriting is, by necessity, a snapshot of the borrower's qualifications, not a moving picture, because its purpose is to predict the ability of the borrower to make future payments as of a given point in time. Certainly, Chase originates loans with an underwriting period far shorter than three months and accepts credit risk on the basis of that underwriting. Every borrower in the proposed class here did make the required trial payments, giving Chase the comfort that such payments were possible.

not they will receive a permanent HAMP modification.  Yet, this is precisely what Chase routinely did.

Each of the proposed Group 1 class representatives accepted, signed and returned a TPP Agreement to Chase, and timely made each of the monthly payments it called for. The TPP also required borrowers to provide specific documentation necessary to verify Chase's initial finding of eligibility.  Where a particular borrower either failed to tender one of the trial payments in the month in which it was due, or failed to return specific documentation requested of it, Treasury directed Chase -- consistent with the terms of the TPP Agreement -- to issue a timely denial at the close of the "Trial Period."  *See* Ex. 26 at 1 (TPP describes plan of limited duration requiring a permanent modification or written denial); Ex. 39 at 4 (Treasury guidance stating that "[t]he servicer must consider the Trial Period Plan to have expired if the borrower has not submitted the required documentation by the end of the Trial Period."); Ex. 40 at 6 (Treasury Report indicating that "[p]rogram guidance directs servicers to cancel or convert trial modifications after three or four monthly payments, depending on circumstances.").[6]

Nevertheless, Chase failed timely to provide class members with either a permanent loan modification agreement or a written denial. For borrowers who eventually received a permanent modification, Chase's failure to send that modification in accordance with the terms of the contract caused borrowers to incur interest charges not permitted by the TPP Agreement, to be assessed improper late fees and foreclosure-related fees, to suffer damage to their credit, and / or to receive loan modification terms that were less favorable than would otherwise have been the

_____

[6] Once the MED had passed, Chase policy explicitly instructed █████████████████████████████████████████████████████████████████████████████. *See* Ex. 45 at CHASE_DURMIC_LIT_000023439 (Chase policy instructing ███████████████████████████████████████████████████████████████; Ex. 46 at 1 (letter template to instructing borrowers to ███████████████████████████

case. Ex. 33 at 19-20.  For borrowers who received an untimely notice of denial, Chase's failure

to send such notice as required by the contract caused borrowers to incur improper late fees and

foreclosure-related fees, to suffer damage to their credit, to be charged improper increases to the

outstanding balance of the loan during the months after the modification effective date, and to be

deterred from seeking out alternatives to a mortgage modification.  *Id.*

> ### *Group 2 Background*

Group 2 Plaintiffs' claims arise from Chase's unfair and deceptive conduct[7] while

processing borrowers' modification applications.  *See* Docket No. 97 at 6.  Facing financial

hardship, Group 2 Plaintiffs contacted Chase for a loan modification.  *See* Ex. 2, Row 3.  Group

2 Plaintiffs received form written forbearance, payment, or repayment plans—followed by no

decision at all, a belated final modification, or a foreclosure sale.[8]  *See* Ex. 51 – Ex. 53

(agreements of Group 2 Plaintiffs);[9] *see also* Ex. 120 (examples of repayment plans sent to

---

[7] This Court's order on Chase's Motion to Dismiss held that Group 2 Plaintiffs could pursue their
claims based on nine unfair and deceptive practices by Chase: (1) instructing mortgagors to stop
making mortgage payments with the false assurance that doing so will not hurt their credit scores
and is a necessary step in obtaining a loan modification; (2) misrepresenting the status of loan
modification applications; (3) misrepresenting the status of mortgagors' accounts; (4) refusing to
put statements in writing when asked; (5) failing or refusing to explain fees and other
assessments charged to mortgagors; (6) concealing or failing to disclose these same fees and
other charges; (7) arbitrarily increasing debt obligations without any meaningful explanations;
(8) rejecting, returning, or refusing payments without justification or explanation; and (9)
misrepresenting credit reporting policies for loans in active TPPs.  *See* Docket No. 97 at 29.
[8] For example, Chase's policy during March 2009-April 2010 was to ███████████████
███████████████████  During that time period, borrowers who had a forbearance
agreement should be presumed to have received it for purposes of getting a modification.  *See*
Ex. 56.  Further, a similar presumption should apply to borrowers who had a repayment plan
because, as noted in the text, Chase ██████████████████████████████████████
█████████████████████  *See* Ex. 119 at 2; Ex. 57.
  Plaintiff Sabouhi received a reduced payment plan over the phone, but Chase never sent him a
written confirmation.  *See* Ex. 105 at 59:19-24.  Nonetheless, Plaintiff Sabouhi's experience
mirrored those of the other Group 2 Plaintiffs.  *See* Ex. 2.  Likewise, although Plaintiff Leopold
received a TPP Agreement, his experience mirrored those of the other Group 2 Plaintiffs—

Group 2 class members).  Chase used substantially similar versions of "repayment" and

"forbearance" plans throughout the class period without distinguishing *between* at least two of

the form agreements -- the forbearance plan and the repayment plan -- rendering this group of

form agreements merely semantically different means to the same end.  *See* Ex. 119 at 2 (stating

that ██████████████████████████████████████████████████

████ ; Ex. 57 (illustrating Chase's ██████████████████████████████████

██████████████████  Under the form agreements, Chase required a predetermined number

of payments and promised that, upon the final payment, borrowers would receive either their

desired modifications or a decision on their modification applications.  *See* Ex. 2, Row 8; Ex. 57;

Ex. 56 ████████████████████████████████████████████████████ .

Pursuant to the terms of their form agreements, Group 2 Plaintiffs submitted the requested

application materials—often multiple times—and made timely payments for several months.  *See*

Ex. 2, Row 3, 4.  Although Group 2 Plaintiffs followed Chase's instructions and fulfilled the

terms of their form agreements, Chase failed to honor its promises to provide timely permanent

modifications, and/or foreclosed on the property.  *See* Ex. 2, Row 5, 6.[10]  *See also* Ex. 116, at 7

(Loan modification audit issued February 22, 2012, shows that ██████████████████

██████████████████████████████████████████████████████

---

including Chase's untimely permanent modification two years after Plaintiff Leopold had
satisfied the terms of his TPP Agreement.  *See* Ex. 2; Ex. 121.

[10] The form written temporary payment, forbearance, and repayment plans required borrowers to
make payments for a predetermined number of months.  Chase represented to borrowers that,
upon completion of the payments, it would provide them with permanent modifications or a
decision on their modification applications.  *See* Ex. 101 at 169:2-13; Ex. 102 at 33:24-34:10;
Ex. 103 at 123:10-23, 124:24-125:11, 141:9-142:9; *see also* Ex. 36 at 5 ("The most
straightforward definition of a timely or late modification denial is based on viewing the end of
any forbearance-to-modification or similar plan as the time when a borrower would expect
notification of a decision.")  Therefore, based on Chase's representations, reasonable borrowers
anticipated that Chase would render a timely decision upon receipt of the final payment.

██████████████████████████████████████████████████████████

████████████████████████████████████████████; Ex. 74

(documenting Chase's awareness of ████████████████████████████████

███████████████.

     Regardless of the type of form agreement, Group 2 Plaintiffs were subjected to Chase's

unfair and deceptive conduct in a uniform manner. First, pursuant to policies requiring a default

as a prerequisite to permanent modification, Group 2 Plaintiffs were instructed to default on their

mortgage loans.  Ex. 2, Row 7; Ex. 58 at 242:13-20; Ex. 59 at 191:17-193:7; Ex. 60; Ex. 61

(Chase FAQ stating ███████████████████████████████; Ex. 62

(instructions for Chase employees to ████████████████████████████████

██████████████████.

     Chase also misrepresented the status of Group 2 Plaintiffs' modification applications.

*See* Ex. 2, Row 8; Ex. 59 at 207:23-209:19; Ex. 63 at 70:11-71:6.  For example, Chase requested

that Group 2 Plaintiffs submit documents in support of their modification applications despite

Chase's having these documents in its possession and Chase's confirming receipt of the

documents.  *See* Ex. 2, Row 8. Group 2 Plaintiffs were required to resubmit the same document

repeatedly.  *Id.*; Ex. 64 at 9-10 (Chase Executive Steering Committee Report noting ████████

████████.  Despite Group 2 Plaintiffs' efforts to comply with Chase's duplicative requests,

when Chase cancelled trial plans or failed to render a timely decision, it blamed Group 2

Plaintiffs for "missing" documents.  *See* Ex. 2 Row 8; Ex. 65 (Chase records noting ████████

████████; Ex. 66 (Chase records noting ████████████████████████

████████; Ex. 116 at. 8, Ex. 122 at 9-10 (audit finding ████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████ At the same time, Chase encouraged Group 2 Plaintiffs to make payments beyond the terms of their form agreements—or enroll in additional form agreements—with promises that a permanent modification was forthcoming. *See* Ex. 2, Row 8; Ex. 67 (Chase policy instructing employees to ███████████ ███████████████████████.

In addition, Chase misrepresented the status of Group 2 Plaintiffs' accounts. *See* Ex. 2, Row 9. Chase's policy was to promise Group 2 Plaintiffs that it would stop foreclosure activities while modifications were pursued. Ex. 68 (Chase FAQ stating that ██████████████████ ██████████████████████ But Group 2 Plaintiffs received threatening letters and notices from Chase that their homes were at risk of foreclosure while pursuing modifications. *See* Ex. 2, Row 9. Although Chase assured Group 2 Plaintiffs that it would not foreclose on their homes, Chase broke that promise as well. *Id.* at Row 6.

Further, Chase concealed or failed to disclose to Group 2 Plaintiffs fees that it charged to their accounts, or failed or refused to explain the fees when asked. *See* Ex. 2, Row 10, 11; Ex. 59 at 107:22-110:22. Group 2 Plaintiffs' loan files reflect fees that Chase charged. Chase gives these fees names such as: "corp. advance adjustment," "property preservation," "misc. f/c and b/r expense," "corp adv statutory exp disb," "corp adv – attorney advance disb," and "corp adv – prop preservation disb." *See* Ex. 109; Ex. 110; Ex. 111; Ex. 112. When Group 2 Plaintiffs inquired about these fees, Chase failed—or refused—to explain them. *See* Ex. 2, Row 10. In fact, Chase repeatedly assured Group 2 Plaintiffs that the fees would be removed once a permanent modification was approved. *See* Ex. 2, Row 10, 11; Ex. 70 (Chase FAQ stating that ███████████████████████████████████████ However, Chase's assurances were false. *See* Ex. 2, Row 10, 11; Ex. 123 at 11 (noting Chase ██████████

9

████████████████████████████████████████████████████████████████

██████████████████████.

As a result, Chase increased Group 2 Plaintiffs' debts. *Id.* at Row 14. Pursuant to the form agreements, Group 2 Plaintiffs made at least three payments (*Id.* at Row 3, 12) and, when Chase instructed them to, they continued to make payments beyond the terms of the form agreements. *Id.* at Row 8. Despite these payments, Group 2 Plaintiffs now owe more on their mortgages than when they started the modification process. *Id.* at Row 12.

Chase also rejected, refused, or returned Group 2 Plaintiffs' payments. *Id.* at Row 13. When Group 2 Plaintiffs inquired about the reason for the rejection or refusal, Chase informed them that a payment would render their pending permanent modifications null and void, or that Chase had terminated their form agreement. *Id.*

Finally, Chase misrepresented its credit reporting policies to Group 2 Plaintiffs. *Id.* at Row 14; Ex. 71 (policy acknowledges ███████████████████████████████ When Chase instructed Group 2 Plaintiffs to default, Group 2 Plaintiffs voiced their concerns that doing so would ruin their credit scores. Ex. 2 at Row 14. Chase, however, assured Group 2 Plaintiffs that pursuing a loan modification, which would require defaulting on the contractual terms of their mortgage, would not negatively impact their credit scores. *Id.* Contrary to Chase's assurances, Group 2 Plaintiffs suffered damaged credit. *Id.*; Ex. 72 (Chase FAQ noting

███████████████████████████████████████████████████████; Ex. 124 at 4 (Defendant is ██████████████████████████████████████████ ███████; Ex. 73 (policy indicating ███████████████████████.

Group 2 Plaintiffs have suffered similar injuries as a result of Chase's unfair and deceptive conduct. Group 2 Plaintiffs' injuries include, *inter alia*, increased debts, unwarranted

fees and interests, damaged credit, and/or having their homes foreclosed.  Ex. 2 at Row 6, 10, 11,

12, 14.  Chase's mortgage servicing platforms can be used to identify borrowers that were placed

in form written temporary payment, forbearance and/or repayment plans, but did not receive

timely permanent modifications, or were foreclosed upon while awaiting a decision.  *See* Ex. 36

at 3-6; Ex. 37 at 1-2.

### Group 3 Background

Group 3 includes borrowers who "cleared the TPP hurdle and received permanent loan

modification agreements."  Docket No. 97 at 3 n.5.  These form agreements permanently

modified the terms of the borrower's underlying loan by changing the interest rate, adjusting the

term, or altering the principal balance, *inter alia. Id.*  Nevertheless, even after class members

executed and began performance, Chase failed to live up to its end of the deal either by making

payment demands inconsistent with the modification, treating the agreement as if it did not exist

or unilaterally canceling it.  Group 3 are represented Kathy Kurtzner and Thomas and Felicia

Minerva. Ex. 3.

### Group 4 Background

Donna Follmer ("Follmer"), the Group 4 Plaintiff, had a residential mortgage loan that

Chase acquired when it was in default.  *See* Docket No. 97 at 8.  Follmer entered into a Loan

Modification Agreement and began making reduced payments.  *Id.*  However, Chase

inexplicably raised her monthly payments.  *Id.*  When Follmer stopped making the increased

payments, Chase initiated foreclosure proceedings, but later offered her a TPP Agreement. *Id.* at

8-9.  Follmer resumed making payments pursuant to the TPP Agreement.  *Id.* at 9.  Upon

completion of the TPP Agreement, Chase sent Follmer neither a modification nor a denial notice,

but instead instructed her to make an additional payment.  *Id.*  Chase accepted Follmer's

payment, but later informed the Group 4 Plaintiff, without an explanation, that her modification application had been denied.  *Id.*  Follmer's claim arises from Chase's violation of the Fair Debt Collection Practices Act.  *Id.* at 8.

### Due to Chase's Discovery Abuses, the Relevant Fact Record Is Still Being Developed

As the court is well aware, Plaintiffs have had to file numerous Motions to Compel to get basic foundational documents in discovery.  Email was originally ordered to be produced by January 15, 2013, and subsequently had to be compelled by the court.  Docket Nos. 205 at 6 & 248 at 1.  Plaintiffs received a first, partial production of email on February 25, 2013, just four days before Plaintiffs' then-deadline to move for class certification, and received subsequent productions on March 8, 2013, and April 1, 2013 totaling tens of thousands of pages of documents – again, mere days before then-operative deadlines to move for class certification.[11]

Even a preliminary review of these productions makes it quite clear that the email Chase concealed until nearly the stroke of midnight for Plaintiffs' class certification presentation contains materials that are highly relevant to class certification.  For example:

- Ex. 114 at 10:



*Id.* at p. 5 of 12. (emphasis added in both).

- Ex. 115 at 2:

---

[11] These productions contain tens of thousands of pages of documents; Plaintiffs have not been able to complete their review in such a short time period for the purposes of integrating all relevant information into this opening memorandum on class certification

- Ex. 116 at 8: ██████████████████████████████████
  ████████████████████████████████████████████████
  ████████████████████████████████ *Id.*

- Ex. 74 (documenting Chase's awareness ██████████████████████

- Ex. 75 (illustrating ██████████████████████████████

- Ex. 125:  Many borrowers did not even get notice, after their trial period, that their permanent modification agreement would not be forthcoming. The Exhibit explains that ███ ████████████████████████████████████████████████ (emphasis added). Ex., 125 at 7. In addition, this document shows that ███████████████████████████████████████ Ex. 125 at 2.

Chase's concealment and delay deprived Plaintiffs of the opportunity, normally central to a fair discovery process, to ask Chase witnesses about these documents.  Similarly, Plaintiffs' experts could not consider them in reaching their opinions.  The emails themselves, as well as the audits and reports first produced because they were attachments to email, make abundantly clear that Chase was fully aware of the serious problems with its modification processing and borrower communications during the class period.  Exhibits 125, 74 and 75 in particular show that Chase generated and relied on data to make specific determinations about its rates of erroneous denial, untimely denial, and improper process controls, which bear directly on questions of ascertainability, numerosity, commonality, and predominance.  There is no reason that the Court cannot utilize the same data in order to try these issues for a class.[12]

---

[12] Because Chase's production continues even now, and because additional email is yet to be produced under this Court's orders, Plaintiffs reserve the right to seek leave to supplement this brief and/or to submit supplemental expert reports.

## III.  ARGUMENT

### A.  The Group 1 Class Should Be Certified

#### 1.  The Group 1 Plaintiffs Satisfy the Requirements of Rule 23(a)

##### a.  The Group 1 Class is Sufficiently Numerous

Plaintiffs do not expect Chase to contest numerosity as to Group 1.[13]  Cumulative data published by Treasury indicates that over 87,000 Chase borrowers entered into TPPs as of May 2010.  *See* Ex. 41 at 4.  Of these Chase borrowers, Treasury reported that over 70% -- the highest rate in the industry -- were in "aged trials," defined as a Trial Period that was at least six months old.  *Id.*  Because HAMP Trial Periods were never longer than four months, this means that at least 60,000 borrowers were languishing in TPP Agreements beyond their contractually defined "Trial Periods" without a decision from Chase. It is self-apparent that joinder would be impracticable as to Group 1 class members.[14]

##### b.  The Court's Interpretation of Uniform Contractual Language Would Yield a Common Answer as to Group 1 Claims

In order to satisfy the commonality prong of Fed. R. Civ. P. 23(a)(2), Plaintiffs must identify at least one question of law or fact that is common to the class. *George v. Nat'l Water Main Cleaning Co.*, 286 F.R.D. 168, 174 (D. Mass. 2012).  Even after the Supreme Court's clarification of this requirement in *Wal–Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541 (2011), class certification requires no more than a single common question of law or fact, the answer to which would drive the resolution of the claims of the class.  *Id.*, 286 F.R.D. at 174-75.  Certification should therefore only be denied on commonality grounds where "there is *no* common question that could generate a common answer to resolve an issue central to the litigation."  *Donovan v. Philip Morris USA, Inc.,* No. 06-12234-DJC, 2012 WL 957633 at *21 (D. Mass. March 21,

---

[13] The class definition for each of the proposed classes is set forth in Plaintiffs' Motion for Class Certification that accompanies this memorandum.

[14] This Court found a similar proposed class of Massachusetts homeowners satisfied the numerosity prong in the context of the *Durmic* action.  *See Durmic* Docket No. 56 at 4.

2012) (quoting *Connor B., ex rel. Vigurs v. Patrick*, 278 F.R.D. 30, 33 (D. Mass. 2011)).

"Courts routinely certify class actions involving breaches of form contracts." *In re Med. Capital Sec. Litigation*, No. SAML 10–2145-DOC (RNBx), 2011 WL 5067208 at *3 (C.D. Cal. July 26, 2011) (gathering cases); *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 37-38 (E.D.N.Y. 2008) (citing cases to conclude that "[a]n overwhelming number of courts have held that claims arising out of form contracts are particularly appropriate for class action treatment."). "When viewed in light of Rule 23, claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action..." *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998) *quoting Kleiner v. First Nat'l Bank of Atlanta*, 97 F.R.D. 683, 691 (N.D. Ga. 1983).

Chief among the common contractual questions for the Group 1 plaintiffs is whether Chase's failure to render a decision at the close of the "Trial Period" constitutes a breach of the form contract language found in each class member's TPP Agreement.[15]  The common answer to this classwide question will drive the resolution of the litigation – a negative answer would be dispositive of each class member's contract claim, whereas a positive answer would lead to a series of subsequent common legal and factual questions regarding waiver,[16] injury and relief.[17]

---

[15] As described in detail in the Background section above, the relevant language involves the express definition of a finite "Trial Period" of three or four months and a provision that "TIME IS OF THE ESSENCE" under this plan.  *See supra* at 4.

[16] For example, where Chase failed to provide a timely written denial, and continued to accept trial payments, did it subsequently waive its ability to raise objections to the borrower's document submissions?  *See* Williston on Contracts § 63:9 ("where a contracting party, with knowledge of a breach by the other party, receives and accepts payment or other performance of the contract, he or she will be held to have waived the breach").

[17] For these same reasons, commonality exists as to the Group 1 Plaintiffs' promissory estoppel claims.  Relevant to that claim, Chase's corporate designee testified that there was no reason why borrowers should not have reason to rely on the representations made by Chase in its TPP Agreements.  *See* Ex. 42 at 161, 174.

While the Court need not provide an answer to this question at the class certification stage,[18] recognition that such an answer would apply generally across the class (or subclasses) to drive the resolution of Plaintiffs' claims warrants certification.[19]  Notably, this Court found that a virtually identical proposed class of Massachusetts homeowners satisfied the commonality requirement in the context of the *Durmic* action.  *See Durmic* Docket No. 56 at 4-5.

Regarding the balance of the Group 1 Plaintiffs' claims, because liability under each relevant state's consumer protection statute ("CPA") can be established using evidence that applies to Chase's modification process as a whole, commonality also exists for each of the statewide CPA classes proposed by Group 1 Plaintiffs.[20]  Each statewide class raises common

---

[18] "Rule 23(b)(3) requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class. . . . [T]he office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the 'metho[d]' best suited to adjudication of the controversy 'fairly and efficiently.'"  *Amgen Inc. v. Connecticut Ret. Plans and Trust Funds,* 133 S. Ct. 1184, 1191 (2013), *quoting* Fed. R. Civ. P. 23(b)(3).

[19] As this Court has noted, there are only rarely differences in the state common law of contract that might justify state-specific outcomes on Plaintiffs' breach of contract claims here.  *See* Docket No. 97 at 20 n. 21, *citing In re Bank of America Home Affordable Modification Program (HAMP) Contract Litigation,* No. 10–md–02193–RWZ, 2011 WL 2637222 at 3 n.3 (D. Mass. July 6, 2011).  This conclusion is consistent with other courts presented with proposed nationwide breach of contract classes, where, as here, key commons question arise from fundamental tenets of contract law, such as the existence of a breach.  *See, e.g., Leszczynski v. Allianz Ins.,* 176 F.R.D. 659, 671– 72 (S.D. Fla. 1997) ("Whether the [contract] provision has been breached appears to be a pure and simple question of contract interpretation which should not vary from state to state."); *Kleiner,* 97 F.R.D. at 694 (N.D. Ga. 1983) ("The application of various state laws would not be a bar where, as here, the general policies underlying common law rules of contract interpretation tend to be uniform.").  *See also Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 233 n.8 (1995) ("[C]ontract law is not at its core diverse, nonuniform, and confusing") (internal citation and quotation omitted). "A breach is a breach is a breach, whether you are on the sunny shores of California or enjoying a sweet autumn breeze in New Jersey." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1263 (11th Cir. 2004), *abrogated on other grounds by Bridge v. Phoenix Bond & Indemnity Co.,* 553 U.S. 639 (2008).  Plaintiffs have also plead statewide breach of contract classes, in the alternative, for each of the states represented by Group 1 Plaintiffs put forth as proposed class representatives.  *See* Docket No. 28 at 219.

[20] Plaintiffs have created an appendix that catalogs and provides citations for each state statute under which the Plaintiffs propose a statewide CPA class. *See* Ex. 5.  Group 1 Plaintiffs move for

questions amenable to resolution "in one stroke," *see Dukes*, 131 S. Ct. at 2541, when assessed

in light of the relevant state statute.  For example, it is a common factual question whether Chase

had a policy or practice of delaying underwriting of loan modifications, thereby ensuring that

borrowers do not receive a decision by the modification effective date.  The answer to that

classwide factual question in turn yields the common legal question whether that conduct

violates the applicable state's CPA.

Here, the discovery record shows that Chase instituted an underwriting policy virtually

guaranteeing that borrowers would not receive the permanent modification decision in a timely

manner.  The policy required that Chase ██████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

████   *See supra* at 2-3, citing Ex. 43.  This policy was put in place despite clear guidance from

Treasury that documents older than 90 days should not be considered in the verification process.

*See* Ex. 38 at 2.  Chase's policy thus guaranteed that borrowers who had quickly returned

documents would be faced with renewed requests for "updated" documentation -- along with the

attendant delay -- based solely on Chase's underwriting policy.  Indeed, the reports that Chase

made duplicative and repeated requests for documents that had already been sent by borrowers

were a constant refrain.[21]  Further exacerbating this systemic delay, Chase exhibited serious

deficiencies in its underwriting competence that lead to improper delays and incorrect decisions.

Ex. 114 at 1 (internal Chase review concluding that ████████████████████████████

---

class certification of statewide classes based on CPA claims in the following states:
Massachusetts, Washington, California, Illinois, Missouri and Minnesota.
[21] Ex. 21 at 96-100; Ex. 114 at 1 ████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
██████████████████████████████████████████ Ex. 59 at 80-81, 125, 266-67 (former
Chase employee describing ██████████████
████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████[22]  *See also*, Exs. 114-116, as cited *supra* at 11-12.  These practices were applicable

across each of the statewide CPA classes and are susceptible to being evaluated against the

standards of each state's respective CPA.

### c.   The Claims of the Group 1 Plaintiffs are Typical

Pursuant to Federal Rule of Civil Procedure 23(a)(3), a class action requires that "the

claims or defenses of the representative parties are typical of the claims or defenses of the class."

"The central inquiry in determining whether a proposed class has 'typicality' is whether the class

representatives' claims have the same essential characteristics as the claims of the other members

of the class." *Barry v. Moran*, No. 05-10528-RCL, 2008 WL 7526753 at *11 (D. Mass. Apr. 7,

2008) quoting *McLaughlin v. Liberty Mut. Ins. Co.*, 224 F.R.D. 304, 310 (D. Mass. 2004). As the

Supreme Court observed in *Dukes*, the typicality analysis aids the Court in "determining whether

under the particular circumstances maintenance of a class action is economical and whether the

named plaintiff's claim and the class claims are so interrelated that the interests of the class

members will be fairly and adequately protected in their absence." *Dukes*, 131 S. Ct. at 2551 n.5

(quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157-158, n.13 (1982)). The class

representatives' claims "need not be identical to those of the class as a whole, [but] they must be

based on the same legal theory and arise from the same practice or course of conduct." *In re*

*Tyco Int'l, Ltd. Multidistrict Litig.*, MDL 02-1335-PB, 2007 WL 1703067, at *2 (D.N.H. June

---

[22] The discovery record raises a number of other systemic practices that are susceptible to being measured against state consumer protection law.  For example, Chase's policies regarding training, resource management, and vendor supervision each present common questions that would apply across each of the statewide classes for the purposes of determining CPA liability.

12, 2007) (quoting *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D.

197, 204-05 (D. Me. 2003) (internal quotations omitted)). Typicality "should be determined with

reference to the defendant's actions, not with respect to particularized defenses it might have

against certain class members." *In re Neurontin Mktg. & Sale Practices Litig.*, 244 F.R.D. 89,

106 (D. Mass. 2007) quoting *Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996).

Here, each proposed class representative shares attributes typical of each class member:

each received a TPP Agreement from Chase; accepted it by execution and return; timely made

the required payments; and in each case Chase breached its promise to provide either an offer of

a permanent loan modification or a written notice of denial at the close of the Trial Period. *See*

Ex. 34 at ¶ 16.[23]  In the interest of economy and simplicity, Plaintiffs have prepared an appendix

listing the essential elements of their claims that each proposed class representative shares with

putative class members, with citations to the discovery record. *See* Ex. 1.

### d.   The Proposed Group 1 Class Representatives Have and Will Fairly and Adequately Protect the Interests of Absent Class Members

Fed. R. Civ. P. 23(a)(4) requires that "the representative parties will fairly and adequately

protect the interests of the class."  The First Circuit interprets this requirement to mean that (1)

the moving party must show first that the interests of the representative party will not conflict

with the interests of any of the class members, and (2) that counsel chosen by the representative

---

[23] Plaintiffs acknowledge that there is a complicating issue with respect to proposed named Plaintiff Julie Karnes, because Chase data indicates that she received a timely denial of a permanent modification.  Ms. Karnes is nevertheless put forward as a class representative because the timely notice they received indicates that it was not a denial of a HAMP loan modification, but rather of a different superseded modification process.  Additional data shows that the denial of her HAMP modification actually was made more than 12 months after the "Trial Period" defined in her TPP.  To the extent Chase has evidence otherwise, Plaintiffs will withdraw Ms. Karnes as a proposed class representative.  By contrast, Plaintiffs have not proposed Jean Licata, Michael or Audra Schmierer, or Dianna Montez as class representatives, although they are named as Plaintiffs in the Complaint, because Chase data shows that they did not make each of their "Trial Period" payments on a timely basis.

party is qualified, experienced and able to vigorously conduct the proposed litigation. *Andrews v. Bechtel Power Corp.*, 780 F. 2d 124, 130 (1st Cir. 1985).

The proposed class representatives will adequately represent the interests of the class. There are no conflicts of interest between the proposed class representatives and other class members – each was subject to the same course of conduct and suffered the same injury. The named plaintiffs each understand the nature of the claims at issue and their obligations as class representatives. The proposed representatives have no disqualifying features and have agreed to pursue those claims vigorously. Plaintiffs have created an appendix setting forth support in the discovery record for each proposed class representative, across all four Groups, as to relevant adequacy elements. *See* Ex. 4.

Further, the proposed class representatives have retained counsel that have competently and vigorously advanced the class' claims. Plaintiffs' counsel are experienced in this type of litigation and well-qualified to represent the Class. *See* Exs. 6-9 (curriculum vitae of proposed co-lead counsel); Exs. 10-15, 17-20 (curriculum vitae of proposed executive committee counsel). The Court has already appointed these same firms as Interim Co-Lead Counsel and members of the Executive Committee. *See* Docket No. 11.

### 2. Rule 23(b) Standards Are Also Met for Group 1

For a class to be certified, it must meet the requirements of Rule 23(a), as well as either Rule 23(b)(2) or Rule 23(b)(3), depending on the nature of the relief sought. In this case, the Group 1 classes may be certified under either Rule 23(b)(2) or Rule 23(b)(3), as both are satisfied.[24] Plaintiffs primarily seek certification under Rule 23(b)(3) for monetary relief,

---

[24] Since there is "no…requirement that (b)(2) be mutually exclusive, and since subpart (c)(4)(a) allows an action to be maintained 'with respect to particular issues,' the fact that damages are sought as well as an injunction or declaratory relief should not be fatal to a request for a (b)(2) suit, so long as the resulting hybrid case can be fairly and effectively managed." *Holmes v.*

including damages and account reformation.  However, because they also seek a class-wide injunction to prevent continued collection of unlawful charges now pending on Chase accounts, for corrective credit repair, and to prevent unlawful collection activities, Rule (b)(2) certification is also appropriate.  *See* Docket No. 28, at ¶ 836.

### a.   The Group 1 Plaintiffs Meet Rule 23(b)(3) Standards

The Court may certify a class under Rule 23(b)(3) if it finds "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

### i.   Common Questions Predominate For The Group 1 Class Claims Because They Are Based On A Form Contract That Was Breached In The Same Way For Each Class Member

The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 597, 623 (1997).  "Common issues predominate where individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria-thus rendering unnecessary an evidentiary hearing on each claim." *Smilow v. Southwestern Bell Mobile Systems, Inc.*, 323 F.3d 32, 40 (1st Cir. 2003).  "Where ... common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain." *Otte ex rel. Estate of Reynolds v. Life Ins. Co. of North America*, 275 F.R.D. 50, 58 (D. Mass. 2011) (applying *Smilow*).  Common questions may predominate despite the existence of individual differences, as long as "a sufficient constellation

---

*Continental Can Co.*, 706 F.2d 1144, 1158 n.10 (11th Cir. 1983). *See also Lemon v. Int'l Union of Operating Eng'rs*, 216 F.3d 577, 581 (7th Cir. 2000). ("The district court could certify a Rule 23(b)(2) class for the portion of the case addressing equitable and a Rule 23(b)(3) class for the portion of the case addressing damages.").

of common issues binds class members together." *Waste Mgmt. Holdings v. Mowbray,* 208 F.3d 288, 296 (1st Cir. 2000).  Applying these principles, courts routinely find that predominance is met in cases involving breaches of written form contracts. *Smilow, supra*, 323 F.3d at 39 (predominance found "where the common factual basis is found in the terms of the contract….").  *See also supra* at 13-14 (citing cases on the amenability of form contracts to class treatment).

Common questions predominate here. With respect to liability, the overriding common question is whether Chase failed to perform its contractual obligations in a timely way.  As discussed above in connection with commonality, *see* 14-15, *supra*, this central liability question can be answered on a common basis for the class as a matter of law.  The common answer that this query yields will have an overwhelming effect on the resolution of class members' claims. The individual issues Chase will raise with respect to liability, especially as those questions concern the return by borrowers of particular documents to Chase, merely raise a key common question – whether the TPP Agreement required Chase to provide the borrower with a timely decision on their permanent modification.  This common question predominates over any individual issues concerning borrower documentation because such issues are rendered irrelevant if Chase was required to issue a timely decision.[25]

---

[25] Chase will undoubtedly seek to inject factual issues peculiar to each class member's circumstances, especially the question concerning the return of documents to Chase by borrowers.  *See Durmic* Docket No. 56 at 6-7.  The TPP Agreement, however, describes a finite time period during which Chase is permitted to review and decide on each class member's individual circumstances  -- including their compliance with document requests.  *See supra* at 2-5.  The common factual scenario shared by both class members and the proposed class representatives is Chase's failure to render a timely decision at the close of the "Trial Period" – an occurrence that uniformly constitutes a breach.  Given the defined time period set out in the contract as well as the "Time is of the Essence" provision, Chase's position that events occurring after Chase's breach could retroactively justify that breach not only presents a common legal question, but one on which Chase's position is untenable as a matter of law because the Agreement itself specifies the deadline for performance.

Chase will argue, incorrectly, that, absent individual review, Plaintiffs cannot show that its breaches caused harm contemplated by the law of contracts.  This is untrue. First, an assessment of Chase's data will reveal borrowers who never received permanent modifications for which they were eligible.  Second, all borrowers, including families who ultimately did not qualify for permanent modifications under applicable agreements, made the partial payments called for by Chase after the close of their temporary plans.  Put simply, Chase failed to inform borrowers that their partial payments would not satisfy the underlying note for the month in which such payment was accepted.  By dragging out its processing of permanent modifications past contractual deadlines, Chase's breaches led to additional debt (in the form of interest and fees), not contemplated by the TPP, that uniformly remains on each class member's account.  *See* Ex. 50 at 70-72.  Moreover, Chase is "capable of calculating a credit to deal with the impact of a delayed modification" by a "mechanical process."  Ex. 42 at 116.

Further, Chase's belief that individualized damages preclude a finding of predominance is incorrect. *See Smilow*, 323 F.3d at 40 ("The individuation of damages ... is rarely determinative under Rule 23(b)(3). Where ... common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain."); *George*, 268 F.R.D. at 175, 180; *Otte*, 275 F.R.D. at 58.[26]  Moreover,

---

[26] On March 27, 2013, the U.S. Supreme Court handed down its decision in *Comcast v. Behrend*, No. 11-864, 2013 WL 1222646 (March 27, 2013).  The *Behrend* Respondents brought antitrust claims against Comcast, alleging that it engaged in clustering its operations in such a way as to eliminate competition and artificially increase price.  *Behrend,* 2013 WL 1222646 at *2.  Restating the standards applicable to antitrust damages under Rule 23 as expressed by the District Court, *Behrend* indicated that the Respondents did not contest a requirement that they show the existence of individual injury as capable of being proved via evidence common to the class (referred to as "antitrust impact"), and that the measurement of such injury could be measured with a common methodology. *Id.,* 2013 WL 1222646 at *3.  *Behrend* noted that the District Court had only accepted one out of the four highly fact-intensive theories of the existence of individual injury proffered by Respondents.  *Id.*  Because the model of antitrust

it is clear that class members can be grouped for damages analysis depending on the their

circumstances at time of trial.  *See Smilow*, 323 F.3d at 40.  As Plaintiffs' expert, Dr. Ayres has

noted, measurement of individual injury here may be accomplished via a common methodology.

Ex. 33 at ¶ 45; Ex. 35 at 134-38, 183-84, 191. *See Smilow, supra*, 323 F.3d at 40  (existence of

computer records necessary to facilitate damage calculations support a predominance finding).

The overriding common question placed before the Court by Group 1 plaintiffs is

---

damages was not specifically matched to this surviving theory, *Behrend* concluded that
Respondents had failed to offer any evidence of the existence of individual injury, or "antitrust
impact."  *Id.,* 2013 WL 1222646 at *6.  In other words, the common damages methodology
proffered by Respondents was faulty because it predicted damages associated with theories of
liability no longer before the court.

*Behrend* does not control the outcome here.  First, as pointed out by the dissent, *Behrend*
"breaks no new ground on the standard for certifying a class action under Federal Rule of Civil
Procedure 23(b)(3)."  *Id.,* 2013 WL 1222646 at *9 (Ginsburg, J. & Breyer, J.,
dissenting).  Instead, "[t]he Court's ruling is good for this day and case only." *Id.* This
observation is based on the Respondents' unique acquiescence in the requirement that injury be
proven on a classwide basis, even if common issues of liability overwhelmingly
predominate. *Id.*  Second, and relatedly, the dissent is correct to point out that *Behrend's* highly
fact specific finding that the proffered model failed to match the theory of antitrust impact
accepted by the District Court does not alter the "well nigh universal" recognition that
individual damages calculations do not ordinarily preclude class certification. *Id.* (citing, *inter
alia*, *Tardiff v. Knox County*, 365 F.3d 1, 6 (1st Cir. 2004)). In other words, the *Behrend* Court's
finding that the Respondents before it failed to offer a model for properly measuring the antitrust
impact in that case does not change the fundamental rule that individuation of damages does not
defeat class certification where they are ascertainable by a proper common method.

Third, *Behrend* is distinguishable because, in that particularized antitrust context, the
Respondents had a difficult underlying burden to establish antitrust injury.  In that context, the
damages expert was faced with the complex task of establishing what circumstances would exist
in a "but for" world without the anticompetitive conduct.  Even if antitrust impact standards were
transposed into this context, there is far more concrete information available here to evaluate the
circumstances that would exist absent Chase's breach.

Contract and CPA damages are not nearly as difficult to calculate as antitrust damages in
*Behrend*.  As described above, Chase was required to compare the present value of a
modification versus the present value of no modification as part of each borrowers' HAMP
process.  To do so, it not only generated the terms of the anticipated permanent modification
before the TPP was granted, it was required to report those "but for" terms to Treasury.  The
necessary data to calculate damages on a contract or CPA theory is thus contained in Chase's
electronic records and is therefore available to measure injury by common algorithms. *See* Ex. 33
at ¶ 45; Ex. 35 at 134-38, 183-84, 191.

interpretation of the TPP Agreement's language.[27]   Common issues predominate where that

common interpretation applies to the proposed class representatives, who, like "all of the

putative class members[,] allege to 'have suffered the same injury' from the same source,"

Chase's failure to make a timely decision. *George*, 286 F.R.D. at 175, *quoting Falcon,* 457 U.S.

at 157.

### ii.   Class Treatment for Group 1 is Superior

To be certified, class treatment of a matter must be "superior to other available methods

for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  The factors

considered in determining superiority include: (A) interests of class members to individually

pursue separate actions, (B) if class members have already commenced litigation concerning the

controversy at issue, (C) desirability of converging the matter into one action, (D) manageability

of a class action. *Id.*

Here, the costs – to class members, the courts,[28] and even Chase[29] – of adjudicating class

members' claims on an individual basis would far outweigh the recovery to which individuals

might be entitled. Class treatment is therefore not only superior, but probably the only effective

remedy available.[30] Costello Decl. at ¶ 3; *see Tardiff v. Knox Cnty.*, 365 F.3d 1, 7 (1st Cir. 2004)

---

[27] *See* Am. Jur. 2d. Contracts § 356 ("Construction of the meaning of a contract begins with the language of the contract … because the determination of what the contracting parties intended is an objective inquiry, the first step is to decide what a reasonable person in the position of the parties would have thought the terms of the contract meant.")

[28]   Absent class treatment, the burden on the judiciary, across many jurisdictions, would be extreme.  *See In Re Chase Bank USA, N.A., "Check Loan" Contract Litigation*, 274 F.R.D. 286, 293  (N.D. Cal. 2011) (burden on the courts is appropriately considered).

[29] Chase will likely disagree, not because it would be cheaper for it or the court system to adjudicate the individual actions, but rather because Chase considers it easier, in balkanized litigation, to avoid responsibility for the national impact of its actions.  Moreover, Chase is aware that Plaintiffs, proceeding individually are extremely unlikely to pursue discovery commensurate with that conducted here, making success in individual litigation more difficult.

[30] While there appear to be some individual actions filed by putative class members against Chase in various jurisdictions that address the issues involved in this lawsuit, if a class is

(individual suits infeasible where it would be financially impractical for affected individuals to sue individually).  In general, there are limited resources available to homeowners seeking to avoid foreclosure, because those individuals, almost by definition, have few resources to pay counsel hourly for a breach of contract case.  *See generally*, *Neighborhood Assistance Corp. of Am. v. First One Lending Corp.*, No. SACV 12–463 DOC(MLGx), 2012 WL 1698368 (C.D. Cal. May 12, 2013) (discussing scheme to take advantage of desperate homeowners facing foreclosure).

Further, the proposed class in this case is manageable.  Plaintiffs' expert -- Dr. Ian Ayres[31] of Yale Law School and Yale School of Management -- prepared two reports in this matter showing how both the data that Chase reports to Treasury, and its internal data can be used to identify class members for whom Chase failed to make timely decisions.  *See* Ex. 33 at 12-19; Ex. 34 at 5-11.  Indeed, Chase has already established a template, as described in the Shine declaration previously used in this Court, for identifying class members.  *See infra* at 27-29 (regarding ascertainability)*;* Ex. 33 at 11-19; Ex. 34 at 5-11; *see Durmic* Docket No. 35.  Dr. Ayres demonstrates the application of his simple methodologies on a randomly generated sample of Chase's loan modification data. Not only is extrapolation possible for the purposes of this motion, the methodologies can be executed equally simply for the entire dataset. *See* Ex. 34 at 10; Ex. 35 at 95-97.

---

certified Plaintiffs will propose mechanisms to allow such individuals to opt out of the class, thereby allowing those who have the desire and ability to proceed on an individual basis the opportunity to do so.

[31] Dr. Ayres is an eminent legal scholar, as well as an expert in econometrics and statistical analysis.  *See* Ex. 33 (Ayres Report) at 4-5 & Appendix 2 (listing qualifications and appending curriculum vitae). Among the many qualifications relevant to his report in this case are his doctorate in economics and his dozens of books and scholarly publications employing statistical techniques.  *Id.*

The existence of relevant loan level account data simplifies the process of trying this case.  The dates of relevant payments, decisions by Chase, and notices to borrowers are present as data points in Chase's records.  Ex. 34 at 5-11; Ex. 50 at 68-70.  Similarly, potential differences in damages do not preclude certification but nevertheless the potential to use Chase records to establish algorithms for contract damages, as described by Plaintiffs' expert, Dr. Ayres, mean individual damage trials need not be required. *See supra* at 22 (predominance section regarding damages).

### b.   The Group 1 Plaintiffs Satisfy the Requirements of Rule 23(b)(2)

Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2). "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart*, 131 S. Ct. at 2557. The prong of the rule does not require, unlike Rule 23(b)(3), that common issues of law and fact "predominate," but only that class members "complain of a pattern or practice that is generally applicable to the class as a whole." *Walters v. Reno,* 145 F.3d 1032, 1047 (9th Cir.1998); *see also Yaffe v. Powers,* 454 F.2d 1362, 1366 (1st Cir. 1972).  Moreover, "[e]ven if some class members have not been injured by the challenged practice, a class may nevertheless be appropriate." *Walters*, 145 F.3d at 1047.[32]

Plaintiffs and most members of the classes they seek to represent continue to be harmed by Chase's conduct.  Class-wide injunctive relief is appropriate here because Chase treated all of

---

[32] "As Judge Easterbrook of the Seventh Circuit has recognized, certification of separate classes for the injunctive aspects and the damages aspects of a lawsuit (such as is requested here) can ensure that money damages do not predominate over injunctive relief in a Rule 23(b)(2) class, for it 'achiev[es] both consistent treatment of class-wide equitable relief and an opportunity for each affected person to exercise control over the damages aspects.'"
*Jefferson v. Ingersoll Int'l Inc.,* 195 F.3d 894, 898 (7th Cir. 1999).

the class members alike by assessing amounts that would not have been due if borrower's loan modification agreements had been honored.[33]   Chase is appropriately enjoined from collecting these amounts to the extent they have not yet been paid.   Similarly, borrowers making payments under a TPP Agreement were entitled to credit reporting consistent with their agreements.[34] Corrective credit reporting is now required.

### 3.   The Group 1 Class is Ascertainable

"While not explicitly mentioned in Rule 23, an implicit prerequisite to class certification is that a 'class' exists – in other words, it must be 'administratively feasible for the court to determine whether a particular individual is a member.'" *Donovan v. Philip Morris USA, Inc.*, 268 F.R.D. 1, 9 (D. Mass. 2010), *quoting Kent v. SunAmerica Life Ins. Co.*, 190 F.R.D. 271, 278 (D. Mass. 2000).  Like all HAMP servicers, Chase is required by Treasury to maintain comprehensive data on a borrower-by-borrower basis for all aspects of its program performance. *See* Ex. 23 at 51-53; Ex. 38 at 19-21; Ex. 33 at 15-19.  The required data elements include information that traces the life cycle of each HAMP borrower throughout the process – from trial plan set-up, to borrower compliance with the trial plan, to the terms of the anticipated permanent modification if the trial plan is successful, and trial plan outcomes.  *See* Ex. 23 at 179-84 (Chase describing categories of reporting required by Treasury, as listed by data dictionary).  The data reported to Treasury is drawn from Chase's internal records, which contain hundreds of additional borrower-by-borrower data points beyond those used for Treasury reporting, including information regarding occupancy, loan terms, property characteristics, payment history, records of contacts and correspondence with borrowers, and alternative loss mitigation outcomes, among

---

[33] The injunction sought by Group 1 Plaintiffs is described in the motion for class certification.
[34] *See Del Campo v. Am. Corrective Counseling Servs., Inc.,* 254 F.R.D. 585, 595-596 (N.D. Cal. 2008) (certifying under (b)(2) for injunctive relief to stop abusive collection practices together with certification under (b)(3) for class members with damages).

many others.  Ex. 34 at 5-11; Ex. 44 (Excerpt of data sample produced by Chase).

First, Dr. Ayres demonstrates that Chase's own methodologies, which it used to identify class members in the *Durmic* matter, *see Durmic* Docket No. 35, can apply equally to the broader Group 1 class that Plaintiffs seek to certify here. Ex. 33 at 12-15. Put simply, as shown in the declaration of Chase's own chief data analyst, Karen M. Shine, Chase's data is sufficient to identify each borrower who was offered and accepted a TPP Agreement, made their payments under the applicable rules about timeliness of payments, and who did not receive either a timely permanent modification or notification that Chase intended to deny the modification.  *Id.*[35]

Dr. Ayres further demonstrates that the analysis necessary to identify Group 1 class members can also properly be based on data that Chase reported to the Department of the Treasury. Ex. 33 at 15-19. That data is contained in a cumulative database that can be broken down into standard spreadsheet format.  *See* Ex. 23 at 108.  Chase has confirmed that the information necessary to identify all borrowers who entered into HAMP TPP Agreements, *id.* at 57, to identify the length of each borrower's Trial Period, *id.* at 240-41; to identify whether each borrower properly made each "Trial Period" plan payment, *id.* at 249, Ex. 25 at 86-87, 93, to identify the Modification Effective Date, *see* Ex. 23 at 219-22; and to identify each borrower's "Trial Period" outcome and the date Chase decided on that outcome, *see id.* at 62, 151-52; Ex. 21 at 162-63, 193-94 is contained in its records.  *See generally* Ex. 33 at 15-19.  The Treasury data thus serves as an independent basis to confirm or supplement the Shine methodologies.  *Id.*

After the intervention of the Court, Chase produced a sample of certain fields of its internal data.  *See* Docket No. 149 at 1-2.  Utilizing these data fields, Dr. Ayres tested his

---

[35] Consistent both with the most conservative Treasury guidance on the subject and with Chase's own treatment of borrowers in TPP Agreements, Dr. Ayres considered HAMP or CHAMP trial payment as considered timely where they were made within the calendar month owed.  *See* Ex. 34 at 10 n.26; Ex. 23 at 99; Ex. 16 at 8.

proposed methodology.  Ex. 34 at 5-10.  In doing so, he not only was able to identify the data

points necessary to follow through on the Shine methodologies for a broader class, but he also

points out that Chase maintains data to fill any purported limitations in that methodology so that

file level review is unnecessary.  *Id.* at 7-8.  His results establish that of the random sample of

500 borrowers, 39% (196 loans) have characteristics that would make those borrowers class

members.[36]

### B.  The Group 2 Class Should Be Certified

#### 1.  The Group 2 Plaintiffs Satisfy the Requirements of Rule 23(a)

##### a.  The Group 2 Class is Sufficiently Numerous

Numerosity is a relatively "low threshold."  *Garcia-Rubiera v. Calderon*, 570 F.3d 443,

460 (1st Cir. 2009), and Plaintiffs do not anticipate opposition from Chase on this point because

its own records demonstrate that the number of potential Group 2 class members is in the

thousands, geographically disbursed across the nation.  Plainly, numerosity is satisfied.

##### b.  The Group 2 Presents Common Questions of Law and Fact

The legal standard to be applied by the Court in considering Rule 23(a) commonality is

articulated above at Section III(A)(1)(b).  In addition, as relevant here, "[w]hat matters to class

certification . . . is . . . the capacity of a classwide proceeding to generate common answers apt to

drive the resolution of the litigation."  *See Wal-Mart Stores*, 131 S. Ct. at 2551 (citation omitted).

As to questions of fact, there is little doubt, from the evidence adduced to date, that Chase

pursued an overarching common course of unfair and deceptive conduct involving multiple

common factual questions impacting each member of the Group 2 class as Chase administered

its mortgage modification program, such as:

---

[36] Chase's expert, Professor Riddiough, puts the number at 192 with slightly different
methodologies.  Ex. 22 at ¶ 21.

(a) Providing Group 2 class members with form agreements requiring a predetermined number of payments, with the accompanying promise that, upon receipt of final payment, Chase would offer them permanent modifications;

(b) Accepting timely payments from Group 2 class members as required by Chase's form agreements;

(c) Requiring Group 2 class members to submit a uniform set of personal financial materials in support of the form agreements; and

(d) Failing to grant Group 2 class members a permanent modification after submission of timely payments and all required personal financial materials.[37]

Similarly, there is an overriding common legal issue affecting the Group 2 class, namely, whether Chase's unfair and deceptive conduct violated the consumer protection and/or unfair and deceptive acts and practices laws of California, Washington and New Jersey. Given the common factual and legal questions raised by Chase's unfair and deceptive conduct, the commonality prong is easily satisfied.

In addition, the Rosenthal Act protects Group 2 Plaintiffs in California, who made payments based on Chase's assurances that the form agreements would lead to a permanent modification—or a timely decision. Thus, their claims will be resolved by this issue: whether,

---

[37] The facts developed in discovery to date support the conclusion that commonality has been satisfied, *see supra* at 6-10, and as further detailed in the appendix Plaintiffs have attached. *See* Ex. 2.

Chase's common and uniform course of unfair and deceptive conduct gives rise to, *inter alia*, the following common factual questions:

(a) Whether Chase instructed mortgagors to stop making mortgage payments with the false assurance that doing so would not hurt their credit scores and was a necessary step in obtaining a loan modification;

(b) Whether Chase misrepresented the status of class members' loan modification applications;

(c) Whether Chase misrepresented the status of class members' accounts;

(d) Whether Chase concealed or failed to disclose fees or charges assessed to class members' accounts, and whether Chase failed or refused to explain these same fees or charges;

(e) Whether Chase arbitrarily increased class members' debt;

(f) Whether Chase rejected, refused or returned class members' payments;

(g) Whether Chase misrepresented its credit reporting policies during the loan modification process; and

(h) Whether and when Chase knew or should have known that class members would be damaged and/or Chase would be enriched by its improper loan modification practices.

under an objective standard, the "least sophisticated debtor" would have been deceived by

Chase's unfair and deceptive conduct and communications.  *See Gonzales v. Arrow Fin. Servs.*

*LLC*, 449 F. Supp. 2d 1140, 1146-47 (S.D. Cal. 2007), *aff'd*, 660 F.3d 1055 (9th Cir. 2011).

### c.   The Group 2 Plaintiffs are Typical and Adequate

The legal standards to be applied by the Court in considering Rule 23(a) typicality and

adequacy are articulated above at Section III(A)(1)(c) and (d), respectively.  Here, Group 2

Plaintiffs' claims arise from the same course of conduct as the Group 2 class members' claims.

As the Plaintiffs' Group 2 Typicality Appendix illustrates, Chase engaged in similar unfair and

deceptive conduct towards the Group 2 Plaintiffs and the Group 2 class members.  *See* Ex. 2.

Chase sent Group 2 Plaintiffs, like all Group 2 class members, form agreements.  *See* Ex. 2 at

Row 1.  Like all Group 2 class members, Chase represented to Group 2 Plaintiffs that the form

agreements would lead to permanent modifications—or at least a timely decision.  *Id.* at Row 5.

Group 2 Plaintiffs, like all Group 2 class members, followed Chase's instructions and fulfilled

the terms of their form agreements.  *Id.* at Row 4, 5.  However, Chase failed to provide Group 2

Plaintiffs, like all Group 2 class members, timely permanent modifications, and/or foreclosed on

them before making a decision on their modification applications.  *Id.* at Row 5, 7.

Additionally, as described in the Complaint, the legal theories on which Group 2

Plaintiffs base their claims are identical to the Group 2 class members' claims. Because Group 2

Plaintiffs' claims are identical to the claims of the Group 2 class members, the interest of the

class members will be protected.  *See George*, 206 F.R.D. at 176 (holding that plaintiffs satisfied

Rule 23(a)(3) because plaintiffs' claims were so "interrelated" with the class's claims that "the

interests of the class member[s] [would] be protected").  *See In re Lupron Mkt. Practices Litig.*,

228 F.R.D. 75, 89-90 (D. Mass. 2005) (holding that plaintiffs met Rule 23(a)(3) where they

alleged harm by defendants' fraudulent scheme and brought claims under state consumer

protection laws).  Finally, for the same reasons stated above in connection with Group 1, the

Group 2 Plaintiffs are adequate to represent the Classes they propose, as illustrated in the

Adequacy Appendix. *See supra* at 18-19; Ex. 4 (Adequacy Appendix).

### 2.   The Group 2 Plaintiffs Satisfy the Standards of Rule 23(b)

### a.   The Group 2 Plaintiffs Have Satisfied the Standards of Rule 23(b)(3)

The legal standards to be applied by the Court in considering Rule 23(b)(3) is articulated

above at Section III(B)(1).

### i.   Common Questions of Law or Fact Predominate for Group 2

Plaintiffs have adduced ample evidence demonstrating that Chase engaged in a common

course of conduct to unfairly and deceptively injure Plaintiffs and the members of the class in

their attempts to obtain loan modifications.  In particular, with respect to the categories of

conduct that the Court identified in upholding the Consolidated Amended Complaint, *see* Docket

No. 97, discovery to date has shown that Chase routinely and uniformly engaged in misconduct

that denied Plaintiffs mortgage modifications and simultaneously caused them consequential

financial injuries.  As discussed above, in the context of commonality, this evidence is clear,

substantial and wide-spread.  *See supra* at 6-10 (detailing the extensive evidence of Chase's

uniform course of conduct affecting all members of the class).  Taken together, predominance is

met as to the Group 2 CPA claims.

The focus of the predominance inquiry is on whether "questions of law or fact common

to class members predominate over any questions affecting only individual members."  Fed. R.

Civ. P. 23(b)(3).  Further, "when adjudication of questions of liability common to the class will

achieve economies of time and expense, the predominance standard is generally satisfied even if

damages are not provable in the aggregate." *Behrend*, 2013 WL 1222646 at *9 (Ginsberg, J. &
Breyer, J., dissenting) (citing Advisory Committee's 1966 Notes on Fed. R. Civ. P. 23, 28 U.S.C.
App., at 141).  That focal test is unquestionably satisfied for the Group 2 class.  Chase's unfair
and deceptive conduct, *i.e.*, the application of its policy of denying and delaying borrowers'
modifications, while accepting their payments, is common classwide.

There can be little doubt that the predominance prong is met, when one focuses on the
elements of the underlying claims at issue.  Group 2 Plaintiffs seek to certify classes under three
states' laws, as opposed to any nationwide relief, putting the focus on whether common issues
predominate within each state.  In particular, as each statute focuses squarely on the unfair and
deceptive conduct of the defendant, the common issue of whether Chase's unfair and deceptive
conduct violated each statute is an overwhelming common issue.  *See* California Unfair
Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* (critical inquiry, for purposes of the
statute, is whether defendant's conduct constituted an unlawful, unfair or fraudulent business act
or practice); New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56.8-1, *et seq.* (Act declares two
general categories of conduct as unlawful, specifically "any unconscionable commercial practice,
deception, fraud, false pretense, false promise or misrepresentation" or any "knowing
concealment, suppression or omission of any material fact"); Washington Consumer Protection
Act, Wash. Rev. Code § 19.86, *et seq.* (consumer must show an unfair or deceptive act or
practice, occurring in the course of trade or commerce that affects the public interest and causes
harm to the consumers' business or property).

Damages are capable of measurement on a classwide basis through a common
methodology using Chase's own account records, including those relating to the original loan
terms, projections of modified loan terms, and the associated default fees and cost data.  Ex. 33

at ¶¶ 45, 52; Ex. 50 at 68-70.  As discussed above, these records could be used on the merits to fashion appropriate damage models based on algorithms rather than individual file review once the Court decides common legal questions that go to the appropriate measure of damages. Ex. 33 at ¶¶ 45, 52; *see supra* at 22.

### ii.  Group 2 Satisfies the Superiority and Manageability Prongs

After consideration of the factors and the alternatives to a class action for the Group 2 Plaintiffs, this Court should conclude that superiority and manageability requirements are met and certify the proposed Group 2, 23(b)(3) class.  When there is little advantage to individual prosecution, a class action is superior. This factor weighs in favor of the proposed class because the size of each class member's loss is relatively modest, while individually prosecuting their actions would be cost-prohibitive.  Ex. 117 at 2 (estimating plaintiffs' median litigation cost at $15,000).  Without a class, litigating the actions would not be economically feasible, realistic, or an efficient or effective use of judicial resources.  Plaintiffs with high damage cases might prefer individual control, but plaintiffs in low damage claims generally will have little incentive to bring separate actions or to seek individual control.  *Amchem*, 521 U.S. at 616-617.  In this case, although there were many actions filed against Chase, these cases were consolidated and transferred by the JPML to this Court.  Thus, the existence of other litigation should not prevent this Court from certifying this case as a class action.  Furthermore, because the Group 2 class members cannot effectively pursue separate litigation, the claims are similar, and it would be most efficient to litigate them together, a class action is superior.

Manageability of Group 2 claims for a class raises few concerns, particularly when compared to other options for resolving the issues present here. Courts favor class certification when "there is no alternative method of adjudication that would be fair and efficient." *Stephenson v. Bell Atl. Corp.*, 177 F.R.D. 279, 289 (D.N.J. 1997); *see also Danvers Motor Co. v.*

*Ford Motor Co.*, 543 F.3d 141, 149 (3d Cir. 2008).  The proposed 23(b)(3) class is therefore both

superior and manageable because common allegations, common legal matters, and common facts

are at the center of the Group 2 Plaintiffs' claims.  Through the class action mechanism courts

avoid the pursuit of "a series of state court actions by a large number of scattered plaintiffs, an

inefficient allocation of judicial and public resources."  *Green v. Wolf Corp.*, 406 F.2d 291, 296

(2d Cir. 1968).  Similar efficiencies arise when many state law claims are removed to federal

court.  A class should therefore be the superior alternative to both overwhelming amounts of

litigation and no litigation at all, particularly where the conduct being challenged is massive and

other wrongdoing will go unpunished if class treatment is denied.  *Carnegie v. Household Int'l,*

*Inc.*, 376 F.3d 656, 661 (7th Cir. 2004).  Without class resolution, the Group 2 Plaintiffs could

not hope to prosecute their rights meaningfully against Chase.

### a)  Violations of the Rosenthal Act Merit a Group 2 California Sub-Class

A Sub-Class of Group 2 Members from California ("California Sub-Class") is

appropriate.  The objective standard under the Rosenthal Act is whether the "least sophisticated

debtor" would have been deceived by Chase's unfair and deceptive conduct and

communications.  *Gonzales*, 449 F. Supp. 2d at 1146-47.  The California Sub-Class does not

require any proof of individualized issues, *i.e.*, they need not prove that they actually relied on

Chase's unfair and deceptive conduct, or that they were even deceived by it.  *Id.* at 1149.  Rather,

the focus of their claims will be on the unfair and deceptive conduct and communications Chase

used to obtain additional payments.  Therefore, common questions of law and fact predominate,

and certification of the California Sub-Class under Rule 23(b)(3) is appropriate.

### b)  Certification of a Rule 23(b)(2) Group 2 Class is Appropriate

The legal standard to be applied by the Court in considering Rule 23(b)(2) is articulated

above at Section III(A)(2)(a).  Group 2 Plaintiffs have alleged that Chase engaged in unfair and

deceptive conduct that affected all similarly situated Group 2 Plaintiffs and the Group 2 class

members in a similar manner.  *See* Docket No. 28 at ¶¶ 302-10.  Group 2 Plaintiffs seek an

injunction requiring Chase to: (1) reform their accounts to eliminate fees and interest improperly

accrued as a result of the modification process; (2) correct all improper negative credit reporting

and inform credit bureaus that their loans are current; and (3) revise the terms of their Loan

Modification Agreements and accounts, as well as those of Group 2 class members, consistent

with the terms that would have been in the Loan Modification Agreements had they been timely

provided, without the increased debt caused by Chase's unfair and deceptive conduct.  *Id.* at ¶¶

364-65.

The first requirement of Rule 23(b)(2) is that the defendant act or refuse to act on grounds

generally applicable to the class.  Here, Chase's unfair and deceptive conduct affected all Group

2 class members similarly situated.  All Group 2 class members entered into form written

temporary payment, forbearance and/or repayment plans because Chase represented to them that

the form agreements would lead to permanent modifications or a timely decision.  *See* Ex. 2 ,

Row 8.  All Group 2 class members followed Chase's instructions and completed the terms of

their form agreements.  *See* Ex. 2, Row 5, 6.  However, instead of receiving timely permanent

modifications, all Group 2 class members were charged improper fees and interest, incurred

increased debts and damaged credit, and/or were foreclosed on prior to a decision. *See* Ex. 2,

Row 6, 10, 11, 12, 14.  Therefore, Chase's unfair and deceptive conduct was generally applicable

to the Group 2 class as a whole.

The second requirement of Rule 23(b)(2) is that the injunctive relief requested be

appropriate for the class as a whole. This requirement is met if the class members' injuries are

sufficiently similar so that they can be addressed in a single injunction without the need to differentiate between the class members. *In re Motor Fuel Temperature Sales Practices Litig.*, 271 F.R.D. 221, 225 (D. Kan. 2010).

Here, as described above, Chase's unfair and deceptive conduct resulted in class wide injuries. *See supra* at 6-10. The requested injunction would provide the appropriate classwide relief by benefitting all Group 2 class members at once.  First, it would prohibit Chase from continuing to engage in unfair and deceptive conduct.  Second, it would prevent Chase from collecting the improper fees and interest, and damaging the Group 2 class members' credit. Further, when, as is the case here, a single injunction would provide relief to each member of the Group 2 class, the requested injunctive relief is appropriate for the Group 2 class as a whole.

### c) The Group 2 California Sub-Class May Also Be Certified Under Rule 23(b)(2)

The Court may also certify the California Sub-Class for violations of the Rosenthal Act. Chase's actions were generally applicable to the Group 2 class in California as a whole because Chase used the same unfair and deceptive conduct and communications to entice the class members to make additional payments.  As a result, an injunction prohibiting Chase from continuing to utilize unfair and deceptive conduct and communications will provide relief to the class as a whole because it would determine the propriety of Chase's unfair and deceptive conduct and communications.  *See Fuller*, 168 F.R.D. at 602 (stating that class action treatment under Rule 23(b)(2) is particularly useful when "it will determine the propriety of the behavior of the party opposing the class in a single action").  Further, an injunction results in aggregate statutory damages to the class as a whole, *see* Cal. Civ. Code § 1788.17, incorporating 15 U.S.C. § 1692(k), because the Rosenthal Act provides a single remedy to a class: "such amount as the court may allow for all other class members, without regard to a minimum individual recovery,

not to exceed the lesser of $500,000 or 1 per centum of the net worth of the debt collector." 15

U.S.C. § 1692(k)(a)(2)(B).

### 3.   The Group 2 Class is Ascertainable

The legal standard to be applied by the Court in considering ascertainability is articulated

above at Section III(A)(3).  Not every class member must be identified, but the class must be

sufficiently ascertainable by objective factors to permit a court to "decide and declare who will

receive notice, who will share in any recovery, and who will be bound by the judgment."  *Kent v.*

*SunAmerica Life Ins. Co.,* 190 F.R.D. 271, 278 (D. Mass. 2000) *Id.*

The Group 2 Class for which Plaintiffs now seek certification satisfies the ascertainability

prerequisite, as demonstrated by the two reports of Plaintiffs' expert, Professor Alan White.  *See*

Ex. 36 & Ex. 37.  As Professor White describes in detail in these reports, "the loan accounts

meeting the class definition in Part 2 of the Complaint can be identified from Defendants'

electronic records."  Ex. 37 at 2.[38]  Chase's internal records and complaint files contain

information sufficient to identify borrowers placed in the form written temporary payment,

forbearance, and/or repayment plans.  Ex. 37 at 1-2; Ex. 36 at 1-2; Ex. 113.  Further, Chase can

readily identify borrowers who made timely payments pursuant to the terms of their form

---

[38] Professor White's reports analyzed Chase's internal records for a slightly different class
definition, as originally asserted in the Consolidated Complaint.  However, the same internal
records and data fields identified by Professor White can be used to identify class members
under the revised, narrower class definition.  Group 2 borrowers fall into one of the following
three ascertainable categories:
   1.  Chase's policy during March 2009-April 2010 was to ████████████████████████████
████  During that time period, borrowers who had a forbearance should be presumed to have
received it for purposes of getting a mod.  *See* Ex. 56.  Further, because Chase ████████████
████████████████████████████████████████████████████ a similar presumption
should apply to borrowers with a repayment plan.  *See supra* at n.10;
   2.  If borrower's ████████████████████████████████████████████ they would also be
included.  *See* Ex. 57 at CHASE_MDL_LIT 00026817; or
   3.  Borrowers who made modified payments beyond the term of their forbearance or
repayment plan.

agreements.  Ex. 37 at 2; Ex. 36 at 3-4.  Chase's internal records can also be used to identify

borrowers who, despite their payments, have not received a permanent modification, and/or

borrowers who were foreclosed on prior to receiving a decision.  Ex. 37 at 2; Ex. 36 at 3, 5.

Therefore, Discovery to date, as described and detailed in Professor White's reports, more than

adequately demonstrates that Chase's own electronic records are sufficient to ascertain the

identity of the members of the Group 2 class.

### C.  The Group 3 Classes Should be Certified

#### 1.  Numerosity is Satisfied as to Group 3

The Group 3 Classes satisfy the numerosity requirement.  In discovery, Chase produced a

random sample of 100 loan account records of borrowers who applied for a modification and

received a permanent loan modification agreement from Chase.  Ex. 34 at 13.  The production

includes 50 loan accounts from borrowers whose properties are located in New York. *Id*. Dr.

Ayres' analysis of these data shows that at least 9% of the loan accounts meet the Group 3 class

definition criteria, namely, that the borrowers accepted the modification by returning a signed

final agreement, but subsequently received payment demands that were inconsistent with the

agreement. *Id.* at 13-14.  As Dr. Ayres explains, "[b]ased on the fact that at least nine loans (9%

of the 100 loans produced) meet the criteria establishing the Group 3 class, one could extrapolate

based on publicly available data or Chase's internal modification reporting to obtain a reasonable

estimate of the likely number of individuals who executed permanent loan modification

agreements that were not properly implemented." *Id.* at 14.[39]

---

[39] Chase's expert, Professor Riddiough, argues that one of these class members was misidentified
because Dr. Ayres failed to recognize that one piece of data was later "updated" based on a
different modification process. Ex. 22 at ¶ 21.  He acknowledged at deposition, however, that the
necessary data exists and that Dr. Ayres could correct his methodology to use the correct data
such that the algorithm for identifying class members would be accurate.  Ex. 50 at 218-225.

Since the beginning of 2009, Chase has offered more than 1.2 million permanent loan modifications to borrowers, but has only approved about 461,000 of them. Ex. 49 at 150. Of the 461,000, approximately 452,000 "have achieved permanent modification" as of December 31, 2011. *Id*. Based on these facts, and extrapolating the rate of 9% against the 748,000 permanent loan modifications Chase has offered that have not "achieved permanent modification," (which only represents a portion of the class period from 2009-2011), it is reasonable to presume that there are at least hundreds, if not thousands, members of the Group 3 class, which is sufficient to meet the numerosity requirement. Joinder is impracticable because these borrowers are disbursed throughout the country (proposed nationwide Group 3 class) and/or throughout New York (proposed statewide Group 3 class). *Id*.

## 2.   The Group 3 Class Satisfies the Commonality Requirement

Chase's Loan Modification Agreements under HAMP and CHAMP are nearly identical written form contracts. Ex. 47 (HAMP) & Ex. 48 (CHAMP); Ex. 49 at 150 (noting that Chase's proprietary program, CHAMP, is "largely modeled" after HAMP). Each form specifies both the date on which the modified terms will take effect, (the "Modification Effective Date") and the date on which the first modified monthly payment is due. Ex. 47 at ¶ 3, Ex. 48 at ¶ 2. All of the Loan Modification Agreements provide that Chase will waive any existing default and provide for changes in terms that may include reduction or increase to the principal balance, adjustments to the interest rate and/or changes to the loan duration. Ex. 47 at ¶ 3, Ex. 48 at ¶ 2.  In general, a loan modification will change the monthly payment amount for the loan to make it more

---

Whether the correct basis for extrapolation is ultimately 9% under Dr. Ayres methodologies or 8% under Professor Riddiough's alternate methodologies has no meaningful impact on the necessary analysis for class certification.

affordable.[40] All of the Loan Modification Agreements provide that, once effective, the original promissory note and mortgage or deed of trust is modified. Ex. 47 at ¶ 3, Ex. 48 at ¶ 2.

These form Loan Modification Agreements uniformly provide for conditions precedent, namely, that the underwriting information Chase uses to qualify the borrower for the loan modification continues to be the same *until the Modification Effective Date.* Ex. 47 at ¶ 3, Ex. 48 at 2.  They explicitly provide that the modified terms are automatically effective on the Modification Effective Date. As discussed above the fact that Plaintiffs' and class members' Agreements are standard forms strongly supports a finding of commonality. *See supra* at 13-14 (discussing the amenability of form contracts to class certification.).

Commonality is satisfied because in this case, there is an overarching common question of law – whether Chase breaches agreements by failing to perform its obligations in a timely way. This is a question that can be answered as a matter of law. Moreover, Plaintiffs and the Group 3 class members have all been subject to Chase's uniform practices that are the basis of their claims: After their Loan Modification Agreements became effective, Chase sent them written demands for payment amounts in excess of what was contractually due. Ex. 107 at 133:3-15, 135:2-6, 104:25 – 105:17; Ex. 106 at 161:19-166:25.

For Group 3 Plaintiffs' consumer protection statutory claim, the common questions are whether Chase's conduct was deceptive and whether Chase's conduct caused Plaintiffs and the class injury. *Stutman v. Chem. Bank,* 95 N.Y.2d 24, 29 (2000).  The injury does not have to be pecuniary. *Small v. Lorillard Tobacco Co.*, 94 N.Y. 2d 43, 55-56 (N.Y. 1999). Chase's uniform and systemic conduct is deceptive and violates N.Y. Gen. Bus. Law. §349, *et seq*. Chase's written communications with Plaintiffs and New York borrowers were materially misleading as

---

[40] When monthly payments are higher, the borrower's benefit is that the modification resolves a prior default by capitalizing the amount in arrears.

they misrepresented the amounts due and owing under Loan Modification Agreements.[41] These written communications are routine periodic form letters Chase sends to borrowers regarding the amount due on their accounts. Plaintiffs and the New York CPA class they seek to represent therefore received these misleading communications based on Chase's uniform loan servicing procedures.

Plaintiffs' economic loss is common and ascertainable using Chase's data and a straightforward methodology to determine the amount of improper fees assessed to the balance of their loans. As Dr. Ayres explains:

> Chase's records contain information on each putative Class member's current payment terms, including unpaid principal balance, monthly payment amount, interest rate, remaining term of the loan, charges placed on the account, and other elements of arrears, that would be sufficient to allow a computation of compensatory damages to the Group 3 Class. For example, monetary relief to the Group 3 Class members may ultimately be measured as the difference between what Chase now claims is due under the loan terms and what would have been due if the contractually mandated permanent modification had been honored by Chase. Another possible measure is fees and charges that were placed on the account that would not have been incurred if the modification had been honored.

Ex. 33 at 23.

Plaintiffs have also suffered non-monetary damages in the form of Chase's negative credit reporting of their loan accounts when it improperly treated them as in default when they were making payments under Loan Modification Agreements. Ex. 107 at 141:13-25, 145:12-18; Ex. 106 at 178:3-22.

### 3.  Group 3 Typicality and Adequacy

Named Plaintiffs Kathy Kurtzner's and Thomas and Felicia Minerva's claims are typical

---

[41] N.Y. Gen. Bus. Law. § 349 does not require the plaintiff to show that he relied on the misrepresentation. *Stutman v. Chem. Bank,* 95 N.Y.2d 24, 30 (2000).

of the Group 3 nationwide breach of contract class and the New York CPA class.[42] As explained by Dr. Ayres using Chase's data, Chase received Ms. Kurtzner's signed final Loan Modification Agreement on March 31, 2010 but did not properly implement it.  *See* Ex. 3.[43]  Instead, Chase sent Ms. Kurtzner a hard denial letter on October 5, 2010.  *Id.*  During this time, Ms. Kurtzner made her modified monthly payments under the agreement.  *Id.*  Chase sent demands for payment that were inconsistent with the agreement and threatened foreclosure.  *Id*

Likewise, the data for the Minervas shows that Chase received their signed final Loan Modification Agreement on June 8, 2010. *Id*. Nevertheless, Chase sent the Minervas a hard denial letter on July 8, 2010. *Id.*  The Minervas have abided by all of the agreement's terms and conditions and have made the required monthly payments to Chase. *Id* .  However, Chase sent demands for payment inconsistent with the agreement. *Id.*  Based on Chase's course of conduct in failing to timely implement agreements, Ms. Kurtzner and the Minervas have suffered similar injuries as the borrowers they seek to represent. *See supra* at 17-18 (setting forth standards for determining typicality).  Ms. Kurtzner and the Minervas are typical of the New York CPA class they seek to represent because they both received materially misleading communications from Chase about the amounts owed under their Loan Modification Agreements and were damaged by Chase's conduct.

Ms. Kurtzner and the Minervas are adequate representatives for the Group 3 breach of contract class and their respective state CPA statute classes for the same reasons described above to establish Group 1 adequacy. *See supra* at 18-19 (setting forth standards for determining adequacy). As illustrated in the Adequacy Appendix, Ms. Kurtzner and the Minervas have

---

[42] Plaintiffs have not put Donna Follmer forward as a Group 3 class representative, because Chase data is inconclusive concerning her claims.

[43] For the convenience of the Court, Plaintiffs use an appendix to summarize the grounds on which the proposed Group 3 Plaintiffs satisfy Rule 23's typicality requirement.  *See* Ex. 3.

actively participated in the litigation and are well suited and committed to representing the class. *See* Ex. 4 (Adequacy Appendix).

### 4.   The Group 3 Classes Meet the Requirements of Rule 23(b)

The Group 3 Claims are based on breach of standard form contracts.  Chase did not implement the contracts at issue according to their plain terms, thereby depriving Group 3 Plaintiffs and the Group 3 putative class of the benefit of their bargain.  The Group 3 plaintiffs therefore adopt and incorporate the discussion of Rule 23(b) factors enumerated above for Group 1, as these factors apply equally to the Group 3 classes.  *See supra* at 20-27.

### 5.   The Group 3 Class is Ascertainable

As discussed throughout this brief, Chase also maintains data sufficient to meet class certification requirements with respect to the Group 3 class definitions.  Chase's internal records contain information on whether a permanent modification was offered to and accepted by the borrower.  Ex. 33 at 21-22; Ex. 34 at 13-14.  Payment records show whether payments in the modified amounts were made and when they were made.  Ex. 33 at 21-22.  Chase has data about whether, following acceptance, it informed the borrower that it would not honor the modification.  When that occurs after the borrower accepted the modification and commenced required payments, the borrower presumptively meets the class definition.  Ex. 34 at 14.

Dr. Ayres then applies his methods to the Group 3 data sample of 100 randomly selected records.  *Id.*  He concludes that 9 of the 100 records produced can be identified as class members and that one could properly extrapolate these numbers based on Chase's records for all loan modifications accepted by borrowers.  *Id.*[44]

---

[44] *See supra* at 25.

### D.  The Group 4 Class Should Be Certified

#### 1.  The Group 4 Plaintiff Has Satisfied the Requirements of Rule 23(a)

##### a.    The Group 4 Class is Sufficiently Numerous

The legal standard to be applied by the Court in considering Rule 23(a) numerosity is articulated above in connection with Group 1.  The Group 4 Plaintiff incorporates by reference the numerosity discussion of the Group 1, 2 and 3 plaintiffs, *supra*. In addition, Chase's own documents reflect that Chase had delivered 332,000 solicitations for financial information, sent 164,000 Trial Plan Offers, and entered into 127,000 trials by September 2009 alone.  *See* Ex. 24 at 33-41; Ex. 55 at 6.  Moreover, those same documents reflect that as of September 9, 2009, "approximately 25%" of delinquencies were on "active trials" and 25% of "all trial plans result in offers." Ex. 55 at 6.  "Precise enumeration of the members of the class is not necessary" to certify a class, and the Court may "use common sense assumptions to determine the validity of [Plaintiffs'] estimates." *Gordon v. Corporate Receivables, Inc*., No. 09-230S, 2010 U.S. Dist. LEXIS 6671, at *3-4 (D.R.I. Jan. 27, 2010).

##### b.  The Group 4 Claims Present Common Questions of Law and Fact

The legal standard to be applied by the Court in considering Rule 23(a) commonality is articulated above in connection with Groups 1 and 2. The Group 4 FDCPA claims are in substance based on the same systematic treatment, standardized solicitations, trial documents, loan modification processing requirements, and loan modification policies and procedures as the Rosenthal Act claims discussed in the Group 2 section on Rule 23(b) above.  The common question at issue is whether Chase "attempted to collect an amount, from each Group 4 class member in excess of that agreed …" under a loan modification agreement. *See* Docket No. 97 at 42. The common facts that would resolve this question are the same as those required to resolve the legal claims of the Group 1, 2 and/or 3 Plaintiffs.  The common legal question is whether

communications demanding amounts due that were precluded by loan modification agreements,

violates the FDCPA's prohibition on the "false representation of … the amount of any debt." 15

U.S.C. § 1692(e)(2).

Courts recognize that commonality is rarely an obstacle to certification in FDCPA cases,

which almost without exception turn on the legality of standardized form communications with

debtors. *See, e.g.*, *Gordon*, 2010 U.S. Dist. LEXIS 6671, at *5 (commonality satisfied because

"the factual and legal issues [underlying Plaintiff's FDCPA claim] are the same for each

potential class member – did they receive the form debt letter …? And, does such letter on its

face violate the FDCPA?"); *Linsley v. FMS Inv. Corp.*, No. 3:11cv961, 2013 U.S. Dist. LEXIS

3908, at *11 (D. Conn. Jan. 10, 2013).

### c.   The Group 4 Plaintiff Meets Typicality and Adequacy Requirements

The legal standard to be applied by the Court in considering Rule 23(a) typicality is

articulated above in connection with Groups 1 and 2.  Ms. Follmer was subject to the same

systematic treatment, including written demands for payment inconsistent with her loan

modification document, as the members of the class she seeks to represent.  She had a TPP

Agreement, met its requirements, was encouraged to make additional payments in the trial

amount without being informed that such payments would not satisfy her monthly obligation for

the month in which the payment was made and was later billed for amounts not contractually

due. Ex. 108 at 172-73.

Ms. Follmer is an adequate representative for the Group 4 FDCPA class for the same

reasons described above to establish Group 1 adequacy.  As illustrated in the Adequacy

Appendix, Ms. Follmer has actively participated in the litigation and is well suited and

committed to representing the class. *See* Ex. 4 (Adequacy Appendix).

### 2.   The Group 4 Plaintiff Has Satisfied the Standards of Rule 23(b)(3)

The legal standard to be applied by the Court in considering Rule 23(b)(3) is articulated

above in connection with Groups 1 and 2.

### a.   Group 4 Predominance

The liability issues on the Group 4 claim center on Defendants' standard business

practices and its dunning procedures for delinquent accounts, not the individual circumstances of

each debtor.  Accordingly, these issues are subject to generalized proof, and thus applicable to

the class as a whole.[45]

The test for materiality under the FDCPA is an objective inquiry into 'whether the debt

collector's communication would deceive or mislead an unsophisticated, but reasonable,

consumer. *Midland Funding, LLC v. Brent*, No. 3:08 CV 1434, 2010 U.S. Dist. LEXIS 117501,

at *11 (N.D. Ohio Nov. 4, 2010).  In other words, the FDCPA "creates a strict-liability rule."

*Randolph v. IMBS, Inc*., 368 F.3d 726, 730 (7th Cir. 2004).  Because FDCPA claims are

governed by the objective "unsophisticated debtor" standard, they are particularly suitable for

class adjudication.  *See Ellis v. Gen. Revenue Corp*., 274 F.R.D. 53, 61 (D. Conn. 2011)

(collecting cases); *Manno v. Healthcare Revenue Recovery Group, LLC.*, No. 11-61357, 2013

WL 1283881 at *12 (S.D. Fla. March 26, 2013).

### b.   Group 4 Superiority

With regard to the first consideration, individual damages under the FDCPA are capped

at $1,000. 15 U.S.C. § 1692k(a)(2)(A).  Therefore, "the interest of members of the class in

individually controlling the prosecution … of separate [FDCPA] actions' is low." *Lewis v. LVNV*

*Funding, LLC*, No. 2:09-cv-1041, 2011 U.S. Dist. LEXIS 100139, *15 (M.D. Ala. Sept. 6,

---

[45] *In re Visa Check/MasterMoney Antitrust Litig*., 280 F.3d 124, 136 (2d Cir. 2001). *See also Young v. County of Cook,* No. 06-522, 2007 U.S. Dist. LEXIS 31086, at *20 (N.D. Ill. Apr. 25, 2007) ("When a class challenges a uniform policy or practice, the validity of that policy or practice tends to be the predominant issue in the ensuing litigation.")

2011).[46] *See also Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich*, 271 F.R.D. 572, 576-77

(N.D. Ohio 2010) (class action is superior means to resolve FDCPA claims because "'it is

unlikely that any proposed class member will bring an individual action against defendants for

their alleged violations of the FDCPA.  The *class action form is the only way* to ensure

defendants' compliance with the FDCPA….'") (quoting *Weber v. Goodman*, 9 F. Supp. 2d 163

(E.D.N.Y. 1998) (emphasis added)).

        "Moreover, courts have held that FDCPA class actions are usually superior for reasons of

judicial economy." *Pawelczak v. Fin. Recovery Servs., Inc*., No. 11 C 2214, 2012 U.S. Dist.

LEXIS 153914, at *15 (N.D. Ill. Oct. 26, 2012).[47]  Absent a class action, thousands of putative

class members would have no remedy in light of the relatively slight potential recovery vis-a-vis

the costs of litigation.  Because Group 4 claims are essentially derivative of those subject to

resolution in Group 1, 2 and 3, they do not present additional concerns that affect management of

the case as a class action.

### 3.  The Group 4 Class is Ascertainable

        The legal standard to be applied by the Court in considering Rule 23(a) ascertainability is

articulated above in connection with Groups 1 and 2.  A threshold issue for identifying the Group

4 Class is limiting it to that portion of the classes set forth in Groups 1, 2 and 3 as to whom

Chase is properly considered a "debt collector" within the purview of the FDCPA.  As the Court

---

[46] *See Quiroz v. Revenue Prod. Mgmt., Inc*., 252 F.R.D. 438, 444 (N.D. Ill. 2008) (FDCPA
claims suitable for class treatment because "Defendant engaged in standardized conduct by
sending form letters to many consumers, and each consumer's claim would likely be too small to
vindicate through an individual suit.  Therefore, a class action is the superior method to resolve
these claims."); *Parker v. Risk Mgmt. Alts., Inc*., 206 F.R.D. 211, 213 (N.D. Ill. 2002) (finding
class action a superior method because damages awarded to individual class members may be
too insignificant to provide enough incentive for them to pursue FDCPA claims individually).
[47] *See also Petrolito v. Arrow Fin. Servs., LLC*, 221 F.R.D. 303, 314 (D. Conn. 2004) ("[T]he
prospect of relatively small recovery on individual [FDCPA] adjudications of identical issues
with differing results makes class form superior to individual litigation by class members.").

correctly held in its order on the motion to dismiss, Chase is a debt collector with respect to any loans it acquired outright or for servicing purposes at a time when the loan was in default. Docket No. 97 at 41 (citing *Bridge v. Ocwen Fed. Bank*, 681 F.3d 355, 359 (6th Cir. 2012)). This represents a very large number of loans in this case, which are easily identifiable by Chase. Ms. Follmer's loan was originated by a Washington Mutual subsidiary and acquired by Chase in September 2009 while it was in default.  Docket No. 28 at ¶¶ 46, 795.  Although Chase has resisted Plaintiffs' discovery efforts to specifically identify similarly situated individuals, public reports make it clear that approximately one-third of the $230.7 billion in loans Chase acquired from WaMu were "nonperforming" or in default. *See* Ex. 118 at 1.  Assuming an average loan balance of $250,000 results in an estimated 316,000 loans in default acquired by Chase from the WaMu acquisition alone.

These consumers are easily identifiable by Chase.  Chris Johnson, Vice President for Collections at Chase, testified that



Ex. 24 at 123:6 – 124:3.  Ex. 21 at 207.[48]  In short, identification of Class members      should be a simple and ministerial task. Ex. 24 at 122:24 – 123:10.

## IV.   CONCLUSION

For all of the reasons stated herein, the Court should grant Plaintiffs' motion for class certification and certify the classes set forth in the accompanying motion.

---

[48] *See* Ex. 24 at 61:4 – 62:7.  For instance,                      *Id.* at 191:4 - 191:17

Dated:  April 5, 2013

Respectfully Submitted,

| | |
|---|---|
| */s/ Gary Klein*<br>Gary E. Klein (BBO No. 560769)<br>Kevin Costello (BBO No. 669100)<br>Shennan Kavanagh (BBO No. 655174)<br>**Klein Kavanagh Costello, LLP**<br>85 Merrimac Street<br>Boston, MA 02114<br><br>Phone: (617) 357-5500<br>Fax: (617) 357-5030<br>Email: klein@kkcllp.com<br>Email: costello@ kkcllp.com<br>Email: kavanagh@ kkcllp.com | */s/ Lynn Sarko*<br>Lynn Lincoln Sarko<br>Gretchen Freeman Cappio<br>Gretchen S. Obrist<br>**Keller Rohrback L.L.P.**<br>1201 Third Ave., Ste 3200<br>Seattle, WA 98101<br><br>Phone: (206) 623-1900<br>Fax: (206) 623-3384<br>Email: lsarko@kellerrohback.com<br>Email:<br>gcappio@kellerrohback.com<br>Email: gobrist@kellerrohback.com<br><br>Sharon T. Hritz<br>**Keller Rohrback L.L.P.**<br>1129 State St., Suite 8<br>Santa Barbara, CA 93101<br><br>Phone: (805) 456-1496<br>FAX: (805) 456-1497<br>shritz@kellerrohback.com |
| */s/ Charles Schaffer*<br>Charles E. Schaffer<br>**Levin, Fishbein, Sedran & Berman**<br>510 Walnut Street, Suite 500<br>Philadelphia, PA 19106<br><br>Phone: (215) 592-1500<br>Fax: (215) 592-4663<br>Email: cschaffer@lfsblaw.com | */s/ Jonathan Cuneo*<br>Jonathan W. Cuneo<br>Charles Joseph LaDuca<br>Jennifer E. Kelly<br>Brendan S. Thompson<br>Mark Malone<br>**Cuneo Gilbert & LaDuca, LLP**<br>507 C Street, NE<br>Washington, DC 2002<br><br>Phone: (202) 789-3960<br>Fax: (202) 789-1813<br>Email: jonc@cuneolaw.com<br>Email: charlesl@cuneolaw.com<br>Email: jkelly@cuneolaw.com<br>Email: brendant@cuneolaw.com |

Alexandra C. Warren
**Cuneo Gilbert & LaDuca, LLP**
106-A S. Columbus Street
Alexandria, VA  22314

Phone: (202) 789-3960
Fax: (202) 789-1813
Email: awarren@cuneolaw.com

Michael J. Flannery
**Cuneo Gilbert & LaDuca, LLP**
300 North Tucker Blvd.
Suite 801
St. Louis, MO  63101

Phone: (314) 226-1015
Fax: (202) 789-1813
Email: mflannery@cuneolaw.com

*Interim Co-Lead Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Gary Klein, hereby certify that on this 5th day of April 2013, I filed the foregoing document and any exhibits electronically through the Court's ECF system. Notice of this filing will be sent to all registered users through the ECF system.

/s/ Gary Klein
Gary Klein