**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| IN RE JPMORGAN CHASE MORTGAGE | ) | No. 1:11-cv-02290-RGS |
| MODIFICATION LITIGATION | ) | |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| All Actions | ) | |
| | ) | |

## REDACTED – PUBLIC VERSION

**PLAINTIFFS' REPLY MEMORANDUM OF LAW**
**IN SUPPORT OF CLASS CERTIFICATION**

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

*(Leave to File Granted May 24, 2013)*

# TABLE OF CONTENTS

Table of Authorities ...................................................................................................................... ii

INTRODUCTION ........................................................................................................................ 1

I.   Group 1 .................................................................................................................................... 2
   A. Commonality is Founded in the Promises Chase Made to Class Members in a Form
      Contract ............................................................................................................................ 2
   B. Chase is Wrong – Adjudication of Class Members' Rights Under the TPP Agreement Does
      not Require Individualized Review .................................................................................... 3
   C. Group 1 Class Members Suffered a Common Injury ........................................................ 6
   D. Chase's Opposition Inappropriately Suggests that Commonality Requires a Complete
      Uniformity of Issues ......................................................................................................... 7
   E. The Group 1 Plaintiffs Satisfy the Requirements for Certification under
      Fed. R. Civ. P. 23(b)(3) ................................................................................................... 8
      1.   Predominance Concerns about Group 1 Claims vanish when considered in light of
           Plaintiffs' true legal claim rather than Chase's straw theories. ................................ 9
      2.   Data exists to Measure Group 1 damages on a common basis. ............................... 10
      3.   Chase's asserted defenses do not defeat certification. ........................................... 11
      4.   Superiority strongly militates in favor of certification here. .................................. 13
      5.   Following certification, the Group 1 classes would be manageable. ....................... 13
   F. The Group 1 Plaintiffs Satisfy the Requirements for Certification under Fed. R. Civ. P.
      23(b)(2) ........................................................................................................................... 14

II.   Group 2 ................................................................................................................................. 15
   A. Group 2 Plaintiffs have established commonality ......................................................... 15
   B. Issues common to the Group 2 Class predominate ........................................................ 18
   C. Indvidualized Issues with Respect to Group 2 Class Do Not Preclude Certification ......... 19
   D. Reliance is not an element of Group 2 Plaintiffs' Claims .............................................. 20
   E. The Group 2 Plaintiffs Satisfy *Comcast* and *Amgen* .................................................... 21

III.   Group 3 ............................................................................................................................... 22
   A. Plaintiffs' Group 3 Claims Are Common And Do Not Require Individualized Inquiries To
      Resolve ............................................................................................................................ 22
   B. Plaintiffs And The Group 3 Class Were Commonly Injured By Chase's Assessment Of
      Improper Fees On Their Loan Accounts, Which Damages Are Calculable Using A
      Common Methodology ..................................................................................................... 23
   C. Plaintiffs' Group 3 Class Is Ascertainable ..................................................................... 24

IV.   Group 4 ............................................................................................................................... 24
   A. The Court Should Certify the Group 4 Class .................................................................. 24

V.   CONCLUSION ..................................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*American Lease Ins. Agency Corp. v. Balboa Capital Corp.*, 579 F.3d 34 (1st Cir. 2009) ............ 4

*Amgen Inc. v. Connecticut Ret. Plans and Trust Funds*, 133 S. Ct. 1184 (2013) .................... 3, 21

*Cave v. Saxon Mortg. Services, Inc.*, No. 12–5366, 2013 WL 1915660
   (E.D. Pa. May 9, 2013) ....................................................................................... 23

*Comcast v. Behrend*, 133 S. Ct. 1426 (2013) ........................................................... 6, 14

*Deleon v. Wells Fargo Bank, N.A.*, No. 10-CV-01390-LHK, 2011
   U.S. Dist. LEXIS 8296 (N.D. Cal. Jan. 28, 2011) .............................................. 21

*Dixon v. Wells Fargo Bank, N.A.,* 798 F. Supp. 2d 336 (D. Mass. 2011). .................................. 13

*Duhaime v. John Hancock Mut. Life Ins. Co.*, 177 F.R.D. 54 (D. Mass. 1997) .......................... 18

*Dupler v. Costco Wholesale Corp.,* 248 F.R.D. 29 (E.D.N.Y. 2008) ........................................... 4

*George v. Nat'l Water Main Cleaning Co.,* 286 F.R.D. 168 (D. Mass. 2012). ................. 7, 18, 20

*Gooch v. Life Investors Insurance Company of America*, 672 F. 3d 402 (6th Cir. 2012) ............. 14

*Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992) ................................................... 11

*Herrera v. LCS Fin. Servs. Corp.*, 274 F.R.D. 666 (N.D. Cal. 2011) ......................................... 25

*Hirschbach v. NVE Bank*, 496 F. Supp. 2d 451 (D.N.J. 2007) .................................................. 18

*In re Am. Cont'l Corp./Lincoln Sav. And Loan Sec. Litig.*, 140 F.R.D. 425 (D. Ariz. 1992) ....... 19

*In re Checking Account Overdraft Litig.*, 281 F.R.D. 667 (S.D. Fla. 2012) ............................... 18

*In re Citimortgage, Inc. Home Affordable Modification Program (HAMP) Litigation*, No. ML
   11-02274 DSF (PLA), 2012 WL 1931030 (C.D. Cal. Apr. 17, 2012) .................................... 13

*In re Damages Foods, Inc.*, *Secs. Litig.*, No. C 11-05386 WHA, 2013 WL 1891382 (N.D. Cal.
   May 6, 2013) ..................................................................................................................... 6

*In re Mercedes-Benz Tele Aid Contract Litig.*, 267 F.R.D. 113 (D.N.J. 2010) ........................... 21

*In re Motor Fuel Temperature Sales Practices Litig.*, MDL No. 1840, 2013 WL 1397125 (D.
   Kan. Apr. 5, 2013) ............................................................................................................ 6

*In re Neurontin Mktg. and Sales Practices Litig.*, 244 F.R.D. 89 (D. Mass. 2007) ............... 18, 19

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450 (D.N.J. 1997) ........... 18

*In re Tobacco II Cases*, 207 P.3d 20 (Cal. 2009) ................................................................... 18

*In re Warfarin Sodium Antitrust Litigation*, 391 F.3d 516 (3rd Cir. 2004). ............................... 7

*Iorio v. Allianz Life Ins. Co. of North America*, No. 05CV633, 2008 WL 8929013 (S.D. Cal. July
   8, 2008) ........................................................................................................................... 8

*Ji v. Palmer*, 755 A.2d 1221 (N.J. Super. Ct. App. Div. 2000) ................................................ 15

*Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 702 F.3d 364 (7th Cir. 2012) ..................... 21

*Keegan v. Am. Honda Motor Co., Inc.*, 284 F.R.D. 504 (C.D. Cal. 2012) ........................... 20, 21

*Keyes v. Bollinger*, 640 P.2d 1077 (Wash. 1982) .................................................................. 18

*Klem v. Washington Mut. Bank*, 295 P.3d 1179 (Wash. 2013) ................................................ 15

*L.H. Controls, Inc. v. Custom Conveyor, Inc.*, 974 N.E.2d 1031 (Ind. Ct. App. 2012); .............. 5

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998) ............................ 9

*Markarian v. Connecticut Mut. Life Ins. Co.*, 202 F.R.D. 60 (D. Mass. 2001) .......................... 19

*Martins v. 3PD, Inc.*, No. 11-11313-DPW, 2013 WL 1320454 (D. Mass. Mar. 28, 2013) ..... 6, 21

*McLaughlin v. Liberty Mut. Ins. Co.*, 224 F.R.D. 304 (D. Mass. 2004) ...................................... 4

*McReynolds v. Merrill Lynch*, 672 F.3d 482 (7th Cir. 2012) ................................................... 14

*Moore v. PaineWebber, Inc.*, 306 F.3d 1247 (2nd Cir. 2002) ................................................. 19

*NYKCool A.B. v. Pacific Fruit, Inc.*, No. 11–4246–cv, 2013 WL 163621
(2nd Cir. Jan. 16, 2013)..................................................................................... 22
*Otte ex rel. Estate of Reynolds v. Life Ins. Co. of North America*,
275 F.R.D. 50 (D. Mass. 2011)......................................................................... 14
*Owen v. Kessler*, 778 N.E.2d 953 (Mass. App. Ct. 2002) ............................................ 5
*Peterson v. H & R Block Tax Services, Inc.*, 174 F.R.D. 78 (N.D. Ill. 1997)................. 8
*Ramirez v. DeCoster*, 203 F.R.D. 30 (D. Me. 2001) .................................................... 4
*Rothschild v. Tyco Internat. (US), Inc.*, 99 Cal. Rptr. 2d 721 (2000)......................... 15
*Rothwell v. Chubb Life Ins. Co. of Am.*, 191 F.R.D. 25 (D.N.H. 1998)..................... 19
*Schnall v. AT&T Wireless Services, Inc.*, 259 P.3d 129 (Wash. 2011)...................... 20
*Sherman v. Lansford*, 723 P.2d 1176 (Wash. App. 1986). ........................................... 5
*Smilow v. Southwestern Bell Mobile Sys.,* 332 F.3d 32 (1st Cir. 2003).................... 14
*Stinson v. City of New York*, 282 F.R.D. 360 (S.D.N.Y. 2012) .................................. 14
*Valentino v. Carter–Wallace, Inc.,* 97 F.3d 1227 (9th Cir. 1996) .............................. 14
*Waste Management Holdings, Inc. v. Mowbray*, 208 F.3d 288 (1st Cir. 2000). .......... 7
*Young v. Wells Fargo*, No. 12-1405, 2013 WL 2165262 (1st Cir. May 21, 2013) .......... 3, 4, 5, 12

## STATUTES

15 U.S.C. § 1692e...................................................................................................... 25
15 U.S.C. § 1692f...................................................................................................... 25
28 U.S.C. § 1407(a) .................................................................................................... 9

## RULES

Fed R. Civ. P. 21 ........................................................................................................ 9
Fed. R. Civ. P. 42(b) .................................................................................................. 9

## TREATISES

RESTATEMENT (SECOND) OF CONTRACTS (1981) ......................................................... 5
WILLISTON ON CONTRACTS ........................................................................................ 5

Chase's Opposition continues to seek to avoid responsibility for the chaos it created in the lives of its customers. It contradictorily asserts, on one hand, that it did everything required of it in connection with its loan modification promises to homeowners, and, on the other, that the myriad problems it created are too diffuse for class treatment. Fundamentally, Chase's Opposition amounts to a scattershot of piecemeal assertions that Plaintiffs' claims may only be resolved individually. This Reply demonstrates the fallacy of each of Chase's contentions.

Chase's assertion that it did not violate its obligations to process mortgage modifications in a timely manner is demonstrably false. Within the last several days – now more than 15 months after the relevant request for documents[1] -- Chase has produced audit documents revealing that it has known of the problems in the modification process for years, without taking serious steps to resolve it. The newly produced documents show, among other things: 1) ████ ████████████████████████████████████████████████████████████████████████ ████████████████ 2) ████████████████████████████████████████████████ ███████ and 3) ███████████████████████████████████████████████████ ████████████████████████.[2] A separate audit confirms Chase's knowledge that ████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ Moreover, Chase's internal documents establish that it was pervasively callous about the impact of its failures including, for example, by failing to commit funds to hire necessary staff, *e.g.*, Ex. 75 to Docket No. 293, and failing to provide corrected information to customers in order to prevent "customer impact." Exhibit 125 to Docket No. 293.

---

[1] Chase represented to the Court that it would produce relevant audits and reports on a rolling basis on September 19, 2012. Docket No. 137 at 18-20. On October 21, 2012, the Court ordered production of those documents "on a timely basis." Docket No. 149.  Chase flouted that Order by failing to complete production not just until after Plaintiffs' experts reports were due, but until just five days before this brief's deadline.

[2] *See* Exhibit 24 to the Declaration of Gary Klein in Support of Class Certification (hereinafter "Klein Decl.") at 0586114.

[3] *See* Exhibit 25 to Klein Decl. at 4.

Throughout its brief, Chase fails to engage the Plaintiffs' arguments. With respect to Group 1, the Opposition is animated by an assumption that it is complicated to prove that each class member was actually entitled by contract and program guidelines to a permanent modification. That is a straw argument. Group 1 Plaintiffs do not assert that Chase's breach was uniform failure to provide permanent modifications, but rather only that Chase breached its promise to provide timely decisions on modifications. That obligation, which is plainly an element of each agreement it reached with a borrower, was uniformly breached to the detriment of each class member. Even though there may have been different consequences based on whether the borrower was ultimately entitled to a modification or not, payment data, cost assessments and other account information is plainly available to establish one or more formulae necessary to award expectation damages associated with delay on a uniform basis. Likewise, the Opposition ignores the compelling evidence of a common course of unfair conduct put forward by Group 2 Plaintiffs.

Chase's Opposition and Motion to Strike attempts to sow confusion by creating a stew of weak and untenable arguments. Often Chase does not even articulate which proposed class a particular argument applies to. Chase's apparent hope is that the Court will throw up its hands in confusion, rather than meaningfully engage the careful class-by-class arguments that Plaintiffs have made.

I.      **GROUP 1**
        A.      **Commonality is Founded in the Promises Chase Made to Class Members in a Form Contract**

The glue that holds the Group 1 Plaintiffs' claims together for commonality purposes is the promise made to each borrower in the TPP Agreement and the contractual time deadline governing Chase's obligation to meet that promise. *See* Opening Mem. at 3-4.[4] Chase agreed to

---

[4] Chase's Opposition argues that "TPPs Were Not Uniform." *See* Opp. at 9.  It is true that a handful of different versions of the TPP were utilized over time. *See* Opening Mem. at 3 n.4. Chase does not point to any material differences, between versions, on the time deadline for Chase's performance, the question at the heart of the Group 1 claims. The minor variations in the form TPP are thus irrelevant. *See George v. Nat'l Water Main Cleaning Co.,* 286 F.R.D. 168, 174-75 (D. Mass. 2012)

provide a signed copy of the Plan and Modification Agreement by the Modification Effective Date *or* "a written notice that [the borrower] do[es] not qualify for the Offer." *Id., quoting* Ex. 26 to Docket No. 293 at 1. In *Young v. Wells Fargo*, handed down just this week, the First Circuit expressly considered the same promise made in a TPP Agreement and concluded that it can be read to create a right to a permanent modification at or before the Modification Effective Date for a performing borrower. *Young v. Wells Fargo*, No. 12-1405, 2013 WL 2165262 at *8 (1st Cir. May 21, 2013). The timeliness of the servicer's decision-making was specifically identified as the promised performance arising from the TPP Agreement. *Id.* The defendants' contrary interpretation "would permit them to exercise an unfettered right to withhold a permanent modification offer for an uncertain period of time after the modification effective date has passed, thereby erasing the benefits to the plaintiff of her compliance with the TPP." *Id.* By focusing on this particular aspect of contract interpretation the First Circuit has identified, expressed and provided substantial guidance on the important common question present here.[5] Answering the question at the merits stage whether the failure of Chase to render a timely decision constitutes a breach of the TPP Agreement will generate a common outcome that will drive the resolution of each Group 1 class member's claim. Commonality under Rule 23(a) requires nothing more.

**B.    Chase is Wrong – Adjudication of Class Members' Rights Under the TPP Agreement Does not Require Individualized Review.**

Citing deposition testimony, Chase first argues that commonality is lacking because individual issues with respect to each borrower's subjective intent must be determined by the Court. Opp. at 23-24. Were this correct, class certification would be categorically inappropriate

---

(rejecting defendant's argument that commonality is destroyed where putative class members "did not work under the same contract or set of contracts. . . .").

[5]  This Court need not resolve the core question described in *Young* for the purposes of certification. As observed in the Opening Mem., the office of a class certification ruling is not to adjudicate the merits of the case, but rather to determine whether class treatment is appropriate. *See* Opening Mem. at 16 n. 18, *quoting Amgen Inc. v. Connecticut Ret. Plans and Trust Funds*, 133 S. Ct. 1184, 1191 (2013).

for breach of contract claims. But this is not the case. *See* Opening Mem. at 15, *citing, inter alia, Dupler v. Costco Wholesale Corp.*, 248 F.R.D. 29, 37-38 (E.D.N.Y. 2008) ("[a]n overwhelming number of courts have held that claims arising out of form contracts are particularly appropriate for class action treatment.") And more to the point, if Chase were correct, a party to any contract wishing to escape its strictures could simply claim a different intent. For this reason, a fundamental tenet of the common law of contract requires parties be bound by the unambiguous tenets of a written instrument, regardless of their subjective intent.[6] The interpretation of the contract, then, is a matter of law. *Young*, 2013 WL 2165262 at *4. It is thus entirely appropriate for the Court to determine the key common questions in this matter – including whether the TPP Agreement required Chase to render a decision to the borrower at or before the Modification Effective Date.[7]

Individual issues with respect to borrower performance (other than payments made)[8] are not implicated in adjudicating the common question of contractual breach. In arguing to the

---

[6] Group 1 Plaintiffs have briefed this point in the context of opposing one of the summary judgment motions that Chase has contemporaneously put before the Court. Docket No. 311 at 6.  *See also American Lease Ins. Agency Corp. v. Balboa Capital Corp.*, 579 F.3d 34, 39 (1st Cir. 2009) (" [t]he best evidence of what parties to a written agreement intend is what they say in their writing.")..

[7] Chase contends that the class representatives' claims are not typical of the class claims because Plaintiffs voluntarily dismissed the claims of several individuals who had originally been pled as class representatives. Opp. at 1.  But this is simply not the standard by which typicality is assessed; rather, the question is "whether the *class representatives'* claims have the same essential characteristics as the claims of the other members of the class." *McLaughlin v. Liberty Mut. Ins. Co.*, 224 F.R.D. 304, 310 (D. Mass. 2004) (emphasis added); *Ramirez v. DeCoster*, 203 F.R.D. 30, 33-34 & n.8 (D. Me. 2001) (voluntary dismissal of certain plaintiffs has no impact on typicality of claims of remaining plaintiffs). The proper question is whether those individuals *remaining* as class representatives have claims typical of the class, which they clearly do. *See* Opening Mem. at 18-19; Ex. 1 to Docket No. 293 (Group 1 typicality appendix).

[8] Chase is wrong to assert that Plaintiffs' class proposal requires individualized inquiry with respect to borrower payments made pursuant to the TPP Agreement. The Group 1 class definition encompasses only those borrowers who made "the trial payments required by their TPP Agreements in the month in which they were due . . . ." *See* Docket No. 291 at 2. This articulation of timeliness is consistent with Treasury's guidance. *See* Docket No. 293-38 at 17. Because Chase maintains data with respect to the dates and amounts of trial payments made by borrowers, see Ex. 33 to Docket No. 293 at ¶ 31, the process of ascertaining class members based on any adjustment to the definition of "timely" trial payments is straightforward, mechanical, and data-based.

contrary, *see* Opp. at 24-25, Chase ignores the common-law contract doctrine of waiver, which presents another common legal question and renders individualized questions of borrower performance moot. *See* RESTATEMENT (SECOND) OF CONTRACTS §§ 84 & 246 (1981); WILLISTON ON CONTRACTS § 63:9. The relevant common law on this point with respect to each state in which the Group 1 Plaintiffs propose a statewide class is summarized in Appendix A. *See* Ex. 1 to Klein Decl. As demonstrated there, where a party to a contract continues to accept the other party's performance with knowledge of the non-occurrence of a condition, that party cannot appeal to the unfulfilled condition to excuse its breach. *See, e.g.*, *L.H. Controls, Inc. v. Custom Conveyor, Inc.*, 974 N.E.2d 1031, 1050-51 (Ind. Ct. App. 2012); *Owen v. Kessler*, 778 N.E.2d 953, 957 (Mass. App. Ct. 2002); *Sherman v. Lansford*, 723 P.2d 1176, 1179 (Wash. App. 1986). Thus, application of the doctrine of waiver obviates Chase's alleged individualized issues: if Chase continued to accept trial payments from the borrower after the Modification Effective Date, it waived the right to assert the non-occurrence of the borrower's performance to excuse its breach. Chase can thus find no comfort in seeking to excuse its failure to render a timely decision in any alleged individualized issue of a paying borrower to perform.

Where Chase determined for any reason that a borrower had failed to perform – whether it was based on document submission, truthfulness of eligibility information, or anything else, its proper recourse under the TPP Agreement was to issue "a written notice that [the borrower] do[es] not qualify for the Offer." *See* Ex. 26 to Docket No. 293 at 1-2 (describing a finite trial period within which to perform).[9] Among other things, this decision would stop the accruing of default via trial payment, trigger the ability of the borrower to appeal a denial or seek other mandatory foreclosure alternatives under the Making Home Affordable program. *See* Ex. 38 to Docket No. 293 (Supplemental Directive 09-01) at 15, 18 (requiring immediate review for other

---

[9] As the *Young* Court recognized, the TPP Agreement is made within the context of HAMP rules. *Young*, 2013 WL 2165262 at *9. On this point, HAMP guidance is clear that a servicer was responsible for issuing a timely denial at the close of the trial period where it believed the borrower had failed to perform. *See* Ex. 39 to Docket No. 293 (Supplemental Directive 09-08) at 4; Ex. 40 to Docket No. 293 (Treasury Report on Servicer Performance) at 6.

foreclosure alternatives if HAMP permanent modification is denied).[10]  In other words, in the absence of proper performance, borrowers who ultimately received untimely denials were left in much worse financial circumstances than would otherwise have been the case.  Similarly, borrowers who ultimately received untimely permanent modifications would have had more advantageous terms. Either outcome arises from the common injury of breach.

### C.    Group 1 Class Members Suffered a Common Injury

Plaintiffs' opening brief addressed the question – raised by Chase in opposition – whether *Comcast v. Behrend*, 133 S. Ct. 1426 (2013) altered the longstanding landscape with respect to injury and damages under Rule 23. *See* Opening Mem. at 23 n. 26.  For the reasons argued there, *Comcast* "should not be read to require, as a prerequisite to certification, that damages attributable to a classwide injury be measurable 'on a class-wide basis.'" *Comcast v. Behrend*, 133 S. Ct. 1426, 1436 (2013) (Ginsburg, J. & Breyer, J., dissenting); *Martins v. 3PD, Inc.*, No. 11-11313-DPW, 2013 WL 1320454, at *8 (D. Mass. Mar. 28, 2013) (certifying class and stating that *Comcast* did "not extinguish[]" proposition that "common questions of liability can predominate in some cases even if some individual issues of damages remain").[11] However

---

[10] Chase makes an effort to transform certain voluntary dismissals into a concession that individualized issues are present. *See, e.g.,* Opp. at 1. But the voluntary dismissal of a given individual does not amount to a concession that they are excluded from the core common issues present in the case. Voluntary dismissal can be caused by any number of reasons. Whatever individualized issues Chase has purportedly identified do not alter the fundamental promise made to each class member of a timely decision. Indeed, the entire purpose of the trial period was to allow the servicer an opportunity to review all of the borrower's circumstances, verify the initial information used to determine eligibility, and render a decision. *See* Ex. 38 to Docket 293 at 5 ("When the borrower returns the Trial Period Plan and related documents, the servicer must review them to verify the borrower's financial information and eligibility . . . .") To the extent that there were individualized issues related to eligibility with respect to a given borrower's performance or eligibility, Chase should have issued a timely denial. What Chase was *not* permitted to do – consistent with the TPP Agreement -- was to keep the borrower in a state of limbo after the trial period ended without a decision one way or the other.

[11] *See also In re Damages Foods, Inc., Secs. Litig.*, No. C 11-05386 WHA, 2013 WL 1891382, at *11-12 (N.D. Cal. May 6, 2013) (certifying class post-*Comcast* and stating that *Amgen* affirms that Rule 23(b)(3) does not require plaintiffs to prove every element of claim is susceptible to classwide proof); *In re Motor Fuel Temperature Sales Practices Litig.*, MDL No. 1840, 2013 WL 1397125, *18-19 (D. Kan. Apr. 5, 2013) (certifying class post-*Comcast* and stating that

*Comcast* is interpreted, it remains the case that Group 1 class members have suffered a classwide injury – breach of the TPP – and the damages arising from that breach are measurable using a common method.  The common methodology available to measure the effects of the classwide breach is further discussed in the context of Rule 23(b)(3)'s predominance element, below.  *See* Section I(E)(1), *infra*.

> **D.     Chase's Opposition Inappropriately Suggests that Commonality Requires a Complete Uniformity of Issues**

Chase's Opposition raises concerns about differences in state common law that might apply to any national class certified by the Court. Plaintiffs' proposal of a nationwide breach of contract class rests on the assumption that the fundamental aspects of contract common law at issue here – formation, breach, relief -- do not invoke material differences in state law. *See* Opening Mem. at 16 n.18. "[T]he fact that there may be variations in the rights and remedies available to injured class members under the various laws of the fifty states … does not defeat commonality and predominance." *In re Warfarin Sodium Antitrust Litigation*, 391 F.3d 516, 530 (3rd Cir. 2004). "[T]he mere fact that such concerns may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones. As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of statutes of limitations will not automatically foreclose class certification under Rule 23(b)(3)." *Waste Management Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1ˢᵗ Cir. 2000).  To satisfy commonality, Plaintiffs need only identify a single common question of law or fact, the answer to which would drive the resolution of their claims. *George,* 286 F.R.D. at 174.[12]

---

"[d]etermining each class members' damages, if any, may require individualized determinations, but the possibility that individual issues may predominate the issue of damages . . . does not defeat class certification by making the liability aspect of the case unmanageable.") (internal quotations omitted).

[12] Plaintiffs' claims that contain a reliance element, such as their claims for promissory estoppel, do not require individualized inquiries to determine whether they relied on Chase's representations. It is appropriate here to presume class-wide reliance because these claims are grounded in the same uniform written representations, contained in TPP Agreements and other loan modification

Chase's argument also ignores the Group 1 Plaintiffs' proposal in the alternative that the Court certify statewide classes for each state in which one of the named plaintiffs resides. *See* Docket No. 335 at 16 n.18, *citing* Docket No. 28 at 219. As an MDL transferee Court, the task at hand is to adjudicate pre-trial issues of each of these cases before remand to their home jurisdiction. To facilitate the review of each of these statewide classes, Plaintiffs have provided a survey of the relevant states' laws with respect to parole evidence, the statute of frauds and subsequent oral modifications, good faith and fair dealing, and the relevant waiver issues of law. *See* Exhibits 1, 2 & 3 to Klein Decl.  If state classes are certified for resolution in the transferring courts following remand, there is no requirement for uniformity across states.  Most importantly, the common questions of law raised by the Group 1 Plaintiffs representing each of the proposed statewide classes can be considered against these state-by-state principles listed in these appendices to reach classwide resolution.

### E.   The Group 1 Plaintiffs Satisfy the Requirements for Certification under Fed. R. Civ. P. 23(b)(3)

Chase's opposition fails to acknowledge the core common legal question concerning whether the TPP Agreement requires timely performance. Mischaracterizing Plaintiffs' Group 1 arguments as if they require individual evaluation of eligibility is a straw argument that Chase also relies on to attack predominance, superiority, manageability and the likelihood of a workable trial plan. Each of these elements are simplified if the Group 1 class claims are analyzed in a manner consistent with the legal theory advanced by Plaintiffs – all class members were harmed by Chase's failure to render a timely decision.

---

contracts. *Iorio v. Allianz Life Ins. Co. of North America*, No. 05CV633, 2008 WL 8929013, at *28 (S.D. Cal. July 8, 2008) (applying a presumption of reliance to absent class members where evidence was sufficient to show that the named Plaintiffs relied on the misrepresentation and all class members received the same misrepresentation); *Peterson v. H&R Block Tax Services, Inc.*, 174 F.R.D. 78, 84-85 (N.D. Ill. 1997) (explaining that courts will presume class members' reliance when it is logical to do so or when the complaint's allegations make reliance apparent. (citation omitted)). By making the payments required by TPP and other loan modification agreements, it is fair and logical to presume that Plaintiffs relied on Chase's promises that it would render a timely decision.  *See Dixon v. Wells Fargo Bank, N.A.*, 798 F. Supp. 2d 336, 346-50 (D. Mass. 2011).

Chase assumes that Plaintiffs propose a single trial of all certified claims for the class to a single jury in this Court. The MDL consolidation process forced together a variety of cases, from a variety of jurisdictions, on multiple state claims. It has never been Plaintiffs' intention to have the cases, to the extent they are certified, tried together in this Court. Nor could it be, because the relevant statute itself prevents it. *See* 28 U.S.C. § 1407(a) (allowing an MDL transferee court to conduct consolidated *pretrial* proceedings before remand to the transferor court for trial). Just as the court should consider each proposed class separately for the purposes of certification (including the Plaintiffs' alternative proposal for separate statewide classes for each state in which a Plaintiff is proposed as a class representative) the Court should also consider that the core trial plan is for remand of claims to the court of origin.[13] The statute requires nothing less. *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998) (transferee court lacks authority to try the consolidated cases itself).

Once certified, particularly if certified to try specific state law claims, concerns about manageability and the trial plan vanishes. Each case that includes a Group 1 claim can be tried in a straightforward way on the core common legal claim of what the TPP Agreement requires. The associated damages can be determined on a straightforward basis in light of data about the amounts paid, the dates of payment, the fees and costs imposed in light of commonly held state principals concerning calculation of contract damages.

1.    ***Predominance Concerns about Group 1 Claims vanish when considered in light of Plaintiffs' true legal claim rather than Chase's straw theories.***

Group 1 Plaintiffs' predominance argument, initially set forth at pages 21-25 of the opening brief (Docket No. 292), is grounded in the plain language and mutual promises of the TPP Agreement and was recently reinforced by the First Circuit's decision in *Young*. The Court of Appeals' opinion strongly supports the Group 1 Plaintiffs' position because it expressly

---

[13] Although Chase does not bother to argue that trial of these separate class cases would present management problems, it is noteworthy that Fed R. Civ. P. 21 provides for severance of claims, even within cases. Rule 42(b) provides for the possibility of separate trials on separate claims.

identifies Plaintiffs' articulation of Chase's breach as a reasonable reading of the TPP Agreement. *See supra* at 3.

2. ***Data exists to Measure Group 1 damages on a common basis.***

The Group 1 class members' damages arising from the common injury of Chase's breach fall into two distinct categories.  Where Chase breached the TPP Agreement by failing to render a timely decision, but subsequently granted the borrower a permanent modification, the class member's damages would be measurable by the difference between the permanent modification terms that the class member received and the permanent modification terms that the class member would have received had a timely decision been rendered. The discovery record makes clear that Chase has the capacity to calculate and implement a modification retroactively based on a mechanical process using this data. Ex. 42 to Docket No. 293 at 116. This is not surprising given that Chase's electronic records contain the contractual terms of the loan, as well as the required terms of modification, and can simply supplant one set of terms with another. Making the terms retroactive is little more than an exercise in subtraction. What did the borrower pay in interest charges and fees that would not have been due if the loan had been modified on the promised terms?[14]

Where Chase breached the TPP Agreement by failing to render a timely decision, but subsequently issued a denial to the class member, the damages are measured by the effect of the delayed decision. The additional interest that accrued during that post-trial limbo period – measured by the difference between the trial payment and the preexisting monthly mortgage payment – captures an empirical financial effect of Chase's breach in these circumstances. In addition, any fees or charges that accrue during the limbo period are attributable to Chase's breach.  By way of example, when named Plaintiffs John and Kathleen Hanf received a denial over 5 months after their Modification Effective Date, Chase immediately demanded a lump sum

---

[14] The hypothetical terms of a modification were calculated by Chase for each TPP at the time the TPP was generated. For HAMP loans, these proposed modified terms were reported to Treasury. *See* Ex. 33 to Docket No. 293 at ¶ 45; Ex. 35 to Docket No. 293 at 134-38, 183-84, 191.

payment of more than $4,300 – representing the arrears and charges accrued during the months of limbo – and sought to foreclose, which forced the Hanfs to obtain an emergency loan to pay Chase. See Docket No. 311 at 3-4.  Chase's expert acknowledges that a similar lump sum was due from each borrower who received a late denial. *See* Ex. 50 to Docket No. 293 at 70-72.

### 3.   *Chase's asserted defenses do not defeat certification.*

Only *unique* defenses that threaten to become the focus of the litigation can make a Plaintiff atypical or defeat predominance. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted). To the extent that a defense is common and can be used against class members on an aggregate basis, it simply provides another common question supporting certification. Individual inquiries are not required here.

Chase's contention that the Rule 23 superiority requirement is not met because some members of the putative class may be eligible for relief under the National Mortgage Settlement or the OCC Consent Order ignores the fact that these governmental actions expressly do not release Chase from liability for other claims. As this Court explained in previously rejecting Chase's preemption argument, *see* Docket No. 97 at 13-19, where this Court's enforcement of Chase's promises is consistent with the express terms of these enforcement actions, those actions are no bar to recovery in this class action. Rather, "[a]ll they prohibit is a borrower obtaining a duplicative recovery, an issue that will not arise until the claims here are finally adjudicated and any off-set can be calculated," *id.* at 18-19, which readily can be resolved on a common basis through settlement records, whether those of Chase, the government, or the relevant settlement administrator, Rust Consulting. *See In re Urethane Antitrust Litig.*, 2013 WL 2097346, at *2 (finding that classwide injury may be shown "even if some members may have mitigated their damages or otherwise did not suffer damages that may be quantified"). Further, neither of the groups targeted by those enforcement actions – limited as they are to foreclosures that occurred in 2009 and 2010 -- are coextensive with the classes here before the Court. Thus, despite Chase's reshaping of its preemption argument here, neither the OCC Consent Order nor the National Mortgage Settlement bar this action on superiority grounds – especially for those class members

who do not fall within the scope of those settlements. To the extent that the relief available does overlap, calculating any offset in damages to prevent duplicative recovery is a mere matter of arithmetic for which this Court has already accounted. *See* Docket No. 97 at 18-19.

Chase's asserted "waiver" defense is particularly perverse. Financially struggling homeowners who were desperate to save their homes entered into an agreement with Chase to receive an answer within a particular timeframe as to whether a loan modification would make this possible. When Chase broke that promise, and a homeowner asked where their answer was, Chase had an explicit policy to issue instructions to continue making payments in the trial amount or else risk losing their home. *See* Opening Mem. at 5 n. 6, *citing* Exhibits 45 & 46 to Docket 293. Now Chase suggests that a desperate borrower fighting to save their home – the *raison d'etre* of HAMP – could be found to have waived the benefit of the bargain by following Chase's own instructions. Unlike application of waiver against Chase in the circumstances described above, *supra* at 4-6, Chase gave nothing in return for such a relinquishing of rights and Chase does not cite a single case or tenet of contractual common law that supports such an assertion. In any event adjudication of the effect of a borrower's post-trial payments constitutes a common question, not an individualized one.

Chase's identification of fraudulent inducement as a unique defense is contrary to the fundamental purpose of the trial period to verify borrower information. *See* Ex. 38 to Docket 293 at 5. As discussed above in connection with eligibility, to the extent that Chase concluded that it was fraudulently induced to enter into a TPP Agreement, it was required to exercise its contractual remedy to issue a timely denial. For Chase to argue that it gets another look at whether the information provided to support the TPP was accurate years later makes a mockery of the entire purpose of the loan modification process and is inconsistent with *Young*. *Young*, 2013 WL 2165262 at *8. Moreover, for the defense to exist, Chase had to reasonably rely on the supposed fraudulent misrepresentation by providing a timely permanent modification. This is

something it did not do for any class member. [15]

> ### 4.   *Superiority strongly militates in favor of certification here.*

At the First Circuit noted in *Young*, federal courts across a variety of jurisdictions are struggling with the issues presented to the Court here for class-wide resolution. *Young,* 2013 WL 2165262 at \*1. There are myriad cases pending across jurisdictions, often being litigated *pro se. See  In re Citimortgage, Inc. Home Affordable Modification Program (HAMP) Litigation*, No. ML 11-02274 DSF (PLA), 2012 WL 1931030, at n.1 (C.D. Cal. Apr. 17, 2012); *Dixon,* 798 F. Supp. 2d at 349. The MDL process has provided this court with an opportunity to alleviate this burden on the courts, but only if the economies of Rule 23 are seized upon. There can be little doubt that resolution of the common classwide issues identified by Group 1 Plaintiffs here, would not just provide uniformity of outcome and remedies for those too poor to hire a lawyer to litigate, but also would alleviate the wide-ranging burden on federal courts associated with the range of individual cases.

> ### 5.   *Following certification, the Group 1 classes would be manageable.*

All of Chase's manageability concerns are articulated based on the assumption that Plaintiffs propose a single trial of all certified claims to one jury in this Court. That is not and could not be Plaintiffs' plan.

Resolution of the Group 1 claims is manageable because the common contractual claims arising from the TPP Agreement can be resolved in a straightforward way, most likely by summary judgment. Even where summary judgment is not possible, questions of contractual interpretation under common form language are simple to try.  The balance of issues, if certified for the proposed national class, could be tried here in a single trial on class-wide common claims. If the court certifies state classes for Group 1, in whole, or in part, those cases get remanded to the transferor courts for trial under the respective state laws in the state of origin. In either event,

---

[15] Chase also asserts a defense of "unclean hands" in connection with claims for injunctive relief on the basis that the borrower may have made misrepresentations to obtain the TPP. Again, Chase had a remedy and a contractual opportunity to exercise its remedy -- denial.

for the reasons discussed above, the available data is a basis for common mathematical formulae that simplify trial of the question of which class members are entitled to which damages.[16]

Chase, fails to note that the alternative, remand for individual (non-class) trials would be as cumbersome as remand for class trials, yet would resolve far less. The mortgage lending and servicing crisis has impacted American families for far too long.  Its time for the wheels of justice to provide remedies to those who are entitled.

### F.   The Group 1 Plaintiffs Satisfy the Requirements for Certification under Fed. R. Civ. P. 23(b)(2)

The Court can summarily disregard Chase's first argument that Plaintiffs cannot certify a Rule 23(b)(2) class because their claims for monetary relief are not incidental, as Plaintiffs do not seek certification solely for a Rule 23(b)(2) class. Rather, Plaintiffs are seeking certification under *both* Rules 23(b)(2) and 23(b)(3) separately. *See* Docket No. 291 at 6. This is entirely appropriate and simply requires the Court to independently evaluate whether Plaintiffs' class meets the requirements of both sections Rule 23(b). *Stinson v. City of New York*, 282 F.R.D. 360, 381 (S.D.N.Y. 2012) (a class is certifiable under both (b)(2) and (b)(3) where the class is seeking both monetary relief and injunctive relief). Nothing in *Dukes* precludes Plaintiffs from seeking certification under both rules. *Id.*; *Bristol Village, Inc. v. Louisiana-Pacific Corp.,* No. 12–CV–263S, 2013 WL 55698, at *10 (W.D.N.Y. Jan. 3, 2013).*See also Gooch v. Life Investors Insurance Company of America*, 672 F. 3d 402, 427 (6th Cir. 2012) ("Rule 23(b)(2) certification

---

[16] "Where ... common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain." *Otte ex rel. Estate of Reynolds v. Life Ins. Co. of North America*, 275 F.R.D. 50, 58 (D. Mass. 2011).   If nothing else, proceeding with class-wide adjudication of liability issues is an efficient and appropriate course for this matter. The overwhelming value of a common set of rulings on liability justifies certification under Fed. R. Civ. P. 23(b)(3). *See Smilow v. Southwestern Bell Mobile Sys.,* 332 F.3d 32, 41 (1st Cir. 2003); *Valentino v. Carter–Wallace, Inc.,* 97 F.3d 1227, 1234 (9th Cir. 1996) ("Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4)(A) and proceed with class treatment of these particular issues."). *Accord McReynolds v. Merrill Lynch*, 672 F.3d 482, 491 (7th Cir. 2012) (certifying under Rule 23(c)(4) despite individual damages issues because, "at least it wouldn't be necessary in each of those trials to determine whether the challenged practices were unlawful.").  *See also Comcast*, 133 S. Ct. 1426, 1437 (Ginsburg, J. & Breyer, J., dissenting).

remains available in other circumstances, including when the plaintiffs seek a declaration about the meaning of a contract. 'What matters to class certification ... [is] the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.' Resolving a dispute over contract interpretation does that…") (citations omitted).

Chase is also wrong that Plaintiffs are seeking injunctive relief to enjoin prospective servicing practices that are anticipated by the OCC's Order. Plaintiffs are seeking an injunction to prevent Chase from assessing and collecting the improper interest, fees and charges on their loan accounts resulting from the breach of their TPP Agreements and other loan modification agreements. Opening Mem. at 27. This relief is common to all class members in this action and is tailored to redress the wrongs. A classwide injunction can issue even where the magnitude and existence of the impact of Chase's practices varies by class member. *Floyd v. City of New York*, 283 F.R.D. 153, 173 (S.D.N.Y. 2012).

## II.    GROUP 2

Chase concedes Plaintiffs have met numerosity, typicality, and adequacy requirements and challenges the proposed class on the basis of commonality, predominance, and ascertainability.  The Court should certify Group 2 as to Plaintiffs' classwide consumer protection claims in California, Washington, and New Jersey.

### A.    Group 2 Plaintiffs have established commonality

The Opposition asserts that Plaintiffs have not offered evidence of a "companywide policy to misrepresent material facts to borrowers seeking loan modifications."[17] Opp. at 33.

---

[17] In addition to being factually untrue, Chase's contention lacks merit as a matter of law because the consumer protection laws of California, New Jersey, and Washington do not require that a defendant intend to mislead or deceive consumers. *See Rothschild v. Tyco, Inc.*, 99 Cal. Rptr. 2d 721, 725 (2000) ("[UCL] imposes strict liability on persons who engage in conduct within its purview; to succeed on [UCL] claim, it is not necessary to establish the defendant intended to injure anyone"); *Ji v. Palmer*, 755 A.2d 1221, 1227 (N.J. Super. Ct. App. Div. 2000) ("intent to deceive is not a prerequisite to the imposition of liability" under CFA); *Klem v. Washington Mut. Bank*, 295 P.3d 1179, 1187 (Wash. 2013) ("act or practice can be unfair [under CPA] without being deceptive"). Thus, Chase's conduct can be unfair or unlawful even absent a "companywide policy to misrepresent material facts" to borrowers.

Putting aside the fact that Rule 23 contains no inherent requirement to show a single, formal policy, Group 2 Plaintiffs have, in fact, cited substantial evidence of Chase's own policies underlying its common course of unfair and deceptive conduct. For example, Chase's policy required borrowers to be in default as a prerequisite to a loan modification[18] and therefore, Chase instructed Group 2 Plaintiffs to default on their mortgage loans.[19] Chase's policies also put borrowers seeking a modification into forbearance, payment, or repayment plans with promises of a permanent modification.[20] For borrowers whose modification was denied, Chase failed to send denial letters.[21] Instead, Chase used an internal code to note the denial, but told borrowers that it was ██████████████████████████████████████████████ ████████████[22] As a result, Group 2 Plaintiffs did not receive a decision, received a belated

---

[18] *See* Ex. 61 to Docket No. 293; Ex. 62 to Docket No. 293 (standardized script instructing representatives to tell borrowers that loans must be ██████████████ for modifications); Ex. 70 to Docket No. 293 (same).
[19] *See* Ex. 2 to Docket No. 293 at Row 7; Ex. 59 to Docket No. 293 at 191:12-192:2, 192:23-193:7 (testifying that ██████████████████████████████████████████████████.
[20] *See* Ex. 56 to Docket No. 293 (stating that forbearance plans were used as ████████ ██████████████████; Ex. 12 to Klein Decl. at 7 (stating that ████████████ ████████████████████████████████████████████████; Ex. 13 tp Klein Decl. at 51179 (standardized procedure manual stating that Chase's order of preference is: ████████████ ████████████████████████████████████████); *see also* Docket No. 291 at 7.
[21] *See* Ex. 125 to Docket No. 293 at 7 (" ████████████████████████████ ████████████████████████████████████████████████ ██████████."). Chase's own audits revealed that ████████████████████████████████████ ████████████ because of " ████████████████████████████████████ ██████████████████████████████████████" *See* Ex. 14 to Klein Decl. ██████ *See* Ex. 125 to Docket No. 293 at 7 ████████████████████████████ ██████████████████"); Ex. 67 to Docket No. 293 (standardized scripts instructing representatives to tell borrowers that Chase was working on their modification and needed more time); Ex. 68 to Docket No. 293 (standardized script stating that ████████████████████████████████████████████████.

permanent modification, or were foreclosed on[23] and continued to pay Chase in reliance on Chase's promises. Thus, Chase misrepresented the status of Group 2 Plaintiffs' modification applications and accounts.[24]

Another aspect of Chase's wrongdoing involved Chase's policy of charging fees to borrowers' accounts during the modification process.[25] Chase did not disclose or explain these fees to borrowers.[26] Chase only told borrowers that it would remove the fees once a permanent modification was approved.[27] Therefore, Chase charged Group 2 Plaintiffs fees that were neither disclosed nor explained to them.[28] Chase's policies also increased Group 2 Plaintiffs' debts.[29]

Still another aspect of Chase's misconduct involved its policy of not suppressing negative credit reporting during trials.[30] Chase told Group 2 Plaintiffs that pursuing a modification would not negatively impact their credit scores.[31] Nonetheless, Group 2 Plaintiffs suffered credit damage.[32] Therefore, Chase misrepresented its credit reporting policies to Group 2 Plaintiffs.[33]

Because Chase's implemented its policies companywide, its unfair and deceptive conduct raises questions of law and fact common to all Group 2 Class members. *See In re Checking*

---

[23] *See* Ex. 2 to Docket No. 293 at Row 4, 5; Ex. 12 to Klein Decl. at 5 (stating that ███████ ████████████████████████████████████ "). *See id.;* Ex. 2 to Docket No. 293 at Row 8, 9.

[25] *See* Exhibits 109-112 to Docket No. 293 (customer account statements reflecting various fees charged).

[26] *See* Ex. 59 to Docket No. 293 at 110:8-12 (testifying that borrowers did not know about fees).

[27] *See* Ex. 70 to Docket No. 293 (standardized script instructing representatives to tell borrowers that ████████████████████████████████ *See* Ex. 2 to Docket No. 293 at Row 10, 11.

[29] *See id.*, at Row 12. *See also*, Ex. 15 to Klein Decl. (internal audit identifying Chase policy of ███████████████████████████████████████████████████ " ██████████████████████ *See* Ex. 73 to Docket No. 293.

[31] *See* Ex. 2 to Docket No. 293 at Row 14; Ex. 71 to Docket No. 293 (standardized procedure acknowledging that borrowers were told ███████████████ .

[32] *See* Ex. 2 to Docket No. 293 at Row 14.

[33] *See* Ex. 72 to Docket No. 293 (standardized script noting ████████████████████ ██████████████████████████████████ ).

*Account Overdraft Litig.*, 281 F.R.D. 667, 674 (S.D. Fla. 2012) ("The commonality element is generally satisfied when a plaintiff alleges that defendants have engaged in a standardized course of conduct that affects all class members."); *George*, 286 F.R.D. at 175 ("*Dukes* makes clear that claims of harm arising from a truly common source [such as a company's own policies and procedures] can provide the common contention required for a class action.")

**B.      Issues common to the Group 2 Class predominate**

Chase contends that differences in the precise language of its oral misrepresentations preclude certification. Docket No. 328 at 33. Chase misapprehends the relevant legal standard applicable at this stage of the litigation. Slight variations in the exact words Chase used to mislead and deceive Group 2 Class members amount to no more than a red herring. In consumer protection cases like this, courts focus on the defendant's wrongful conduct to uphold the relevant statute's purpose of protecting the general public from unfair and deceptive conduct.[34] Accordingly, courts look to defendant's common course of conduct, not the precise language a defendant may have employed in its misrepresentations, to identify the predominant issue. *In re Neurontin Mktg. and Sales Practices Litig.*, 244 F.R.D. 89, 108 (D. Mass. 2007) (courts will "look past minor variations" in misrepresentations because common scheme "transcends the specific details of the oral communications"); *Duhaime v. John Hancock Mut. Life Ins. Co.*, 177 F.R.D. 54, 64 (D. Mass. 1997) (finding that differences in oral misrepresentations did not defeat predominance where defendant engaged in common course of conduct); s*ee In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 513 (D.N.J. 1997) ("common scheme may indicate predominance, even where the scheme is implemented through oral misrepresentations"); *In re Am. Cont'l Corp./Lincoln Sav. And Loan Sec. Litig.*, 140 F.R.D. 425,

---

[34] *See In re Tobacco II Cases*, 207 P.3d 20, 30 (Cal. 2009) ("UCL's focus [is] on the defendant's conduct" in furtherance of the statute's "purpose of protecting the general public"); *Hirschbach v. NVE Bank*, 496 F. Supp. 2d 451, 457 (D.N.J. 2007) ("focus of [a] [CFA] case" is on "honesty and reasonableness of defendant's conduct"); *Keyes v. Bollinger*, 640 P.2d 1077, 1082 (Wash. 1982) (if defendant's conduct "possess[es] a tendency or capacity to deceive" it "serves the protective purposes of the [CPA] to impose liability").

431 (D. Ariz. 1992) (holding that "the underlying scheme" and not "the exact wording of the oral misrepresentations" is the predominant issue). Moreover, courts "favor certification" in cases where the unfair and deceptive conduct "involve[s] uniform, scripted, and standardized misrepresentations." *In re Neurontin*, 244 F.R.D. at 108 (D. Mass. 2007). Here, Chase's representatives used uniform, standardized scripts and procedure manuals that Chase's Rule 30(b)(6) witnesses stated were drafted, pre-approved, and disseminated by Chase with instructions on "what to do and what to say on the phone." *See* Ex. 16 to Klein Decl. at 38:8-16, 166:21-167:5, 186:4-18; Ex. 17 to Klein Decl. at 123:1- 20, 141:9-142:7.[35]

Next, Chase tries to distract the Court from its uniform policies by selectively quoting and mischaracterizing deposition testimony, including that of a *single former* plaintiff who was *not* put up as a Group 2 class representative. Opp. at 34-35. However, the proper focus of Group 2 Plaintiffs' claims is Chase's own common course of unfair and deceptive conduct. The Group 2 Class members' claims will be resolved by one single question: did Chase's common course of unfair and deceptive conduct violate the consumer protection laws of California, New Jersey, and Washington.

## C. Indvidualized Issues with Respect to Group 2 Class Do Not Preclude Certification

Chase contends that individual inquiries as to each Group 2 Class members' injuries preclude certification. Opp. at 36-37. Chase's contention lacks merit for three separate and independent reasons.[36] First, under California and Washington law, only named plaintiffs are

---

[35] The cases Chase cites do not warrant a contrary finding. The materials in those cases were not standardized. *See Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1256 (2nd Cir. 2002) (materials and presentations were not uniform); *Markarian v. Connecticut Mut. Life Ins. Co.*, 202 F.R.D. 60, 69 (D. Mass. 2001) (agents did not receive common training or scripts); *Rothwell v. Chubb Life Ins. Co. of Am.*, 191 F.R.D. 25, 31 (D.N.H. 1998) (no uniformity in materials).

[36] In *Young* 2013 WL 2165262 at *12, the court found the plaintiff's allegations that the defendant's "repeated mistakes during the forbearance and loan modification process" caused her to lose equity in her home, damaged her credit, and resulted in her paying increased interest rates on any existing or future loans and credit cards. *Id.* Thus, plaintiff's injuries amounted to "economic damages that adversely affect her now and will continue to affect her in the future" sufficient to state a claim under Massachusetts's consumer protection law. *Id.*

required to provide individualized proof of injury. *See Keegan v. Am. Honda Motor Co., Inc.*, 284 F.R.D. 504, 533-34 (C.D. Cal. 2012) (stating that "relief under the UCL is available without individualized proof of deception, reliance and injury"); *Schnall v. AT&T Wireless Services, Inc.*, 259 P.3d 129, 137 (Wash. 2011) (reversing trial court's finding that CPA required individualized proof of injury).

Second, as discussed *supra*, because Chase engaged in a common course of unfair and deceptive conduct, common issues predominate. Thus, the question of whether Chase engaged in a common course of unfair and deceptive conduct, and whether Chase's conduct violated the consumer protection laws of California, New Jersey, and Washington are the predominant common questions of law and fact that must be decided in this case. *See George*, 286 F.R.D. at 180 (whether defendant engaged in alleged illegal conduct toward the putative class is the predominant question of law and fact). Thus, to the extent that individual issues of injury exist, common issues as to Chase's liability still predominate. *See id.* (stating that difference in plaintiffs' injuries "do not predominate over the main issue" of whether defendant engaged in alleged unlawful conduct).

Third, Chase's focus on the language of the forbearance, payment, and repayment plans is misplaced. Opp. at 36-37. Group 2 Plaintiffs have never stated claims for breach of contract making the plans' language irrelevant to Group 2 Plaintiffs' claims. Rather, the focus is on Chase's *use of the plans* in an unfair and deceptive manner—placing borrowers in plans with false promises a permanent modification. Thus, Chase's reliance on promissory estoppel case law is irrelevant and unavailing. *Compare id.* at 30, n. 34 (elements of UCL, CFA, and CPA claims) *with id. at* 35, n. 39 (elements of promissory estoppel claim).

D.     **Reliance is not an element of Group 2 Plaintiffs' Claims**

Chase contends that individual inquiries as to each Group 2 Class members' reliance on the alleged misrepresentations preclude certification. Opp. at 37. However, reliance is not an

element of Group 2 Plaintiffs' claims. *See Keegan, Inc.*, 284 F.R.D. at 533-34 (C.D. Cal. 2012) (UCL relief is available "without individualized proof of deception, reliance and injury"); *In re Mercedes-Benz Tele Aid Contract Litig.*, 267 F.R.D. 113, 119 (D.N.J. 2010) (individualized reliance not required by the CFA); *Schnall*, 259 P.3d at 137 (stating that courts have "firmly rejected the principle that reliance is necessarily an element of the [CPA]").[37]

### E.      The Group 2 Plaintiffs Satisfy *Comcast* and *Amgen*

Relying on *Comcast*, Chase contends that questions of individual damages calculations preclude certification. Opp. at 38. However, courts "generally find the predominance requirement to be satisfied even if individual damages issues remain." *Martins*, 2013 WL 1320454, at *8. Furthermore, in a decision affirming class certification, the Supreme Court recently reiterated that Rule 23(b)(3) "does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." *Amgen*, 133 S. Ct. at 1196 (internal quotations omitted). Here, for Group 2 Plaintiffs, Chase's common course of unfair and deceptive conduct is the predominant issue. Therefore, issues common to the Group 2 Class overwhelm any issues of individual damages.

Moreover, contrary to Chase's contention, Group 2 Class members' damages can be calculated on a classwide basis. Evidence adduced to date shows that Chase's internal systems contain data fields related to Group 2 Class members' increased debt, unwarranted fees, higher interest rates, erroneous reports damaging credit scores, and foreclosed homes. Therefore, once Chase's liability is determined, calculation of Group 2 Class members' damages "will be mechanical, formulaic, [and] a task not for the trier of fact but for a computer program." *See Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 702 F.3d 364, 372 (7th Cir. 2012) (affirming class certification). Indeed, one of Chase's own internal audits confirms that Chase can

---

[37] The *only* case which Chase asserts in support of its argument, *Deleon v. Wells Fargo Bank, N.A.*, No. 10-CV-01390-LHK, 2011 U.S. Dist. LEXIS 8296 (N.D. Cal. Jan. 28, 2011), holds that reliance was required for the plaintiffs' *intentional misrepresentation* claim. *Id.* at *22-23. Chase's remaining cases, which deal with common law fraud and promissory estoppel, are unconvincing because Group 2 Plaintiffs state no common law fraud or promissory estoppel claims.

 by "█

" *See* Ex. 15 to Klein Decl.

## III.   GROUP 3
### A.   Plaintiffs' Group 3 Claims Are Common And Do Not Require Individualized Inquiries To Resolve

The Group 3 Plaintiffs likewise satisfy commonality. Chase's business practices are uniform with respect to how it handles borrowers' accounts when it does not implement final loan modification agreements. It is undisputed that when Chase does not implement the terms of agreements, its servicing systems reflect the terms of the original (unmodified) loan contracts as though they are in effect. *See e.g.*, Ex. 10 to Klein Decl. at 72:15-25; 246:1-4 (the original contract is still in force when there is no permanent modification). This is because to implement final loan modification agreements, Chase has to make necessary changes in its systems to reflect the modified loan terms, such as the new monthly payment amount and interest rate. *See* Ex. 4 to Klein Decl. at 84:18-85:15. If final loan modification agreement is not implemented, late charges, penalties, fees and interest accrue and remain on a borrower's account. Ex. 10 to Klein Decl. at 297:8-19. The Court can infer that Chase demanded the amounts its system showed were due. Moreover, as Dr. Ayres explained in his Supplemental Report, if Chase revoked an agreement after it received it signed from the borrower, it is reasonable to infer that Chase continued to demand payments inconsistent with the agreement. Ex. 34 to Docket No, 293 at ¶21. Chase's practice of demanding amounts that are "inconsistent with the terms of the final modification" when it fails to implement agreements is therefore uniform and affects all members of the Group 3 class.

The circumstances Chase cites at pages 41-42 of its Opposition that purportedly permit it to dishonor agreements do not require individualized inquiries. As a matter of contract law, Chase expressed its intention to be bound to the agreements when it accepted borrowers' modified monthly payments. *NYKCool A.B. v. Pacific Fruit, Inc.*, No. 11–4246–cv, 2013 WL

163621, at *2 (2nd Cir. Jan. 16, 2013) ("[P]artial performance is an unmistakable signal that one party believes there is a contract; and the party who accepts performance signals, by that act, that it also understands a contract to be in effect."). The Group 3 class is defined to include borrowers who returned an executed copy of a final loan modification agreement to Chase and began making the modified payments. Docket No. 28 at ¶ 685. Therefore, Plaintiffs and each member of the Group 3 class have valid breach of contract claims because the Effective Date in their final loan modification agreements passed and Chase continued to accept their modified payments.

Finally, as discussed above in connection with Group 1 predominance, because the Group 3 class is comprised of borrowers who have form agreements containing identical provisions requiring implementation by a date certain,[38] any defense to Plaintiffs' breach of contract claim based on these conditions is a common defense that can be used against class members on an aggregate basis.[39]

**B.    Plaintiffs And The Group 3 Class Were Commonly Injured By Chase's Assessment Of Improper Fees On Their Loan Accounts, Which Damages Are Calculable Using A Common Methodology**

As Chase acknowledges, the Group 3 class claims that they have been injured by Chase's improper assessment of fees to their loan accounts when they were making full payments as required under their final loan modification agreements. Opp. at 42. It is undisputed that late charges, penalties, fees and interest accrue and remain on a borrower's account when a final loan modification is not implemented or is revoked. Ex. 10 to Klein Decl. at 297:8-19. *See also Cave v. Saxon Mortg. Services, Inc.*, No. 12–5366, 2013 WL 1915660, at *8 (E.D. Pa. May 9, 2013) (explaining that when a loan servicer does not implemented a permanent modification, the

---

[38] The HAMP form of final loan modification agreement is nearly identical to the Chase form agreements that Ms. Kurtzner and the Minervas' received (Opening Mem. at 41-42), which are themselves identical form contracts. Exs. 16 and 17 Docket No. 328-1.

[39] Chase does not argue, because it cannot, that it did not implement Ms. Kurtzner's or the Minervas' Agreements because either of them misrepresented information in their loan modification applications. If the Court chooses to exclude borrowers for whom Chase deemed to have made misrepresentations on their applications, Chase can ascertain from its payment records whether it rescinded agreements because the payment history will show a reversion back to the original loan amount after a series of modified payments.

borrower incurs increased principal and interest payments). Ms. Kurtzner and Mr. Minerva are not atypical because they did not know the contents of Chase's business records regarding their loan accounts when they were deposed. Indeed, copies of foreclosure letters Chase sent to Ms. Kurtzner and the Minervas seeking improper fees are attached to the Consolidated Complaint as Exhibits 19 and 21.[40]

### C.      Plaintiffs' Group 3 Class Is Ascertainable

As explained in Plaintiffs' Opposition to Chase's Motion to Strike the Expert Reports of Dr. Ayres and Professor White ("Motion to Strike"), members of the Group 3 class are identifiable by using data fields in Chase's system that contain, "the amount invoiced or demanded or billed" to the borrower and compare those amounts with the payment amounts required in the final modifications accepted by the borrowers. Ex. 33 to Docket 293 at 158:11-15. It is undisputed that mortgage servicers like Chase maintain information about the monthly payment of principal and interest that is due in its servicing systems. Ex. 10 to Klein Decl. at 321:2-322:1. Chase also keeps data on the terms of the final loan modifications agreements it sends to borrowers. Ex. 5 to Klein Decl. at 196:14-197:8 (information Chase used to populate the final loan modifications it sent to borrowers is available in its systems). The only relevant information necessary to determine whether Chase demanded payments in excess of what the agreement required is the modified monthly payment amount and the amount billed.

## IV.   GROUP 4
### A.      The Court Should Certify the Group 4 Class

Chase contends that Plaintiffs' failure to identify a single "uniform debt collection communication" that violated the FDCPA precludes certification of the Group 4 Class. Opp. at 45. However, as Chase acknowledges, Plaintiffs' FDCPA claim rests on the express language of its standardized written communications, including the TPP. Opp. at 47 n.64. The FDCPA

---

[40] As with Group 1 damages, there is a straightforward common methodology for measuring damages suffered by the Group 3 class using Chase's payment history data. The measure of damages is yielded by a comparison of the payment history of the unmodified loan account with what should have been the payment history of the modified loan under the final loan modification agreement.

prohibits, *inter alia*, the use of false and misleading representations and unfair or unconscionable means to collect a debt. *See* 15 U.S.C. §§ 1692e, 1692f. Here, Chase violated these provisions by soliciting the Group 4 Class members to seek modifications through participation in trial plans based on the false representation that if they made the trial payments and fulfilled the trial period conditions, Chase would permanently modify their loans.[41]

At least one common issue relative to Plaintiffs' FDCPA claim, as identified by Chase itself in recently produced documents, is Chase's systemic failure to ███████████████████ ████████████████████████████████████████████████" *See* Ex. 15 to Klein Decl. Indeed, with respect to denial letters, Chase itself found that its own controls were so utterly lacking that " ███████████████████████████ " Ex. 17 to Klein Decl.

Lastly, contrary to Chase's contention, Ms. Follmer is also typical of the class because the TPP and other written communications underlying the FDCPA claim were directed to Ms. Follmer, not any attorney representing her.[42] And Chase "has not established that it has a bona fide error defense with respect to [Ms. Follmer], much less that this defense will be central to the case." *Herrera v. LCS Fin. Servs. Corp.*, 274 F.R.D. 666, 679-81 (N.D. Cal. 2011) (certifying FDCPA class"). Indeed, Chase's maintenance of "procedures reasonably adapted to avoid any such error" for purposes of the bona fide error defense is itself an issue common to the class.

## V.    CONCLUSION

For the reasons stated here, as well as in Plaintiffs' Opening brief (Docket No. 292) and other supporting papers, the Court should certify the classes as set forth in Plaintiffs' Motion for Class Certification. *See* Docket No. 291.

---

[41] *See* Ex. 18 to Klein Decl. (stating "if you make those payments successfully and fulfill all the trial period conditions, we *will* permanently modify your mortgage loan" (emphasis added)); *see also* Ex. 23 to Klein Decl. (stating "[a]fter successful completion of the Trial Period Plan, Chase *will* send you a Modification Agreement for your signature which will modify your loan as necessary to reflect this new payment amount" (emphasis added).
[42] No attorney acted as intermediary here. *See In re Walker*, 194 B.R. 165 (Bankr. E.D. Tenn. 1996). The fact that Chase interacted with her attorney a year earlier is simply irrelevant.

Dated: May 24, 2013

                                                  Respectfully Submitted,

| | |
|---|---|
| */s/ Gary Klein*<br>Gary E. Klein (BBO No. 560769)<br>Kevin Costello (BBO No. 669100)<br>Shennan Kavanagh (BBO No. 655174)<br>**Klein Kavanagh Costello, LLP**<br>85 Merrimac Street<br>Boston, MA 02114<br><br>Phone: (617) 357-5500<br>Fax: (617) 357-5030<br>Email: klein@kkcllp.com<br>Email: costello@ kkcllp.com<br>Email: kavanagh@ kkcllp.com | */s/ Lynn Sarko*<br>Lynn Lincoln Sarko<br>Gretchen Freeman Cappio<br>Gretchen S. Obrist<br>**Keller Rohrback L.L.P.**<br>1201 Third Ave., Ste 3200<br>Seattle, WA 98101<br><br>Phone: (206) 623-1900<br>Fax: (206) 623-3384<br>Email: lsarko@kellerrohback.com<br>Email:<br>gcappio@kellerrohback.com<br>Email: gobrist@kellerrohback.com<br><br>Sharon T. Hritz<br>**Keller Rohrback L.L.P.**<br>1129 State St., Suite 8<br>Santa Barbara, CA 93101<br><br>Phone: (805) 456-1496<br>FAX: (805) 456-1497<br>shritz@kellerrohback.com |
| */s/ Charles Schaffer*<br>Charles E. Schaffer<br>**Levin, Fishbein, Sedran & Berman**<br>510 Walnut Street, Suite 500<br>Philadelphia, PA 19106<br><br>Phone: (215) 592-1500<br>Fax: (215) 592-4663<br>Email: cschaffer@lfsblaw.com | */s/ Jonathan Cuneo*<br>Jonathan W. Cuneo<br>Charles Joseph LaDuca<br>Jennifer E. Kelly<br>Brendan S. Thompson<br>Mark Malone<br>**Cuneo Gilbert & LaDuca, LLP**<br>507 C Street, NE<br>Washington, DC 2002<br><br>Phone: (202) 789-3960<br>Fax: (202) 789-1813<br>Email: jonc@cuneolaw.com<br>Email: charlesl@cuneolaw.com<br>Email: jkelly@cuneolaw.com<br>Email: brendant@cuneolaw.com |

|  | Alexandra C. Warren<br>**Cuneo Gilbert & LaDuca, LLP**<br>106-A S. Columbus Street<br>Alexandria, VA 22314<br><br>Phone: (202) 789-3960<br>Fax: (202) 789-1813<br>Email: awarren@cuneolaw.com<br><br>Michael J. Flannery<br>**Cuneo Gilbert & LaDuca, LLP**<br>300 North Tucker Blvd.<br>Suite 801<br>St. Louis, MO 63101<br><br>Phone: (314) 226-1015<br>Fax: (202) 789-1813<br>Email: mflannery@cuneolaw.com |
|---|---|
| *Interim Co-Lead Counsel for Plaintiffs* | |

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the Court's CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 24, 2013.

*/s/ Gary Klein*
Gary Klein