# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE JPMORGAN CHASE MORTGAGE MODIFICATION LITIGATION | ) | No. 1:11-cv-02290-RGS |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| All Actions | ) | |

## DECLARATION OF PROFESSOR MICHAEL S. BARR
## IN SUPPORT OF SETTLEMENT

I, Michael S. Barr, declare:

1.      I am a Professor of Law at the University of Michigan Law School and a Professor of Public Policy (by courtesy) at the University of Michigan's Gerald R. Ford School of Public Policy.

2.      I am also a nonresident senior fellow at the Center for American Progress and the Brookings Institution and a nonresident research fellow at the Filene Institute. I am a member of the Research Advisory Board of the Center for Equitable Growth, and a member of the FDIC's Advisory Committee on Economic Inclusion.

3.      At the University of Michigan, whose faculty I joined in 2001, I teach Financial Regulation, International Financial Regulation, and related courses. I have written extensively and published on a wide range of housing, consumer protection, community development, and financial services issues and have conducted large-scale empirical research regarding low- and moderate-income consumers' access to financial services. In the lead up to the housing crisis, I wrote extensively on loan modification problems. My most recent books include *No Slack: The Financial Lives of Low-Income Americans* (Brookings Press, 2012), *Insufficient Funds* (Russell

Sage, 2009, co-edited with Rebecca Blank), and *Building Inclusive Financial*

*Systems* (Brookings Press, 2007, co-edited with Anjali Kumar and Robert Litan).

4.     From 2009 to 2010, I served as the U.S. Department of the Treasury's Assistant

Secretary for Financial Institutions, where I was responsible for developing and working with

Congress to enact the Dodd-Frank Wall Street Reform and Consumer Protection Act. I was

involved in helping to develop the Administration's response to the financial and housing crisis,

including helping to develop policies for the Home Affordable Modification Program (HAMP),

although program administration and execution of HAMP was the responsibility of the Assistant

Secretary for Financial Stability. I have requested and obtained permission from the Treasury

Department's ethics office to prepare this declaration.

5.     My curriculum vita is attached to this declaration as Exhibit 1.

6.     I have reviewed the settlement agreement.  In addition, I have reviewed

information provided by JP Morgan Chase pursuant to paragraph 16.3 of the Settlement

Agreement on a confidential basis and find that such information is relevant to and broadly

consistent with my independent conclusions.  JP Morgan Chase has had an opportunity to review

my conclusions about the settlement value.

7.     In this settlement, class members will be provided with an invitation letter

providing them with an opportunity to apply to Chase for a permanent loan modification through

HAMP, or under one of Chase's own loan modification programs.  Chase will dedicate trained

personnel to handle the class members' applications, provide class members with access to

housing counseling assistance paid for by Chase, agree to adhere to processing timelines, provide

class members with reasons for any denial, and provide an opportunity for class members to seek

additional information about their denials and to appeal any denial decisions. Chase will put in

place a foreclosure hold so that class members will not face the threat of foreclosure while their applications are processed. Class members who receive permanent modifications will also benefit from fee waivers.

8.      In my opinion, given my background on issues related to financial services, consumer protection, housing, loan servicing, and loan modification, the settlement benefits to the class are substantial. The settlement provides an opportunity for loan modifications, which, if granted, would result in substantial benefits to the class members. These benefits would include reduced monthly payments and avoidance of the actual and emotional costs of foreclosure. The settlement provides streamlined application procedures, foreclosure holds, fee waivers and housing counseling assistance to class members. These features of the settlement are both benefits in and of themselves, and also increase the likelihood that class members will receive the benefits of permanent modifications of their loans and avoid foreclosure.  Even class members that do not obtain a permanent modification will benefit from foreclosure holds, which will give them more time to explore alternatives to foreclosure, and many will benefit from housing counseling, which is likely to assist them in exploring such alternatives to foreclosure.

9.      I have been asked to estimate the value of the economic benefits of the settlement. In my judgment, the settlement would provide approximately $500 million in quantifiable benefits to class members.  The details regarding the settlement value follow.

*Opportunity to Apply for a Permanent Loan Modification*

10.      In my opinion, the opportunity to apply for a permanent loan modification through the application process outlined in the settlement will provide a substantial benefit to class members. I will first estimate the value to class members of the opportunity to apply for a

permanent loan modification and will then describe how the application process provided for by the settlement enhances these benefits to class members.

11.     To understand the full value of the opportunity to apply for a permanent loan modification, it is important to understand the context in which this opportunity is provided. Since the beginning the foreclosure crisis in 2006, loan servicers, including Chase, have struggled to keep up with the increasing volume of mortgage delinquencies, requests for loan modifications, and foreclosures. What began as complaints by homeowners about poor servicing practices grew to include lawsuits and enforcement actions brought by federal agencies. For example, in April 2011, the Office of the Comptroller of Currency (OCC) brought an enforcement action against Chase and seven other servicers for unsafe and unsound practices related to their mortgage loan servicing and foreclosure processing.[1] In its complaint against Chase the Comptroller contended, among other things, that Chase had engaged in robo-signing, "failed to devote sufficient financial, staffing and managerial resources to ensure proper administration of its foreclosure processes," and failed to devote "adequate oversight, internal controls, policies, and procedures, compliance risk management, internal audit, third party management, and training" to its foreclosure processes.[2]

12.     Chase was also cited for its poor performance processing homeowners' applications for modifications through HAMP. In June 2011, the Department of Treasury identified Chase as one of four servicers whose performance was in need of "substantial improvements" and began withholding Chase's incentive payments.[3] The Department of Treasury's report noted that 31% of Chase's homeowner evaluations contained income

---

[1] Press Release, Office of the Comptroller of Currency, OCC Takes Enforcement Action Against Eight Servicers for
[2] Consent Order at 3, *In the Matter of: JPMorgan Chase Bank, N.A*, AA-EC-11-15.
[3] Press Release, U.S. Department of Treasury, Obama Administration Releases May Housing Scorecard Featuring New Making Home Affordable Servicer Assessments, Regional Spotlight on Phoenix Housing Data (June 9, 2011), *available at* http://www.treasury.gov/press-center/press-releases/Pages/tg1205.aspx.

calculation errors.[4] Chase's incentive payments were not reinstated until March 2012 after Chase improved its processing speed and strengthened its internal quality controls.[5]

13.   Chase was cited by the Monitor for the National Mortgage Settlement in December 2013 for failing certain metrics required to be met by the settlement, such as timely review of applications, and was ordered to put in place corrective action plans.[6]

14.   Although progress appears to be slow and uneven, overall, in my judgment, mortgage servicers appear to be improving their processes in response to outside oversight. Thus, in my judgment, additional oversight of Chase's loan modification process, through actions such as this settlement, are likely to contribute to better outcomes for class members.

15.   The settlement class consists of mortgage loan borrowers whose loans are serviced by Chase, who participated in a trial period plan, and who made the timely required payments under the plan, but who were denied a permanent modification by Chase (or as to whom Chase never made a final determination). Borrowers whose property has been subject to a completed foreclosure and borrowers who have a pending bankruptcy action are excluded from the class. Based on the data supplied by Chase, there are approximately 67,000 class members eligible to apply for a modification through the settlement's procedures.

16.   Based on the information available to me, and using conservative assumptions, I estimate that 40% of class members (26,800 class members) will apply for a modification. To reach this estimate, I examined the claim rates in other mortgage-related settlements and in other class action settlements.

---

[4] Making Home Affordable, Program Performance Report Through April 2011 25, http://www.treasury.gov/initiatives/financial-stability/results/MHA-Reports/Documents/April%202011%20MHA%20Report%20FINAL.PDF.
[5] Press Release, U.S. Department of Treasury, Obama Administration Release February Housing Scorecard (March 2, 2012), *available at* http://www.treasury.gov/press-center/press-releases/Pages/tg1441.aspx.
[6] Monitor's Report Regarding Compliance By Defendants J.P. Morgan Chase & Company and J.P. Morgan Chase Bank, N.A. for the Measurement Periods Ended March 31, 2013 and June 30, 2013, Case 1:12-cv-00361-RMC, Document 119, Filed 12/04/13.

17.    It is reported that 55% of eligible borrowers filed a claim in the National

Mortgage Settlement, the settlement between five mortgage servicers, including Chase, and 49

state attorneys general.[7]

18.    On the one hand, the claim rate in this case may be lower than that in the National

Mortgage Settlement because the National Mortgage Settlement received significant national

media attention.[8] Moreover, class members may be discouraged because they previously applied

for a loan modification and made timely monthly payments under a trial plan, but were not given

a permanent modification. In addition, class members may believe, correctly or incorrectly, that

they will not be eligible for relief.

19.    On the other hand, the claim rate in this case may be higher, because class

members will receive a specific invitation letter and because two nationally recognized housing

counseling organizations will be providing free counseling services under the settlement. As

discussed further below, housing counseling is likely to increase take-up rates and improve the

likelihood of success of applicants in obtaining a mortgage modification. Moreover, class

members may be more resilient than other borrowers, as demonstrated by the fact that they made

timely payments under a previous trial plan, and by the fact that they are still in their homes,

have not undergone a final foreclosure sale and do not have a pending bankruptcy action.

20.    Other settlements might suggest a lower rate: Under the federal government's

Independent Foreclosure Review process, which received less media attention, and which was

ultimately abandoned in favor of a settlement that provided for automatic payments to borrowers,

---

[7] Press Release, Indiana Office of Attorney General, 18,448 Indiana Borrowers Receive Payment Through the National Mortgage Settlement (June 4, 2013).
[8] *See e.g.* Ann Carrns, *A Preliminary Guide to the National Mortgage Settlement*, N.Y. Times Bucks Blog, March 19, 2012.

approximately 18% of eligible borrowers filed a claim.[9] A study of securities class action settlements found that on average approximately 28% of eligible institutional investors file claims in the settlements.[10] An earlier study by the same authors found that 25 to 33% of investors submitted claims in securities class action settlements.[11]

21.      On balance, I believe that an estimated application rate of 40% is reasonable.

*HAMP Modifications*

22.       I estimate the total benefit to class members from HAMP trial plan and permanent modifications to be approximately $354 million.

23.      Based on data from Chase's responses to the U.S. Treasury Department's Monthly Servicer Survey, from the beginning of HAMP through November 2013, Chase has approved approximately 29% of applicants for HAMP trial plans.[12]

24.      Applying this rate to the 26,800 class members estimated to apply for a modification, I estimate that approximately 7,700 class members will be approved for a HAMP trial payment plan.

---

[9] United States General Accountability Office, Foreclosure Review: Lessons Learned Could Enhance Continuing Reviews and Activities under Amended Consent Orders (2013).

[10] James D. Cox & Randall S. Thomas, *Letting Billions Slip Through Your Fingers: Empirical Evidence and Legal Implications of the Failure of Financial Institutions to Participate in Securities Class Action Settlements*, 58 Stan. L. Rev. 411, 424 (2005).

[11] James D. Cox & Randall S. Thomas, *Leaving Money on the Table: Do Institutional Investors Fail To File Claims in Securities Class Actions?*, 80 Wash. U. L.Q. 855 (2002).

[12] Making Home Affordable, HAMP Application Activity by Servicer as of November 2013, *available at* http://www.treasury.gov/initiatives/financial-stability/reports/Pages/HAMP-Servicer.aspx.

25.     As of November 2013, the median monthly savings for homeowners in HAMP modifications is $546.48. Assuming each class member approved for a HAMP trial payment plan spends three months in the trial plan, the total benefit to the class members from the HAMP trial payment plans would be approximately $12.6 million.[13]

26.     Based on data reported by Chase into the HAMP system of record, from the beginning of HAMP through November 2013, Chase has converted 60% of trial payment plans into permanent modifications. However, since the end of stated-income trials and the start of verified trials, on or about June 1, 2010, Chase's conversion rate has risen to approximately 90%.[14] HAMP trial modifications made under the settlement will be verified income modifications. Although conversion rates for class members may not match conversion rates for the population as a whole, I believe it would be reasonable to apply a conversion rate of 90%.

27.     Applying this rate to the estimated 7,700 class members approved for a HAMP trial payment plan, I estimate that approximately 6,930 class members would be approved for HAMP permanent modifications.

28.     Based on the information available to me, I estimate that the total benefit to class members from the reduction in monthly payments through HAMP permanent modifications would be approximately $340.8 million. To reach this estimate I used the median monthly savings for homeowners in HAMP modifications, $546.48, and estimated the number of months class members with a permanent modification would receive this monthly savings.

---

[13] Making Home Affordable, Program Performance Report Through November 2013 7, *available at* http://www.treasury.gov/initiatives/financial-stability/reports/Pages/Making-Home-Affordable-Program-Performance-Report.aspx.
[14] *Id.* at 11.

29.     The average life of a mortgage loan depends on a range of factors, including characteristics of the borrower, the home, the neighborhood, and the type and cost of the mortgage used by the borrower to finance her home, the interest rate and stated term of the loan, and other factors.  Loans typically do not last as long as their stated term because of either voluntary prepayment or default. To estimate how long class members who receive HAMP permanent modifications will continue to remain in their homes benefiting from their modified mortgages, I considered a number of factors.

30.     Class members might remain in their homes and with the modified mortgage for a shorter period of time than is typically the case with unmodified mortgages, because class members may have a higher propensity to default than borrowers with an unmodified mortgage who have never defaulted on their loans. In the OCC Mortgage Metrics Report, as of June 2013, 53.8% of HAMP permanent modifications were then current and performing, 1.7% had been paid off, 6.7% were in the process of foreclosure or had completed foreclosure, 5.4% were 30-59 days past due, and 7.2% were seriously delinquent.[15] The remaining 25.3% of the loans were no longer in the servicer's portfolio and their disposition in not known.[16] According to Treasury, approximately 70% of HAMP permanent modifications started are still active as of November 2013.[17]

31.     At the same time, re-default performance is improving.  For recent vintage HAMP modifications (2012), the 1-year re-default rate is 10%; performance has been steadily improving from vintage to vintage, and borrower re-default rates decline over time.[18]  That is, each successful month of payment reduces the chance that the borrower will default in the next month.

---

[15] Office of the Comptroller of Currency, OCC Mortgage Metrics Report Third Quarter 2013 at 40.
[16] *Id.*
[17] Making Home Affordable, Program Performance Report Through November 2013 at 3.
[18] Making Home Affordable, Program Performance Report Through September 2013 at 7-8.

Moreover, improvements in the labor market and in home prices with a strengthening economy will likely lower re-defaults even further over time.

32.     Class members who do not re-default may stay in their homes and with their modified mortgages for a longer period of time than is typically the case for borrowers with unmodified loans, as the borrowers will have a mortgage that is well below current market rates (even after rates begin to adjust beyond the 5-year initial period).  Thus, voluntary prepayment rates are likely to be quite low compared to non-modified mortgages.

33.     On balance, I believe it is reasonable to use an average life of 7.5 years (90 months) to estimate the benefits of a permanent modification. Using that time period, class members would receive an average benefit of approximately $49,183.20 for a permanent modification, for a total of approximately $341 million for all permanent modifications.

34.     In sum, class members would receive approximately $354 million in total benefits, composed of approximately $13 million in benefits from temporary modifications and $341 million in benefits from permanent modifications, under HAMP.

35.     These estimates are conservative, as they do not assume any increase in performance based on the presence of housing counseling, which, as discussed below, may improve performance and thus extend the average benefit for the class.

*Chase Proprietary Mortgage Modification Programs*

36.     In addition to HAMP modifications, I estimate that the class would benefit in the amount of $58.8 million from Chase's proprietary mortgage modification programs.

37.     Based on data from Chase's responses to the U.S. Treasury Department's Monthly Servicer Survey, I estimate that 5,744 class members who are not approved for HAMP trial payment plans, or whose HAMP trial payment plans are cancelled, or whose HAMP

permanent modifications become disqualified because of severe delinquency, would receive a modification through one of Chase's proprietary mortgage modification programs.

38.     Chase reports that 28% of homeowners not accepted for a HAMP trial payment plan or whose HAMP trial payment plan was cancelled nonetheless receive an alternative modification or payment plan from Chase.[19]

39.     I estimate that just under 20,000 class members who apply for a modification will not be accepted for a HAMP trial payment plan or will have their HAMP trial payment plan cancelled rather than made permanent. I reached this number by subtracting the estimated number of class members who will receive HAMP trial payment plans (7,700) from the estimated number of class members who will apply for a modification (26,800), then subtracting the estimated number of class members who will receive a permanent modification (6,930) from the estimated number of class members who will receive a trial payment plan (7,700), and then adding these two numbers together.

40.     Applying Chase's reported 28% rate to the estimated number of class members not accepted for a HAMP trial payment plan or whose HAMP trial payment plan was cancelled (20,000), I estimate that 5,600 class members not accepted for a HAMP trial payment plan or whose HAMP trial payment plan was cancelled would receive an alternative modification or payment plan from Chase.

41.     The OCC reports that in the third-quarter of 2013, non-HAMP modifications reduced monthly mortgage payments by an average of $350 a month.[20]

---

[19] Making Home Affordable, Program Performance Report Through November 2013 15.
[20] Office of the Comptroller of Currency, OCC Mortgage Metrics Report Third Quarter 2013 30.

42.      Non-HAMP modifications have higher re-default rates than HAMP loans. As of June 2013, 46.2% of non-HAMP permanent modifications were current and performing, 2.8% had been paid off, 11.8% were in the process of foreclosure or had completed foreclosure, and 20.6% were delinquent or seriously delinquent.[21] The remaining 18.6% of the loans were no longer in the servicer's portfolio and their disposition is unknown.[22] A recent academic paper finds that HAMP loan modifications are approximately 50% less likely to re-default than non-HAMP loan modifications.[23]

43.      Given the lower performance of non-HAMP modifications, and the fact that a portion of these modifications will be of loans that have cancelled trial modifications because of the failure of the borrower to make timely payments or otherwise meet program guidelines, and the possibility that borrower characteristics are also worse for non-HAMP modifications, as well the likelihood that voluntary prepayments on these modified loans will be higher than on HAMP modifications, I assume that the average duration of the modification is much shorter for these proprietary modifications, approximately 30 months.

44.      The total benefit to class members for non-HAMP modifications is thus 5,600 modified loans, times $350 per month, times 30 months, or $58,800,000.

45.      If a HAMP loan becomes seriously delinquent, under HAMP guidelines, servicers are required to work with borrowers to determine whether an alternative payment plan should be provided. Chase reports that 36% of homeowners whose HAMP permanent modifications were

---

[21] *Id.* at 40.
[22] *Id.*
[23] Voicu et al., *Performance of HAMP Versus Non-HAMP Loan Modifications—Evidence from New York City* (2011).

disqualified because they are more than 90 days past due on their modified loan payment

received an alternative modification or payment plan from Chase.[24]

46.    I estimate that 5.8% of class members' HAMP permanent modifications will be

disqualified for serious delinquency within 6 months of permanent modification, affecting

approximately 400 borrowers.[25]

47.    Applying Chase's reported 36% rate to the estimated number of class members'

whose HAMP permanent modifications will be disqualified for serious delinquency, I estimate

that 144 class members whose HAMP permanent modification will be cancelled will receive an

alternative modification or payment plan from Chase. I am not aware of reliable information

regarding the average monthly benefit of these types of modifications or the average duration of

such modified loans. I have thus not included these modifications in my totals.

48.    I estimate that the total benefit to class members from Chase proprietary loan

modification programs and repayment plans to be $58,800,000.

*Additional Benefits of Permanent Modifications*

49.    Class members who receive permanent modifications will also benefit from

avoiding foreclosure, with a direct saving of approximately $70 million.

50.    When a home is foreclosed, its owner incurs substantial moving costs, legal fees,

and administrative charges. The total cost to homeowners of these direct expenses is estimated to

---

[24] Making Home Affordable, Program Performance Report Through November 2013, at 15.
[25] Making Home Affordable, The Effect of the Principal Reduction Alternative (PRA) on Re-default Rates in the Home Affordable Modification Program (HAMP): Early Results (2012), available at http://www.treasury.gov/resource-center/economicpolicy/Documents/ MHAPrincipalReductionResearchSummary_vFINALv2.pdf.

be $10,000.[26]  Some homeowners who receive permanent modifications will have already begun

the process of foreclosure, and their foreclosure-related costs are permitted to be capitalized into

the loan prior to modification.  Thus, not all class members will save $10,000 in foreclosure

avoidance; it is reasonable to reduce the average savings to approximately $7,000.

51.    Re-default rates vary by the vintage of loan modification, the type and extent of

loan modification, the number of months since modification, whether the loan modification is a

HAMP or non-HAMP modification, and other factors. For example, one-year default rates for

2009 vintage HAMP loans is 20.5%, while one-year default rates for 2012 vintage modifications

is about 10%. The average default rate under HAMP is 27%, while the cumulative default rate

for the 2009 vintage is 46%. Of re-defaulted HAMP loans, approximately 22% have gone into

foreclosure, as opposed to other loss mitigation measures.[27] Re-default rates for non-HAMP

loans are approximately 50% higher.[28]

52.    On a blended basis, and with reasonable assumptions about modifications, re-

default rates as well as ultimate foreclosure rates (as opposed to other dispositions) for newly

modified HAMP and non-HAMP loans, it is plausible that approximately 10,000 class members

would avoid foreclosure, saving a total of $70,000,000.

53.    I have not included in this estimate various other measures of benefit from

foreclosure avoidance. I have not included a measure of the option value to default obtained by

modifications, nor have I calculated the potential benefit of having one's credit record indicating

a payment under a modified loan as opposed to an ongoing delinquency, or a foreclosure. These

---

[26] Neil Mayer, Peter A. Tatian, Kenneth Temkin, and Charles A. Calhoun, *NeighborWorks® America National Foreclosure Mitigation Counseling Program Evaluation* 99 (2011); Department of Housing and Urban Development, Regulatory Impact Analysis: Emergency Homeowners' Loan Program, 2 (2010).
[27] SIGTARP, Quarterly Report to Congress July 24, 2013 (2013); McArdle, Mark, *Understanding HAMP Re-Default Rates* (2013), available at http://www.treasury.gov/connect/blog/Pages/Understanding-HAMP-Re-Default-Rates.aspx.
[28] Voicu et al., *supra.*

class members will also avoid the "emotional stress of being forced from one's home and possible a higher cost of housing in the future due to a poor credit rating."[29] While these benefits are difficult to estimate, they should nonetheless be considered substantial benefits to the class members.

*Effects of Housing Counseling on Trial and Permanent Modifications*

54.     In this settlement, class members will have access to free and independent housing counseling assistance from nationally recognized and expert non-profit organizations, and will receive a letter informing them that this assistance is available.

55.     A recent study of mortgage delinquency counseling has shown that homeowners who receive counseling assistance are more likely to receive a modification and less likely to default on their modification.[30] The study also showed that homeowners with counseling assistance received modifications with lower monthly payments.[31] Specifically, 17% of homeowners with counseling received a modification compared to 9% without counseling.[32] Counseled homeowners received modifications with monthly payments that were 7.8% lower, or $176 per month less, on average, than non-counseled homeowners.[33] Finally, counseled homeowner had an "89 percent probability of sustaining their modified loans over nine months, compared with a 63 percent probability for those without counseling."[34]

56.     As a result of the availability of this housing counseling assistance, my estimate of the benefits to class members from trial payment plans and permanent modifications may

---

[29] Department of Housing and Urban Development, Regulatory Impact Analysis: Emergency Homeowners' Loan Program 2 (2010).
[30] Mayer, *supra*, at 12-13.
[31] *Id.* at 106.
[32] *Id.* at 13.
[33] *Id.* at 12, 106.
[34] *Id.* at 12, 71.

underestimate the actual benefits that the class members will receive. In particular, more members of the class may qualify for and obtain trial and permanent modifications than I have estimated, and borrowers may re-default at lower rates than suggested by my estimates.

*Effect of Improvements in Application Process*

57.     In this settlement, Chase will provide an improved application process. Specifically, Chase will make available specific personnel who have received training on the requirements of this settlement agreement to handle requests from class members. Moreover, the settlement agreement provides a specific timeline for the processing of the class member's application, requires that Chase provide class members with a denial notice that includes the reasons for denial, and gives class members the right to request additional information about the reasons for denial, to request second-look review, and to appeal any denial.

58.     I believe these procedures provide a benefit to class members. Housing counselors cite the lack of servicer response as the biggest challenge to obtaining successful outcomes for their clients.[35] The procedures outlined in the settlement agreement address the servicer problems specifically cited by housing counselors as obstacles to obtain modifications for their clients: the "slow response or lack of response by servicers to applications for loan modifications, servicers losing documents submitted," and the "lack of clear and transparent standards by which servicers determine what, if any, workout solutions was offered."[36]

59.     In my judgment, these procedures are likely to improve the borrower experience, and increase the success rate for entry into trial and permanent modifications. I am not able to estimate the direct benefit of these streamlined procedures.

---

[35] *Id.* at 99.
[36] *Id.*

*Foreclosure Holds*

60.     In this settlement, Chase has agreed to place a foreclosure hold on the loan of each class member. When these holds are in place Chase will not conduct a foreclosure sale or take further legal action to foreclose. These holds will be available to members of the class who, after receiving the class notice, have submitted a completed loan modification application package and requested a hold. These holds will also be put in place for all class members as of the date the invitation letter is sent or 45 days after the effective date of the agreement, whichever is sooner.

61.     While the value of these holds are difficult to quantify, they do provide a significant benefit to class members by eliminating the stress and confusion that results when a servicer considers a homeowner for a modification at the same time it moves forward with foreclosure – a procedure known as "dual tracking."

62.     Dual tracking can result in higher fees paid by the borrower. Dual tracking can discourage the borrower from following through, either on fully pursuing a modification in the mistaken belief that the home will inevitably be lost, or on fully defending her rights in a foreclosure proceeding, on the mistaken belief that the modification process will be sufficient protection. Dual tracking can also increase the risk that the borrower is wrongly foreclosed upon while faithfully following modification protocols with the servicers, or even after receiving and complying with trial and permanent modifications.[37]

---

[37] National Consumer Law Center, The CFPB Should End Dual Track and Mandate Sensible Loan Modifications 1-2, 4 (2013).

63.     Foreclosure holds will benefit all class members, not simply those who ultimately obtain a permanent modification.  All class members would benefit from the reduced stress and increased time to work with counselors to determine the appropriate disposition of their loan, including not only modification but also short sales or other resolutions.

64.     The benefits of the foreclosure hold are difficult to quantify. Nonetheless, in my judgment they are of a considerable benefit to members of the class.

*Fee Waivers*

65.     I estimate the total value of all fees waived by Chase to be approximately $17 million.

66.     In this settlement, Chase agrees to waive all late charges, penalties, stop-payment fees, and administrative processing costs (including notary fees, recordation fees, title costs, property valuation fees, and credit report fees) for class members whose loans are permanently modified. Chase also agrees to capitalize any foreclosure-related fees and costs into the loans before they are modified, so that the resulting modified loan meets affordability guidelines.

67.     Even before the foreclosure crisis, servicers were documented charging borrowers unwarranted fees.[38] These practices included adding unauthorized fees and charges to monthly payments, charging borrowers late fees even when their payments were made on time or when the payments were posted late because of the servicer's own mismanagement, and pyramiding their late fees so that they could charge late fees month after month.[39]

---

[38] Kurt Eggert, *Limiting Abuse and Opportunism by Mortgage Servicers*, 15 Housing Policy Debate 3 (2004).
[39] *Id.* at 758-760.

68.     I estimate that the class members will receive a benefit of $5 million as a result of the waiver of late fees. Late fees are generally equal to 5% of a borrower's monthly payment.[40] I assume that the class members' monthly mortgage payments are $1,000. This estimate is based on the Department of Housing and Urban Development and U.S. Census Bureau's American Housing Survey, which found that median monthly housing costs for owner-occupied homes, excluding second and subsequent mortgages and maintenance costs, in 2011 were $996.[41] Therefore, the late fee per class member per month would be $50. The average homeowner is over 8 months delinquent when they begin a HAMP trial payment plan with Chase.[42] Therefore, I estimate that the average late fees waived per class member will be $400. Approximately 6,900 HAMP modifications and 5,600 non-HAMP modifications will be eligible for the late fee waiver, for a total of $5 million in relief.

69.     Chase has also agreed to waive stop-payment fees for class members who receive permanent modifications. Other mortgage loan servicers charge between $20 and $50 for returned checks.[43] Conservatively estimating that Chase charges $30 for stop-payment fees; I estimate that the class members will receive a benefit of $375,000.

70.     Finally, in this settlement Chase has agreed to waive all administrative processing costs related to the class members' prior participation in a stated-income HAMP or non-HAMP trial payment plan for class members who ultimately receive permanent modifications.

---

[40] Adam J. Levitin & Tara Twomey, *Mortgage Servicing*, 28 Yale J. on Reg. 1, 41 (2011).
[41] U.S. Department of Housing and Urban Development and U.S. Census Bureau, American Housing Survey for the United States: 2011 63, *available at* http://www.census.gov/content/dam/Census/about/our-surveys/american-housing-survey/data/2011/h150-11.pdf.
[42] Making Home Affordable, Program Performance Report Through November 2013 13.
[43] Acqura Loan Services, Mortgage Loan Servicing Fee Schedule, http://www.acqurals.com/feeschedule.html (up to $50); Sovereign Bank, FAQ—*What are the* Mortgage Loan Servicing Fees*?*, https://customerservice.sovereignbank.com/app/answers/detail/a_id/22/~/what-are-the-mortgage-loan-servicing- fees%3F ($30); Steuben Trust, Schedule of Retail Mortgage and Home Equity Loan Servicing Fees, http://www.steubentrust.com/custom/fi/steubentrustco/fb/disclosure/Schedule-of-Retail-Mortgage.pdf ($20).

71.     Based on my review of other mortgage servicers' fee schedules, I estimate that the waiver of these administrative processing costs will result in a benefit of $11,750,000 to class members. Many of the administrative costs associated with trial payment plans, including recordation and credit report fees, are generally low, between $10 and $30 each.[44] However, some of the costs, including property valuation fees and title costs, are much more expensive. One servicer charges between $375-500 for a property valuation and between $300-600 for title costs.[45] Another servicer charges up to $125 for valuations and up to $800 for title costs.[46] Still another servicer charges between $225-820 for property valuations and between $100-625 for title costs.[47] Taking into account these fee ranges, I estimate the following average value of the fees waived by Chase: property valuation fee, approximately $360; title costs, approximately $540, and other administrative costs, $40. Together, I estimate that the average fees associated with the prior trial payment plans waived per class member who ultimately receives a permanent modification will be $940. The total benefit to the class from the waiver of these administrative processing costs would be $11,750,000.

*Housing Counseling*

72.     In this settlement, Chase has agreed to pay for up to 50 hours of counseling assistance per mortgage loan by independent, non-profit organizations, HomeFree USA and The National Council of La Raza. Chase has agreed to pay for additional counseling hours in cases of demonstrated need.

---

[44] Dovenmuehle, Mortgage Servicing Fee Schedule, http://www.dovenmuehle.com/mortgage-servicing-fee-schedule/ ($10-50 recordation fee); Affinity Federal Credit Union, Mortgage Fees, http://www.affinityfcu.org/site/privacy_fee.html ($11.50-20 credit report fee); Wells Fargo, Mortgage Related Fees and Costs, https://www.wellsfargo.com/mortgage/manage-account/fees ($11 credit report fee).
[45] Dovenmuehle, Mortgage Servicing Fee Schedule, http://www.dovenmuehle.com/mortgage-servicing-fee-schedule/.
[46] M&T Bank, Fee Table, https://www.mtb.com/customerservice/Documents/mtg-allowable-fee-table.pdf.
[47] Wells Fargo, Mortgage Related Fees and Costs, https://www.wellsfargo.com/mortgage/manage-account/fees ($11 credit report fee).

73.     As detailed above, a recent study has found that foreclosure mitigation counseling makes it more likely that homeowners receive modifications, results in modifications with lower monthly payments, and reduces the likelihood that homeowners who receive modifications re-default.[48] Other studies of foreclosure mitigation counseling have found similar results.[49]

74.     Housing counselors provide important services to homeowners. Most counseling programs not only help homeowners develop a strategy to avoid foreclosure but also help homeowners diagnosis their problem, create budgets, prioritize debts for re-payment, and maximize their income through public programs and benefits.[50] Counselors may also help provide homeowners with information about the foreclosure process and their options, connect homeowners with programs designed to help distressed homeowners, and may provide the support necessary for homeowners to overcome the crippling anxiety often brought on by financial distress.[51]

75.     I estimate that 20% of class members (13,400 class members) will request counseling assistance. In studies where delinquent borrowers were sent a letter offering counseling assistance and the counselor attempted to contact the borrowers three times by phone, approximately one-third accepted the assistance and received counseling over the phone.[52] Given that the settlement class members will receive a letter offering counseling assistance but will not necessarily be contacted by phone, I estimate that the percentage of class members who use the assistance will be lower than that in the study.

---

[48] Mayer, *supra*, at 12, 13, 106.
[49] *See e.g.* J. Michael Collins & Maximilian D. Schmeiser, *The Effects of Foreclosure Counseling for Distressed Homeowners*, 32 Journal of Policy Analysis and Management 1 (2013).
[50] *Id.* at 84.
[51] J. Michael Collins & Maximilian D. Schmeiser, *Estimating the Effects of Foreclosure Counseling for Troubled Borrowers* 7-9 (2010).
[52] Lei Ding, Roberto G. Quercia, and Janneke Ratcliffe, *Post-purchase Counseling and Default Resolutions among Low- and Moderate- Income Borrowers*, 30 Journal of Real Estate Research 3, 323 (2008).

76.     A 2008 Department of Housing and Urban Development study on housing counselors found that the median number of hours spent on mortgage delinquency counseling per loan was 7 hours.[53] The same study found that the average cost to an agency of counseling per client was $431,[54] or approximately $466 in today's dollars.

77.     Applying this to the 13,400 class members expected to use the counseling assistance, I estimate total benefit to class members of this free housing counseling to be $6,244,400.

*Summary: Total Economic Benefits of the Settlement*

78.     I have calculated the total benefit of the settlement to class members as follows: $354 million for HAMP modifications, $58.8 million for proprietary modifications, $70 million for foreclosure avoidance, $17 million for fee waivers, and $6.2 million for counseling.

79.     In my judgment, concerning the benefits to class members that are quantifiable, the total economic value of this settlement to class members is approximately $500 million.

80.     There are other, substantial, non-quantifiable benefits of this settlement to class members, discussed above.

81.     My judgment regarding the value of the settlement is based on current information made available to me and with the assumption of prompt implementation of the settlement.  If implementation is delayed, the value of the settlement may go down, as some class members may go into bankruptcy or foreclosure, incur additional foreclosure-related costs, or be placed in inferior modifications or other loss-mitigation actions.

---

[53] Christopher E. Herbert, Jennifer Turnham, & Christopher N. Rodger, *The State of the Housing Counseling Industry* 78 (2008).
[54] *Id.* at 72.

I declare under penalty of perjury under the laws of the United States of America that this document is true and correct.

Executed this 13th day of February 2014.

_____

Michael S. Barr